UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
BENJAMIN SELL,

                     Plaintiff,               Case No.:  19 CV 3105(RJD)(RER)

     - against -

UNITED STATES OF AMERICA, UNITED STATES
DEPARTMENT OF TRANSPORTATION, UNITED
STATES MERCHANT MARINE ACADEMY
and JOHN DOES 1-10,

                    Defendants.
--------------------------------------------------------------------X

# LOCAL RULE 56.1 STATEMENT OF BENJAMIN SELL IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

HOGAN & CASSELL, LLP
Attorneys for Benjamin Sell
500 North Broadway, Suite 153
Jericho, New York 11753
(516) 942-4700

Pursuant to Rule 56.1(a) of the Rules of this Court, Benjamin Sell ("Sell" or "Plaintiff") respectfully submits this Rule 56 Statement in support of his motion for summary judgment on Plaintiff's claims against the defendants, United States of America, United States Department of Transportation and United States Merchant Marine Academy (the "Academy") (collectively "Defendants"), pursuant to the Administrative Procedure Act.

## FACTS IN SUPPORT OF SELL'S POSITION

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| 1. Plaintiff filed the Complaint in this action on or about May 23, 2019. | See generally Complaint (attached hereto without exhibits as Exhibit A). |
| 2. As set forth in the Complaint, this is an action for declaratory, injunctive and equitable relief based upon Defendants' conduct resulting in Sell's expulsion/disenrollment from the Academy in violation of the Academy's own rules and procedures and the Due Process clause of the Fifth Amendment. | See generally Complaint. |
| 3. The Complaint contains three causes of action. | See generally Complaint. |
| 4. The first Count in the Complaint seeks relief pursuant to the Administrative Procedure Act. The second and third Counts in the Complaint seek relief for Due Process violations. | See Complaint ¶¶ 60-85. |
| 5. In or about June 2015, Sell entered the Academy, Class of 2019. | See Complaint ¶ 11; see also Administrative Record ("AR") (attached hereto as Exhibit B) AR000011[1] (indicating that Sell was admitted June 30, 2015). |
| 6. In Plaintiff's third academic year, Plaintiff was accused of cheating on a humanities project. This project was assigned to Sell during his second class sea period. | See Complaint ¶ 12; see also AR000055-000091. |
| 7. As a result of this charge, the matter was referred to an Honor Review Board to undertake an investigation. | See Complaint ¶ 13; see also AR000055-000091. |

---

[1] The Administrative Record is bates stamped in the bottom right corner. AR followed by a page number references the bates stamped page.

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| 8. As set forth in the Midshipman Honor Manual (the "Honor Manual"), the Honor Review Board can decide to schedule a formal hearing, which permits a jury to vote on the matter; dismiss the matter; or refer the matter to the Commandant for disciplinary action. | See Complaint ¶ 14; see also AR000104-000107; Honor Manual Paragraphs 301, 302, 303 (AR000298-000304).[2] |
| 9. The Honor Review Board determined that Sell should appear before a formal hearing. The formal hearing was held on September 19, 2018. | See Complaint ¶ 15; see also AR000054, AR000108. |
| 10. Sell admitted to the allegations against him and the Honor Board was convened pursuant to Paragraph 304 of the Honor Manual. | See Complaint ¶ 16; see also AR000063-000064; Honor Manual Paragraph 304 (AR000312-000317). |
| 11. Paragraph 304(E) of the Honor Manual provides that a midshipman accused of an honor violation has numerous rights. | See Complaint ¶ 17; see also Honor Manual Paragraph 304(E) (AR000313-000314). |
| 12. Paragraph 304(H) of the Honor Manual states that the "burden of demonstrating sufficient cause for retention by a preponderance of the evidence is on Midshipman." | See Complaint ¶ 18; see also Honor Manual Paragraph 304(H) (AR000315). |
| 13. The rules of the Academy provide that in order for a midshipman's penalty to be disenrollment from the Academy, at least six of the nine jury members must so find. | See Complaint ¶ 19; see also Honor Manual Paragraph 304(O) ("All members shall cast a vote and six (6) votes are required for separation.") (AR000316). |
| 14. After the formal hearing, the jury voted unanimously (9-0) that Sell should not be separated from the Academy or setback. The jury voted unanimously that Sell should be retained by the Academy and should be required to participate in a remediation program. | See Complaint ¶ 20; see also AR000029-000046, AR000108. |
| 15. Pursuant to Paragraphs 308 and 309 of the Honor Manual, the Superintendent of the Academy at the time, James A. Helis ("Helis"), was tasked with rendering "a final decision regarding the sanctions imposed." | See Complaint ¶ 21; see also Honor Manual Paragraphs 308 and 309 (AR000318). |
| 16. On the same date that the jury issued its decision, September 25, 2018, the Regimental Honor Board, via Commandant Mikel E. Stroud ("Stroud") wrote a letter to Superintendent Helis stating that the Honor Staff disagrees | See Complaint ¶ 22; see also AR000051-000052. |

---

[2] The Honor Manual is included in the Administrative Record at AR000286-000342.

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| with the determination by the jury that the Academy "retain MIDN Sell and recommended he participate in the 120-day remediation program." | |
| 17. The Honor Staff argued in its letter that the penalty imposed by the jury was not severe enough and that Sell should be setback to the class of 2020. The Honor Staff stated in its letter that it "does not recommend disenrollment." | See Complaint ¶ 23; see also AR000051-000052. |
| 18. On September 28, 2018, Honor Advisor Stephen J. McDade, via Stroud, wrote an Honor Advisor Recommendation to Superintendent Helis. | See Complaint ¶ 24; see also AR000050. |
| 19. In the letter, McDade recommended that Sell be disenrolled from the Academy. | See Complaint ¶ 25; see also AR000050. |
| 20. In support of his position, McDade emphasized Sell's academic problems, claiming that "Sell's current transcript has 7 F's and 3 D's." | See Complaint ¶ 26; see also AR000050; transcript for Sell (AR000011-000013). |
| 21. On October 11, 2018, Superintendent Helis provided his decision to Sell. | See Complaint ¶ 27; see also AR000047-000048. |
| 22. Superintendent Helis affirmed the findings of the Honor Board as to Sell's guilt and directed multiple "actions." Superintendent Helis did not find a basis to disenroll Plaintiff. | See Complaint ¶ 28; see also AR000047-000048. |
| 23. Superintendent Helis determined that Plaintiff should be set back to the Class of 2020. He also required Sell to complete 50 hours of community service. | See Complaint ¶ 29; see also AR000047-000048. |
| 24. Superintendent Helis required that prior to Plaintiff joining the Class of 2020 that he take and pass a Physical Readiness Test ("PRT"). | See Complaint ¶ 30; see also AR000047-000048. |
| 25. Finally, Superintendent Helis's decision stated that if the Commandant determined that Plaintiff did not properly remediate (i.e. comply with the terms set forth in the Superintendent's Decision) then in such a situation, Plaintiff "will be referred to an Executive Board or Superintendent's hearing and may be disenrolled from the Academy." | See Complaint ¶ 31; see also AR000047-000048. |
| 26. The determination by Superintendent Helis advised Plaintiff that he had the right, pursuant to Paragraph 310B | See Complaint ¶ 32; see also AR000047-000048; Honor Manual Paragraph 310B |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| of the Honor Manual, to appeal the final determination. | (AR000318). |
| 27. Plaintiff acknowledged receipt of the Superintendent's Decision on October 11, 2018. Sell acknowledged his responsibility to abide by the determination. Plaintiff had the right to but did not appeal the determination. | See Complaint ¶ 33; see also AR000049. |
| 28. Upon information and belief, October 11, 2018 was the last day that Superintendent Helis served as Superintendent at the Academy. | See Complaint ¶ 34. |
| 29. The very next day, the Commandant of Midshipmen, Stroud, made a recommendation for an Executive Board suitability hearing (the "Recommendation"), to the new (interim) Superintendent of the Academy, Susan Dunlap. | See Complaint ¶ 35; see also AR000001. |
| 30. The Recommendation stated that Stroud recommended an Executive Board to determine the suitability of Sell based upon Sell's failures in honor, academics and PRT's. | See Complaint ¶ 36; see also AR000001. |
| 31. Based upon the Recommendation, the Academy provided Sell with notice on or about October 18, 2018, that he would have to appear before an Executive Board for a suitability determination pursuant to Section 6.1 of the Regulations. | See Complaint ¶ 37; see also AR000168-000171; Midshipman Regulations (the "Regulations") Section 6.1 (AR000276).[3] |
| 32. The scheduling of an Executive Board based upon the Recommendation was severely flawed for numerous reasons and in violation of Plaintiff's Due Process rights. | See Complaint ¶ 38. |
| 33. First, while Section 6.1 of the Regulations empowers the Superintendent to convene an Executive Board in response to a recommendation of the Commandant, the Regulations only permit convening a hearing under two limited circumstances:  1) to address a disciplinary offense; or 2) if there is a report by the Commandant's Performance Review Board that "indicates a serious lack of aptitude or suitability of a Midshipman for a career in the merchant marine and the United States Navy Reserve." | See Complaint ¶ 39; see also Regulations Section 6.1 (AR0000276). |
| 34. The Recommendation by Stroud was neither premised upon a disciplinary offense nor was it premised upon a report after a Performance Review Board. | See Complaint ¶ 40; see also AR000001. |
| 35.  No Performance Review Board was ever held | See Complaint ¶ 41; see also |

[3] The Regulations is included in the Administrative Record at AR000208-000285.

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| concerning Sell (the procedures for a Performance Review Board are detailed in Chapter 5 of the Regulations). | AR000001; Regulations Chapter 5 (AR000273-000275). |
| 36.   The Academy's scheduling of an Executive Board was in contravention of its own rules and regulations. | See Complaint ¶ 42; see also AR000001; Regulations Chapter 5 (AR000273-000275); Regulations Section 6.1 (AR0000276). |
| 37.   Second, while part of the Recommendation was premised upon Sell appearing before an Honor Board, Sell had already been disciplined and punished for his conduct, resulting in the October 11, 2018 final decision by Superintendent Helis.   Sell had already accepted the punishment and did not appeal Superintendent Helis's determination. | See Complaint ¶ 43; see also AR000047-000049. |
| 38.   The Academy's conduct in double-punishing Sell for the same exact conduct violated his Due Process rights. | See Complaint ¶ 44. |
| 39.   Third, although the Recommendation was premised upon Plaintiff being placed on deferred graduate status after an Academic Review Board ("ARB"), the Academy was advised that the results of Sell's ARB was "voided" and "superseded" by the October 11, 2018 final decision by Superintendent Helis:<br><br>Good Afternoon [Dean Taha],<br>Do you have the letter from the board on the results of [Midshipman] Sell's ARB?  If so, can you please enclose?<br>Thank you.<br>V/R,<br>Benjamin Wiese<br><br>Ben,<br>**We voided that letter, as the SUPT's honor letter included and sulersedes[sic] the Academic terms**.<br>Dianne [Taha] | See Complaint ¶ 45; see also October 12, 2018 email chain between Dean Taha and Benjamin Wiese (emphasis added) (AR000005). |
| 40.  Stroud was clearly aware of the fact that the results of Plaintiff's ARB had been voided and superseded inasmuch as he was provided with Dean Taha's email on October 15, 2018. | See Complaint ¶ 46; see also AR000005. |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| 41.    Moreover, prior to making his determination, Superintendent Helis was provided with an objection by McDade wherein McDade specifically recommended that Sell be disenrolled from the Academy based upon his academics.    Clearly, then, in determining Sell's punishment, Superintendent Helis had already considered Plaintiff's academic record. | See Complaint ¶ 47; see also AR000047-000048, AR0000050. |
| 42.    Stroud's reliance upon Plaintiff's PRT's as a basis to recommend an Executive Board was clearly improper. | See Complaint ¶ 48; see also AR000001. |
| 43.    In his Recommendation, Stroud relied upon failed tests for the first and the third trimester for the "AY 2016," which was Sell's first academic year.    Sell, however, had already fully remediated these failed physical exams. | See Complaint ¶ 49; see also AR000001, AR000006-000007, AR000205. |
| 44.    In fact, Plaintiff would not have been permitted to spend a semester at sea in his second academic year, had he not been deemed physically fit. | See Complaint ¶ 50; see also AR000205. |
| 45.    Likewise, with regard to the failure in the first trimester of the 2018 academic year, Plaintiff remediated this failure, which is confirmed by the fact that he spent the second and third trimesters at sea that year. | See Complaint ¶ 51; see also AR000205. |
| 46.    Though Stroud's Recommendation references a failed test in the first trimester, academic year 2019, indicating an unexcused absence, in actuality the scores for that test were misplaced by the test proctor, Greg Ilaria ("Ilaria"). On October 10, 2018, Plaintiff sent an email to Ilaria regarding his missing test results and asked Ilaria to advise whether there was an outstanding issue with his test results.    Confirming that there was no issue with Plaintiff's test results, Ilaria responded "You are all set." | See Complaint ¶ 52; see also emails attached hereto as Exhibit C. |
| 47.    The Executive Board was thereafter adjourned until November 15, 2018.    Sell was advised that at the Executive Board he will "bear the burden of demonstrating sufficient cause for retention by a preponderance of the evidence." | See Complaint ¶ 53; see also AR000025. |
| 48.    The Executive Board discussed the issues in the Recommendation by Stroud, such as Sell's cheating on a project pertaining to humanities; Sell's grades; and Sell's alleged failures of the physical fitness tests. | See Complaint ¶ 54; see also AR000008-000009. |
| 49.    Section 6.6, paragraph 1, of the Regulations provides | See Complaint ¶ 55; see also |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| that at a Suitability Hearing, the "burden for demonstrating sufficient cause for retention by a preponderance of the evidence is on the Midshipman." | AR000283. |
| 50.  The Executive Board determined that Sell could not sustain his burden and recommended that Plaintiff be disenrolled from the Academy. | See Complaint ¶ 56; see also AR000008-000009. |
| 51.  Superintendent Buono, who had replaced interim Superintendent Susan Dunlap, affirmed the decision by the Executive Board that Sell should be disenrolled from the Academy. | See Complaint ¶ 57; see also AR000009. |
| 52.  Pursuant to Section 6.9 of the Regulations, Sell appealed the determination to the Maritime Administrator. | See Complaint ¶ 58; see also AR000019, AR000285. |
| 53.  By letter dated March 5, 2019, the Maritime Administrator denied Sell's appeal and upheld the decision by the Superintendent. | See Complaint ¶ 59; see also AR000010. |

Dated:  November 27, 2019

Respectfully submitted,

HOGAN & CASSELL, LLP
Attorneys for Plaintiff, Benjamin Sell

By: _____
    Michael Cassell
    500 North Broadway, Suite 153
    Jericho, New York 11753
    (516) 942-4700
    mcassell@hogancassell.com

8

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
BENJAMIN SELL,

                                  Plaintiff,

        - against -                                          **COMPLAINT**

UNITED STATES OF AMERICA, UNITED STATES
DEPARTMENT OF TRANSPORTATION, UNITED
STATES MERCHANT MARINE ACADEMY
and JOHN DOES 1-10,

                                  Defendants.
----------------------------------------------------------------X

        The plaintiff, Benjamin Sell ("Sell" or "Plaintiff"), by his attorneys, Hogan & Cassell,

LLP, as and for his Complaint against the defendants, United States of America, United States

Department of Transportation, United States Merchant Marine Academy and John Does 1-10

(collectively "Defendants"), alleges the following:

## SUMMARY OF THE CLAIMS

        1.      This is an action for declaratory, injunctive and equitable relief based upon

Defendants' conduct resulting in the expulsion/disenrollment of Plaintiff from the United States

Merchant Marine Academy (the "Academy") in violation of the Academy's own rules and

procedures and the Due Process clause of the Fifth Amendment.

## JURISDICTION AND VENUE

        2.      This action arises under the Administrative Procedures Act, 5 U.S.C. § 701, et

seq. and the Due Process Clause of the Fifth Amendment.

        3.      This Court has original jurisdiction over this action under 28 U.S.C. §§ 1331 and

2201.

4.     Venue is properly established in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) as the acts complained of occurred in the Eastern District of New York.

5.     This is not an action that seeks to recover for any claims for negligence or any claims that could be covered by the Tort Claims Act.  Thus, Plaintiff is not required to serve a Notice of Claim.

## JURY DEMAND

6.     Plaintiff demands a trial by jury in this action on each and every one of his claims for which he is entitled to a jury.

## THE PARTIES

7.     Plaintiff is an individual who resides in South Carolina.

8.     At all times set forth herein, upon information and belief, the defendant United States Department of Transportation is an agency of the United States of America, located at the West Building, 1200 New Jersey Avenue, SE, Washington, D.C.  Upon information and belief, the United States Department of Transportation operates, funds and/or maintains the United States Merchant Marine Academy, located at Kings Point, New York.

9.     At all times set forth herein, upon information and belief, the Academy is an educational institution that is an instrumentality of the federal government charged with the responsibility of training the officers of the United States Merchant Marine, located at 300 Steamboat Road, Kings Park, New York.  The Academy is owned, operated and/or maintained by the United States Department of Transportation.

10.     Defendants John Does 1-10 are agents, employees and/or officers of the United States Department of Transportation and/or the Academy.

2

## FACTUAL BACKGROUND

11.     In or about June 2015, Sell entered the Academy, Class of 2019.

12.     In Plaintiff's third academic year, Plaintiff was accused of cheating on a humanities project.  This project was assigned to Sell during his second class sea period.

13.     As a result of this charge, the matter was referred to an Honor Review Board to undertake an investigation.

14.     As set forth in the Midshipman Honor Manual (June 2015) (the "Honor Manual"), the Honor Review Board can decide to schedule a formal hearing, which permits a jury to vote on the matter; dismiss the matter; or refer the matter to the Commandant for disciplinary action. (relevant portions of the Honor Manual are attached hereto as Exhibit 1).

15.     The Honor Review Board determined that Sell should appear before a formal hearing.  The formal hearing was held on September 19, 2018.

16.     Sell admitted to the allegations against him and the Honor Board was convened pursuant to Paragraph 304 of the Honor Manual.

17.     Paragraph 304(e) of the Honor Manual provides that a midshipman accused of an honor violation has numerous rights.

18.     Paragraph 304(h) of the Honor Manual states that the "burden of demonstrating sufficient cause for retention by a preponderance of the evidence is on Midshipman."

19.     The rules of the Academy provide that in order for a midshipman's penalty to be disenrollment from the Academy, at least six of the nine jury members must so find.

20.     After the formal hearing, the jury voted unanimously (9-0) that Sell should not be separated from the Academy or setback.   The jury voted unanimously that Sell should be

3

retained by the Academy and should be required to participate in a remediation program. The Deliberation Results of the Jury dated September 25, 2018 are attached hereto as Exhibit 2.

21.    Pursuant to Paragraphs 308 and 309 of the Honor Manual, the Superintendent of the Academy at the time, James A. Helis ("Helis"), was tasked with rendering "a final decision regarding the sanctions imposed."

22.    On the same date that the jury issued its decision, September 25, 2018, the Regimental Honor Board, via Commandant Mikel E. Stroud ("Stroud") wrote a letter to Helis stating that the Honor Staff disagrees with the determination by the jury that the Academy "retain MIDN Sell and recommended he participate in the 120-day remediation program." A copy of this letter is attached hereto as Exhibit 3.

23.    The Honor Staff argued in its letter that the penalty imposed by the jury was not severe enough and that Sell should be setback to the class of 2020. The Honor Staff stated in its letter that it "does not recommend disenrollment."

24.    On September 28, 2018, Honor Advisor Stephen J. McDade, via Stroud wrote an Honor Advisor Recommendation to Helis. A copy of this letter is attached hereto as Exhibit 4.

25.    In the letter, McDade recommended that Sell be disenrolled from the Academy.

26.    In support of his position, McDade emphasized Sell's academic problems, claiming that "Sell's current transcript has 7 F's and 3 D's."

27.    On October 11, 2018, Helis provided his decision to Sell (attached hereto as Exhibit 5).

28.    Helis affirmed the findings of the Honor Board as to Sell's guilt and directed multiple "actions." Significantly, Helis did not find a basis to disenroll Plaintiff.

29.    Helis determined that Plaintiff should be set back to the Class of 2020. He also

4

required Sell to complete 50 hours of community service.

30.    Helis required that prior to Plaintiff joining the Class of 2020 that he take and pass a Physical Readiness Test ("PRT").

31.    Finally, Helis's decision stated that if the Commandant determined that Plaintiff did not properly remediate (i.e. comply with the terms set forth in the determination by Helis) then in such a situation, Plaintiff "will be referred to an Executive Board or Superintendent's hearing and may be disenrolled from the Academy."

32.    The determination by Helis advised Plaintiff that he had the right, pursuant to Paragraph 310B of the Honor Manual, to appeal the final determination.

33.    Plaintiff acknowledged receipt of Helis's final determination on October 11, 2018. Sell acknowledged his responsibility to abide by the determination. Plaintiff had the right to but did not appeal the determination. See Exhibit 6.

34.    Upon information and belief, October 11, 2018 was the last day that Helis served as Superintendent at the Academy.

35.    The very next day, the Commandant of Midshipmen, Stroud, made a recommendation for an Executive Board suitability hearing (the "Recommendation"), to the new (interim) Superintendent of the Academy, Susan Dunlap. See Exhibit 7.

36.    The Recommendation states that Stroud recommended an Executive Board to determine the suitability of Sell based upon Sell's failures in honor, academics and PRT's.

37.    Based upon the Recommendation, the Academy provided Sell with notice on October 18, 2018, that he would have to appear before an Executive Board for a suitability determination pursuant to Section 6.1 of the Regulations (relevant portions of the Regulations are attached hereto as Exhibit 8).

38.    The scheduling of an Executive Board based upon the Recommendation was severely flawed for numerous reasons and in violation of Plaintiff's Due Process rights.

39.    First, while Section 6.1 of the Regulations empowers the Superintendent to convene an Executive Board in response to a recommendation of the Commandant, the Regulations only permit convening a hearing under two limited circumstances: 1) to address a disciplinary offense; or 2) if there is a report by the Commandant's Performance Review Board that "indicates a serious lack of aptitude or suitability of a Midshipman for a career in the merchant marine and the United States Navy Reserve."

40.    The Recommendation by Stroud was neither premised upon a disciplinary offense nor was it premised upon a report after a Performance Review Board.

41.    In fact, upon information and belief, no Performance Review Board was ever held concerning Sell (the procedures for a Performance Review Board are detailed in Chapter 5 of the Regulations).

42.    Thus, the Academy's scheduling of an Executive Board was in contravention of its own rules and regulations.

43.    Second, while part of the Recommendation was premised upon Sell appearing before an Honor Board, Sell had already been disciplined and punished for his conduct, resulting in the October 11, 2018 final decision by Helis. See Exhibit 5. Sell had already accepted the punishment and did not appeal Helis's determination. See Exhibit 6.

44.    The Academy's conduct in double-punishing Sell for the same exact conduct violated his Due Process rights.

45.    Third, although the Recommendation was premised upon Plaintiff being placed on deferred graduate status after an Academic Review Board ("ARB"), the Academy was

6

advised that the results of Sell's ARB was "voided" and "superseded" by the October 11, 2018 final decision by Helis:

> Good Afternoon [Dean Taha],
> Do you have the letter from the board on the results of [Midshipman] Sell's ARB?
> If so, can you please enclose?
> Thank you.
> V/R,
> Benjamin Wiese
>
> Ben,
> We voided that letter, as the SUPT's honor letter included and sulersedes[*sic*] the Academic terms.
> Dianne [Taha]

See October 12, 2018 email chain between Dean Taha and Benjamin Wiese (emphasis added) (attached hereto as Exhibit 9).

46.    Stroud was clearly aware of the fact that the results of Plaintiff's ARB had been voided and superseded inasmuch as he was provided with Dean Taha's email on October 15, 2018. See Exhibit 9.

47.    Moreover, prior to making his determination, Helis was provided with an objection by McDade wherein McDade specifically recommended that Sell be disenrolled from the Academy based upon his academics. See Exhibit 4. Clearly, then, in determining Sell's punishment, Helis had already considered Plaintiff's academic record.

48.    Stroud's reliance upon Plaintiff's PRT's as a basis to recommend an Executive Board was clearly improper.

49.    In his Recommendation, Stroud relied upon failed tests for the first and the third trimester for the "AY 2016," which was Sell's first academic year. Sell, however, had already fully remediated these failed physical exams.

50.    In fact, Plaintiff would not have been permitted to spend a semester at sea in his

7

second academic year, had he not been deemed physically fit.

51.    Likewise, with regard to the failure in the first trimester of the 2018 academic year, Plaintiff remediated this failure, which is confirmed by the fact that he spent the second and third trimesters at sea that year.

52.    Though Stroud's Recommendation references a failed test in the first trimester, academic year 2019, indicating an unexcused absence, in actuality the scores for that test were misplaced by the test proctor, Greg Ilaria ("Ilaria"). On October 10, 2018, Plaintiff sent an email to Ilaria regarding his missing test results and asked Ilaria to advise whether there was an outstanding issue with his test results. Confirming that there was no issue with Plaintiff's test results, Ilaria responded "You are all set." See emails attached hereto as Exhibit 10.

53.    The Executive Board was thereafter adjourned until November 15, 2018.

54.    The Executive Board discussed the issues in the Recommendation by Stroud, such as Sell's cheating on a project pertaining to humanities; Sell's grades; and Sell's alleged failures of the physical fitness tests.

55.    Section 6.6, paragraph 1, of the Regulations provides that at a Suitability Hearing, the "burden for demonstrating sufficient cause for retention by a preponderance of the evidence is on the Midshipman."

56.    Upon information and belief, the Executive Board determined that Sell could not sustain his burden and recommended that Plaintiff be disenrolled from the Academy.

57.    Superintendent Buono, who had replaced interim Superintendent Susan Dunlap, affirmed the decision by the Executive Board that Sell should be disenrolled from the Academy.

58.    Pursuant to Section 6.9 of the Regulations, Sell appealed the determination to the Maritime Administrator.

8

59.    By letter dated March 5, 2019, the Maritime Administrator denied Sell's appeal and upheld the decision by the Superintendent.  See Exhibit 11.

## COUNT I
## RELIEF PURSUANT TO THE ADMINISTRATIVE PROCEDURE ACT

60.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "59" above as if set forth fully herein at length.

61.    Defendants are all agents as defined by 5 U.S.C. § 701, and thus, their actions are subject to review under the Administrative Procedure Act.

62.    Defendants' actions are final.

63.    There is no adequate remedy at law.

64.    Defendants' actions, which resulted in the expulsion/disenrollment of Plaintiff from the Academy, are violative of the Academy's own rules and procedures and the Due Process clause of the Fifth Amendment.

65.    Defendants' actions, rules and regulations, which resulted in the expulsion/disenrollment of Plaintiff from the Academy, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to Constitutional right (specifically the Due Process clause of the Fifth Amendment); and/or in excess of statutory jurisdiction, authority, or limitations.

66.    Pursuant to 5 U.S.C. § 706, this Court should hold Defendants' actions to be unlawful and should set aside Defendants' conduct in expelling/disenrolling Plaintiff.

67.    Pursuant to 5 U.S.C. § 706, this Court should hold Defendants' actions to be unlawful and should compel Defendants to reinstate Plaintiff to the Academy.

## COUNT II
## VIOLATION OF THE FIFTH AMENDMENT PROCEDURAL DUE PROCESS

68.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "67" above as if set forth fully herein at length.

69.     Sell has property and liberty rights in his education, the degree he sought, an official commission and all other benefits granted thereunder as a result of successfully graduating from the Academy.

70.     Defendants' action with respect to Sell's property and liberty rights amounted to a deprivation of such rights in that Defendants improperly expelled/disenrolled Sell from the Academy.

71.     The deprivation occurred without due process as afforded by the Fifth Amendment of the United States Constitution, as Defendants failed to afford Sell a meaningful opportunity to properly oppose his expulsion.

72.     Defendants failed to follow the normal procedures to safeguard the rights of Sell and treated Plaintiff in a manner that was inconsistent with the manner in which they treated other midshipmen.

73.     Defendants failed to comply with their own procedures relating to the timing of any discipline, including, but not limited to, the procedures set forth in the Academic Policies Handbook; Midshipman Regulations; and the Honor Manual.

74.     Defendants' conduct was also violative of 46 CFR, part 310, including 46 CFR parts 310.8, 310.10, 310.65, 310.67.

75.     In addition, Defendants' rules placed an improper burden on Sell to demonstrate why he should be retained by the Academy.

76.     Further, Plaintiff was not provided with a fair process inasmuch as he was

10

penalized twice for the same exact conduct and disenrolled for conduct for which it had already been determined that disenrollment was not warranted.

77.     The decision to disenroll Plaintiff was not a careful and deliberate decision.

78.     As a result of Defendants' conduct, Plaintiff is entitled to declaratory and injunctive relief.

### COUNT III
### VIOLATION OF THE FIFTH AMENDMENT, SUBSTANTIVE DUE PROCESS

79.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "78" above as if set forth fully herein at length.

80.     Sell has property and liberty rights in his education, the degree he sought, an official commission and all other benefits granted thereunder as a result of successfully graduating from the Academy.

81.     Defendants' actions with respect to Sell's property and liberty rights amounted to a deprivation of such rights in that Defendants improperly expelled/disenrolled Plaintiff from the Academy.

82.     Defendants' decision to disenroll Plaintiff was arbitrary and capricious and did not involve the exercise of professional judgment.

83.     Defendants' decision to disenroll Plaintiff was motivated by faith or ill will unrelated to Plaintiff's academic performance.

84.     Defendants' aforementioned conduct violated Sell's rights and was in violation of the Fifth Amendment of the United States Constitution.

85.     Defendants' violations of the Fifth Amendment have injured and will continue to injure Sell. Sell is entitled to equitable and injunctive relief, compensatory and punitive damages sustained as a result of Defendants' violations.

11

WHEREFORE, Plaintiff requests that this Court grant the following relief:

1.      Declare the actions of Defendants, their agents, employees, others and successors in interest as illegal and violative of the U.S. Constitution and federal law.

2.      Pursuant to 5 U.S.C. § 706, hold Defendants' action to be unlawful and set aside Defendants' conduct in precluding Plaintiff from graduating.

3.      Pursuant to 5 U.S.C. § 706, hold Defendants' action to be unlawful and compel Defendants to reinstate Plaintiff.

4.      Grant Plaintiff reinstatement as a Midshipman at the Academy and afford him all rights and benefits that he would have been afforded but for Defendants' improper conduct.

5.      Order Defendants to compensate, reimburse and otherwise make Plaintiff whole for compensatory, actual and punitive damages in an amount to be determined at trial.

6.      Direct Defendants to pay Plaintiff all of his costs, expenses and reasonable attorneys' fees.

7.      Grant such other and further relief as is just.

Dated:  May 23, 2019

Respectfully submitted,

HOGAN & CASSELL, LLP

By: _____

Michael Cassell
*Attorneys for Plaintiff, Benjamin Sell*
500 North Broadway, Suite 153
Jericho, New York 11753
Tel.  516-942-4700
Fax  516-942-4705
Email:  mcassell@hogancassell.com

12

# EXHIBIT B



**UNITED STATES MERCHANT MARINE ACADEMY**
OFFICE OF THE COMMANDANT OF MIDSHIPMEN
300 STEAMBOAT ROAD
KINGS POINT NEW YORK 11024-1699

12 Oct 2018

From:   Commandant of Midshipmen
To:     Superintendent (interim) of United States Merchant Marine Academy

Subj:   RECOMMENDATION FOR EXECUTIVE BOARD SUITABILITY HEARING ICO MIDN 1/C BENJAMIN SELL

Ref:    (a) Superintendent Instruction 2018-07; Midshipman Regulations
        (b) Superintendent Instruction 2017-02; Physical Fitness Assessment

Encl:   (1) Superintendent's Letter, Honor Board decision
        (2) Email correspondence in reference to Midn Sell's ARB
        (3) Email from PFA coordinator.

1. IAW Ref (a) and (b), I am recommending Midn 1/C Sell appear before an Executive Board to determine his suitability to remain in the Regiment of Midshipman. His conduct is not what is expected and certainly is not reflective, or worthy, of the distinction of being a "Kings Point graduate".

2. Midn 1/C Sell recently stood an Honor Board for Cheating Encl (1). The Superintendents decision was Setback. Prior to this board Midn Sell was presented to the Academic Review Board and the Superintendent decided that Midn Sell would be placed on Deferred Graduate status in order to complete his failed Sea Year Projects, Encl (2).

3. Additionally, Midn 1/C Sell has received multiple PFA failures, Encl (3).
   a. AY 2016 T1 – Failed
   b. AY 2016 T3   Failed
   c. AY 2018 T1 – Failed
   d. AY 2019 T1   Failed (unexcused absence)

4. In light of Midn 1/C Sell's failures in Honor, Academics, maintaining PFA standards I recommend convening an Executive Board to determine the suitability of Midn 1/C Sell to remain in the Regiment of Midshipman.

MIKE E. STROUD
Captain      USMS

AR000001



SUPERINTENDENT
UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT   NEW YORK 11024-1699

11 October 2018

From:   Superintendent

To:     MIDN Benjamin Sell, 2010

Subj:   Superintendent's Decision, Honor Board of 19 September 2018

Upon review of your case, I have decided to affirm the finding of the Honor Board that you are guilty of lying and direct the following actions:

1. You will complete Term 1, Academic Year 2018-19 and then placed on leave of absence. You will depart the Academy for your leave of absence on a date determined by the Commandant of Midshipmen. You will not depart the Academy until any outstanding board actions are completed.

2. You will return to the Academy and be set back to the Class of 2020 on a date to be determined jointly by the Academic Dean and Provost and Commandant of Midshipmen but no earlier than the start of Term 3, Academic Year 2018-19. You will resume your academic studies, to include remediation of failed sea projects, with a schedule as determined by the Academic Dean and Provost.

3. During your leave of absence, you must complete 50 hours of community service, which must be documented in writing by the agencies or organizations you are supporting. You must also enroll in and pass a college-level ethics-based course prior to returning to the Academy. The course must be approved in advance by the Commandant or his designated representative.

4. You will report your progress to the Commandant or his designated representative every thirty days during your leave of absence.

5. Prior to joining the Class of 2020, you must take and pass a Physical Readiness Test as administered by the Commandant or his designated representative. You will receive instructions for the time and place of the PRT from the Commandant's Office.

6. Upon return to the Academy, you will undergo an honor remediation program in accordance with Paragraph 312 of the June 2015 Honor Manual. The Commandant of Midshipmen will designate an officer to serve as your remediation officer. At the discretion of the Commandant, remediation activities may be assigned during your leave of absence. These activities will not shorten the 120-day remediation period once you return to the Academy.

7. You will comply with all Remediation restrictions in Paragraph 312B of the June 2015 Honor Manual. You must request any exception in writing through your chain of command to the Commandant of Midshipmen, who will make a decision. The Commandant's decisions on exceptions to restriction are final. The Commandant may not delegate the authority to decide exceptions to restriction. You are ineligible for Sea Duty until your remediation is complete.

AR000002

8.  If the Commandant determines your remediation was unsuccessful you will be referred to an Executive Board or Superintendent's hearing and may be disenrolled from the Academy.

You may appeal this decision in accordance with Paragraph 310B of the June 2015 Honor Manual.

By copy of this memorandum, the Office of the Dean, Commandant of Midshipmen, and Registrar are directed to implement this decision immediately.


Sincerely,


James A. Helis
Rear Admiral, USMS
Superintendent

Encl:    Acknowledgement of Decision

cc:    Office of the Dean
       Commandant of Midshipmen
       Registrar

UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK

From:      MIDN Benjamin Sell, 2019

To:        Superintendent

Subj:      Superintendent's Decision re:
           Honor Board of 19 September 2018

I am in receipt of the Superintendent's Decision of 11 October 2018 concerning the Honor Board which was convened to inquire into my conduct.

I acknowledge the terms set forth in that decision, my responsibilities to abide by them, and the consequences should I fail to do so.

I acknowledge that I have until the close of the business day after receipt of this notice to provide the Superintendent written notice of my intent to appeal this decision. I acknowledge that I must submit my appeal in writing no later than seven days after receipt of this decision.

_____
Midshipman Benjamin Sell

                                                    _____11/1/18_____
                                                          Date

This acknowledgement shall be hand delivered to the Office of the Superintendent within 24 hours.

AR000004

**Stroud, CAPT Mikel**

| | |
|---|---|
| **From:** | Wiese, ENS Ben |
| **Sent:** | Monday, October 15, 2018 7:50 AM |
| **To:** | Stroud, CAPT Mikel |
| **Subject:** | Fw: MIDN Sell - ARB |

Below is the email from Dean Taha.

From: Taha, Dianne
Sent: Friday, October 12, 2018 5:12:40 PM
To: Wiese, ENS Ben
Subject: Re: MIDN Sell - ARB

Ben,

We voided that letter, as the SUPT's honor letter included and sulersedes the Academic terms.

Dianne

On Oct 12, 2018, at 3:50 PM, Wiese, ENS Ben <WieseB@USMMA.EDU<mailto:WieseB@USMMA.EDU>> wrote:

Good Afternoon,

Do you have the letter from the board on the results of M/N Sell's ARB?  If so, can you please enclose?

Thank you.

V/R,

Benjamin Wiese
Ensign, USN
Operations Officer
Midshipman Personnel Officer
U.S. Merchant Marine Academy '17
Palmer Hall – Zero Deck 1119
Office: (516) 726-5931

1

**MIDN Benjamin Seil**   Class of 2019
**BCA History**

| Official BCA | Height | Weight | Neck | Waist | BF% |
|---|---|---|---|---|---|
| 7/20/2015 | 67 | 191 | 15 | 36 | 23% |

| Remedial BCA | July 20th Official BCA | Week of 27-Jul | Week of 3-Aug | Week of 10-Aug | Week of 17-Aug | Week of 24-Aug |
|---|---|---|---|---|---|---|
| | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT |
| | 23%/191 | No Show | No Show | 20%/175 | 18%/172 | 18%/174 |

| Official BCA | Height | Weight | Neck | Waist | BF% | |
|---|---|---|---|---|---|---|
| 3/14/2016 | 68 | 183 | | | | Pass by weight |

| Official BCA | Height | Weight | Neck | Waist | BF% |
|---|---|---|---|---|---|
| 7/18/2016 | 67 | 177 | 15 | 35.5 | 18% |

| Official BCA | Height | Weight | Neck | Waist | BF% |
|---|---|---|---|---|---|
| 3/13/2017 | 67 | 206 | 15 | 35 | 21% |

AR000006

| Official BCA | Height | Weight | Neck | Waist | BF% | |
|---|---|---|---|---|---|---|
| 7/17/2017 | 67 | 189 | 15 | 35 | 21% | *But failed the PRT |

| Remedial | July 17th | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Official BCA | 24-Jul | 31-Jul | 7-Aug | 14-Aug | 21-Aug | 28-Aug | 5-Sep | 11-Sep | 18-Sep | 25-Sep | 2-Oct | 10-Oct | 16-Oct |
| | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT |
| | 21%/189 | | | 22%/191 | 21%/188 | NO SHOW | 19%/183 | 21%/186 | 20%/185 | 21%/188 | PFA Passed | | | |

| Official BCA | Height | Weight | Neck | Waist | BF% | |
|---|---|---|---|---|---|---|
| 7/16/2018 | 67 | 172 | | | | Passed by Weight |

AR000007



# Memorandum

**U. S. Department
of Transportation**

**Maritime
Administration**

**Superintendent
U S Merchant Marine Academy**

---

15 November 2018

To:         RADM Jack Buono, Superintendent

From:       RDML Sue Dunlap, Deputy Superintendent *S. Z. Dunlap*

Subject:    Recommendation of the Executive Board ICO Midshipman 1/C Benjamin Sell

Reference:  (a) RADM Jack Buono letter to RDML Sue Dunlap dtd 09 November 2018
            (b) Superintendent Instruction 2017-02, *Physical Fitness Assessment (PFA)*

---

1.  In accordance with reference (a), an Executive Board met on 15 November 2018 to consider the suitability of Midshipman 1/C Benjamin Sell to continue as a Midshipman at the United States Merchant Marine Academy (Academy). He appeared before the Board due to his failure to pass three out of six Physical Fitness Assessments (PFA) as required per reference (b). He also had been placed on a set back for failed Sea Year projects and had appeared before an Honor Board in which he was found guilty of cheating on a Sea Year project. The following individuals served as members of the Board: Deputy Superintendent and Chair, RDML Sue Dunlap; Assistant Academic Dean, David Pulls; Head, Department of Naval Science, CDR Brad Hawksworth; Assistant Athletic Director, CAPT William Fell; and Second Battalion Commander, Midshipman 1/C Adam Viscovich.

2.  The Board found by a vote of 5-0 that Midshipman Sell should be disenrolled from the Academy. The primary reason for Midshipman Sell's PFA failures has been his inability to pass the Physical Readiness Test (PRT) portion of the PFA. His first failure during plebe year, he was unable to meet the standard for curl ups, push ups and the run. His second failure during plebe year, he was unable to meet the standard for curl ups and push ups. In his third failure, during Second Class year, he was unable to meet the standard for the run. The proximate reason for his inability to pass the PRT, he says, was that he was more focused on academics than he was on passing the PRT.

3.  In reaching the decision that Midshipman Sell should be disenrolled, the Board took into consideration the following:
    *   He has established a pattern of failing the PFA;
    *   He failed three sea projects during Second Class Sea Year period, for which he has been set back;
    *   He stood before an Honor Board due to cheating on his Humanities sea project and was found guilty;
    *   His admission that when he focuses on athletics, his grades suffer and when he focuses on grades, his athletic performance suffers; and
    *   His inability to understand the principles of leadership.

Page 2

4. The Board did consider that the Academy has already invested four years in Midshipman Sell's career. It was clear, however, that Midshipmen Sell had not only avoided any leadership responsibilities during his tenure at the Academy but that he did not understand what it meant to be a leader. He contended that he had to have a Regimental leadership position in order to demonstrate his leadership abilities. He failed to understand the concept of "leadership by example," and did not recognize that his work with plebes on the Power Squadron or that his authority in the Auto Club constituted leadership. Midshipman Sell lets fear and impulse rule his actions. While he said that he was comfortable taking pieces of machinery apart, he was leery about leading people because he was afraid to fail. He admitted to cheating on his sea project out of fear. Midshipman Sell did have one character witness, Midshipmen Dellarso, who spoke to his mechanical ingenuity. When asked to describe Midshipman Sell's leadership qualities, however, Midshipman Dellarso was more reserved, saying that Midshipman Sell's best leadership quality was "kindness."

5. The Board determined that there was no way forward for Midshipman Sell and that disenrollment would be the best option.

**RECOMMENDATION**

Disenroll Midshipman Sell.

Superintendent Buono

APPROVED: _Buono_

DISAPPROVED: _____

COMMENTS: _____

DATE: _11 / 20 / 2018_



**U.S. Department
of Transportation
Maritime
Administration**

Administrator

1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

March 5, 2019

MIDN Benjamin Sell
c/o USMMA
300 Steamboat Road
Kings Point, NY 11024

RE: Disenrollment Appeal

Dear Midshipman Sell:

This letter constitutes final Agency action with regard to your appeal of your disenrollment from the U.S. Merchant Marine Academy ("Academy"). This decision follows your written appeal dated December 4, 2018, and is based upon the written record I have received from the Academy via memorandum from the Superintendent dated January 15, 2019. I have reviewed the appeal in its entirety in reaching my decision.

Upon review of the appeal, I find the decision to disenroll was proper. Having considered your arguments on appeal and the written record in its entirety, I have determined to uphold the disenrollment decision reached by the Superintendent and to deny your appeal.

The Superintendent or his representative will be in touch with you to complete your disenrollment paperwork.

Regards,

Mark H. Buzby

cc:    RADM Jack Buono, Superintendent, USMMA

**UNITED STATES MERCHANT MARINE ACADEMY**
**KINGS POINT, NEW YORK**
**REVIEW TRANSCRIPT**
******************************************************************

Page 1 of 3

Date: 10/16/2018

Name : Sell, Benjamin Arthur

Social Security No.: XXX-XX-9969
USMMA Address - P.O. Box: 0633      Split: A
Major: Marine Engineering
SAT - Verbal:    0        Math:    0
ACTIVE

Class Year: 2019

Admitted: 06/30/2015

Address:

Remarks:

| | 4TH CLASS FIRST TERM | ACADEMIC YEAR 15-16 | | | 2016/1 |
|---|---|---|---|---|---|
| CHEM100 | General Chemistry | D | 4.00 | 4.000 | |
| CMDT100 | Social Responsibility | P | 0.00 | 0.000 | |
| ECME101 | Intro to Marine Engineering I | B | 3.50 | 10.500 | |
| LITR101 | Composition & Literature | C- | 3.00 | 5.010 | |
| MATH101 | Calculus I | C | 3.00 | 6.000 | |
| NAUT101 | Intro to Nautical Science | B | 3.00 | 9.000 | |
| PE&A110 | Basic Swimming | B+ | 1.00 | 3.330 | |

SEM TOTAL CRED: 17.50    SEM TOTAL QUAL PTS: 37.840    SEM QPA: 2.162
CUM. TOTAL CRED: 17.50    CUM TOTAL QUAL PTS: 37.840    CUM QPA: 2.162

| | 4TH CLASS SECOND TERM | ACADEMIC YEAR 15-16 | | | 2016/2 |
|---|---|---|---|---|---|
| ECEE100 | Intro to Electrical Engineering | C+ | 3.50 | 8.155 | |
| ECMT100 | Engineering Graphics | A- | 1.00 | 3.670 | |
| ECMT111 | Engineering Shop I | B+ | 1.00 | 3.330 | |
| MATH120 | Calculus II | B- | 3.00 | 8.010 | |
| NASC100 | Introduction to Naval Science | B | 2.00 | 6.000 | |
| NAUT110 | Basic Firefighting and Safety | B | 2.00 | 6.000 | |
| PE&A120 | First Aid | B+ | 0.50 | 1.665 | |
| PE&A125 | Self Defense Tactics | A | 0.50 | 2.000 | |
| PHYS110 | Physics 1 | F | 3.00 | 0.000 | |

SEM TOTAL CRED : 16.50    SEM TOTAL QUAL PTS : 38.830    SEM QPA: 2.353
CUM. TOTAL CRED: 34.00    CUM TOTAL QUAL PTS: 76.670    CUM QPA: 2.255

| | 4TH CLASS THIRD TERM | ACADEMIC YEAR 15-16 | | | 2016/3 |
|---|---|---|---|---|---|
| ECES100 | Statics | C | 3.00 | 6.000 | |
| ECME105 | Intro to Marine Engineering II | B+ | 3.50 | 11.655 | |
| ECMT112 | Engineering Shop II | B | 1.00 | 3.000 | |
| HIST100 | History of Sea Power | B- | 3.00 | 8.010 | |
| LITR220 | Technical & Professional Com | B+ | 2.00 | 6.660 | |
| MLOG120 | VSL PERS w/ Secty Duties | P | 0.00 | 0.000 | |
| PE&A130 | Aquatic Survival | A | 1.00 | 4.000 | |
| PHYS110 P | Physics 1 | C+ | 3.00 | 6.990 | |

SEM TOTAL CRED : 16.50    SEM TOTAL QUAL PTS: 46.315    SEM QPA: 2.807
CUM. TOTAL CRED: 47.50    CUM TOTAL QUAL PTS: 122.985    CUM QPA: 2.589

| | 4TH CLASS SUMMER SESSION | ACADEMIC YEAR 15-16 | | | 2016/3/X |
|---|---|---|---|---|---|
| PHYS120 | Physics 2 | B | 3.00 | 9.000 | |

SEM TOTAL CRED : 3.00    SEM TOTAL QUAL PTS : 9.000    SEM QPA: 3.000
CUM. TOTAL CRED: 50.50    CUM TOTAL QUAL PTS: 131.985    CUM QPA: 2.614

AR000011

UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REVIEW TRANSCRIPT

Page 2 of 3

10/16/2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Sell, Benjamin Arthur                                       XXX-XX-9969

| | 3RD CLASS FIRST TERM | | ACADEMIC YEAR 16-17 | | 2017/1 |
|---|---|---|---|---|---|
| ECES200 | Thermodynamics | C+ | 3.50 | 8.155 | |
| ECES210 | Dynamics | B+ | 2.00 | 6.660 | |
| LITR201 | Literature | A- | 3.00 | 11.010 | |
| MATH220 | Differential Equations 1 | D | 3.00 | 3.000 | |
| NASC200 | Strategic Sealift | B+ | 2.00 | 6.660 | |
| WTRF100 | Safety of Life at Sea | B | 2.00 | 6.000 | |

SEM TOTAL CRED : 15.50     SEM TOTAL QUAL PTS. 41.485     SEM QPA: 2.676
CUM. TOTAL CRED: 66.00     CUM TOTAL QUAL PTS: 173.470     CUM QPA: 2.628

| | 3RD CLASS SEA PERIOD | | ACADEMIC YEAR 16-17 | | 2017/2/A |
|---|---|---|---|---|---|
| EPRJ210 | Machine Shop Sea Project | B- | 1.00 | 2.670 | |
| EPRJ230 | Marine Propulsion 1 Sea Proj | F | 2.00 | 0.000 | |
| EPRJ240 | Shipboard Sys 1 Sea Proj | B | 2.00 | 6.000 | |
| NPRJ245 | Sea Year Deck Ops for Engrs | F | 1.00 | 0.000 | |

SEM TOTAL CRED . 6.00     SEM TOTAL QUAL PTS: 8.670     SEM QPA: 1.445
CUM. TOTAL CRED: 72.00     CUM TOTAL QUAL PTS : 182.140     CUM QPA: 2.530

| | 3RD CLASS THIRD TERM | | ACADEMIC YEAR 16-17 | | 2017/3 |
|---|---|---|---|---|---|
| CHEM200 | Chemistry for Marine Engrs | D+ | 3.00 | 3.990 | |
| ECEE200 | Electric Circuits | C- | 2.50 | 4.175 | |
| ECES220 | Intro to Materials Engr | C | 2.00 | 4.000 | |
| ECES221 | Intro to Matls Engr Lab | A | 0.50 | 2.000 | |
| ECES230 | Fluid Mechanics | C | 3.50 | 7.000 | |
| MATH210 | Probability & Statistics | F | 3.00 | 0.000 | |
| PE&A200 | Medical Care Provider | B- | 1.00 | 2.670 | |

SEM TOTAL CRED : 15.50     SEM TOTAL QUAL PTS: 23.835     SEM QPA: 1.538
CUM. TOTAL CRED· 87.50     CUM TOTAL QUAL PTS · 205.975     CUM QPA: 2.354

| | 3RD CLASS SUMMER SESSION | | ACADEMIC YEAR 16-17 | | 2017/3/X |
|---|---|---|---|---|---|
| MATH210 | Probability & Statistics | A | 3.00 | 12.000 | |

SEM TOTAL CRED : 3.00     SEM TOTAL QUAL PTS  12.000     SEM QPA. 4.000
CUM. TOTAL CRED: 90.50     CUM TOTAL QUAL PTS: 217.975     CUM QPA: 2.409

| | 2ND CLASS FIRST TERM | | ACADEMIC YEAR 17-18 | | 2018/1 |
|---|---|---|---|---|---|
| BUSN210 | Principles of Economics | B | 3.00 | 9.000 | |
| ECDL400 | Basic Tanker Ops-Danger Liq | B | 2.00 | 6.000 | |
| ECEE300 | Electric Machines | B | 3.50 | 10.500 | |
| ECES300 | Strength of Materials | B | 3.50 | 10.500 | |
| ECES310 | Heat Transfer | A | 3.00 | 12.000 | |
| NASC400 | Naval Leadership & Ethics | B- | 2.00 | 5.340 | |

SEM TOTAL CRED · 17.00     SEM TOTAL QUAL PTS. 53.340     SEM QPA: 3.138
CUM. TOTAL CRED. 107.50     CUM TOTAL QUAL PTS: 271.315     CUM QPA: 2.524

AR000012

UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REVIEW TRANSCRIPT
*****************************************************************

Page 3 of 3

10/16/2018

*Sell, Benjamin Arthur*                                        XXX-XX-9969
2ND CLASS SEA PERIOD              ACADEMIC YEAR 17-18          2018/3/A

| | | | | |
|---|---|---|---|---|
| EPRJ230 | Marine Propulsion 1 Sea Proj | A- | 2.00 | 7.340 |
| EPRJ310 | Maintenance Management | B | 1.00 | 3.000 |
| EPRJ320 | Naval Arch Sea Project | C- | 1.00 | 1.670 |
| EPRJ330 | Marine Propulson 2 Sea Proj | B | 2.50 | 7.500 |
| EPRJ335 | Refrigeration Sea Project | F | 1.00 | 0.000 |
| EPRJ340 | Shipboard Sys II Sea Proj | F | 2.00 | 0.000 |
| EPRJ345 | Electrical Engr Sea Proj | B- | 1.00 | 2.670 |
| EPRJ350 | Marine Propulsion 3 | C- | 2.50 | 4.175 |
| HPRJ300 | Humanities Sea Project | F | 1.00 | 0.000 |
| INSP100 | Internship | B+ | 1.00 | 3.330 |
| NPRJ245 | Sea Year Deck Ops for Engrs | C- | 1.00 | 1.670 |
| NPRJ340 | Maritime Business | C | 1.00 | 2.000 |

SEM TOTAL CRED : 17.00       SEM TOTAL QUAL PTS : 33.355       SEM QPA: 1.962
CUM. TOTAL CRED · 124.50     CUM TOTAL QUAL PTS · 304.670      CUM QPA: 2.447

Academic Status:2016/2 AW - 2017/2/A RFD-Academic Probation - 2017/3 RFD-CAP - 2018/3/A RF
DEFICIENCY CODE.

AR000013

Class of 2019

In order to facilitate your registration for Plebe year we request that you complete the following brief questionnaire indicating a choice of major/license program.

Name: Benjamin Arthur Self

DECK LICENSE PROGRAM:

☐    Marine Transportation

☐    Maritime Logistics and Security

☐    I am not sure of a particular Marine Transportation major but I am interested in a DECK License.

ENGINEER LICENSE PROGRAM:

☐    Marine Engineering

☐    Marine Engineering Systems

☐    Marine Engineering & Shipyard Management

☒    I am not sure of a particular Engineering major, but I am interested in an ENGINEER License

Please read the attached for information about your major choices.  Also, consult our online Catalog at http://www.usmma.edu/leadership/academic-dean/2017-usmma-catalog for further course descriptions for each major.  You will have an opportunity during your first term to confirm your response above or to indicate another major choice.

Please return this form by mail in the enclosed envelope by June 8, 2015.

AR000014

# U. S. Merchant Marine Academy

25 September 2015

To:    Benjamin Arthur Sell                          Class of 2019
Student ID: ████████████

From: Ms. Lisa Jerry
                    Academy Registrar

Subject:    Major/Split Selections

## Choice of Major

The courses for which you will be registered depend on your choice of major.
Please indicate your choice of major below.

I wish to major in:

☐    Marine Transportation            ☐    Marine Engineering

☐    Maritime Logistics and Security

**Students should be aware that the splits must have the same amount of students.  We will try to accommodate your request but can't always do so; when making your selection please be sure this is what you want.**

## Choice of Sea Year Split

☐    B    Assigned to sea    1st Sailing 1st trimester of 3rd class year
                                        2nd Sailing 3rd trimester of 3rd class year and 1st trimester of 2nd class year

☐    A    Assigned to sea    1st Sailing 2nd trimester of 3rd class year
                                        2nd Sailing 2nd and 3rd trimester of 2nd class year

Signature                                                    Date:

AR000015

To: Class of 2019
From: Department of Engineering

Date **April** 18, 2016

In order to facilitate your registration for 3/C year, please complete the following brief questionnaire indicating a choice of major/license program

Name (print) _____    MID ID _____ Split. _____

ENGINEERING MAJOR SELECTION

___   Marine Engineering

___   Marine Engineering Systems (Requires CQPA>2.67 as of the end of third term of your 4/c year)

___   Marine Engineering & Shipyard Management (Requires CQPA>2.67 as of the end of third term of your 4/c year)

Signature _____    Date _____

Please read the attached for information about your major choices. Also consult the Catalog for further course descriptions for each major. If you have any questions, please contact the Program Coordinator below.

Marine Engineering    Professor Poliseno
Marine Engineering Systems -- Professor Gardner
Marine Engineering & Shipyard Management - Professor Kahl

Please return to the Engineering Department office, Fulton Hall room 312 by April 29, 2016. If you do not submit this form by the due date, your major will be selected as Marine Engineering.

AR000016



Midshipman Benjamin Sell                                                    June 20, 2017
Class of 2019
Marine Engineering

## TERMS OF PROBATION

MIDN Sell:

After a careful review of your academic record, I have accepted the recommendation of the Interim Academic Dean and the Academic Review Board that you be put on Continued Academic Probation status. The terms of your probation are as follows:

You will be on Academic Probation status through the end of the second sailing period; No Fs and QPA/CQPA ≥ 2.000. Any deficiency status will constitute a violation of terms, and will result in your being Referred for Disenrollment.

Failure to meet the conditions set herein may result in your disenrollment. Disenrollment will jeopardize your degree, your license, and your ability to fulfill your service obligations, potentially subjecting you to efforts by the federal government to recoup the cost of your education.

I therefore urge you to dedicate yourself to successful completion of the USMMA program.

JAMES A. HELIS
Rear Admiral, USMS
Superintendent

cc: D, R, A, MPO, ADH, HDWL

I hereby acknowledge and understand the probationary terms set forth in this letter.

Signed_____                    Date_____

AR000017



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK 11024-1699

Midshipman Benjamin Sell                                      June 29, 2017
Class of 2019
Marine Engineering

**TERMS OF PROBATION**

MIDN Sell,

After a careful review of your academic record, I have accepted the recommendation of the Interim Academic Dean and the Academic Review Board that you be put on **Continued Academic Probation** status. The terms of your probation are as follows:

You will be on Academic Probation status through the end of the second sailing period: No Fs and QPA/CQPA > 2.00. Any deficiency status will constitute a violation of terms, and will result in your being Referred for Disenrollment.

Failure to meet the conditions set herein may result in your disenrollment. Disenrollment will jeopardize your degree, your license, and your ability to fulfill your service obligations, potentially subjecting you to efforts by the federal government to recoup the cost of your education.

I therefore urge you to dedicate yourself to successful completion of the USMMA program.

JAMES A. HELIS
Rear Admiral, USMS
Superintendent

cc: D. R. C, MPO, ADH, HDWI

I hereby, acknowledge and understand the probationary terms set forth in this letter

Signed, _____       Date: 7/19/17



**SUPERINTENDENT**
**UNITED STATES MERCHANT MARINE ACADEMY**
**KINGS POINT, NEW YORK 11024-1699**

Date:           15 January 2019

From:           RADM Jack Buono, USMS

To:             The Honorable Mark H. Buzby
                Maritime Administrator

Subject:        Appeal of Disenrollment by Midshipman Benjamin Sell

Enclosed is the formal Appeal of Disenrollment letter to the Maritime Administrator from Midshipman Benjamin Sell in accordance with Paragraph 9 in Chapter 6 of the Midshipman Regulations.

Midshipman Sell appeared before an Executive Board on 15 November 2018 to determine his suitability to remain in the Regiment of Midshipmen. Prior to making its recommendation regarding the suitability of Midshipman Sell to continue as a student at the Academy, the Board carefully considered Midshipman Sell's voluntary opening and closing statements in addition to his responses to the Board's questions, his academic file, personnel jacket, Midshipmen Profile, Sea Year file and PFA record. The Executive Board unanimously recommended that Midshipman Sell be disenrolled from the Academy.

After review of the Executive Board's recommendation and all documents previously referenced and finding no procedural errors, I decided to uphold the Executive Board's recommendation to disenroll Midshipman Sell. Midshipman Sell's failure of three Sea Year projects, multiple PFA failures, his honor offense, and his inability to understand the principles of leadership support my decision for disenrollment.

I recommend Midshipman Sell's appeal be rejected and his disenrollment be upheld.

Respectfully,

RADM Jack Buono USMS
  c:     Counsel to the Academy

AR000019

Dear ADM Buzby,

In this letter I will address each issue in my separately for clarity and organization. Academics have been hard on me at Kings Point, but they are getting easier to maintain. It seemed like the board dismissed the fact that I enjoyed learning something I am actively involved in (engineering) and the fact that I had an acceptable GPA at the time of the board. I enjoyed working during sea year, I gained some of the best experiences of my life at sea, and I actually enjoyed doing some of my sea projects (hard to admit this). As far as academics go, I feel like I have only had a few slip ups where the course material was overwhelming and hard to understand. It was also hard to get help with these courses as my section mates were just as stumped or didn't care to help. Sea projects are a different story as help can only be found in reading material or in the experience of the engine department of your vessel. I have always shown that I can recover from my failures in classes and sea projects with an acceptable mark. Over my three years at Kings Point, my GPA has been a little rocky, but is showing an upward trend and I believe it would remain to reflect that at graduation.

Another factor that was considered at the board was my physical fitness. During my plebe year I failed 2 PRT's and realized that that was unacceptable. I ended up failing the run by 2 seconds during my 2nd Class year and made it up after being on PEP for 2-3 weeks. For the first half of the board, the members were unsure or not if I passed my most recent PRT. This was clarified when Coach Ilaria was called in as a witness. It was noted by a board member that a performance review board is supposed to take place after two PRT failures; this did not take place. For the rest of the case, the board seemed to feel that I was unfit or struggling with fitness which is not the case; this can be seen by the fact that I passed the PRT after spending 8 months at sea.

My ability as a leader was questioned last during the board. The board asked to describe how I have shown that I am a good leader at Kings Point. It is very hard to show how one has led at Kings Point without being in a position to lead. The board disagreed, but I believe that one can lead from any position, however how would the board know whether or not I was a leader if my records don't indicate that. It is very hard for someone to lead their own peers and I have admired my command staff for doing such. My lack of leadership during my senior year stemmed from trying to focus on my academics, figuring it was more important to have a good GPA than some bars on my shoulder. Although I had less interest in leadership, I have been interested in a few positions after my honor board trial, pending setback. My honor board was also a big footnote on the board. At the time I was pending setback/remediation. I committed my offense out of fear and impulse. As a leader, one is expected to make impulsive decisions, but in the right direction. I have learned a lot about myself from the honor board process, with the help of my advisor.

I believe that my false no show to the PRT is the catalyst of my executive board, because otherwise I have already been punished for my honor violation as well as my failed sea projects. Since I have already been punished for these issues, the PRT was the only thing that was outstanding, and the only problem was an error recording my scores. I took the PRT on 17 July and myself and 2 others emailed coach Ilaria about our missing scores on 17 August. I then emailed coach Ilaria again on 10 October and the issue was fixed, about a week before I was called to appear before an executive board. If the PRB had taken place, I may or may not be in the same place that I am. I have been at this academy for 3½ years and have improved physically, academically, and as a person. I believe that Kings Point is the best thing that has happened in my life and that I am just going through a rough time. My sea

AR000020

project failures, honor board, and executive board have all stemmed from each other and if I could go back in time I would do it differently every time. Although I have been fearful of taking responsibility, I do believe that I can prove that I belong at Kings Point and that I should stay here. I also believe that my classmates have faith and trust in me to always be a better person and to become a good leader.

Very Respectfully,

M/N Benjamin A. Seil 1/c

AR000021



**UNITED STATES MERCHANT MARINE ACADEMY**
OFFICE OF THE COMMANDANT OF MIDSHIPMEN
300 STEAMBOAT ROAD
KINGS POINT NEW YORK 11024-1699

12 Oct 2018

From:   Commandant of Midshipmen
To:     Superintendent (interim) of United States Merchant Marine Academy

Subj:   RECOMMENDATION FOR EXECUTIVE BOARD SUITABILITY HEARING ICO
        MIDN 1/C BENJAMIN SELL

Ref:    (a) Superintendent Instruction 2018-07; Midshipman Regulations
        (b) Superintendent Instruction 2017-02; Physical Fitness Assessment

Encl:   (1) Superintendent's Letter, Honor Board decision
        (2) Email correspondence in reference to Midn Sell's ARB
        (3) Email from PFA coordinator.

1.  IAW Ref (a) and (b), I am recommending Midn 1/C Sell appear before an Executive Board to determine his suitability to remain in the Regiment of Midshipman.  His conduct is not what is expected and certainly is not reflective, or worthy, of the distinction of being a "Kings Point graduate",

2.  Midn 1/C Sell recently stood an Honor Board for Cheating Encl (1).  The Superintendents decision was Setback.  Prior to this board Midn Sell was presented to the Academic Review Board and the Superintendent decided that Midn Sell would be placed on Deferred Graduate status in order to complete his failed Sea Year Projects, Encl (2).

3.  Additionally, Midn 1/C Sell has received multiple PFA failures, Encl (3),
    a.  AY 2016 T1 – Failed
    b.  AY 2016 T3 – Failed
    c.  AY 2018 T1 – Failed
    d.  AY 2019 T1 – Failed (unexcused absence)

4.  In light of Midn 1/C Sell's failures in Honor, Academics, maintaining PFA standards I recommend convening an Executive Board to determine the suitability of Midn 1/C Sell to remain in the Regiment of Midshipman.

MIKEL E. STROUD
Captain      USMS

AR000022

UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK 11024-1699
COMPANY OFFICER'S REVIEW OF MIDSHIPMAN PERFORMANCE
FOR ACADEMIC EVALUATION & RETENTION

Midshipman __Benjamin Sell__ Class/Company __2019 2Co__

| FACTORS | UNSATIS-FACTORY | FAIR | GOOD | VERY GOOD | EXCEPT-IONAL |
|---|---|---|---|---|---|
| INDUSTRY - Attentive to duties above normal requirements | | | x | | |
| DEPENDABILITY - Can be counted on to carry out assignments | | x | | | |
| ATTITUDE - Degree of interest Midshipman shows in work | | x | | | |
| APTITUDE - Degree of natural/potential ability in the Merchant Marine/Military | | | x | | |
| KNOWLEDGE - Indicate degree displayed, considering experience | | | x | | |
| CAPACITY TO ASSUME RESPONSIBILITY - Indicate degree when opportunities have been afforded | | x | | | |
| RELATIONSHIP WITH PEOPLE - His/her daily contact with others | | | x | | |
| PERSONAL APPEARANCE - Include care & appearance of quarters & personal effects | | | x | | |
| OVERALL EVALUATION OF MIDSHIPMAN - By the Company Officer | | | x | | |

Review for: 1st Trimester, 2nd Trimester, 3rd Trimester, Sea Year      dated: 29AUG18
Comments:
Retention:

Company Officers Endorsement: (considering the Midshipman's length of service)

Ben Sell keeps to himself.  He does not bother me in anyway but he also does no stand out in anyway. He comes to muster. He get a haircut and does not say much. He was the same way in class. He showed up, worked on his project and then left.  He has struggled before academically and does not have many aspirations towards the regiment.  He is a quiet guy! End of story

1.   Progress since arriving at Kings Point:
_____ Not satisfactory
___x_Progressing, but not as rapidly as possible.
_____Making good progress.
_____Progressing very rapidly.
_____Doing exceptionally well.
2.   If midshipman were able to stay at Kings Point, I would be:
____ Prefer not to have him/her.
__x__ Willing to have him/her.
___ Glad to have him/her.

*John C. Jaeger*
LT John C. Jaeger, USMS
2nd Company Officer

AR000023

## U.S. MERCHANT MARINE ACADEMY
## KINGS POINT, NEW YORK

10/19/2018

DEFICENCIES FOR     Sell, Benjamin Arthur

| CLASS | OFFENSE DATE | REPORTED BY | REPORTED DEMERITS | APPROVED DEMERITS | AWARDED |
|---|---|---|---|---|---|
| **Academic Year     2019** | | | | | |
| II | 07/16/2018 | McDade, LCDR Stephen | 50 | 0 | UnProcess |
| ABSENT ACCOUNTABILITY CHECK | | | | | |
| | | TOTALS FOR:     2019 | 50 | 0 | |
| **Academic Year     2018** | | | | | |
| II | 08/21/2017 | Ilaria, Greg | 50 | 0 | Dismissed with Warning |
| DISREGARD OF ORDERS | | | | | |
| II | 08/21/2017 | Braut, Dan | 50 | 0 | Dismissed with Warning |
| DISREGARD OF ORDERS | | | | | |
| II | 09/01/2017 | Ilaria, Greg | 50 | 0 | Dismissed with Warning |
| DISREGARD OF ORDERS | | | | | |
| III | 09/12/2017 | MIDN Chad Cleary | 16 | 0 | Dismissed with Warning |
| Absent Regimental Muster or Activity | | | | | |
| III | 10/24/2017 | Max Maudsley | 26 | 0 | UnProcess |
| Absent from Watch | | | | | |
| II | 08/28/2018 | Treacy, Stephen | 50 | 0 | UnProcess |
| *Failure to comply with specific instructions of a Commissioned Officer. | | | | | |
| | | TOTALS FOR:     2018 | 242 | 0 | |
| **Academic Year     2017** | | | | | |
| II | 06/10/2017 | Lt Jaeger | 50 | 30 | Approved |
| ^Improper liberty procedure. | | | | | |
| II | 06/10/2017 | Lt Jaeger | 50 | 20 | Approved |
| ^Improper liberty procedure. | | | | | |
| | | TOTALS FOR:     2017 | 100 | 50 | |
| **Academic Year     2016** | | | | | |
| III | 08/16/2015 | Boyle, LT Fionna | 50 | 26 | Approved |
| Late to Watch (Over 10 Minutes) | | | | | |
| | | TOTALS FOR:     2016 | 50 | 26 | |
| Grand | | | 442 | 76 | |

1

AR000024



# Memorandum

U. S. Department
of Transportation

U. S. Merchant
Marine Academy

Maritime
Administration

---

To:         MIDN Benjamin Sell, Class of 2019

From:       RDML Susan L. Dunlap
            Deputy Superintendent

Date:       09 November 2018

Re:         Fourth Revised Notice of Executive Board Suitability Hearing

---

In accordance with Chapter 6, Section 6.1, of the 2018 USMMA Midshipman Regulations (as set forth in SI 2018-07), you are hereby directed to appear before an Executive Board for a hearing to determine your suitability to continue as a Midshipman at the Academy.  You were placed on Deferred Gradute status for failed Sea Year projects; you stood before an Honor Board on 19 September 2018 and were found guilty; and you have failed the Physical Fitness Assessment (PFA) multiple times during your tenure at the Academy.

While you are expected to appear, you are not required to provide evidence, make a statement, or answer questions.  However, be advised that your suitability to continue as a Midshipman at the Academy will be considered based on the evidence, statements, and/or information presented at the hearing.  You bear the burden of demonstrating sufficient cause for retention by a preponderance of the evidence.

The hearing shall be convened on Thursday, 15 November 2018 at 1030 in the Patterson Conference Room, 2nd Deck, Wiley Hall.  Uniform shall be Seasonal Dress Uniform.

The Executive Board Secretary, a non-voting participant, will maintain detailed, but not verbatim, minutes of the hearing (except for the deliberations).  The hearing may also be digitally recorded (except for the deliberations).  The Secretary's minutes will be deemed a sufficient record of the proceedings in the event a digital recording is not made or preserved.  A copy of the minutes or the recording, if made, will be provided to you upon your request, subject to your acceptance and signature of a Confidentiality/Non-Disclosure Agreement, if applicable.  Once the Executive Board procedures have been completed, including any appeals, if applicable, the copy of the minutes or digital recording must be returned to the Executive Board Secretary.  Requests for a copy of the minutes or digital recording made after the conclusion of all disciplinary proceedings will be denied.

The following individuals will serve as members of the Executive Board:

RDML Susan L. Dunlap, Deputy Superintendent, Chair
CDR David Pulis, Assistant Academic Dean
CDR Bradley Hawksworth, Head, Department of Naval Science
CAPT Bill Fell, Assistant Athletic Director, Department of Physical Education and Athletics

AR000025

09 November 2018
Page 2

MIDN Adam Viscovich, Battalion Commander

The Academy intends to call the following witnesses at the Hearing:

LT John Jaeger, Company Officer
Ms. Melinda Eng, Athletic Trainer, Department of Physical Education and Athletics
Mr. Greg Ilaria, Coach, Department of Physical Education and Athletics
Mr. Rick Sager, Director, Health Services

You are being provided with copies of the following documents, which will be considered by the Executive Board:

1. The Commandant's recommendations that an Executive Board be convened and the Superintendent's notification that a hearing will be held;

2. Academic File (with transcript), as maintained by the Academic Dean;

3. Company File, as maintained by your Company Officer;

4. Midshipman Profile, prepared by your Company Officer;

5. Personnel Jacket, as maintained by the Commandant;

6. Honor Case File, as maintained by the Honor Board;

7. Sea Year File, as maintained by the Department of Career Services and Professional Development; and

8. PFA history.

The Executive Board will also consider all documentary evidence and witness testimony provided by you.

You have the following rights prior to and at the hearing:

1. To receive written notice of the Executive Board hearing at least five (5) days before the hearing, which notice shall include the following: (1) the specific charges to be considered by the Executive Board; (2) the date, time, and location of the hearing; (3) the names of those who will comprise the Executive Board; (4) the witnesses to be called by the Executive Board, if any; (5) the uniform to be worn at the hearing; and (6) your additional rights, as delineated below.

2. To receive, with the written notice, copies of all documentation to be considered by the Executive Board in making its recommendation, subject to you signing a Confidentiality/Non-Disclosure Agreement upon request by the Chair. (With your consent, your advisor and/or counsel may receive a copy of the relevant

AR000026

documentation, likewise subject to execution of a Confidentiality/Non-Disclosure Agreement, upon request by the Chair.)

3.  To seek advice and assistance of legal counsel in the preparation of your case at your own expense. Legal counsel will not be permitted to be present during the Executive Board hearing unless, at the time of the Board hearing, you are charged with a criminal offense by a Federal, state, or local jurisdiction arising out of the same circumstances as the charge before the Board. In such cases, counsel shall not actively participate in the proceedings but shall be allowed to be present to consult with you and provide advice.

4.  To request any Academy faculty or staff member other than a Chaplain, Counsel to the Academy or Assistant Counsel, member of the Commandant's Office, or witness to be called at the hearing to act as your advisor as long as serving in that capacity does not present a conflict with the faculty or staff member's professional responsibilities. In the event that you are unable to obtain an advisor, the Superintendent will appoint one on request.

5.  To challenge the impartiality of any or all members of the Executive Board. A written justification for any such challenge must be submitted to the Secretary of the Executive Board within 24 hours of you being informed of the membership of the Executive Board. The Chair will rule on any such challenge. Members disqualified will be replaced by the Chair. Challenge of the Chair will be resolved by the Superintendent. You shall be notified of the decision on any such challenge and the substitution of new members, if any.

6.  To be present during the entire hearing, except for the Executive Board's deliberations.

7.  To make opening and closing statements.

8.  To present evidence including but not limited to documentary evidence and the testimony of reasonably available witnesses during the hearing. You must notify Ms. Ross in the Superintendent's Office, Wiley Hall, 2nd Deck in writing no later than 1030 on 13 November 2018 of the identity of your witnesses. The Academy shall make reasonable efforts to insure the attendance of the witnesses identified by you who are enrolled at or employed by the Academy. Appearance by witnesses not employed by, or enrolled at, the Academy are your sole responsibility.

9.  To question all witnesses, whether called by the Academy or by you.

10. To receive, upon request, a copy of the minutes prepared by the Executive Board Secretary and/or a copy of the digital recording of the hearing (exclusive of deliberations), if made, subject to your signing a Confidentiality/Non-Disclosure Agreement upon request by the Chair. (With your consent, your advisor and/or counsel may also receive a copy of the recording, likewise subject to execution of a Confidentiality/Non-Disclosure Agreement, upon request by the Chair.) Once the disciplinary procedures have been completed, including any appeals, any copy of

AR000027

09 November 2018
Page 4

> the minutes or digital recording must be returned to the Executive Board Secretary.  Requests for a copy of the minutes or digital recording made after the conclusion of all disciplinary proceedings will be denied.

Attached to this Notice is a copy of Superintendent's Instruction 2018-07, Chapter 6, which sets forth the procedures for an Executive Board Hearing.

RECEIPT ACKNOWLEGED:

M/N Benjamin Sell

11 / 9 /18

Date

AR000028



RETENTION

SEPARATION

AR000029

RETENTION

SEPARATION

AR000030

RETENTION

SEPARATION

AR000031

RETENTION

SEPARATION

AR000032

RETENTION

SEPARATION

AR000033



SEPARATION

AR000034

RETENTION

SEPARATION

AR000035



SEPARATION

AR000036

RETENTION

SEPARATION

AR000037

SET BACK

HONOR REMEDIATION

Additional Recommendations:

AR000038

SET BACK

HONOR REMEDIATION

*Additional Recommendations:*



APOLOGIZE TO HUMANITIES DEPT

REL. HONOR TRAINING LECTURES

AR000039

SET BACK

HONOR REMEDIATION

Additional Recommendations:

Retention w/ Sea year Lecture Appearance,
Holding a reg Period honor class in each
Company & Acting as the accused for
INDOC honor board cases

AR000040

SET BACK

HONOR REMEDIATION

Additional Recommendations:
WRITTEN AND PERSONALLY DELIVERED APOLOGIES
TO HUMANITIES
- REG TRAINING
- SEA YEAR LECTURE

AR000041

SET BACK



HONOR REMEDIATION

Additional Recommendations:

TALK To OTHER CLASSES/ MAKE A REG PERIOD FOR EACH COMPANY ABOUT THIS

AR000042

SET BACK



AR000043

SET BACK



AR000044

SET BACK



HONOR REMEDIATION

Additional Recommendations:

AR000045

SET BACK

HONOR REMEDIATION

Additional Recommendations:




**SUPERINTENDENT**
**UNITED STATES MERCHANT MARINE ACADEMY**
KINGS POINT, NEW YORK 11024-1699

11 October 2018

From:   Superintendent

To:      MIDN Benjamin Sell, 2019

Subj:   Superintendent's Decision, Honor Board of 19 September 2018

Upon review of your case, I have decided to affirm the finding of the Honor Board that you are guilty of lying and direct the following actions:

1.  You will complete Term 1, Academic Year 2018-19 and then placed on leave of absence.  You will depart the Academy for your leave of absence on a date determined by the Commandant of Midshipmen.  You will not depart the Academy until any outstanding board actions are completed.

2.  You will return to the Academy and be set back to the Class of 2020 on a date to be determined jointly by the Academic Dean and Provost and Commandant of Midshipmen but no earlier than the start of Term 3, Academic Year 2018-19.  You will resume your academic studies, to include remediation of failed sea projects, with a schedule as determined by the Academic Dean and Provost.

3.  During your leave of absence, you must complete 50 hours of community service, which must be documented in writing by the agencies or organizations you are supporting.  You must also enroll in and pass a college-level ethics-based course prior to returning to the Academy.  The course must be approved in advance by the Commandant or his designated representative.

4.  You will report your progress to the Commandant or his designated representative every thirty days during your leave of absence.

5.  Prior to joining the Class of 2020, you must take and pass a Physical Readiness Test as administered by the Commandant or his designated representative.  You will receive instructions for the time and place of the PRT from the Commandant's Office.

6.  Upon return to the Academy, you will undergo an honor remediation program in accordance with Paragraph 312 of the June 2015 Honor Manual.  The Commandant of Midshipmen will designate an officer to serve as your remediation officer.  At the discretion of the Commandant, remediation activities may be assigned during your leave of absence.  These activities will not shorten the 120-day remediation period once you return to the Academy.

7.  You will comply with all Remediation restrictions in Paragraph 312B of the June 2015 Honor Manual.  You must request any exception in writing through your chain of command to the Commandant of Midshipmen, who will make a decision.  The Commandant's decisions on exceptions to restriction are final.  The Commandant may not delegate the authority to decide exceptions to restriction.  You are ineligible for Sea Duty until your remediation is complete.

AR000047

8.  If the Commandant determines your remediation was unsuccessful you will be referred to an Executive Board or Superintendent's hearing and may be disenrolled from the Academy.

You may appeal this decision in accordance with Paragraph 310B of the June 2015 Honor Manual.

By copy of this memorandum, the Office of the Dean, Commandant of Midshipmen, and Registrar are directed to implement this decision immediately.


Sincerely.

James A. Helis
Rear Admiral, USMS
Superintendent

Encl:    Acknowledgement of Decision

cc:      Office of the Dean
         Commandant of Midshipmen
         Registrar

AR000048

UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK

From:      MIDN Benjamin Sell, 2019

To:        Superintendent

Subj:      Superintendent's Decision re:
           Honor Board of 19 September 2018

I am in receipt of the Superintendent's Decision of 11 October 2018 concerning the Honor Board which was convened to inquire into my conduct.

I acknowledge the terms set forth in that decision, my responsibilities to abide by them, and the consequences should I fail to do so.

I acknowledge that I have until the close of the business day after receipt of this notice to provide the Superintendent written notice of my intent to appeal this decision. I acknowledge that I must submit my appeal in writing no later than seven days after receipt of this decision.

Midshipman Benjamin Sell

Date

This acknowledgement shall be hand delivered to the Office of the Superintendent within 24 hours.

AR000049



**UNITED STATES
MERCHANT MARINE ACADEMY**

**Honor Board Advisor**

September 28, 2018

From:     LCDR Stephen J McDade, USN
          Regimental Honor Board Advisor

Via:      *CAPT Mike Stroud, USMS*
          *Commandant of Midshipmen*

To:       RADM James Helis, USMS
          Superintendent, USMMA

Subject:  Honor Advisor Recommendation for MIDN 1/C Benjamin Sell , 2018-09

RADM Helis,

It is my recommendation, in Case 2018-09, that MIDN 1/C Benjamin Sell be separated from The Academy.

MIDN Benjamin Sell, 1/C stood trial, 19SEP2018, for an Honor Offense in front of nine USMMA Midshipmen and The Regimental Honor Board Staff. Recommendations from the jury were for Guilty with the following sanctions; Retention and 120 Days of Honor Remediation. After reading all documents and reviewing all material, I disagree with the jury's recommendation.

MIDN Sell was a 1st class midshipman at the time of the incident, returning to campus for his 7th trimester in residence. This case was one of admitted guilt. MIDN Sell only provided three character statements and none on the professional level. All three were from his classmates. MIDN Sell's current transcript has 7 F's and 3 D's. His conduct record represents one that shows he has been stuck for the same infractions multiple times (Disregard of Orders, Improper Liberty Procedure).

Overall, in my judgment, MIDN Sell has had three years to 'right the ship' and present himself to be a worthy of graduating from USMMA. He has not done so. This recent offense, a paper 98% plagiarized, shows his total disregard for honor and integrity.

Very Respectfully Submitted,

Stephen J McDade
LCDR,     USN
Honor Advisor

AR000050



**UNITED STATES MERCHANT MARINE ACADEMY**

**REGIMENTAL HONOR BOARD**

Date: 25 SEP 18

To:      RADM James A. Helis, USMS, Superintendent
Via (1):  LCDR Stephen McDade, USN, Honor Board Advisor
Via (2): CAPT Mikel E. Stroud, USMS, Commandant of Midshipman

From:  MIDN LCDR Tyler Wickesberg, RHBC

Subject: Honor Board Recommendation for MIDN 1/C Benjamin Sell, Case 2018-9

RADM Helis,

In regards to MIDN Sell's case, the Honor Staff must disagree with the jury's recommendation.  The jury unanimously voted to retain MIDN Sell and recommended he participate in the 120-day remediation program.  The Honor Staff disagrees and believes MIDN Sell should be setback to the class of 2020.

There is no question as to whether or not MIDN Sell committed an honor offense.  In fact, the way MIDN Sell cheated and stole someone else's work is as blatant as could be.  At the time of the offense, MIDN Sell was behind on sea projects and experiencing the pressure from running out of time.  Additionally, MIDN Sell was already in a "deficient sailor" status for failing first sailing projects, and feared he would automatically be setback or disenrolled if he failed to complete all of his second sailing projects.  As a result, MIDN Sell consciously submitted work that was not his own; however, he only submitted two parts of a three-part project, which would have been enough criteria for failure, regardless if the work was his own or not.

When asked if he was aware of the consequences for turning in someone else's work.  MIDN Sell responded that he was aware he would probably be caught, he was aware that an honor board could follow suit, and he was aware that the results of the honor board process could be worse than not turning in the project.  When asked why he did not turn in all three parts of the project, MIDN Sell responded that he recognized what he did was wrong and could not bring himself to turn in a third, plagiarized part.  This fact resonated with the jury and convinced them that MIDN Sell felt remorse for his actions.

MIDN Sell's claims may be true, however, the Honor Staff will not overlook the fact that MIDN Sell *consciously and deliberately* chose an alternative that compromised his honor.  This fact alone demonstrates a lack of foresight, maturity, and responsibility. MIDN Sell's reaction to a stressful situation presents an overall flaw in his character.

The majority of the jury members empathized with the circumstances that forced MIDN Sell to do what he did.  Because all the jury members understand the fatigue and panic that sets in at the end of sea year, the Honor Staff believes their recommendation would have been the same if an underclassman was in the same predicament.  Furthermore, the Honor Staff believes the jury was more empathetic to MIDN Sell because they believed he was remorseful.  Their empathy was demonstrated through their deliberations.  The jury members seemed to have made up their mind fairly early in the trial and as a result, the deliberation seemed to be more of a formality than anything else.  The jury members failed to ask the "hard-hitting" questions, in particular about his character, and failed to see the severity of MIDN Sell's actions.  Granted, cheating in this context is hard to relate to larger scale situations, but it is the approach and intention in which the actions were committed that should be scrutinized.



# UNITED STATES MERCHANT MARINE ACADEMY
## REGIMENTAL HONOR BOARD

The Honor Staff does not condone MIDN Sell's actions and believes he would best benefit from a setback to the class of 2020. Because he never took ownership of his actions and apologized, or even attempted to apologize, MIDN Sell failed to convey and convince his remorse to the Honor Staff. He failed to articulate how he contributes to the academy, how he helps those around him, and why he should remain onboard. The Honor Staff believes a year away from the academy will be a humbling experience for MIDN Sell and will allow him the time to truly reflect on his morals and values and how those are demonstrated through his actions.

MIDN Sell did exhibit somewhat of an attitude and gave the impression that he did not care throughout the entire honor board process, however the Honor Staff does not recommend disenrollment. The Honor Staff believes the reality of receiving a setback so close to graduating may be the equivalent of realizing all men are mortal. The staff hopes the recommendation will weigh on MIDN Sell and if he truly cares and wishes to contribute to the benefit of others and not just himself, he will return—if he is stuck in his ways and mindset, then he will not. From the Staff's perspective, MIDN Sell possessed little awareness of integrity before this incident, but has the potential to learn, given the proper time away from the academy and through the honor remediation program upon his return.

Very Respectfully,

MIDN LCDR Tyler Wickesberg
Regimental Honor Board Chairman

AR000052



CONFIDENTIAL

**UNITED STATES MERCHANT MARINE ACADEMY**

**REGIMENTAL HONOR BOARD**

## CASE Number

## 2018 - 9

## Investigating Officer

# MIDN LT Nicholas Anders, 1/C

# Regimental Honor Board Vice Chairman of Investigation

CONFIDENTIAL

AR000053



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

## RESULT OF HONOR BOARD FORMAL HEARING

25 SEP 18

To:          The Superintendent
Via (1):     Honor Board Advisor
Via (2):     Commandant of Midshipmen

From: MIDN LCDR Tyler Wickesberg, 1/C, RHBC

Subj:  Result of Honor Board Formal Hearing

Sir,

On the evening of 19 SEP 18, a formal hearing was convened to hear case 2018-9 concerning allegations of MIDN 1/C Benjamin Sell, who had previously admitted guilt. The Voting Members of the board recommended retention, and that MIDN Sell participate in the 120-day Honor Remediation Program per the 2017 revision of the Honor Manual.

Attached is the case file.  The Honor Staff disagrees with the jury's recommendation, and recommends the sanction of setback.

Very Respectfully,

MIDN LCDR Tyler Wickesberg, 1/C
Regimental Honor Board Chairman

Case No.: 2018-9

HB-15
AR000054



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

## HONOR BOARD CASE CONTROL FORM
### CASE NO: __2018 - 9__

1. Report of Possible Honor Violation (**HB-1**) received on  13 AUG 2018

2. Notification (**HB-2**) give to accused Midshipman on  14  AUG  2018

3. Accused acknowledgement of rights (**HB-2**) received on  22 AUG 2018

4. Formal Counseling Session held on _____ 22 AUG 2018_____

5. Formal Counseling Session completed by  22  AUG  2018

6. Selection of Advisor (**HB-2**)       22  AUG  2018

7. Accused MIDN Plea received on ___ 22  AUG  2018

8. Formal Counseling Report (**HB-3**) received on  27 AUG 2018

9. Honor Review Board Review of Formal Counseling (**HB-4**) completed on

_____ 27  AUG  2018

10. Result of HRB (**HB-5**) received by Accused

11. Accused Midshipman's Statement Received on

12. Investigation Team:  Date of Assignment:

        Regimental Honor Board Officer:
        Company Honor Board Chairman:

13. Interview with Accused held on

14. Interview with Accuser held on

15. Interview with Witness _____ held on _____
    Interview with Witness _____ held on _____
    Interview with Witness _____ held on _____
    Interview with Witness _____ held on _____
    Interview with Witness _____ held on _____

16. Formal Investigation Report (**HB-7**) received on _____

17. Honor Review Board Review of Formal Investigation (**HB-8**) completed on _____

18. Result of HRB (**HB-9**) received by Accused _____

19. Notification of Hearing to Witnesses (**HB-10**) distributed on _____

20. Notification of Hearing to Jurors (**HB-11**) distributed on _____

21. Open Board Option (**HB-12**) selected on _18 SEP 18_

22. Formal Hearing convened on __17 SEP 18.__

23. Deliberation Results (**HB-14**) completed __25 SEP 18__

24. Result of Formal Hearing (**HB-15**) forwarded to Honor Advisor _26 SEP 18_

25. Superintendent's Final Action received on _____

AR000056



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

## REPORT OF POSSIBLE HONOR VIOLATION

Date: *13 August 2018*

From: *Jeffrey F. Taffet, Ph.D., Professor of History, Department of Humanities*
To:    Regimental Honor Board Chairman

Subj:  REPORT OF POSSIBLE HONOR VIOLATION

Ref:   MIDSHIPMAN HONOR MANUAL

1. Midshipman who may have committed an honor violation:

   *Benjamin Sell*

2. Time/date of violation: *occurred on 18 July 2018, discovered on 10 August 2018*

3. Part of code broken:    *Cheating and possibly stealing (this case is clearly about an attempt to cheat, but may also involve stealing. An investigation will need to determine that).*

4. Did you counsel the midshipman on the matter? *No*

5. Description:

*MIDN Sell's submission of his first writing assignment for his humanities sea project was almost exactly the same writing assignment that a student, ▓▓▓▓▓▓▓ had submitted in July 2017. In the roughly nine page text, I believe only two words are different (other than MIDN Sell putting his name on the assignment).*

*An investigation should determine how MIDN Sell obtained ▓▓▓▓▓▓▓ text. I am not aware of ▓▓▓▓▓▓▓ status. If he did not graduate, he also should face an honor board for his efforts to aid cheating, which is, by definition, an act of dishonesty.*

Submitted: (sig) _____ CONFIDENTIAL



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### REPORT OF POSSIBLE HONOR VIOLATION

Date: *September 5, 2018*

From: *Jeffrey F. Taffet, Professor of History*
To:     Regimental Honor Board Chairman

Subj:   REPORT OF POSSIBLE HONOR VIOLATION

Ref:    MIDSHIPMAN HONOR MANUAL

1. Midshipman who may have committed an honor violation:

*Benjamin Sell*

2. Time/date of violation: *July 18, 2018*

3. Part of code broken:        *Cheating, and possibly stealing depending on how  MIDN Sell obtained the paper he used to cheat.*

4. Did you counsel the midshipman on the matter?  *No*

5. Description:

*MIDN Sell's submission for his second writing assignment for his humanities sea project was almost identical to the submission that another student,* ▓▓▓▓▓▓ *submitted in July 2017.*

*MIDN Sell's only change to the submission by* ▓▓▓▓▓ *was to change the name of the ship in the story from the USNS Fall River to the USNS Robert E. Peary.*

Submitted: *Submitted/signed electronically by Jeffrey F. Taffet, PhD*

HB-1



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

ACCUSED NOTIFICATION

Date: 14 AUG 18

To: MIDN ___Sell___ 1/c

From: Regimental Honor Board

Subj: Accused of Honor Violation

MIDN ___Sell 1/c___, you have been accused of violating the Academy's Honor Code by **lying / cheating /stealing**.  You are hereby ordered to complete the following tasks:

1.  You are to set up a formal counseling session between your Company Commander, Company Honor Board Chairman, a Regimental Honor Board Staff Member and yourself.   You have until **Date:** 21 AUG (five (5) days from the date above) to complete the Formal Counseling.

2.  You must sign your Rights of the Accused (enclosed) and bring them to your Formal Counseling session and turn them into your Company Honor Board Chairman.

3.  If you choose to have an advisor, you must make your selection and complete the enclosed form no later than your Formal Counseling Session.  Your advisor may be present at the Formal Counseling.

4.  If you choose to write an official statement it must be turned into your Company Honor Board Chairman no later than **Date:** 23 AUG (seven (7) days from the date above).

If you have any questions, please refer to the Honor Manual and/or ask your Company Honor Board Chairman.

Very Respectfully,


MIDN LCDR Tyler Wickesberg
Regimental Honor Board Chairman


Enclosure:


Case No.: 2018-9

1 of 3 HB-2
AR000059



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### The Rights of a Midshipman Accused of an Honor Violation

Every midshipman who is accused of an honor violation has the following rights:

1. The right to remain silent.

2. The right not to be subjected to self-incrimination.

3. The right to have an advisor.

4. The right to submit a statement to the Honor Board for consideration in the case.

5. The right to protest any Honor Board Representative selected for the Formal Honor Board Hearing.

6. If found guilty of an Honor Violation, the right to submit an appeal to the Honor Officer Advisor concerning procedural matters.

7. The right to submit a statement to the Superintendent for the consideration in the final decision.

8. The right to appeal to the Maritime Administrator if a disenrollment sanction is imposed.

If there are any questions concerning your rights or the procedures that the Honor Board will follow during its course of action, please direct them to your Company Honor Board Chairman.

Accused Name (Print) _Benjamin A. Sell_

Accused Signature _(signature)_

Date _8-14-18_

Case No.: 2018-9



### UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

## ADVISOR SELECTION

August 13, 2018

From: _MIDN Sell ½c_

To: Regimental Honor Board Chairman

Subj: Selection of an Advisor, Case No. _2018-9_

As the accused midshipman, I have decided to (circle 1 or 2):

1. Select _CAPT KAHL, MIDN Carroll_ as my advisor.

2. Waive my right to an advisor.

Very Respectfully,

Name: _Benjamin A. Sell_
Signature: _[signature]_

Case No.: 2018-9

3 of 3 HB-2

AR000061



### UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

## FORMAL COUNSELING REPORT

To: Honor Review Board
From: Company Honor Board Chairman
Subj: MIDN _Sell    1/C_

The following people were present for the Formal Counseling session that was held on,
Date: _22 AUG 2018_

**Company Commander**
Print Name: _LUKE THERIAULT_
Signature: _____

**Company Honor Board Chairman**
Print Name: _CONNOR COLE_
Signature: _____

**Regimental Honor Board Staff Member**
Print Name: _Nicholas Anders_
Signature: _____

**Accused Midshipman**
Print Name: _Benjamin Sell_
Signature: _____

**Accused Advisor**
Print Name: _Bryce W. Carroll_
Signature: _____

Enclosed with this sheet is the report from the Formal Counseling Session, for the use in the Honor Review Board.

Case No.: 2018 - 9                                    HB-3

AR000062



**UNITED STATES MERCHANT MARINE ACADEMY**

**KINGS POINT, NEW YORK**
**REGIMENTAL HONOR BOARD**

### Accused Midshipman Plea in Regards to Accusations against Him or Her

After studying the Honor Manual, and having a full and fair understanding of what I am being accused of, I Midshipman _____Benjamin Sell_____ plead

**Guilty**                              **Not Guilty**

To the accusation(s) that have been made against me.

CONFIDENTIAL

Signed: (Printed Name) _Benjamin Sell_

    Signature: _Ben Sell_

    Date: _8/22/18_

Case No.: 2018-9                              Accused Midshipman Plea

AR000063

MIDN Benjamin Sell 1/C
2nd Company
Class of 2019

## Official Honor Board Statement:

I, MIDN Benjamin Sell, plead guilty to violating the Academy's Honor Code by cheating. I copied my Humanities Sea Project from a pony. Under the pressure of turning in sea projects after already failing two during my previous sailing, I was scared that I would not be able to remediate the project without being set back.

Very Respectfully,

MIDN Benjamin Sell, 1/C



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### Initial Investigation Interview Notes

**Investigating Officer:**    RHBVCI MIDN LT Nicholas Anders

**Accused:**    MIDN ENS Benjamin Sell

**Date:**    22 AUGUST 2018

1. *How did you obtain MIDN ▮▮'s humanities project?*

   MIDN Sell does not remember how he obtained the project. However, he had the project on his hard drive.

2. *Who gave you the humanities project?*

   MIDN Sell does not remember who gave him MIDN ▮▮ project. He had multiple projects for humanities on his hard drive. As well as other ponies for different sea projects.

3. *When did you decide to use MIDN ▮▮'s paper?*

   MIDN Sell claims that it was a spur of the moment decision. He was behind on other projects and was worried he would be setback or disenrolled from the academy if he did not turn it in.

4. *Were you behind on sea projects? When did you finish this project and print it?*

   MIDN Sell was behind on projects and only finished part one of three for the humanities project. He was aware he was already going to fail the project for not submitting all the parts. However, when faced with failing the project and compromising his honor, he stated he chose to compromise his honor even though he knew he would fail and knew what he was doing was wrong.

5. *Did you know what you were doing was wrong?*

   MIDN Sell stated he knew what he was doing was wrong.

Case No.: 2018 - 9

6. *What was going through your mind as you printed and turned in MIDN ▇▇▇ project?*

   MIDN Sell did not know how to answer this question.

7. *Did you cheat on any other sea projects?*

   MIDN Sell claims he did not cheat on any other sea projects.

8. *Why did you turn in the same exact paper?*

   MIDN Sell was afraid he would fail, however he already knew he would fail for not completing the project.

9. *Why didn't you just take the failure for this humanities paper?*

   MIDN Sell was not aware that the project could be remediated. MIDN Sell was afraid of being setback or disenrolled.

10. *Did you think you would not be caught?*

    MIDN Sell knew that he would more than likely be caught. The project was submitted in turnitin.com.

11. *Were you aware of the consequences for turning in someone else's work?*

    MIDN Sell was aware that an honor board would occur from such an act. He also knew the consequences could be worse than not turning in the project.

12. *Why should you remain at the United States Merchant Marine Academy?*

    MIDN Sell believes he made a big mistake and feels like he should be able to redeem himself. However, he is not sure at the moment on how to redeem his honor.

13. *Did you talk to the professor about the honor offense and apologize?*

    MIDN Sell did not talk to the professor nor has he apologized to this date. MIDN Sell said he should apologize for wasting the professors' time.

14. *Did you complete all other sea projects and turn them all in?*

Case No.: 2018 - 9

AR000066



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

## RHBVCI STATEMENT OF INTERVIEW

MIDN Sell chose to cheat on his humanities project knowing that he was going to fail it anyways for not submitting the rest of the project. I am still baffled to why he chose to cheat if he knew he would already fail the project. MIDN Sell willing chose to throw his honor out the window for no apparent reason just to avoid a setback, which could be a possible outcome of this case, at the minimum, regardless. In addition, I am bothered by that fact that MIDN Sell said he should apologize to the teacher for wasting his time instead of apologizing for what he did. This case should be taken to a formal investigation and subsequently a formal hearing.

Very Respectfully,

MIDN LT Nicholas Anders
RHBVCI
Investigating Officer
Case: 2018 – 9

Case No.: 2018 - 9

AR000067



### UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

## Informal Investigation Investigating Officer's Notes

| | |
|---|---|
| **From:** | **MIDN LTJG Connor Cole** |
| **To:** | **Honor Review Board** |
| **Date:** | **20 August 2018** |

Notes

1. **Explain how you got someone else's sea project.**

Responded that he does not remember how he got them. It was a pony from his hard drive. He had more than one pony.

2. **Why did you decide to submit exact same project?**

Scared for disenrollment because he failed two other projects before. He finished the project one of the days, he was back at the academy before turn in. He was focused on other heavier weighted projects. The project was turned in to turnitin.com.

3. **Were you aware this was possible outcome?**

Yes. He was not aware he could remediate the project. He thought it was an automatic setback.

4. **Did you cheat on any other sea projects?**

No

5. **What was going through your mind when you submitted the project?**

He did not feel confident with it and did not think he would get away with it and was not very sure.

Case No.: 2018 -- 9

AR000068

6. Any reason you only changed the name?

He was not thinking and was crunching down on time. After the fact he had remorse-contemplated decision and thought it was obvious, he would be kicked out. He only did one part of the project which consisted of three parts.

Case No.: 2018 – 9

AR000069



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

**Initial Investigation Interview Recommendation**

Investigating Officer:    CHBC MIDN 1/C Connor Cole

Accused:    MIDN ENS Ben Sell

Date:    27 AUG 2018

It is my recommendation based off the initial statement and interview that a **formal investigation** is needed. A formal investigation will allow us to have a better understanding of the events that led to M/N Sell to submit a sea project that was the same as a previous midshipman's. The questions that I want to ask M/N Sell and Professor Taffet are:

1. When was the project submitted?

2. Which portions of the project were completed and when?

3. Where you aware that without completing the project you were going to fail regardless?

AR000070



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### Initial Investigation Interview Recommendation

**Investigating Officer:**     N/A

**Accused:**                   MIDN ENS Sell

**Date:**                      27 AUG 2018

It is my recommendation that this case is **referred to a formal investigation**. It appears that the submitted work was not written by the accused midshipman and plagiarism is a form of lying, stealing and cheating.

Very Respectfully,

M/N Luke Theriault
2019B
CC2

AR000071



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### REVIEW OF FORMAL COUNSELING

After holding an Honor Review Board on Date: __27 AUG 2018__ the board voted on the case of the accused MIDN __Sell  1/c__ , who is held in violation of the Honor Code by:

### LYING / CHEATING / STEALING

The results are as followed:

RHBC _____     Formal Investigation / Dismiss / Refer to Commandant

RHBVC _____     Formal Investigation / Dismiss / Refer to Commandant

RHBVCI _____     Formal Investigation / Dismiss / Refer to Commandant

RHBVCE _____     Formal Investigation / Dismiss / Refer to Commandant

RHBVCO _____     Formal Investigation / Dismiss / Refer to Commandant

CHBC _____     Formal Investigation / Dismiss / Refer to Commandant

CONFIDENTIAL

Case No. __2018 - 9__

HB-4

AR000072



**UNITED STATES MERCHANT MARINE ACADEMY**
**KINGS POINT, NEW YORK**
**REGIMENTAL HONOR BOARD**

### RESULT OF HONOR REVIEW BOARD

To: MIDN _Sei__ __11c_                     Date: _30 AUG 2018_
From: Honor Review Board
Subj:  Result of Honor Review Board

After examining the report from your Formal Counseling and your written statement, if you chose that right, the Honor Review Board has voted in majority to:

Proceed with a Formal Investigation

You will receive another notification no later than seven (7) business days from the date posted above regarding the result of the second Honor Review Board after the Formal Investigation is complete.  Your investigating officers will be MIDN _Anders_. and MIDN _Cole_.

### OR

Dismiss your case.

### OR

Refer your case to the Commandant's Department for disciplinary action.

Following receipt of this notification, your case will be dismissed as an honor board case and opened as a disciplinary case.  The Commandant's Department will review the investigation done by the Honor Board and review the facts of the matter, after which an appropriate punishment will be assigned.

If you have any further questions, please direct them to your Company Honor Board Chairman.  All decisions made by the Honor Board are pending the Superintendent's final decision.

Very Respectfully,

CONFIDENTIAL

MIDN LCDR Tyler Wickesberg
Regimental Honor Board Chairman

Case No.: 2018-9                                                          H3-5

HONOR MANUAL



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

**RECORD OF INTERVIEWS**

To: Honor Review Board

From: Investigating Team

Subj: Record of Interviews conducted for Investigation

A record of all interviews conducted during the formal Investigation process should be kept. All interviews should be recorded on this form, with multiple copies present if necessary to denote multiple interviews.

**DATE OF INTERVIEW:** 9/4/2018

**PLACE OF INTERVIEW:** Aaron Seesan Room

**PERSONS PRESENT AT INTERVIEW:**

Name: MIDN LT AnderS        Title: RHBVCl
    Signed:

Name: MIDN LTJGCOLE        Title: CHBC 2
    Signed:

Name: JEFFUEY F. TAFFET        Title: PROFESSOR OF HISTORY
    Signed:

Name: MION BRIANNA HAWAYGN 3/C        Title: RXBVC/PO
    Signed:

Form HB-6

AR000074



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### Formal Investigation Interview Notes

**Investigating Officer:**    **RHBVCI MIDN LT Nicholas Anders**

**Interview:**    **Dr. Taffet**

**Date:**    ~~4 AUGUST 2018~~   5 SEPT 2012

1. *Did MIDN Sell turn in his entire humanities project?*

   MIDN Sell turned in all but one assignment. the 3rd assignment

2. *Did MIDN Sell apologize to you at all or contact you in regards to his project?*

   No

3. *When did MIDN Sell submit his humanities sea project?*

   The first and second assignment were both submitted on 18 July 2018.

4. *How did you discover the paper was plagiarized?*

   Turnitin.com

5. *Could the project be remediated?*

   Yes, this project can be remediated on campus.


### Notes

After conducting this interview, I was contacted later that evening by Professor Taffet. He looked back through MIDN Sell's submissions for his project and discovered he also plagiarized his second submission for this project. Another HB-1 has been placed into this case packet for the second violation.



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### Formal Investigation Investigating Officer's Notes

**From:**              **MIDN LTJG Connor Cole**

**To:**                **Honor Review Board**

**Date:**              **4 September 2018**

                       **Dr. Taffet**

Notes:

1. Did M/N Sell turn in all of his project?

He believes all of the parts were submitted and one did not have plagiarism, one was not opened, and one was plagiarized.

He found the plagiarism from turnitin.com. It was a 98% match. Turnitin.com keeps a history of every paper ever submitted and checks most of web.

His recommendation was "south of disenrollment"

Case No.: 2018 – 9

AR000076



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT. NEW YORK
REGIMENTAL HONOR BOARD

## RECORD OF INTERVIEWS

To: Honor Review Board

From: Investigating Team

Subj: Record of Interviews conducted for Investigation

A record of all interviews conducted during the formal Investigation process should be kept. All interviews should be recorded on this form. with multiple copies present if necessary to denote multiple interviews.

DATE OF INTERVIEW: 4/6/18

PLACE OF INTERVIEW: Aaron Seesan Room

PERSONS PRESENT AT INTERVIEW:

Name: Anders.N          Title: RHBUCI
    Signed:

Name: CONNOR COLE       Title: CHBC 2
    Signed:

Name: Benjamin Bell     Title: Ansrc/
    Signed:

Name: CAPT Peter Kahl   Title: Prof
    Signed: Kahl

    MIDN 3/C BRIANNA HAWKEN       R-MNCIPO

    WICKESBERG, TYLER             RHBC

Case No.:

JIB-6
AR000077



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

**Formal Investigation Interview Notes**

**Investigating Officer:**    RHBVCI MIDN LT Nicholas Anders

**Accused:**    MIDN ENS Benjamin Sell

**Date:**    6 SEPT 2018

1. *What have you learned from this offense and how can you make yourself better?*

   I have learned a lot about myself and my values and how sometimes they can go wrong. I am not sure how I can make myself better, but I would somehow like to do that.

2. *Did you turn in all three parts of the project?*

   No, just two parts.

3. *Why did you tell us you didn't submit a second assignment and why did you not initially tell us that you plagiarized more than one assignment?*

   I thought you already knew about it.

4. *What is your status here at the academy?*

   I had an ARB, 30 AUG 2018, Deferred Graduate. They were not aware of the HB-1.

5. *Have you apologized or talked to Dr. Taffet?*

   No net yet.

6. *Why do you think you should remain at the academy?*

   I believe I can become a great leader and a great engineer and represent the school well while I am here and when I leave.

Case No.: 2018 - 9

7. *Did you cheat on any other sea projects?*

   I did not cheat on any other projects.

8. *Why did you chose MIDN ████'s work to turn in for both assignments?*

   That was just the pony I had on hand, I do not remember where I got them.

9. *Do you think this was a spur of the moment decision?*

   I was planning to do the project; I would say it was a spur of the moment decision. I was behind on four or five projects. I failed refrigeration for an incomplete project and humanities.

10. *If you knew you could remediate it, would you have done anything different?*

    If I knew, I could have remediated it I would not have turned it in. I would have focused my time on something else.

11. *Why didn't you cheat on the third assignment?*

    I already knew I screwed up so I did not see a point in submitting the third part. I was scared I already failed two sea projects last sailing. I just did not want another failure. I did not want to submit a blank project because it did not look good.

12. *What do you think would be a fair consequence for your actions?*

    Something that would show my remorse and something that would rehabilitate me and fix my character.

13. *What is the definition of honor to you?*

    Honor is a value displayed by people who have great character and integrity.

14. *What do you think the consequences would be for plagiarizing information out in the merchant fleet or active duty?*

    I feel like this is a good antidote to teach honor. This is a real example to show them that they cannot get away and there are consequences to your actions.

15. *How would you address a situation like this with someone under your command?*

    I would want to know why and the circumstances they were under, find the root of the problem, and see if the character of that individual is flawed or if something made them do it?

Case No.: 2018 - 9

AR000079

*16. How is your honor reflective of your character?*

Plays a big part into character. I feel like my lack of honor in this situation has damaged mine. People look at me different now, outside of my circle of friends.

*17. Have you told your family about the honor violation?*

Yes, they told me to tell the truth.

*18. Why didn't you bother to change any of the paper?*

I was running out of time.

*19. How was your work ethic at sea?*

It was decent; I stuck to two hours a night working on sea projects.

Very Respectfully Submitted,

MIDN NICHOLAS ANDERS
RHBVCI

Case No.: 2018 – 9

AR000080



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

**Formal Investigation Investigating Officer's Notes**

**From:**         MIDN LTJG Connor Cole

**To:**           Honor Review Board

**Date:**         6 September 2018

                  M/N Sell 1/C

Notes:  A second HB1 was submitted and is being placed in this same investigation.
1. Did you turn in all parts?
No, just two parts of the three.
2. Is there a reason you chose M/N ███s project?
It was just the pony he had and does not remember where he got it from.
3. Is there a reason you did not submit a third assignment?
At that point he knew he was "screwed" and didn't want to submit another part.
It was turned in to turnitin.com so he knew he cheated and knew that they knew he cheated.
4. Why cheat when knowing the consequence of cheating was the same as not doing it when knowing that the teacher knew you would be cheating?
He was scared and was already afraid of failing out because of failed projects earlier. Wanted to turn something in because it would look better.
5. What's your status here?
Had an ARB last week on Thursday. He is to remediate projects out at sea.
6. Have you talked to Dr. Taffet or apologize?
No, not yet.
7. Did you change anything in the papers?
Just the names of the ships. He didn't edit anything else because he was running out of time.
8. What was your work ethic out at sea like?
"Steady, working on projects two hours a night." He had 9 total projects to accomplish.
Did you work with anyone on your project?
No.
9. Have you told your family?
Yes, they weren't happy about it and told me to tell the truth.
10. During the first interview, we only knew about the first part of the project being plagirized...
Thought we all knew about it and that the teacher graded the whole thing.
11. If you knew you could have remediated it would you have done things differently?
"I would have not done it."
12. What have you learned from this offense?

Case No.: 2018 – 9

Learned a lot about himself and his values and that things can go wrong. He does not know how he can make himself better but would somehow like to do that.

13. What is your definition of honor?

"Honor is a value displayed by people who have great character, integrity, and great values."

14. Were those at the ARB aware of honor violation?

He does not believe so.

15. Why do you think you should remain at the academy?

"I believe that I can become a great leader engineer and example while I am here and once I leave."

16. Would you consider this spur of the moment?

He was planning on doing the project the whole sailing and at the end it was a spur of the moment decision.

16. What do you think is fair consequences for your actions?

"Something that would show my remorse and something that would rehabilitate me and fix my character."

"Doesn't think that he has poor character, people just slip up sometimes."

AR000082

## Interview One: Accused

1.) Explain how you obtained someone else's work?

   –I don't remember, from a hard drive, I have many.

2.) Do you have other ponies? (For this project?)

   - Yes

3.) Do you have more from the Prof?

   -Yes, one was from Group B.

4.) Why did you decide to turn in the same one?

   - Crunched for time, failed 2 projects first sailing, scared.

5.) When did you finish it?

   - When I came back, I was more focused on other things.

6.) Were you not done with other sea projects?

   -Some but not all.

7.) Was it on Turnitin.com?

   - Yeah

8.) Were you aware of this outcome?

   - Yes

9.) You did it anyways, though?

   - Yeah

10.) Were you aware that there was remediating? (for this project)

- No, I was afraid of a setback.

11.) Did you cheat on other projects?

- No

12.) What went through your mind when compiling this?

AR000083

- Not really confident about it, wasn't sure.

13.) Do you have any remorse, or fear for the consequences?

- After the fact I did, before I was just trying not to get kicked out.

- It was pretty obvious I would get caught.

14.) Why did you decide to just leave it the way it was, only change the name?

- Spur of the moment, no time, and other sea projects.

15.) Was anyone else aware?

- No

16.) Did you talk to the professor about this?

- No

17.) Did you talk to the MIDN whose work you used?

- No

18.) At any point did you feel you should come forward or talk to the professor?

- I feel like I owe him an apology

19.) Did you talk to him?

- Not yet.

20.) Are you aware of the consequences?

- Yes

21.) Why do you feel you should be here?

- I feel I should be able to redeem myself and regain the trust I lost from peers and staff.

22.) How?

- I am not sure.

AR000084

- Honor is a value displayed by people who have great character, integrity, and just- great values.

20.) Was the ARB aware of your honor violations?

- I don't think so.

21.) Why do you think you should remain at the academy?

- I believe I could become a great leader and officer and represent the school well while I am here and when I leave.

22.) Would you say this was a spur of the moment decision?

- Yes, I wouldn't have done it if I didn't have the other projects.

23.) And you were behind at the time?

- Behind on four or five projects.

24.) (Which ones did you fail? - idk question)

- Humanities and Refrigeration

25.) What do you think is considered a fair consequence for your actions?

- I guess something that would show my remorse and something that would rehabilitate me and fix my character.

26.) How do you think your honor is reflective of your character?

- I think it is a very big part, just in general. It (the situation) definitely hurt mine and I feel people look at me different.

27.) How do you think this incident is reflective of your character and reflective of being a mariner/ active duty officer?

- I feel like this is a good anecdote to teach honor, to try to teach them they can't get away with lying and cheating. That if they believe that, here is a real example and the consequences for your actions.

28.) As a future mariner/ active duty officer, how would you address something like this?

AR000085

- No.

10.) Did you change anything on the papers other than your name and ship's names?

- Not anything specific.

11.) You turned it in on the 28th?

- Nods yes.

12.) How was your work ethic out at sea? (specifically on projects)

- Pretty decent. Spent 2 hours a night on sea projects.

13.) How many projects from first sailing?

- 2 (9 projects total)

14.) Did you work with anyone on the ship?

- No.

15.) Have you told your family? (about the honor violation)

- Yes, they were not too happy but they told me to tell the truth.

16.) First interview we only knew about the first paper, tell us about the second.

- I thought he (Professor Taffet) already knew about the second. Didn't know he didn't check it.

17.) If you knew you could remediate the project, would you have done differently?

- Yes, I wouldn't have even done it and would have spent time on something else/ I wouldn't have wasted time on copying someone else.

18.) What have you learned from this/ how would you improve yourself from it?

- I learned a lot about myself and my values and how something can go wrong like this. I am not sure how to make myself better from this, but I would like to somehow do that.

19.) What is your definition of honor?

AR000086

## Interview 2: Professor

1.) Did he turn in all humanities projects or just that one?

-He turned in all of them, I didn't open the third one because the second one because he already failed because the second one was plagiarized.

2.) You caught it with Turnitin.com?

- Yeah, the original was quite unique so I might have caught it without Turnitin.com, but I can't be sure.

3.) Was it exactly the same?

– Yes except the name and like one line. ("18, sir." VS. "21, sir.")

4.) The project could have been remediated?

- Yes.

5.) Did you receive any contact from him?

- No, other than sending out the offense notice.

6.) Did not have him as a student.

7.) Not abnormally long, more mechanical less creative writing.

8.) Typical punishment?

– Automatic failure from humanities.

9.) When was it submitted?

- TENTATIVE (July 26th)(Incorrect date)

AR000087

done, he
cts together.

wi

Ha

## INTERVIEW 4: 2nd ACCUSED

    1.) Did you turn in all three parts of the project?
-    No, just two.

    2.) Why specifically MIDN ▮▮▮▮?
-    Just had them on hand.

    3.) Don't know where you got them?
-    Yeah.

    4.) Is there a reason why you didn't submit a third assignment?
-    I already knew I was already screwed by submitting two so I didn't see a point in submitting a third. I knew i cheated, they knew I cheated; it wouldn't really help if I added to the cheating.
-    I was scared. I already failed projects first sailing and I was scared not to submit anything because it never looks good.

    5.) What is your status here? (ERB, ARB, etc.)
-    ARB for deferred graduate and remediating projects.

    6.) When was the ERB?
-    Last Thursday, 8/31.

    7.) Have you talked to Professor Taffet?
-    No, not yet.

    8.) You did not have any other issues on projects?
-    No

    9.) Did you cheat on any other projects?

AR000088

- First ask why they did it, find the root of what caused it like their character, they were a flawed person, or if something made them do it.

30.) So kind of to turn the question back around, what made you do it, using your answers?

- I don't think I have flawed character, but sometimes people slip up I guess. Sometimes there are extenuating circumstances, or you are scared, or lazy.

AR000089



**UNITED STATES MERCHANT MARINE ACADEMY**
**KINGS POINT, NEW YORK**
**REGIMENTAL HONOR BOARD**

## REPORT OF FORMAL INVESTIGATION

To: Honor Review Board

From: Investigation Team

Subj: Investigation Results

Following is a report of the investigation regarding a possible honor violation by MIDN ___Sell_____. Class of __2019____.

All materials pertaining to the investigation of the above mentioned midshipman should be included in this report of investigation. All records of interviews (HB-6), copies of tests, and other pertinent documentation should be included in this report. This report will be used in the formal hearing process, so the materials included should be as complete and accurate as possible to ensure a fair process for the accused.

**Note; Before turning this Investigation Report in to the Honor Review Board, the Investigation Team should sign this report.**

Name: Anders n                          Title: RHBvcI

Signed: _____

Name: CONNOR COLE                       Title: CHBC

Signed: _____

Name: BRIANNA HALVORSEN                  Title: RHBvcI PO

Signed: _____

Name: _____               Title: _____

Signed: _____

Case No.:

HB-7
AR000090



# UNITED STATES MERCHANT MARINE ACADEMY
## KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

## REVIEW OF FORMAL INVESTIGATION

After holding an Honor Review Board on Date: 12 Sept 13 the board voted on the case of the accused MIDN  Sei , who is held in violation of the Honor Code by:

## LYING / CHEATING / STEALING

The results are as followed:

RHBC  WICHLESBERG, T.          Formal Hearing / Dismiss / Refer to Commandant

RHBVC  HAMM, C                 Formal Hearing / Dismiss / Refer to Commandant

RHBVCI  Anders N               Formal Hearing / Dismiss / Refer to Commandant

RHBVCE ZAKEEVSKI, D.           Formal Hearing / Dismiss / Refer to Commandant

RHBVCO Menott, S               Formal Hearing / Dismiss / Refer to Commandant

CHBC  CONNOR COLE              Formal Hearing / Dismiss / Refer to Commandant

RHBPO                          Formal Hearing / Dismiss / Refer to Commandant

RHBPO                          Formal Hearing / Dismiss / Refer to Commandant

RHBPO                          Formal Hearing / Dismiss / Refer to Commandant

RHBA                           Formal Hearing / Dismiss / Refer to Commandant

Case No.:

HB-8

AR000091



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### RESULT OF HONOR REVIEW BOARD

Date: 12 SEP 18

To: MIDN 1/C Benjamin Sell
From: Honor Review Board
Subj: Result of Honor Review Board

After examining the report from your Formal Counseling and your written statement, if you chose that right, the Honor Review Board has voted in majority to:

### Proceed with a Formal Hearing

- You are hereby advised to familiarize yourself with the Honor Board procedures, outlined in the Midshipman Honor Manual and SOP.
- Your Formal Hearing will be held in the Eliot M. See room in Wiley Hall on:
  - Date: **19 SEP 18**
  - Time: **1615**
- The uniform for this Honor Board is the seasonal dress uniform.
- Be prepared (with witnesses and statements) to present your case to the nine voting members of the jury.  All statements and the names of any witnesses must be presented to the RHBC prior to the Hearing.

### OR

### Dismiss your case.

### OR

### Refer your case to the Commandant's Department for disciplinary action.

Following receipt of this notification, your case will be dismissed as an honor board case and opened as a disciplinary case.  The Commandant's Department will review the investigation done by the Honor Board and review the facts of the matter, after which an appropriate punishment will be assigned.

If you have any further questions, please direct them to your Company Honor Board Chairman.  All decisions made by the Honor Board are pending the Superintendent's final decision.

Very Respectfully,

MIDN LCDR Tyler Wickesberg, 1/C
Regimental Honor Board Chairman

Case No.:

HB-9
AR000092



**UNITED STATES MERCHANT MARINE ACADEMY**
**KINGS POINT, NEW YORK**
**REGIMENTAL HONOR BOARD**

### FORMAL HEARING

Date:

To: Regimental Honor Board Chairman

From: MIDN 1/C Benjamin Sell

Subj: Option for Open Board Proceedings

The decision has been made to proceed with to a formal hearing. You now have the option to allow the members of the Regiment of Midshipmen to attend your hearing.

### I wish to have an open hearing

I have no issue with members of the Regiment attending my formal hearing. I understand that the final decision on the allowance of an open hearing is at the discretion of the RHBC. I acknowledge that certain members of the Regiment may be permitted to observe the hearing with or without my consent. I also understand that the final decision on whether the Hearing will be open or not will be made by the RHBC, with or without my consent.

### I do not wish to have an open hearing

I, for my own reasons, do not wish members of the Regiment to attend my formal hearing. I understand that certain members of the Regiment may be permitted to observe the hearing with or without my consent. I also understand that the final decision on whether the Hearing will be open or not will be made by the RHBC, with or without my consent.

Very Respectfully,

(sig.)

Case No.:

HB-12
AR000093



## UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

### JURORS AND WITNESSES

12 SEP 18

To: MIDN 1/C Benjamin Sell
From: Investigating Officer
Subj: Notification of Jurors and Witnesses

Below is the list of selected Jury members and Witnesses that have been called for your hearing on (date): **19 SEP 18** at (time): **1615**. Please review the selections and challenge any that you believe should not be a Juror for your trial.

### JUROR SELECTION:

| | |
|---|---|
| M/N CDR John Kelly, 1/C | Agree to Selection / Challenge Selection |
| M/N LCDR John Cline, 1/C | Agree to Selection / Challenge Selection |
| M/N LCDR Tyler Mowry, 1/C | Agree to Selection / Challenge Selection |
| M/N LCDR Maura Malone, 1/C | Agree to Selection / Challenge Selection |
| M/N LT Martin DuBois, 1/C | Agree to Selection / Challenge Selection |
| M/N LTJG Charlie McCary, 1/C | Agree to Selection / Challenge Selection |
| M/N LCDR Matthew Wiegner, 1/C | Agree to Selection / Challenge Selection |
| M/N LT Pearson Chesney, 1/C | Agree to Selection / Challenge Selection |
| M/N LT Raymond Gaspardo, 1/C | Agree to Selection / Challenge Selection |
| M/N Mattheus Macedo, 1/C  (alternate) | Agree to Selection / Challenge Selection |
| M/N Devan OHaro, 1/C (alternate) | Agree to Selection / Challenge Selection |
| M/N Vincent Policastro, 1/C (alternate) | Agree to Selection / Challenge Selection |
| M/N Ethan Pieper  1/C (alternate) | Agree to Selection / Challenge Selection |

Case No..

Page 1 of 2 Juror Selection

AR000094

**WITNESSES CALLED:**

_____     _____

_____     _____

_____     _____

**CHALLENGES:**

Please explain the reason behind any challenge. The Presiding Officer reserves the right to make the final decision regarding any challenged jury member.

_____

_____

_____

_____

_____

_____

Accused Name (Print) _____

Accused Signature _____

Date _____



# Character Reference

To: Regimental Honor Board

From: M/N Michael Montesclaros 1/C

Regarding: M/N Benjamin Sell 1/C

    M/N Sell and I have been friends since plebe year. He and I had an instant bond from the first time we met. We would go to every dinner together, hangout whenever we could, and even hangout during breaks. We learned quickly that we only lived an hour from each-other and were soon best friends. During these times, M/N Sell showed me kindness, loyalty and a friendship that I never would want to lose. He would always want to help me if I needed something whether that be help studying for my physics test to just giving me a razor for me to shave. His humor matched my humor and that is why we became such good friends. During sea year, M/N Sell diligently worked on his projects. However, we never worked on projects together because he was an engineer and I was a deck major. We would check back in with each other with a quick episode of anime after our work had been done. The news about Sell's honor board left me in shock and feeling scared for my fellow midshipman. I never thought he would resort to doing what he did and it is unlike him. I honestly could not believe it when I heard the news. I believe M/N Sell was in a tight spot and acted spontaneously and foolishly.

    I want to tell the board that M/N Sell has never been the one to lie, cheat, or steal. He is a midshipman of good character and although acted irresponsibly, deserves to be at this school and deserves to finish his senior year.

Very Respectfully,

M/N Michael Montesclaros 1/C

USMMA 2019



# Character Reference

To: Regimental Honor Board

From: MIDN Thomas Curry 1/C

Regarding: MIDN Benjamin Sell 1/C

During my time at the United States Merchant Marine Academy, I have had the opportunity to become friends with M/N Sell. He was one of the first friends I made while being here as we shared a section during our first trimester as Plebes. Since I have known M/N Sell, I have always seen him uphold the Academy Honor Code. He understood why the Honor Code was important and followed it to the best of his ability. For this reason, I was surprised to hear that he was going through this process. With that said, I believe that everyone makes mistakes and that this one mistake does not define who M/N Sell is. He currently understands the severity of his mistake and realizes that he has done something wrong, and I believe that he will do everything in his ability to fix his mistake.

M/N Sell is an honorable man who made a mistake. This mistake should be seen as a mistake and I believe that M/N Sell deserves the opportunity to gain back the trust that he broke.

Very Respectfully,

M/N Thomas Curry 1/C

USMMA 2019



# Character Reference

To: Regimental Honor Board

From: M/N Preston Cervantes 1/C

Regarding: M/N Benjamin Sell 1/C

     For the past 3 years I have had the pleasure of being M/N Benjamin Sell's roommate. During my tenure at Kings Point I have been able to get to know M/N Sell as a fellow classmate and as a friend. M/N Sell has always been a stand up Kings Pointer. During my time knowing him, I have always seen M/N Sell uphold the standard of the Academy's honor code. It is a shock to me as well as the rest of my class that M/N Sell is going through this process right now. Despite this mishap, I know that this is not who M/N Sell is as a person. He embodies what it means to be KP. I know that he will learn from this and I know that my faith will be easily restored in M/N Sell.

     I believe that while M/N Sell has made a severe mistake he is well deserving of earning back the trust of his classmates and the trust of the honor board.

Very Respectfully,

M/N Preston Cervantes 1/C

USMMA 2019

2019Anders, Nicholas

| | |
|---|---|
| **From:** | Taffet, Dr. Jeffrey <TaffetJ@USMMA.EDU> |
| **Sent:** | Wednesday, September 5, 2018 1:08 PM |
| **To:** | 2019Anders, Nicholas |
| **Subject:** | Re: Interview Follow-up |

MIDN Anders,

I needed to inform my dept. head of this new HB-1, and in looking at my email from last night realized I wrote that the submission date was July 18, 2017. It was obviously July 18, 2018.

J. Taffet

Jeffrey F. Taffet, Ph.D.
Professor of History
United States Merchant Marine Academy

From: Taffet, Dr. Jeffrey
Sent: Tuesday, September 4, 2018 9:52 PM
To: 2019Anders, Nicholas
Subject: Re: Interview Follow-up

MIDN Anders,

I reviewed MIDN Sell's submissions to turnitin.

First, I need to amend something I stated incorrectly. I really should have brought my computer, or at least better notes.

As you know, the Humanities Sea Project for MIDN Sell had three parts.

I was incorrect in stating that MIDN Sell submitted the 3rd assignment. He actually did not submit anything for the 3rd assignment.

I am sorry for getting that wrong. I don't know that it makes a difference to the case, but I should not have stated it without being sure.

Second, you asked the date of submission of MIDN Sell's assignments. Both his first and second assignments were submitted on July 18, 2017.

Third, you asked about MIDN Sell's 2nd assignment (the 1st assignment was the one reported on the HB-1).

I discovered just now that, like his 1st assignment, MIDN Sell also took the draft submitted by ███████████ in 2017, put his name on it, and submitted this as his own work. Once again he made one small change. ████████ had mentioned the name of his ship, the USNS Fall River, and MIDN Sell changed it to USNS Robert E. Peary. Other than that, it is the exact same thing.

I do not know if the honor board will determine that this constitutes a separate honor violation. If a student submitted two assignments over the course of a semester, and both had plagiarism, that would be two distinct instances of honor code violations. My instinct is that I should submit a second HB-1 for this honor code violation. Given that these were separate assignments, that seems like the logical thing to do.

1

AR000099

I assume you will want to talk about this second honor code violation with your staff. Please let me know how I should proceed.

I am attaching both MIDN Sell's and ▮▮▮▮▮▮▮ paper to this email. I am also attaching a copy of the syllabus that MIDN Sell received.

J. Taffet


Jeffrey F. Taffet, Ph.D.
Professor of History
United States Merchant Marine Academy


**From:** 2019Anders, Nicholas <Nicholas.Anders.2019@midshipman.usmma.edu>
**Sent:** Tuesday, September 4, 2018 4:12 PM
**To:** Taffet, Dr. Jeffrey
**Subject:** Interview Follow-up

Sir,

Could you please let me know the date of submission of the assignment for the humanities sea project?

In addition, could you provide details on the other two parts of the humanities project and if they were completed and submitted?

Very Respectfully,

MIDN LT Nicholas Anders
Regimental Honor Board Vice Chairman of Investigations
Marine Engineering
Class of 2019



AR000100

***** U N O F F I C I A L  C O P Y *****

Page 1 of 2

Name : Sell, Benjamin Arthur

Social Security No.: XXX-XX-9969
USMMA Address - P.O. Box: 0633    Split: A
Major:  Marine Engineering
SAT - Verbal: 0    Math: 0
ACTIVE

Date: 8/29/2018
Class Year: 2019

Admitted: 06/30/2015

Address:

Remarks:

### 4TH CLASS FIRST TERM AY 15-16

| | | | | |
|---|---|---|---|---|
| CHEM100 | General Chemistry | D | 400 | 4000 |
| CMDT100 | Social Responsibility | P | 000 | 0000 |
| ECME101 | Intro to Marine Engineering I | B | 350 | 10500 |
| LITR101 | Composition & Literature | C- | 300 | 5010 |
| MATH101 | Calculus I | C | 300 | 6000 |
| NAUT101 | Intro to Nautical Science | B | 300 | 9000 |
| PE&A110 | Basic Swimming | B+ | 100 | 3330 |

SEM. TOTAL. CRED 17.50 Q.P. 37640
QUALITY POINT AVERAGE: 216

### 4TH CLASS SECOND TERM AY 15-16

| | | | | |
|---|---|---|---|---|
| ECEE100 | Intro to Electrical Engineering | C+ | 350 | 8155 |
| ECMT100 | Engineering Graphics | A- | 100 | 3670 |
| ECMT111 | Engineering Shop I | B+ | 100 | 3330 |
| MATH120 | Calculus II | B- | 300 | 8010 |
| NASC100 | Introduction to Naval Science | B | 200 | 6000 |
| NAUT110 | Basic Firefighting and Safety | B | 200 | 6000 |
| PE&A120 | First Aid | B+ | 050 | 1665 |
| PE&A125 | Self Defense Tactics | A | 050 | 2000 |
| PHYS110 | Physics 1 | F | 300 | 0000 |

SEM. TOTAL. CRED 16.50 Q.P. 38830
QUALITY POINT AVERAGE: 235

### 4TH CLASS THIRD TERM AY 15-16

| | | | | |
|---|---|---|---|---|
| ECES100 | Statics | C | 300 | 6000 |
| ECME105 | Intro to Marine Engineering II | B+ | 350 | 11655 |
| ECMT112 | Engineering Shop II | B | 100 | 3000 |
| HIST100 | History of Sea Power | B- | 300 | 8010 |
| LITR220 | Technical & Professional Com | B+ | 200 | 6660 |
| MLOG120 | VSL PERS w/ Secty Duties | P | 000 | 0000 |
| PE&A130 | Aquatic Survival | A | 100 | 4000 |
| PHYS110 P | Physics 1 | C+ | 300 | 6990 |

SEM. TOTAL. CRED 16.50 Q.P. 46315
QUALITY POINT AVERAGE: 281

### 4TH CLASS SUMMER SESSION AY 15-16

| | | | | |
|---|---|---|---|---|
| PHYS120 | Physics 2 | B | 300 | 9000 |

SEM. TOTAL. CRED 3.00 Q.P. 9000
QUALITY POINT AVERAGE: 300

### 3RD CLASS FIRST TERM AY 16-17

| | | | | |
|---|---|---|---|---|
| ECES200 | Thermodynamics | C+ | 350 | 8155 |
| ECES210 | Dynamics | B+ | 200 | 6660 |
| LITR201 | Literature | A- | 300 | 11010 |

| | | | | |
|---|---|---|---|---|
| MATH220 | Differential Equations 1 | D | 300 | 3000 |
| NASC200 | Strategic Sealift | B+ | 200 | 6660 |
| WTRF201 | Safety of Life at Sea | B | 200 | 6000 |

SEM. TOTAL: CRED 15.50 Q.P. 41485
QUALITY POINT AVERAGE : 268

### 3RD CLASS SEA PERIOD AY 16-17

| | | | | |
|---|---|---|---|---|
| EPRJ210 | Machine Shop Sea Project | B- | 100 | 2670 |
| EPRJ230 | Marine Propulsion 1 Sea Proj | F | 200 | 0000 |
| EPRJ240 | Shipboard Sys 1 Sea Proj | B | 200 | 6000 |
| NPRJ245 | Sea Year Deck Ops for Engrs | F | 100 | 0000 |

SEM. TOTAL. CRED 6.00 Q.P. 8670
QUALITY POINT AVERAGE : 145

### 3RD CLASS THIRD TERM AY 16-17

| | | | | |
|---|---|---|---|---|
| CHEM200 | Chemistry for Marine Engrs | D+ | 300 | 3990 |
| ECEE200 | Electric Circuits | C- | 250 | 4175 |
| ECES220 | Intro to Materials Engr | C | 200 | 4000 |
| ECES221 | Intro to Matls Engr Lab | A | 050 | 2000 |
| ECES230 | Fluid Mechanics | C | 350 | 7000 |
| MATH210 | Probability & Statistics | F | 300 | 0000 |
| PE&A200 | Medical Care Provider | B- | 100 | 2670 |

SEM. TOTAL: CRED 15.50 Q.P. 23835
QUALITY POINT AVERAGE : 154

### 3RD CLASS SUMMER SESSION AY 16-17

| | | | | |
|---|---|---|---|---|
| MATH210 | Probability & Statistics | A | 300 | 12000 |

SEM. TOTAL: CRED 3.00 Q.P. 12000
QUALITY POINT AVERAGE : 400

### 2ND CLASS FIRST TERM AY 17-18

| | | | | |
|---|---|---|---|---|
| BUSN210 | Principles of Economics | B | 300 | 9000 |
| ECDL400 | Basic Tanker Ops-Danger Liq | B | 200 | 6000 |
| ECEE300 | Electric Machines | B | 350 | 10500 |
| ECES300 | Strength of Materials | B | 350 | 10500 |
| ECES310 | Heat Transfer | A | 300 | 12000 |
| NASC400 | Naval Leadership & Ethics | B- | 200 | 5340 |

SEM. TOTAL: CRED 17.00 Q.P. 53340
QUALITY POINT AVERAGE : 314

### 2ND CLASS SEA PERIOD AY 17-18

| | | | | |
|---|---|---|---|---|
| EPRJ230 | Marine Propulsion 1 Sea Proj | A- | 200 | 7340 |
| EPRJ310 | Maintenance Management | B | 100 | 3000 |
| EPRJ320 | Naval Arch Sea Project | C- | 100 | 1670 |
| EPRJ330 | Marine Propulson 2 Sea Proj | B | 250 | 7500 |

CONFIDENTIAL

AR000101

***** U | JFFICIALCOPY *****

**Name :**  Sell, Benjamin Arthur     **Social Security No.:**  XXX-XX-9969     **Date:**  8/29/2018

| | | | | |
|---|---|---|---|---|
| EPRJ335 | Refrigeration Sea Project | F | 100 | 0000 |
| EPRJ340 | *Shipboard Sys II Sea Proj* | F | 200 | 0000 |
| EPRJ345 | Electrical Engr Sea Proj | B- | 100 | 2670 |
| EPRJ350 | Marine Propulsion 3 | C- | 250 | 4175 |
| HPRJ300 | Humanities Sea Project | F | 100 | 0000 |
| INSP100 | Internship | B+ | 100 | 3330 |
| NPRJ245 | Sea Year Deck Ops for Engrs | C- | 100 | 1670 |
| NPRJ340 | Maritime Business | C | 100 | 2000 |

SEM. TOTAL: CRED 17.00 Q.P. 33355
QUALITY POINT AVERAGE : **196**

CUM. TOTAL: CRED.124.50  Q.P.  30467
CUMULATIVE QUAL. PT. AVG.  **2.447**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **END OF TRANSCRIPT** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AR000102



## U.S. MERCHANT MARINE ACADEMY
## KINGS POINT, NEW YORK

8/28/2018

DEFICENCIES FOR    Sell, Benjamin Arthur

| CLASS | OFFENSE DATE | REPORTED BY | REPORTED DEMERITS | APPROVED DEMERITS | AWARDED |
|-------|--------------|-------------|-------------------|-------------------|---------|
| **Academic Year    2019** | | | | | |
| II | 07/16/2018 | McDade, LCDR Stephen | 50 | 0 | UnProcess |
| ABSENT ACCOUNTABILITY CHECK | | | | | |
| | | TOTALS FOR:    2019 | 50 | 0 | |
| **Academic Year    2018** | | | | | |
| II | 08/21/2017 | Ilaria, Greg | 50 | 0 | Dismissed with Warning |
| DISREGARD OF ORDERS | | | | | |
| II | 08/21/2017 | Braut, Dan | 50 | 0 | Dismissed with Warning |
| DISREGARD OF ORDERS | | | | | |
| II | 09/01/2017 | Ilaria, Greg | 50 | 0 | Dismissed with Warning |
| DISREGARD OF ORDERS | | | | | |
| III | 09/12/2017 | MIDN Chad Cleary | 16 | 0 | Dismissed with Warning |
| Absent Regimental Muster or Activity | | | | | |
| III | 10/24/2017 | Max Maudsley | 26 | 0 | UnProcess |
| Absent from Watch | | | | | |
| II | 08/28/2018 | Treacy, Stephen | 50 | 0 | UnProcess |
| *Failure to comply with specific instructions of a Commissioned Officer. | | | | | |
| | | TOTALS FOR:    2018 | 242 | 0 | |
| **Academic Year    2017** | | | | | |
| II | 08/10/2017 | Lt Jaeger | 50 | 30 | Approved |
| ^Improper liberty procedure. | | | | | |
| II | 08/10/2017 | Lt Jaeger | 50 | 20 | Approved |
| ^Improper liberty procedure. | | | | | |
| | | TOTALS FOR:    2017 | 100 | 50 | |
| **Academic Year    2016** | | | | | |
| III | 08/16/2015 | Boyle, LT Fionna | 50 | 26 | Approved |
| Late to Watch (Over 10 Minutes) | | | | | |
| | | TOTALS FOR:    2016 | 50 | 26 | |
| **Grand** | | | 442 | 76 | |

CONFIDENTIAL

1



## UNITED STATES MERCHANT MARINE ACADEMY
## KINGS POINT, NEW YORK
## REGIMENTAL HONOR BOARD

### RESULT OF HONOR REVIEW BOARD

Date: 12 SEP 18

To: MIDN 1/C Benjamin Sell
From: Honor Review Board
Subj:  Result of Honor Review Board

After examining the report from your Formal Counseling and your written statement, if you chose that right, the Honor Review Board has voted in majority to:

#### Proceed with a Formal Hearing

- You are hereby advised to familiarize yourself with the Honor Board procedures, outlined in the Midshipman Honor Manual and SOP.
- Your Formal Hearing will be held in the Eliot M. See room in Wiley Hall on:
    o  Date: **19 SEP 18**
    o  Time: **1615**
- The uniform for this Honor Board is the seasonal dress uniform.
- Be prepared (with witnesses and statements) to present your case to the nine voting members of the jury.  All statements and the names of any witnesses must be presented to the RHBC prior to the Hearing.

#### OR

#### Dismiss your case.

#### OR

#### Refer your case to the Commandant's Department for disciplinary action.

Following receipt of this notification, your case will be dismissed as an honor board case and opened as a disciplinary case.  The Commandant's Department will review the investigation done by the Honor Board and review the facts of the matter, after which an appropriate punishment will be assigned.

If you have any further questions, please direct them to your Company Honor Board Chairman.  All decisions made by the Honor Board are pending the Superintendent's final decision.

Very Respectfully,

MIDN LCDR Tyler Wickesberg, 1/C
Regimental Honor Board Chairman

Case No.: 2018-9



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

**FORMAL HEARING**

Date:

To: Regimental Honor Board Chairman

From: MIDN 1/C Benjamin Sell

Subj:  Option for Open Board Proceedings

The decision has been made to proceed with to a formal hearing. You now have the option to allow the members of the Regiment of Midshipmen to attend your hearing.



**I wish to have an open hearing**

I have no issue with members of the Regiment attending my formal hearing. I understand that the final decision on the allowance of an open hearing is at the discretion of the RHBC.  I acknowledge that certain members of the Regiment may be permitted to observe the hearing with or without my consent. I also understand that the final decision on whether the Hearing will be open or not will be made by the RHBC, with or without my consent.

**I do not wish to have an open hearing**

I, for my own reasons, do not wish members of the Regiment to attend my formal hearing.  I understand that certain members of the Regiment may be permitted to observe the hearing with or without my consent.  I also understand that the final decision on whether the Hearing will be open or not will be made by the RHBC, with or without my consent.

Very Respectfully,

(sig.)

Case No. 2018-9

HB-12

AR000105



## UNITED STATES MERCHANT MARINE ACADEMY
## KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

### JURORS AND WITNESSES

12 SEP 18

To: MIDN 1/C Benjamin Sell
From: Investigating Officer
Subj: Notification of Jurors and Witnesses

Below is the list of selected Jury members and Witnesses that have been called for your hearing
on (date): **19 SEP 18** at (time): **1615.** Please review the selections and challenge any that you
believe should not be a Juror for your trial.

**JUROR SELECTION:**

| | |
|---|---|
| M/N CDR John Kelly, 1/C | Agree to Selection / Challenge Selection |
| M/N LCDR John Cline, 1/C | Agree to Selection / Challenge Selection |
| M/N LCDR Tyler Mowry, 1/C | Agree to Selection / Challenge Selection |
| M/N LCDR Maura Malone, 1/C | Agree to Selection / Challenge Selection |
| M/N LT Martin DuBois, 1/C | Agree to Selection / Challenge Selection |
| M/N LTJG Charlie McCary, 1/C | Agree to Selection / Challenge Selection |
| M/N LCDR Matthew Wiegner, 1/C | Agree to Selection / Challenge Selection |
| M/N LT Pearson Chesney, 1/C | Agree to Selection / Challenge Selection |
| M/N LT Raymond Gaspardo, 1/C | Agree to Selection / Challenge Selection |
| M/N Mattheus Macedo, 1/C (alternate) | Agree to Selection / Challenge Selection |
| M/N Devan OHaro, 1/C (alternate) | Agree to Selection / Challenge Selection |
| M/N Vincent Policastro, 1/C (alternate) | Agree to Selection / Challenge Selection |
| M/N Ethan Pieper, 1/C (alternate) | Agree to Selection / Challenge Selection |

Case No.: 2018-9

Page 1 of 2 Juror Selection

AR000106

**WITNESSES CALLED:**

_____        _____

_____        _____

_____        _____

**CHALLENGES:**

Please explain the reason behind any challenge. The Presiding Officer reserves the right to make the final decision regarding any challenged jury member.

_____

_____

_____

_____

_____

_____

Accused Name (Print) _Benjamin A. Sell_

Accused Signature _____

Date _9-18-18_

Case No.: 2018-7                                Page 2 of 2 Juror Selection

AR000107



**UNITED STATES MERCHANT MARINE ACADEMY**
**KINGS POINT, NEW YORK**
**REGIMENTAL HONOR BOARD**

### DELIBERATION RESULTS

Date: 25 SEP 18

A Formal Hearing was convened on (date) 19 SEP 18 for the accused, MIDN Benjamin Sell, 1/C.

The possible honor violation presented before the voting members was:

### LYING / CHEATING / STEALING

**The ballot results are as follows:**

| Guilty | N/A | Not Guilty | N/A |
|---|---|---|---|
| Separation | 0 | Retention | 9 |
| Setback | 0 | Remediation | 9 |

*In a case of "Not Guilty," a two-thirds majority (6/9) vote is required for determining the accused midshipman as guilty.
**In a case of admitted guilt, a two-thirds majority (6/9) is required for recommending separation.
***If the Presiding Officer fails to receive a two-thirds majority vote in either case, the accused will be considered "Not Guilty," or retained.

**Sanctions Imposed:**
(if the accused is found "Not Guilty," the case will be recommended to the Commandant or dismissed)

120-day Honor Remediation

Presiding Officer Name: MIDN LCDR Tyler Wickesberg, 1/C

x _(signature)_

Case No.: 2018-9

HB-14

AR000108

Humanities
Group B
M/n Benjamin Sell 2019-A

# Humanities Sea Year Project

# Group B

### M/N Benjamin Sell

### Class of 2019 A

### Professor Taffet

CONFIDENTIAL

AR000109

Humanities
Group B
M/n Benjamin Sell 2019-A

# Assignment 2: The Life of Others

READING:
Rachel Moran, *Paid For: My Journey Through Prostitution*

WRITING ASSIGNMENT

## *Crooked Paths Made Straight*

I woke up still writhing in pain - my knuckles still bloody from the night before. I didn't sleep much, but I couldn't lay around any longer. It was only 6 a.m. and I had to be at work at the port in an hour. I had no idea how I was going to get through the workday. My body was sore and in pain from head to toe. I walked to the fridge in hopes to get at least an egg or two for breakfast. My groaning was interrupted by the refrigerator compressor kicking in an out. I prayed it didn't break, because I had no idea how I would get another one. I opened the door to three eggs and a bottle of juice. It looks like I wouldn't be having breakfast. Maria and the kids needed it. I walked back to the bedroom and lightly jostled Maria awake.

"Get some groceries today sweetie, we need some more." I said gently.

"I just used all of the money we had left on Joseph and Angela's school fee's" she replied groggily.

"I got some more", as I pointed to the bed stand with my cut and crushed finger.

She acknowledged the money and shot a sharp glare at me. She kept telling me that I was going to get hurt, hurt bad, something I couldn't get back. I knew she didn't like me fighting. We've spent countless nights arguing about it, trying not to let the kids hear us, but in the end

AR000110

Humanities
Group B
M/n Benjamin Sell 2019-A

she knew we needed the money to put Joseph and Angela through school. The meager pay from my day-job at the port was simply not enough.

I walked out of the bedroom without saying a word—aching pains and now a growling stomach. As I opened the screened porch door, I walked outside and I heard Mark do the same next door. He cursed under his breath when his door wouldn't shut. I looked at him and chuckled, and held my smile until I made sure he saw me.

"What are you laughing at?!" he yelled at me.

"Nothing!" I shouted back. "It hurts me too much!"

Mark laughed and yelled "Oh boy do I need to make sure to make you laugh today then!" We convened at the end of the road as we waited for the Jeepney to pick us up.

"So did ya win?!" he excitedly asked as he punched me in the arm.

"I did." I groaned as I grabbed my arm. "But this one definitely took a toll on me... You mind helping me with some of the heavy things today?"

"Of course" Mark said. "Anything for GABRIEL…" Raising his voice and suddenly yelling into an imaginary microphone, "THE BEAST FROM THE EAST… LIGHTWEIGHT CHAMPION OF SUBIC BAY!" he exclaimed.

The Jeepney began to pull alongside as he finished his rant.

"Alright, keep it down now!" I said, as we hopped in the back. Mark was younger than me, but still a good friend. He was in his early 20's, just married, and worked at the port with me. I could tell the idea of me fighting at night excited him.

"So how'd you win?" he whispered quickly. "Knockout? Did you fight all of 10 rounds? How big was the guy? Did you..."

"I'll tell you later! Cut it out!" shutting him up. "Can we just ride to work in peace?"

AR000111

"Alright, fine," he said  We sat in silence for the rest of the ride as the Jeepney made its stops, picking up many other workers we see at the port. Soon the Jeepney became crowded to the point where everyone was shoulder to shoulder, like sardines in a can. Although, I love Jeepneys and how they represent Fillipino culture, today I hated how close people were packed next to me. The bumps from the road and the other people jolting into me gave me aches, only leading me to try and hide the pain. My swollen eye and bruised cheek bone only drew more curious looks. The Jeepney finally arrived at the entrance of Subic Bay Port, and a good portion of its passengers jumped off with me and headed to work

My boss, Joshua, told a few of us that the *USNS Robert E. Peary*, an American ship, would be arriving shortly to receive some fuel and that he needed us to tie it up. I stood in the back, but despite my best efforts, his peering eyes saw my face.

"Gabriel!" he called loudly. "Whad'ya do to yourself this time? You fighting again?" All eyes met mine, and I saw Mark's eyebrows raise with a concerned look.

"No Sir. I was just working on my leaking roof, and the ladder came out from underneath me and I fell." I replied quickly. I could tell that Mark seemed impressed by the impromptu lie.

"Well, get somebody to hold the ladder next time, you idiot!" Joshua coldly shot back. "You better be ok to work, I won't have any of it if you're injured, and slowing down work again."

"It won't be a problem Sir, I promise." I said, but internally my mind spun in circles. I just needed to get through the day. I knew I couldn't let Joshua see me in pain or slacking in any way.

The *USNS Robert E. Peary* was now just arriving. I could see the American's speaking on their radios on deck, and preparing their lines as they neared the dock. The rag-tag bunch

AR000112

joked, but moved efficiency as they quickly threw their lines to us. By all appearances, they seemed to be experienced sailors. Soon they were tied alongside the dock, and the fuel hose was being connected on their port stern. I was assigned the duty of watching the fuel hose at the manifold. All I had to do was sit next to the connection point and ensure that no fuel leaked during the transfer process. The job was a God-send to get me through the day. Fuel transfers to a ship usually take around eight hours, and would get me to near the end of the day. I wouldn't have to lift anything heavy, I just had to watch. A young American man worked with me as we connected the fuel hose. He looked younger than the rest of the crew, and had a strong, athletic build to him. His boss jokingly yelled at him, but it was still better than what I had received from my boss. The young man's job was to watch the hose for leaks as well. Somebody is liable to watch from both ends of the transfer, so it looked as though we would be watching it together.

   The two of us sat next to each other in silence for most of the transfer. I relaxed in the chair relieved to give my body a break, and happy that I got a safe job for the day. After some time passed, I occasionally saw my young American watch buddy steal some glances at me. Eventually his curiosity started up conversation in a strong American accent.

   "Well since we're gonna be sitting next to each other for a while, I may as well get your name." he said.

   "Gabriel" I replied cordially. "Yours?"

   "Aaron" he said, as we shook hands. A long pause occurred again.

   "How'd you get that big scar on your leg? ...If you don't mind me asking" Aaron curiously asked.

The scar was a long, glaring, and brazen scar. One that I had long stopped even thinking about but was now reminded of it. I thought about the question, and whether I wanted to answer

AR000113

Humanities
Group B
M/n Benjamin Sell 2019-A

truthfully or not. I looked at the young man with his curious eyes, and realized I had no reason to hide anything from him. It was simply just us two, on the stern of the ship, and he would be gone and back to America within a few days. He probably wouldn't think much of it, ever again. So I told him.

"I was stabbed." I said.

Aaron's eyes widened with surprise and excitement, much the same as Mark's would.

"Really?! Wow, what happened? How come?" he prodded.

"I was caught up with some bad people growing up. One day a man tried to rob me at knifepoint." I continued. "I told the robber, he messed with the wrong guy and we started fighting. I got the knife from him and then broke his arm, but he still managed to cut me there." I visibly showed him the motion of how I broke the man's arm, and then ran my finger down my scar.

"Wow that's crazy, and very brave of you." he said. "Where did you learn to break someone's arm like that?"

"I fight." I said. "I've learned from a very good mixed martial arts instructor for many years now. Those skills come in handy when you're getting robbed."

Aaron nodded.

"I have to fight for money occasionally… when I need it. But I'm getting too old for it now."

"I wrestled in high-school, and I learned a lot of self-defense from that but I know it's not nearly the same as your MMA fighting but it definitely helps." Aaron said. "I didn't like it though, and I couldn't imagine a life dependent upon fighting; that life's not for me."

I wasn't surprised that he wrestled, his build showed that. However, I was surprised at his perspective at such a young age. Many young men are ready to have mortal combat over a

AR000114

Humanities
Group B
M/n Benjamin Sell 2019-A

spilled beer, and here, this young American was one who looked like he had the potential to be a good fighter at that, but who wasn't eager for any of it. This conversation quieted again.

Aaron and I talked about many things throughout the rest of the day. We spoke about my wife and kids, and I also asked if he had any. He laughed and said "No, I'm only 20, but I have a girlfriend though". I was surprised at his age and told him he looked much older. Maybe it was his attempt at a beard that made him look older. However, he did say he had plans to marry his girlfriend and have kids one day. He spoke about being an engine cadet on the ship, and about how he's going to be graduating from a military academy soon. It seemed like the bustling young man had a bright future ahead of him. The conversation throughout the fuel transfer gave me a lot of time to reflect. I thought about my early years. I wish I had pursued my education more as a kid, and that I had not gotten wrapped up in silly fights. At one point, I thought that fighting was my future and my only way out. But, here was someone staring me right in the face that sharply contradicted that. The young man across from me looked as though he hadn't fought a soul in his whole life, yet he seemed to be doing alright for himself.

The conversation I had with Aaron changed something in me. I prayed that my kids could have a life like his. My kids, as well as myself, may not have the same opportunities that this young man did in America, but I know we can still overcome our difficulties. I needed to stop fighting. There had to be another way to make more money. Maria is right. "Oh boy, Maria is right" I thought to myself. The Beast from The East, the Lightweight Champion of Subic Bay had to end. I decided then. Meanwhile, it was nearing sunset as the fuel transfer was finally completed. Aaron and I made the disconnection together, still with thoughts running through my head. Before I left, I looked at Aaron and shook his hand.

"Thanks." I simply said.

AR000115

Humanities
Group B
M/n Benjamin Sell 2019-A

"Thanks, uh to you too." the young American unsurely said. He walked away on his ship, looking over his shoulder, with a confused look on his face, I just smiled and looked forward to going home to tell Maria; and optimistic of what the future would bring.

AR000116

# Assignment 2

*by* 

CONFIDENTIAL

Submission date: 26-Jul-2017 01:24 PM (UTC-0500)
Submission ID: 833305729
File name: Humanities-_Assignment_2.docx (25.61K)
Word count: 2062
Character count: 9008

AR000117



Humanities
Group B
M/n     2/c

# Humanities Sea Year Project

## Group B

M/n  2/c

Professor Taffet

1

AR000118

Humanities
Group B
M/n ████ , 2/C

# Assignment 2: The Life of Others

READING:
Rachel Moran. *Paid For: My Journey Through Prostitution*

WRITING ASSIGNMENT

## *Crooked Paths Made Straight*

I woke up still writhing in pain – my knuckles still bloody from the night before. I didn't sleep much, but I couldn't lay around any longer. It was only 6 a.m. and I had to be at work at the port in an hour. I had no idea how I was going to get through the workday. My body was sore and in pain from head to toe. I walked to the fridge in hopes to get at least an egg or two for breakfast. My groaning was interrupted by the refrigerator compressor kicking in an out. I prayed it didn't break, because I had no idea how I would get another one. I opened the door to three eggs and a bottle of juice. It looks like I wouldn't be having breakfast. Maria and the kids needed it. I walked back to the bedroom and lightly jostled Maria awake.

"Get some groceries today sweetie, we need some more" I said gently

"I just used all of the money we had left on Joseph and Angela's school fee's" she replied groggily.

"I got some more", as I pointed to the bed stand with my cut and crushed finger

She acknowledged the money and shot a sharp glare at me. She kept telling me that I was going to get hurt, hurt bad, something I couldn't get back. I knew she didn't like me fighting. We've spent countless nights arguing about it, trying not to let the kids hear us, but in the end

2

AR000119

Humanities
Group B
M/n        2/C

she knew we needed the money to put Joseph and Angela through school. The meager pay from

my day-job at the port was simply not enough.

I walked out of the bedroom without saying a word—aching pains and now a growling

stomach. As I opened the screened porch door, I walked outside and I heard Mark do the same

next door. He cursed under his breath when his door wouldn't shut. I looked at him and

chuckled and held my smile until I made sure he saw me.

"What are you laughing at?!" he yelled at me.

"Nothing!" I shouted back. "It hurts me too much!"

Mark laughed and yelled. Oh boy do I need to make sure to make you laugh today then!"

We convened at the end of the road as we waited for the Jeepney to pick us up.

"So did ya win?!" he excitedly asked as he punched me in the arm.

"I did," I groaned as I grabbed my arm. "But this one definitely took a toll on me. You

mind helping me with some of the heavy things today?"

Of course" Mark said. Anything for GABRIEL . . . Raising his voice and suddenly

yelling into an imaginary microphone. "THE BEAST FROM THE EAST . . . LIGHTWEIGHT

CHAMPION OF SUBIC BAY!" he exclaimed.

The Jeepney began to pull alongside as he finished his rant.

"Alright, keep it down now!" I said, as we hopped in the back. Mark was younger than

me, but still a good friend. He was in his early 20's, just married, and worked at the port with

me. I could tell the idea of me fighting at night excited him.

"So how'd you win?" he whispered quickly . . . Knockout? Did you fight all of 10 rounds?

How big was the guy? Did you

"I'll tell you later! Cut it out!" shutting him up. "Can we just ride to work in peace?'"

5

Humanities
Group B
M/█████████    2/C

"Alright, fine," he said. We sat in silence for the rest of the ride as the Jeepney made its stops, picking up many other workers we see at the port. Soon the Jeepney became crowded to the point where everyone was shoulder to shoulder, like sardines in a can. Although, I love Jeepneys and how they represent Fillipino culture, today I hated how close people were packed next to me. The bumps from the road and the other people jolting into me gave me aches, only leading me to try and hide the pain. My swollen eye and bruised cheek bone only drew more curious looks. The Jeepney finally arrived at the entrance of Subic Bay Port, and a good portion of its passengers jumped off with me and headed to work.

My boss, Joshua, told a few of us that the *USNS Fall River*, an American ship, would be arriving shortly to receive some fuel and that he needed us to tie it up. I stood in the back, but despite my best efforts, his peering eyes saw my face.

"Gabriel!" he called loudly. "Whad'ya do to yourself this time? You fighting again?!" All eyes met mine, and I saw Mark's eyebrows raise with a concerned look.

"No Sir, I was just working on my leaking roof, and the ladder came out from underneath me and I fell," I replied quickly. I could tell that Mark seemed impressed by the impromptu lie.

"Well, get somebody to hold the ladder next time, you idiot!" Joshua coldly shot back. "You better be ok to work, I won't have any of it if you're injured, and slowing down work again."

"It won't be a problem Sir, I promise," I said, but internally my mind spun in circles. I just needed to get through the day. I know I couldn't let Joshua see me in pain or slacking in any way.

The *USNS Fall River* was now just arriving. I could see the American's speaking on their radios on deck, and preparing their lines as they neared the dock. The rag-tag bunch joked, but

4

AR000121

Humanities
Group B
M/n                    2/C

moved efficiency as they quickly threw their lines to us. By all appearances, they seemed to be experienced sailors. Soon they were tied alongside the dock, and the fuel hose was being connected on their port stern. I was assigned the duty of watching the fuel hose at the manifold. All I had to do was sit next to the connection point and ensure that no fuel leaked during the transfer process. The job was a God-send to get me through the day. Fuel transfers to a ship usually take around eight hours, and would get me to near the end of the day. I wouldn't have to lift anything heavy. I just had to watch. A young American man worked with me as we connected the fuel hose. He looked younger than the rest of the crew, and had a strong, athletic build to him. His boss jokingly yelled at him, but it was still better than what I had received from my boss. The young man's job was to watch the hose for leaks as well. Somebody is liable to watch from both ends of the transfer so it looked as though we would be watching it together.

The two of us sat next to each other in silence for most of the transfer. I relaxed in the chair, relieved to give my body a break, and happy that I got a safe job for the day. After some time passed, I occasionally saw my young American watch buddy steal some glances at me. Eventually, his curiosity started up conversation in a strong American accent.

"Well since we're gonna be sitting next to each other for a while, I may as well get your name," he said.

"Gabriel," I replied cordially. "Yours?"

"Aaron," he said, as we shook hands. A long pause occurred again.

"How'd you get that big scar on your leg? ... If you don't mind me asking," Aaron curiously asked.

The scar was a long, glaring, and broken scar. One that I had long stopped even thinking about but was now reminded of it. I thought about the question, and whether I wanted to answer

5

Humanities
Group B
M/n ███ 2/C

truthfully or not. I looked at the young man with his curious eyes, and realized I had no reason to hide anything from him. It was simply just us two, on the stern of the ship, and he would be gone and back to America within a few days. He probably wouldn't think much of it, ever again. So I told him

"I was stabbed." I said.

Aaron's eyes widened with surprise and excitement, much the same as Mark's would

"Really?! Wow, what happened? How come?" he prodded.

'I was caught up with some bad people growing up. One day a man tried to rob me at knifepoint." I continued. "I told the robber, he messed with the wrong guy and we started fighting. I got the knife from him and then broke his arm, but he still managed to cut me there." I visibly showed him the motion of how I broke the man's arm, and then ran my finger down my scar

"Wow that's crazy, and very brave of you." he said. "Where did you learn to break someone's arm like that?"

"I fight." I said. "I've learned from a very good mixed martial arts instructor for many years now. Those skills come in handy when you're getting robbed."

Aaron nodded

"I have to fight for money occasionally when I need it. But I'm getting too old for it now"

"I wrestled in high-school, and I learned a lot of self-defense from that but I know it's not nearly the same as your MMA fighting but it definitely helps." Aaron said. "I didn't like it though, and I couldn't imagine a life dependent upon fighting; that life's not for me."

I wasn't surprised that he wrestled, his build showed that. However, I was surprised at his perspective at such a young age. Many young men are ready to have mortal combat over a

6

AR000123

Humanities
Group B
M/h          2/L

spilled beer, and here, this young American was one who looked like he had the potential to be a good fighter at that, but who wasn't eager for any of it. This conversation quieted again.

Aaron and I talked about many things throughout the rest of the day. We spoke about my wife and kids, and I also asked if he had any. He laughed and said "No, I'm only 20, but I have a girlfriend though" I was surprised at his age and told him he looked much older. Maybe it was his attempt at a beard that made him look older. However, he did say he had plans to marry his girlfriend and have kids one day. He spoke about being an engine cadet on the ship, and about how he's going to be graduating from a military academy soon. It seemed like the bustling young man had a bright future ahead of him. The conversation throughout the fuel transfer gave me a lot of time to reflect. I thought about my early years. I wish I had pursued my education more as a kid, and that I had not gotten wrapped up in silly fights. At one point, I thought that fighting was my future and my only way out. But here was someone staring me right in the face that sharply contradicted that. The young man across from me looked as though he hadn't fought a soul in his whole life, yet he seemed to be doing alright for himself.

The conversation I had with Aaron changed something in me. I prayed that my kids could have a life like his. My kids, as well as myself, may not have the same opportunities that this young man did in America, but I know we can still overcome our difficulties. I needed to stop fighting. There had to be another way to make more money. Maria is right. "Oh boy, Maria is right" I thought to myself. The Beast from the East, the Lightweight Champion of Subic Bay had to end. I decided then. Meanwhile, it was nearing sunset as the fuel transfer was finally completed. Aaron and I made the disconnection together, still with thoughts running through my head. Before I left, I looked at Aaron and shook his hand

"Thanks." I simply said

AR000124

Humanities
Group B
M/n ████████ 2/C

"Thanks, uh to you too." the young American unsurely said. He walked away on his ship looking over his shoulder, with a confused look on his face. I just smiled and looked forward to going home to tell Maria: and optimistic of what the future would bring.

8

## Assignment 2

/0                                        **Instructor**

AR000126

# Humanities Sea Year Project

# Group B

### M/N Benjamin Sell

### Class of 2019 A

### Professor Taffet



AR000127

Humanities
Group B
M/n Benjamin Sell 2019-A

# Assignment 1: The Life of the Mind

READINGS:
Sartre, *No Exit*
Kafka, *The Trial*
Tolstoy, *The Death of Ivan Ilyich*
Geertz, "Notes on a Balinese Cockfight"

WRITING ASSIGNMENT:

### *The Ironclad Law of Captain Henry*

It was May 30th, 1754 the year of our Lord, and I had never been more eager and ready to go. The Roanoke was set to sail at 0900 this morning. The ship and her crew, myself now included, were to travel to the New World, an adventure I was most excited for. I was only a cabin boy, but as it was my first voyage as a sailor, it was something I was more than happy to take. I landed the job only yesterday. I saw the Roanoke from a distance, with her large white sails and thick wooden hull pull into port only a few days ago, and wanted to take my chances at the great opportunity. I decided yesterday that I had to go and simply ask. I walked up to the gangway in hopes to meet the Captain, but nearly had my head bit off in the process.

"What'ya think you're doing boy?!" a man standing on the deck of the ship angrily shouted from a distance. "You should know not to just walk on a Mate's ship unannounced! I'll have your head if you move another step!"

2

AR000128

Frozen in my tracks, I stuttered, "Uh. um, I'm sorry Sir. I... I just wanted to see the Captain, I'm looking for work."

"Ahhh work ehh?" the Mate began. "Well why didn't you say so?! Hmmm... you look like you've never properly established your sea legs if me eyes don't fail me. You ever sailed on a ship before, lad?"

The man spoke with a thick brogue, and by all appearances, he seemed to me a seasoned sailor hailing from Ireland. I didn't like his rough, rather confrontational manner.

"No, err, I haven't... but I am very eager to learn and help!" I replied.

"Well very well, I'll take you to Captain Henry, and see what he thinks of ya. What's your name anyway, boy?"

"Johnathan Dates" I said as we began walking towards the stern of the ship. The whole ship was in a bustle, with people and barrels moving all across the deck. I drew some stares by some of the other sailors. We walked through a large wooden door near the after end of the ship, and entered what I presumed to be the Captain's quarters.

"Captain Henry, we got ourselves some fresh meat!" the Mate yelled.

The Captain was standing above his desk, and looked up from an old map that he was looking at. He peered at me from across the room for what seemed like minutes.

"Little young." he said shortly. "But he looks strong."

The older man was an Englishman of no doubts, but had what seemed like a permanent scowl on his face. He began to slowly walk around his desk and towards us.

3

AR000129

Humanities
Group B
M/n Benjamin Sell 2019-A

"What's your name, boy?" he asked.

"Johnathan Dates, Sir." I said again. I felt as though I was cattle being judged at an auction.

"How old are ye? he prodded.

"Twenty One, Sir." I replied, The Captain paused, trying to look stern, I'm sure of it.

"Well Mr. Dates…. it seems as though you're in luck. It appears our last cabin boy has run off upon us arriving in South Hampton, and it seems as though he will not be returning. That devil." The latter part he said beside himself.  "And the Roanoke needs a cabin boy. So out of necessity…. you're hired."

My eyes widened with glee. I was hired, I was going to be working on a ship.

"Thank you, thank you very much Captain. You won't be sorry!" I could hardly get the words out. I couldn't contain my excitement and I think it became apparent to the Captain.

"Go on, now!" he said. "Go home, get your affairs in order, and say goodbye to your Mum and Da. We sail tomorrow morning, sonny. Escort him off, Connor"

At that, I hurried out the door with excitement. I would be sailing for the New World on the Roanoke tomorrow.

I didn't need to do much at home. I said goodbye to my folks, just as Captain Henry said, and packed two pairs of clothes for the journey ahead. The following morning, I was walking through the port town towards the Roanoke. The ship lay in harbor in South Hampton, England along the docks. I heard from some of the longshoreman that the ship was setting sail towards the Caribbean islands. The ship would be transporting tobacco along the islands and then back to

4

Humanities
Group B
M/n Benjamin Sell 2019-A

England. Tobacco was a cash crop that drew a high price on the market. As I listened closely to the longshoreman yesterday evening, I also learned that Captain Henry was the owner of the Roanoke, and was becoming a rich man on the tobacco trade. I reached the gangway and closely looked for the watch man. Once I finally made eye-contact with him, I yelled "I'm Jonathan Dates, the new Cabin Boy, Sir. Permission to come aboard?"

"Of course!" the younger man said. "My name is Edward, but you can call me Ed, nice to meet you."

"Nice to meet you too." I said as we shook hands. I was relieved to find at least one kind person on board. "What's your job on board?" I asked.

"Oh, just a deck hand." Ed replied, "I pull ropes, tie ropes, rig masts, lift heavy things, all that business. I'm part of the lowly folk around here. And hey, John, just some advice, if you're the cabin boy I'd keep your head down, you don't want to be pissin' off the Mate or the Captain on this ship".

"Thank you, really." I responded. It seemed that he wasn't trying to scare me, but that he was genuinely trying to look out for me. I was starting to wonder what I was getting myself into.

Within an hour, the Roanoke let go of its ties and we set sail for the new world. My journey had begun. My duties onboard as a cabin boy mostly consisted of cooking and simply lending a hand. Routine at sea quickly became apparent. Work, eat, and sleep. That's how the Captain liked it. The days were exhausting. As the cabin boy, I was picked on a great deal by the sailors. They always grumbled for more food, something they knew I couldn't give them, but they would hate me nevertheless when I wouldn't "spot em'".

5

AR000131

Humanities
Group B
M/n Benjamin Sell 2019-A

The third night on the ship was one of my worst. As I was headed to bed, three or four sailors suddenly grabbed me, most of which I had never even said a word too. A sock was placed over my mouth to hush my screams as I was dragged down below to a dark, storage deck. I heard one of them say that tonight was my "sailor indoctrination". They hit me mercilessly with socks filled with grain. A bucket of water lay on the floor, in which they repeatedly forced my head into until my lungs screamed for air. Thoughts of such anger and confusion ran through my head. I thought I may even die that night. They laughed as they hit me, and just when I was bruised in every way I thought I could be, they ran off and left me. I crawled to my bed that night in tears, cursing as to why I ever joined the ship. The next morning, I said nothing, and my bruised face went unnoticed.

I soon learned, from an encounter with Jack Cunningham, the Quartermaster, that I could really do nothing other than take it. Jack was an overweight, and harsh man who I would always see stealing food from the stores. One day I witnessed Jack stealing food in the middle of the day, with the Captain nearby and I wrestled up the courage to say something. Not soon, after me accusing him, Jack had walked out of the galley and walked directly to the Captain and me. I figured he suspected our conversation.

"Jack," the Captain began, "Mr. Dates here has accused you of stealing food from the galley here, and me knowing you to be an honorable man, was wondering if you had anything to say for yourself?"

Jack's face of denial glared at me sternly, "Stealing?! I would do no such thing! What's this boy's aim here anyway? I bet he's the one stealing the food. He is the cabin boy; it would never

6

Humanities
Group B
M/n Benjamin Sell 2019-A

be easier. I see, he's just trying to make excuses for the shortage of food we got here on this ship, and trying to blame someone walking out of the galley at the proper time!"

Anger soared through my veins and with dumb courage I shot back "No Captain, Sir, I would never! Honest! I see Mr. Cunningham stuffing his face with food that's not his all the time!"

"Mind your manners, boy!" The Captain angrily interrupted me as he poked my chest with his big finger. "Don't be interrupting an officer of this ship, you hear me. Making accusations, of a man, saying he's stuffing his face, with absolutely no proof. You need to learn your place boy. How dare you disrespect the Quartermaster. I'll tell you what.... your food rations are cut for three days, and if I catch you sneaking a bite, I'll have you thrown overboard. Mark my words."

At that, he and the Quartermaster marched out of the galley. I simply sat there, as I sank into my chair, staring into the wall. Three days of no food.... I hadn't done anything wrong. Anger welled up inside of me and I struggled to fight back tears. Merely speaking was a grave mistake. One I wouldn't let happen again.

We finally arrived to our first island in the Caribbean, they called it Hispaniola. My excitement to get on land and off the stinking ship could not be contained. I looked upon the island as we docked as if it were heaven itself. Once the crew was given leave, I eagerly made my way towards the gangway until I was abruptly stopped by a giant arm, that swung against my chest.

"Whoa, where do you think you're going laddy?" said the Captain.

I stood there in fear, with our last conversation still in the back of my mind.

7

AR000133

Humanities
Group B
M/n Benjamin Sell 2019-A

"You see all of those barrels down there on the dock?", as he pointed. "Well those are filled with tobacco ya see, and they're not going to get up on the deck all by themselves right? And seeing as you're my fine cabin boy, and on thin ice with me, I would see to it that you get those barrels up on deck you hear?"

"Yes sir." I solemnly said.

"That's a good boy, and ya know cabin boys don't get off the ship right? I'm gonna need your muscles in every port."

This news was devastating. I wanted to explore, find my adventure, see the world, but little did I know that my world was becoming this hell of a ship.

The end of my time on the Roanoke however, came quicker than I thought. As we left the port of Havana, I was out on deck at night. Connor, the Mate I first met at the gangway of the ship came back to the ship extremely drunk and angrily yelling obscenities. I ignored him. I could see him out of the corner of my eye, watching me as I stood there "looking at the stars". The drunk mate was looking for trouble, I knew it. I turned to look at him.

Immediately he slurred, "Whatcha looking at, boy?"

I said nothing.

"Hey, I'm talking to ya Johnny boy! Now what are you looking at?"

"Nothing Sir, and I think you should go to bed, you're drunk.". I tried to say as calmly as I could.

At this point he was nearing close to me, and suddenly went into a drunken rage,

8

AR000134

Humanities
Group B
M/n Benjamin Sell 2019-A

"Don't tell me what to do!" Connor yelled, as he pulled a knife from his pocket and lunged at me at the same time. I quickly dodged the jab, but the knife landed itself into a rope that was securing many barrels of tobacco. In an instant, the rope snapped and sent barrels rolling across the deck. To make matters worse, the ship was experiencing heavy seas and the rolling of the ship was now sending barrels overboard. The ruckus now caught the attention of the crew who now scurried out on deck to contain the unsecured cargo. Before I could even begin helping, I could hear Connor yelling "It was the boy's fault! He cut the line, I saw him!"

Throughout this yelling, much of the barrels now were far gone. The knife, Connor was holding had now long disappeared and suddenly the Captain stood behind me. I was horrified.

"No! Not me! I didn't do anything!" I cried, but it was no use. I could see the Captain's anger boiling, his faced reddened. He had just lost so much money, and I knew he loved his money. Without hesitation I felt a hard slap across my face, sending me to the ground.

"Boy, this is the last straw." he said.

Immediately he walked towards me and without emotion grabbed my collar of my shirt. I was now being drug backwards across the deck. Fear struck me, and I didn't bother to fight. I was dragged to the end of the ship. I could see the crew silently follow the Captain, no one  dared to challenge him. I heard rumors of rogue Captains having absolute power on their ships, but I never imagined it would be anything like this. I had no trial, there was no law, no justice.

I screamed, "It wasn't me! It was the Mate, I SWEAR!" but my words fell on deaf ears.

We reached the stern of the ship and he picked me up on my feet. His grasp was strong and he looked me dead in the eyes with a glare. Without a final plead or word from me, I felt him grab me and begin to lift me over the small railing. I fell spiraling down, crashing into the cold

9

AR000135

water. I yelled for help, but nothing came. Soon I saw the twinkling lights of the Roanoke fade away. This was it. I was going to die.

I swam for what seemed like hours. My legs cramped, and waves were rushing over my head, with water filling my mouth. Just when I thought I couldn't go anymore, I heard something, the slapping of wood against the water. I suddenly had a surge of urgency to live. I followed my ears and the small light I had from the moon. The sound was getting closer. Before I knew it I came upon a barrel. My salvation. The lid had popped off and the barrel had the smell of tobacco. It came from the Roanoke. It must have been one of the barrels that rolled overboard. I clung to the barrel for dear life as it kept me afloat all night. Daylight broke, and soon I could see the shore, and I could hear people yelling.

10



Humanities
Group B
M/n _____ 2/C

# Humanities Sea Year Project

# Group B

M/n  2/c

### Professor Taffet



Humanities
Group B
M/n█████████, 2/C

# Assignment 1: The Life of the Mind

**READINGS:**
Sartre, *No Exit*
Kafka, *The Trial*
Tolstoy, *The Death of Ivan Ilyich*
Geertz, "Notes on a Balinese Cockfight"

**WRITING ASSIGNMENT:**

### The Ironclad Law of Captain Henry

It was May 30th, 1754 the year of our Lord, and I had never been more eager and ready to go. The Roanoke was set to sail at 0900 this morning. The ship and her crew, myself now included, were to travel to the New World, an adventure I was most excited for. I was only a cabin boy, but as it was my first voyage as a sailor, it was something I was more than happy to take. I landed the job only yesterday. I saw the Roanoke from a distance, with her large white sails and thick wooden hull pull into port only a few days ago, and wanted to take my chances at the great opportunity. I decided yesterday that I had to go and simply ask. I walked up to the gangway in hopes to meet the Captain, but nearly had my head bit off in the process.

"What'ya think you're doing boy?!" a man standing on the deck of the ship angrily shouted from a distance. "You should know not to just walk on a Mate's ship unannounced! I'll have your head if you move another step!"

Frozen in my tracks, I stuttered, "Uh, um, I'm sorry Sir. I... I just wanted to see the Captain, I'm looking for work."

2

AR000138

Humanities
Group B
M/n ████, 2/C

"Ahhh work ehh?" the Mate began. "Well why didn't you say so?! Hmmm... you look like you've never properly established your sea legs if me eyes don't fail me. You ever sailed on a ship before, lad?"

The man spoke with a thick brogue, and by all appearances, he seemed to me a seasoned sailor hailing from Ireland. I didn't like his rough, rather confrontational manner.

"No, err, I haven't... but I am very eager to learn and help!" I replied.

"Well very well, I'll take you to Captain Henry, and see what he thinks of ya. What's your name anyway, boy?"

"Johnathan Dates" I said as we began walking towards the stern of the ship. The whole ship was in a bustle, with people and barrels moving all across the deck. I drew some stares by some of the other sailors. We walked through a large wooden door near the after end of the ship, and entered what I presumed to be the Captain's quarters.

"Captain Henry, we got ourselves some fresh meat!" the Mate yelled.

The Captain was standing above his desk, and looked up from an old map that he was looking at. He peered at me from across the room for what seemed like minutes.

"Little young." he said shortly. "But he looks strong."

The older man was an Englishman of no doubts, but had what seemed like a permanent scowl on his face. He began to slowly walk around his desk and towards us.

"What's your name, boy?" he asked.

3

Humanities
Group B
M/n ████, 2/C

"Johnathan Dates, Sir." I said again. I felt as though I was cattle being judged at an auction.

"How old are ye? he prodded.

"Eighteen, Sir." I replied. The Captain paused, trying to look stern, I'm sure of it.

"Well Mr. Dates.... it seems as though you're in luck. It appears our last cabin boy has run off upon us arriving in South Hampton, and it seems as though he will not be returning. That devil." The latter part he said beside himself. "And the Roanoke needs a cabin boy. So out of necessity.... you're hired."

My eyes widened with glee. I was hired, I was going to be working on a ship.

"Thank you, thank you very much Captain. You won't be sorry!" I could hardly get the words out. I couldn't contain my excitement and I think it became apparent to the Captain.

"Go on, now!" he said, "Go home, get your affairs in order, and say goodbye to your Mum and Da. We sail tomorrow morning, sonny. Escort him off, Connor"

At that, I hurried out the door with excitement. I would be sailing for the New World on the Roanoke tomorrow.

I didn't need to do much at home. I said goodbye to my folks, just as Captain Henry said, and packed two pairs of clothes for the journey ahead. The following morning, I was walking through the port town towards the Roanoke. The ship lay in harbor in South Hampton, England along the docks. I heard from some of the longshoreman that the ship was setting sail towards the Caribbean islands. The ship would be transporting tobacco along the islands and then back to England. Tobacco was a cash crop that drew a high price on the market. As I listened closely to

4

the longshoreman yesterday evening, I also learned that Captain Henry was the owner of the Roanoke, and was becoming a rich man on the tobacco trade. I reached the gangway and closely looked for the watch man. Once I finally made eye-contact with him, I yelled "I'm Jonathan Dales, the new Cabin Boy, Sir. Permission to come aboard?"

"Of course!" the younger man said. "My name is Edward, but you can call me Ed, nice to meet you."

"Nice to meet you too." I said as we shook hands. I was relieved to find at least one kind person on board. "What's your job on board?" I asked.

"Oh, just a deck hand." Ed replied, "I pull ropes, tie ropes, rig masts, lift heavy things, all that business, I'm part of the lowly folk around here. And hey, John, just some advice, if you're the cabin boy I'd keep your head down, you don't want to be pissin' off the Mate or the Captain on this ship".

"Thank you, really." I responded. It seemed that he wasn't trying to scare me, but that he was genuinely trying to look out for me. I was starting to wonder what I was getting myself into.

Within an hour, the Roanoke let go of its ties and we set sail for the new world. My journey had begun. My duties onboard as a cabin boy mostly consisted of cooking and simply lending a hand. Routine at sea quickly became apparent. Work, eat, and sleep. That's how the Captain liked it. The days were exhausting. As the cabin boy, I was picked on a great deal by the sailors. They always grumbled for more food, something they knew I couldn't give them, but they would hate me nevertheless when I wouldn't "spot em'".

The third night on the ship was one of my worst. As I was headed to bed, three or four sailors suddenly grabbed me, most of which I had never even said a word too. A sock was placed

5

Humanities
Group B
M/n ▮▮▮▮, 2/C

over my mouth to hush my screams as I was dragged down below to a dark, storage deck. I heard one of them say that tonight was my "sailor indoctrination". They hit me mercilessly with socks filled with grain. A bucket of water lay on the floor, in which they repeatedly forced my head into until my lungs screamed for air. Thoughts of such anger and confusion ran through my head. I thought I may even die that night. They laughed as they hit me, and just when I was bruised in every way I thought I could be, they ran off and left me. I crawled to my bed that night in tears, cursing as to why I ever joined the ship. The next morning, I said nothing, and my bruised face went unnoticed.

I soon learned, from an encounter with Jack Cunningham, the Quartermaster, that I could really do nothing other than take it. Jack was an overweight, and harsh man who I would always see stealing food from the stores. One day I witnessed Jack stealing food in the middle of the day, with the Captain nearby and I wrestled up the courage to say something. Not soon, after me accusing him, Jack had walked out of the galley and walked directly to the Captain and me. I figured he suspected our conversation.

"Jack," the Captain began, "Mr. Dates here has accused you of stealing food from the galley here, and me knowing you to be an honorable man, was wondering if you had anything to say for yourself?"

Jack's face of denial glared at me sternly. "Stealing?! I would do no such thing! What's this boy's aim here anyway? I bet he's the one stealing the food. He is the cabin boy; it would never be easier. I see, he's just trying to make excuses for the shortage of food we got here on this ship, and trying to blame someone walking out of the galley at the proper time!"

6

Anger soared through my veins and with dumb courage I shot back "No Captain, Sir, I would never! Honest! I see Mr. Cunningham stuffing his face with food that's not his all the time!"

"Mind your manners, boy!" The Captain angrily interrupted me as he poked my chest with his big finger. "Don't be interrupting an officer of this ship, you hear me. Making accusations, of a man, saying he's stuffing his face, with absolutely no proof. You need to learn your place boy. How dare you disrespect the Quartermaster. I'll tell you what…. your food rations are cut for three days, and if I catch you sneaking a bite, I'll have you thrown overboard. Mark my words."

At that, he and the Quartermaster marched out of the galley. I simply sat there, as I sank into my chair, staring into the wall. Three days of no food…. I hadn't done anything wrong. Anger welled up inside of me and I struggled to fight back tears. Merely speaking was a grave mistake. One I wouldn't let happen again.

We finally arrived to our first island in the Caribbean, they called it Hispaniola. My excitement to get on land and off the stinking ship could not be contained. I looked upon the island as we docked as if it were heaven itself. Once the crew was given leave, I eagerly made my way towards the gangway until I was abruptly stopped by a giant arm, that swung against my chest.

"Whoa, where do you think you're going laddy?" said the Captain.

I stood there in fear, with our last conversation still in the back of my mind.

"You see all of those barrels down there on the dock?", as he pointed. "Well those are filled with tobacco ya see, and they're not going to get up on the deck all by themselves right?

And seeing as you're my fine cabin boy, and on thin ice with me, I would see to it that you get those barrels up on deck you hear?"

"Yes sir." I solemnly said.

"That's a good boy, and ya know cabin boys don't get off the ship right? I'm gonna need your muscles in every port."

This news was devastating. I wanted to explore, find my adventure, see the world, but little did I know that my world was becoming this hell of a ship.

The end of my time on the Roanoke however, came quicker than I thought. As we left the port of Havana, I was out on deck at night. Connor, the Mate I first met at the gangway of the ship came back to the ship extremely drunk and angrily yelling obscenities. I ignored him. I could see him out of the corner of my eye, watching me as I stood there "looking at the stars". The drunk mate was looking for trouble, I knew it. I turned to look at him.

Immediately he slurred. "Whatcha looking at, boy?"

I said nothing.

"Hey, I'm talking to ya Johnny boy! Now what are you looking at?"

"Nothing Sir, and I think you should go to bed, you're drunk.", I tried to say as calmly as I could.

At this point he was nearing close to me, and suddenly went into a drunken rage.

"Don't tell me what to do!" Connor yelled, as he pulled a knife from his pocket and lunged at me at the same time. I quickly dodged the jab, but the knife landed itself into a rope that was securing many barrels of tobacco. In an instant, the rope snapped and sent barrels rolling

8

across the deck. To make matters worse, the ship was experiencing heavy seas and the rolling of the ship was now sending barrels overboard. The ruckus now caught the attention of the crew who now scurried out on deck to contain the unsecured cargo. Before I could even begin helping, I could hear Connor yelling "It was the boy's fault! He cut the line, I saw him!"

Throughout this yelling, much of the barrels now were far gone. The knife, Connor was holding had now long disappeared and suddenly the Captain stood behind me. I was horrified.

"No! Not me! I didn't do anything!" I cried, but it was no use. I could see the Captain's anger boiling, his faced reddened. He had just lost so much money, and I knew he loved his money. Without hesitation I felt a hard slap across my face, sending me to the ground.

"Boy, this is the last straw," he said.

Immediately he walked towards me and without emotion grabbed my collar of my shirt I was now being drug backwards across the deck. Fear struck me, and I didn't bother to fight. I was dragged to the end of the ship. I could see the crew silently follow the Captain, no one dared to challenge him. I heard rumors of rogue Captains having absolute power on their ships, but I never imagined it would be anything like this. I had no trial, there was no law, no justice.

I screamed, "It wasn't me! It was the Mate, I SWEAR!" but my words fell on deaf ears.

We reached the stern of the ship and he picked me up on my feet. His grasp was strong and he looked me dead in the eyes with a glare. Without a final plead or word from me, I felt him grub me and begin to lift me over the small railing. I fell spiraling down, crashing into the cold water. I yelled for help, but nothing came. Soon I saw the twinkling lights of the Roanoke fade away. This was it. I was going to die.

9

Humanities
Group B
M/n ███████ 2/C

I swam for what seemed like hours. My legs cramped, and waves were rushing over my head, with water filling my mouth. Just when I thought I couldn't go anymore, I heard something, the slapping of wood against the water. I suddenly had a surge of urgency to live. I followed my ears and the small light I had from the moon. The sound was getting closer. Before, I knew it I came upon a barrel. My salvation. The lid had popped off and the barrel had the smell of tobacco. It came from the Roanoke. It must have been one of the barrels that rolled overboard. I clung to the barrel for dear life as it kept me afloat all night. Daylight broke, and soon I could see the shore, and I could hear people yelling.

10

AR000146



**SUPERINTENDENT**
**UNITED STATES MERCHANT MARINE ACADEMY**
KINGS POINT, NEW YORK 11024-1699

11 October 2018

From:   Superintendent

To:     MIDN Benjamin Sell, 2019

Subj:   Superintendent's Decision, Honor Board of 19 September 2018

Upon review of your case, I have decided to affirm the finding of the Honor Board that you are guilty of lying and direct the following actions:

1.  You will complete Term 1, Academic Year 2018-19 and then placed on leave of absence. You will depart the Academy for your leave of absence on a date determined by the Commandant of Midshipmen. You will not depart the Academy until any outstanding board actions are completed.

2.  You will return to the Academy and be set back to the Class of 2020 on a date to be determined jointly by the Academic Dean and Provost and Commandant of Midshipmen but no earlier than the start of Term 3, Academic Year 2018-19. You will resume your academic studies, to include remediation of failed sea projects, with a schedule as determined by the Academic Dean and Provost.

3.  During your leave of absence, you must complete 50 hours of community service, which must be documented in writing by the agencies or organizations you are supporting. You must also enroll in and pass a college-level ethics-based course prior to returning to the Academy. The course must be approved in advance by the Commandant or his designated representative.

4.  You will report your progress to the Commandant or his designated representative every thirty days during your leave of absence.

5.  Prior to joining the Class of 2020, you must take and pass a Physical Readiness Test as administered by the Commandant or his designated representative. You will receive instructions for the time and place of the PRT from the Commandant's Office.

6.  Upon return to the Academy, you will undergo an honor remediation program in accordance with Paragraph 312 of the June 2015 Honor Manual. The Commandant of Midshipmen will designate an officer to serve as your remediation officer. At the discretion of the Commandant, remediation activities may be assigned during your leave of absence. These activities will not shorten the 120-day remediation period once you return to the Academy.

7.  You will comply with all Remediation restrictions in Paragraph 312B of the June 2015 Honor Manual. You must request any exception in writing through your chain of command to the Commandant of Midshipmen, who will make a decision. The Commandant's decisions on exceptions to restriction are final. The Commandant may not delegate the authority to decide exceptions to restriction. You are ineligible for Sea Duty until your remediation is complete.

8. If the Commandant determines your remediation was unsuccessful you will be referred to an Executive Board or Superintendent's hearing and may be disenrolled from the Academy.

You may appeal this decision in accordance with Paragraph 310B of the June 2015 Honor Manual.

By copy of this memorandum, the Office of the Dean, Commandant of Midshipmen, and Registrar are directed to implement this decision immediately.

Sincerely,

James A. Helis
Rear Admiral, USMS
Superintendent

Encl:    Acknowledgement of Decision

cc:    Office of the Dean
        Commandant of Midshipmen
        Registrar

AR000148

UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK

From:      MIDN Benjamin Sell, 2019

To:        Superintendent

Subj:      Superintendent's Decision re:
           Honor Board of 19 September 2018

I am in receipt of the Superintendent's Decision of 11 October 2018 concerning the Honor Board which was convened to inquire into my conduct.

I acknowledge the terms set forth in that decision, my responsibilities to abide by them, and the consequences should I fail to do so.

I acknowledge that I have until the close of the business day after receipt of this notice to provide the Superintendent written notice of my intent to appeal this decision. I acknowledge that I must submit my appeal in writing no later than seven days after receipt of this decision.

Midshipman Benjamin Sell                                    Date

This acknowledgement shall be hand delivered to the Office of the Superintendent within 24 hours.

AR000149

MPO – PALMER HALL

**U.S. MERCHANT MARINE ACADEMY**
*Office of Midshipman Personnel*
*KINGS POINT NY 11024-9801*

**FOURTH CLASS QUESTIONNAIRE:** TYPE or PRINT [very neatly], using **BLACK INK ONLY**, all information on this form. Do not abbreviate. **You must COMPLETE ALL QUESTIONS.** After completion, return questionnaire in the postage paid envelope marked MPO-Palmer Hall which is provided. Do not include forms from other departments in MPO return envelope.

†**PRINT YOUR FULL NAME AS RECORDED ON BIRTH CERTIFICATE**††     | †Sex | Social Security Number

Birth Date (MM/DD/YYYY) | †Place of Birth (City-State-Country) | †Height (Ft-In.) | †Weight (Pounds) | †Hair Color | †Eye Color

†Area Code - Home Number and/or Cell Number

Father's First & Last Name | †Mother's First & Last Name

Father's Address, City-State-Zip Code (if same as your print name) | †Mother's Address, City-State-Zip Code (if same as your print name)

Area Code & Home and/or Cell Telephone Number | †Area Code & Home and/or Cell Telephone Number

Father's Occupation & (Area Code) Office Telephone Number | †Mother's Occupation & (Area Code) Office Telephone Number

Father's Home email address | †Mother's Home email Address

Name of High School you attended - City & State | †Dates attended (MM/YYYY to MM/YYYY)

Name of College you attended - City & State | †Dates attended (MM/YYYY to MM/YYYY)

List school activities you participated in (Teams, Clubs, etc.)

Work Experience (Position's held) | †Military Experience or Training

Person to contact in an emergency if Parents are not available (Name - Relationship - Phone Number)

List any Relatives who attended the USMMA (Name - Relationship - Year)

List any Musical Instruments you play | †Would you like to be in the Regimental Band?

If you are 18 years of age, it is MANDATORY that you register with the Selective Service. You can register on the Internet at WWW.SSS.GOV or apply at your local Post Office.

I authorize the United States Merchant Marine Academy to release any/all information to the Uniformed Services when required.

Today's Date | †Signature

**AR000150**



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK 11024

Midshipman Benjamin Sell                                              June 29, 2017
Class of 2019
Marine Engineering

TERMS OF PROBATION

MIDN Sell,

After a careful review of your academic record, I have accepted the recommendation of the
Interim Academic Dean and the Academic Review Board that you be put on Continued
Academic Probation status. The terms of your probation are as follows:

You will be on Academic Probation status through the end of the second sailing period: No Fs
and QPA/CQPA > 2.00. Any deficiency status will constitute a violation of terms, and will result
in your being Referred for Disenrollment.

Failure to meet the conditions set herein may result in your disenrollment. Disenrollment will
jeopardize your degree, your license, and your ability to fulfill your service obligations,
potentially subjecting you to efforts by the federal government to recoup the cost of your
education.

I therefore urge you to dedicate yourself to successful completion of the USMMA program.

JAMES A. HELIS
Rear Admiral, USMS
Superintendent

cc: D, R, C, MPO, ADH, UDWF

I, hereby, acknowledge and understand the probationary terms set forth in this letter.

Signed: _____    Date: 7/14/17

AR000151



SUPERINTENDENT
UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK 11024-1699

Midshipman Benjamin Sell                                    June 29, 2017
Class of 2019
Marine Engineering

## TERMS OF PROBATION

MIDN Sell:

After a careful review of your academic record, I have accepted the recommendation of the
Interim Academic Dean and the Academic Review Board that you be put on Continued
Academic Probation status. The terms of your probation are as follows:

You will be on Academic Probation status through the end of the second sailing period: No Fs
and QPA/CQPA ≥ 2.00. Any deficiency status will constitute a violation of terms, and will result
in your being Referred for Disenrollment.

Failure to meet the conditions set herein may result in your disenrollment. Disenrollment will
jeopardize your degree, your license, and your ability to fulfill your service obligations,
potentially subjecting you to efforts by the federal government to recoup the cost of your
education.

I therefore urge you to dedicate yourself to successful completion of the USMMA program.


JAMES A. HELIS
Rear Admiral, USMS
Superintendent


cc: DR, CMPO, ADH, HDWL

I, hereby, acknowledge and understand the probationary terms set forth in this letter


Signed: _____                    Date: _____


AR000152

U S  Department
of Transportation
Maritime
Administration

## NOMINATION FOR THE UNITED STATES MERCHANT MARINE ACADEMY

### INSTRUCTIONS

After completion by the nominating authority the original and all copies of
this form are to be returned to the Director of Admissions, U S  Merchant
Marine Academy, where, after acceptance, copies will be distributed as noted
at bottom of this form

The copy marked "Congressional Copy" will be returned to the
nominating authority

**Date**    01-23-2015

RETURN TO

Director of Admissions
U S Merchant Marine Academy
Kings Point, New York 11024

### NAME OF CANDIDATE (Last name, First name, Middle name)

Safi Benjamin A

### ADDRESS

### TELEPHONE NUMBER

TEMPORARY ADDRESS (if any)

DATE OF BIRTH (Month, Day, and Year)

█████

### SOCIAL SECURITY NUMBER

XXX-XX-

### FOR ACADEMY USE ONLY

Congressional Code

Resident Code

I Representative James Clyburn, hereby nominate the above named individual as a candidate for admission to the United States
Merchant Marine Academy as Midshipman

The nominee is not a resident of my constituency, and, after due inquiry, I believe that he/she is in every respect qualified for
appointment

I understand that the Superintendent, United States Merchant Marine Academy will be informed of my candidate's nomination, and that I am his/her
sponsor  The Superintendent will furnish the candidate with all necessary instructions regarding the competitive and physical examination

I understand that the application records created for my candidate are subject to the Privacy Act of 1974 (5 U S C 552a)
However, the fact of this nomination and this nomination form is considered to be public information by my office

FULL NAME OF NOMINATING AUTHORITY AND CONGRESSTIONAL DISTRICT

Representative James Clyburn

District  6 - Representative James Clyburn

Nomination Entered By

Campbell Donna

U S Department
of Transportation
Maritime
Administration

**NOMINATION FOR THE UNITED STATES MERCHANT MARINE ACADEMY**

PRIVACY ACT NOTICE
(To accompany MA Form 423)

In accordance with 5 USC 552a(e)(3), the following statement is provided in connection with your submission of personal information to the Maritime Administration.

1  **AUTHORITY** for solicitation of the Information: 46 USC 1295b

2. **PRINCIPAL PURPOSES(S)** for which information is intended to be used: The name and social security number are to be used in administering the nomination of applicants to the U.S. Merchant Marine Academy

3. **ROUTINE USES** which may be made of this information: The social Security number is a basic identifier  This information will be maintained by the Maritime Administration in official records and will not be divulged without your written authorization to anyone other than persons involved in evaluating applicants for the U.S. Merchant Marine Academy (e.g., members of Congress and their staffs, other designated nominating officials, officials of the U.S. Merchant Marine Academy, DOD, U.S. Coast Guard and NOAA).

4  Whether or not **DISCLOSURE** of such information is mandatory or voluntary (required by law or optional) and the effects on the individual, if any, of not providing all or any part of the requested information  Disclosure of the information is voluntary, but failure to provide requested information may adversely affect a candidate's acceptance to the U S  Merchant Marine Academy:

AR000154

U.S. Department
of Transportation

Maritime
Administration

**U.S. Merchant Marine Academy**
300 Steamboat Road, Kings Point, New York 11024-1699

## CANDIDATE APPLICATION — PART 2

APPLICANT NAME  Last, First, Middle, and Suffix (Jr. Sr. II, III, etc.)                              STATE OF RESIDENCE

| SOCIAL SECURITY NO. | NOMINATION SOURCE(S) |
|---|---|

IDENTIFY ONLY THOSE ACTIVITIES IN WHICH YOU PARTICIPATED FROM GRADE 9 TO PRESENT.

(YOU MAY CHOOSE TO ATTACH A DETAILED ACTIVITY/SPORTS RESUME IN PLACE OF FILLING OUT THIS SECTION)

NON-ATHLETIC ACTIVITIES.

| Activity | Number in Award | Office Held | Year |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

SCHOOL ATHLETIC ACTIVITIES.

| Activity | Number in Award | Position | Special Achievement | Year |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

KP 2-68 (JANUARY 2012.                    **Continued on Reverse**

AR000155

BIOGRAPHICAL SKETCH/ESSAY:

I understand that if I am appointed, after reporting to the Academy to begin the program, I must sign a *Service Obligation Contract* as set forth in the current catalog.

I certify that the statements or dates, place of birth, citizenship, and all other information contained on Parts I and II of this application, are true and correct to the best of my knowledge. Knowingly providing false information may result in forfeiture of appointment to the Academy.

| | Date |
|---|---|
| | |

**I certify that the statements of dates, place of birth, citizenship, and all other information contained on Parts I and II of this application, are true and correct to the best of my knowledge**

I hereby consent to my son, daughter or ward's appointment as a Midshipman to the U.S. Merchant Marine Academy, should he/she become entitled to such appointment. I am aware and in agreement with their mandatory obligation to serve in the U.S. Merchant Marine and to seek and accept, if tendered, a commission in an armed force reserve unit as set forth in the current catalog.

**I certify that the statements of dates, place of birth, citizenship, and all other information contained on Parts I and II of this application, are true and correct to the best of my knowledge. Knowingly providing false information may result in forfeiture of appointment to the Academy**

| | Date |
|---|---|
| | |

## APPLICATION DEADLINE IS MARCH 1

**An Appointment will not be considered unless Parts 1 and J and the Biographical Essay described above are also completed and received by the above deadline**

## Privacy Act Statement

In accordance with 5 USC 552a(e)(3), the following information is provided to you when supplying personal information to the Maritime Administration.

Authority which authorized the solicitation of the information: 46 App. USC 1295b and 1295a

Principal purpose(s) for which information is intended to be used: The information is used to evaluate each applicant for an appointment to the U.S. Merchant Marine Academy.

The routine uses which may be made of the information: As background information on applicants for the selection process. To contact the applicant. The social security number is a basic identifier.

Whether or not disclosure of such information is mandatory or voluntary (required by law or optional) and the effects on the individual if any, of not providing all or any part of the requested information. Disclosure of the information is voluntary, but the applicant will not be considered further if information is not provided

KP 2-66 JANUARY 2012

AR000156

# Benjamin Sell's USMMA Biography

U.S. Merchant Marine Academy

300 Steamboat Road

Kings Point, NY 11024.

United States

Fax: 516-773-5390

AR000157

My name is Benjamin Sell and I want to attend the US Merchant Marine Academy. I was born ████████████████████████. I want to attend this school for 3 main reasons; I believe it will help me grow and create a good future for myself, it has a strong marine engineering presence, and it will help me diversify myself with culture from around the world.

I come from a long line of servicemen. My father, uncles, and grandfather and great grandfather have all served in the military. My grandfather served in the Air Force during the Vietnam War and my father was a drill sergeant, recruiter and a paratrooper. During his service he served in Desert Storm, Korea, Berlin and Haiti.

I am a Boy Scout in Troop 8 at Incarnation Lutheran Church where I have earned countless achievements. I earned the rank of Eagle Scout in February 2015. It is the highest rank in scouting. I started out in the cub scouts in 2008. In 2009 I achieved my arrow of light, advancing me to a Boy Scout. I have participated in Wreath Across America twice and an emergency preparedness drill at McEntire AFB. I have 23 merit badges, including aviation, engineering, communications, and automotive maintenance. I renovated a building for a church to use for charity fundraising as my Eagle Scout project. Through Scouts I have incorporated the scout law (trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent) into my life.

I am thankful for having access to my father's boat as well as somewhere to use it. I appreciate being able to go out onto the water most anytime. My primary curriculum preference is engineering, but I would like to specialize in either industrial, electrical, or computer engineering. I have prepared for this by choosing my high school classes to center around technology, engineering, and math. I will be a Project Lead The Way (PLTW) completer this

year, having taken 5 pre-engineering courses. I will also be completing AP BC Calculus, the highest level math you can take in high school.

I hope to get accepted to the merchant marine academy because it is challenging, and more diverse than traditional schooling, and I hope that it will take me places that I have never been. After my schooling is finished, I believe that being an Eagle Scout and USMMA alumni will hold great merit and distinction and give me a competitive edge in life.

# U.S. Merchant Marine Academy

## CANDIDATE APPLICATION

Report Date:    12/2/2014

**Personal Information**

| | | | | |
|---|---|---|---|---|
| Applicant Name: | Benjamin Sell | | SSN: XXX-XX- | D.O.B: |
| Gender: | Male | Race: Caucasian | Hispanic: No | Phone: |
| Home Address: | | | | Birth Country USA |
| Mailing Address: | | | | is a US Citizen    Yes |
| Citizen of: AA | | Email: | | Height: 5 ft 7 in. |
| Weight | 175 | Have you ever applied to the USMMA in past years? | No | If "Yes", When? |

**Parent / Guardian Information**

| Relationship | Name | Address | Home Phone |
|---|---|---|---|
| Father | | | |

**High School Information**

| | | | |
|---|---|---|---|
| High School: | lower richland high school | E.T.S Code: 411070 | G.P.A: 3.5 |
| Rank: 33 | OF 204 | Graduation Year: 2015 | |

|  | S.A.T | | A.C.T | |
|---|---|---|---|---|
| | Math. | Verbal. | Math. | Verbal: |

Name of college and/or Prep School attended after high school graduation

| College: | N | School Name: | State: |
|---|---|---|---|

**Activities**

| Activity | High School | Varsity Letter | USMMA |
|---|---|---|---|
| Sports Band | Yes | 1 Yr | No |

**Moment**

| | |
|---|---|
| Is your visual acuity 20/400 or better? | Yes |
| Is correctable to 20/20? | No |
| Do you have problems with your color vision? | No |
| Do you have a history of asthma? | No |
| Trigonometry (at least 1 Semester)? | Yes |
| Chemistry (with Lab)? | Yes |
| Physics (with Lab)? | Yes |
| If you are currently in the Military (Guard, Reserve or Active Duty), what is your pay grade? | NA |

1

AR000160

**Sources**

Who was your Initail Source of Information about the
U.S. Merchant Marine Academy?                    Relative

The Admissions Office may disclose information regarding your candidacy to:

Nominating Authority                    No

Parents/Guardian/Other Relative          Yes

School Counselor/Principal/Other School Official    Yes    school counselor

Other

Applying for class of:        2019

**Share Maritime info with:**

Father

**Industry**

| | |
|---|---|
| Have you served as Captain of an organized athletic team? | Yes |
| Have you served in a High School Student Government position? | Yes |
| Have you actively participated in Community Organizations such as Religious, Scouts, 4H, Sea Cadets, Coast Guard Auxiliary, Civil Air Patrol, ect.? | Yes |
| Have you received special recognition such as Eagle Scout or Gold Award, Boys' State or Girls' State, Billy Mitchell or Amelia Earhardt Award, etc.? | Yes |
| Have you worked at least 10 hours per week during the school year? | Yes |
| Have you ever been rejected for any Branch of the Armed Forces, ROTC, or a service Academy? | No |

**Reason:**

Have you ever been arrested, indicted, or convicted of any violation of civil or
military law?                                          No

**Reason:**

2

**U.S. Department of Transportation**
**Maritime Administration**

**SERVICE OBLIGATION CONTRACT FOR UNITED STATES MERCHANT MARINE ACADEMY**

**Authority: P.L. 96-453**

NAME: *(Last, First, MI)*

Sell, Benjamin, Arthur

SOCIAL SECURITY NUMBER

DATE OF BIRTH

I hereby accept appointment as a cadet in the United States Merchant Marine Academy (Academy) for the class entering in July__2015_____.

A.    **ACKNOWLEDGEMENTS**
    (1)  I acknowledge that the Maritime Administration is hereby conditionally appointing me a cadet pending the approval of my entry as a midshipman into the United States Naval Reserve. My conditional appointment may be immediately revoked if I fail in any respect to meet the requirements established for appointment as a midshipman in the United States Naval Reserve.
    (2)  I acknowledge that a prerequisite for continuance of my cadet status at the Academy is enrollment and service as a midshipman in the United States Naval Reserve or an approved substitute reserve component.
    (3)  Unless entered into an approved substitute reserve component, I acknowledge that loss of Midshipman status at any time and for any reason constitutes cause for immediate separation from the Academy.

B.    **SERVICE OBLIGATION COMMITMENT**
In consideration for appointment as a cadet to the Academy, I hereby commit to:
    (1)  complete the course of instruction at the Academy;
    (2)  fulfill the requirements for a U.S. Coast Guard (USCG) Merchant Mariner Credential (MMC) with an unlimited license endorsement as an officer in the merchant marine of the United States on or before the date of my graduation from the Academy;
    (3)  maintain a valid U.S. Coast Guard (USCG) Merchant Mariner Credential (MMC) with an unlimited license endorsement as an officer in the merchant marine of the United States for at least six (6) years following the date of my graduation from the Academy, accompanied by the appropriate national and international endorsements and certifications as required by the USCG for service aboard vessels on domestic and international voyages to include but not be limited to a Standards of Training, Certification, and Watchkeeping (STCW) endorsement as an officer in charge of a navigation (OICNW) or engineering (OICEW) watch and a valid Transportation Worker Identification Credential (TWIC);
    (4)  apply for an appointment as, to accept if tendered an appointment as, and to participate as a commissioned officer in the United States Naval Reserve (including the Merchant Marine Reserve, United States Naval Reserve), the USCG Reserve, or any other Reserve component of an armed force of the United States, prior to my graduation from the Academy; and to maintain the commission for six (6) years.
    (5)  serve the foreign and domestic commerce and the national defense of the United States for at least five (5) years following the date of graduation from the Academy —
        (a)  as a merchant marine officer serving on vessels documented under the laws of the United States or on vessels owned and operated by the United States or by any State or territory of the United States;
        (b)  as an employee in a United States maritime-related industry, profession, or marine science (as determined by the Maritime Administration), if the Maritime Administration determines that service under clause (a) is not available to me;
        (c)  as a commissioned officer on active duty in an armed force of the United States, as a commissioned officer in the National Oceanic and Atmospheric Administration (NOAA), or other maritime-related employment with the Federal Government which serves the national security interests of the United States, as determined by the Secretary; or
        (d)  by combining the services specified in clauses (a), (b) and (c); and
    (6)  submit an annual service obligation compliance report via the Maritime Service Compliance System (MSCS) https://mscs.marad.dot.gov between January 1 and March 1 of each year following the year of graduation, until all components of my service obligation are fulfilled and have been so reported. A hard copy MA-930 Annual Service Obligation Compliance Report form may also be mailed to the Maritime Administration, Office of Maritime Workforce Development (MAR-740), 1200 New Jersey Ave SE, Washington DC 20590. If I am granted a deferment of the service obligation to engage in a graduate course of study, as described below, reports must be submitted during the period of graduate course study, and then annually for the period following such deferment.
    (7)  as an alternative to fulfilling the obligations enumerated in items 3, 4 and 5 above, I may instead serve for the five year period following graduation as a commissioned officer on active duty in an armed force of the United States, or as a commissioned officer of the NOAA or the United States Public Health Service (USPHS).

**BREACH OF SERVICE OBLIGATION CONTRACT**
    (1)  Failure to complete any of the obligations outlined above constitutes a breach of this agreement, unless I am excused from performance of subsections 3, 4 and 5 of Section B by fully performing the obligation as set out in Section B, subsection 7.
    (2)  Whether at the Academy or at sea, at any time subsequent to the beginning date of my seventh (7th) trimester, should I fail to complete the course of instruction at the Academy, as prescribed in Section B, Paragraph 1 above, I understand and agree that:
        (a)  I may be ordered by the Secretary of Defense to active duty in one of the armed forces of the United States to serve for a period of time not to exceed two (2) years. The determination as to whether I have failed to complete the course of instruction shall be made by the Maritime Administration; or

MA FORM-889 (Rev. 8-2013)



**U.S. Department of Transportation**
**Maritime Administration**

NAME: *(Last, First, MI)*
Sell, Benjamin, Arthur

**SERVICE OBLIGATION CONTRACT FOR UNITED
STATES MERCHANT MARINE ACADEMY**

SOCIAL SECURITY NUMBER

Authority: P.L. 96-453

DATE OF BIRTH

I hereby accept appointment as a cadet in the United States Merchant Marine Academy (Academy) for the class entering in July __ 2015 ___ .___ _

A.    ACKNOWLEDGEMENTS

(604)    I acknowledge that the Maritime Administration is hereby conditionally appointing me a cadet pending the approval of my entry as a midshipman into the United States Naval Reserve. My conditional appointment may be immediately revoked if I fail in any respect to meet the requirements established for appointment as a midshipman in the United States Naval Reserve.

(605)    I acknowledge that a prerequisite for continuance of my cadet status at the Academy is enrollment and service in the United States Naval Reserve or an approved substitute reserve component.

(606)    Unless entered into an approved substitute reserve component, I acknowledge that loss of Midshipman status at any time and for any reason constitutes cause for immediate separation from the Academy.

B.    SERVICE OBLIGATION COMMITMENT

In consideration for appointment as a cadet to the Academy. I hereby commit to:

(1207)    complete the course of instruction at the Academy;

(1208)    fulfill the requirements for a license as an officer in the merchant marine of the United States on or before the date of my graduation from the Academy;

(1209)    maintain a valid license as an officer in the merchant marine of the United States for at least 6 years following the date of my graduation from the Academy, accompanied by the appropriate national and international endorsements and certifications as required by the United States Coast Guard for service aboard vessels on domestic and international voyages,

(1210)    apply for an appointment as, to accept if tendered an appointment as, and to participate as a commissioned officer in the United States Naval Reserve (including the Merchant Marine Reserve, United States Naval Reserve), the United States Coast Guard Reserve, or any other Reserve Component of an Armed Force of the United States. for at least 6 years following the date of my graduation from the Academy;

(1211)    serve the foreign and domestic commerce and the national defense of the United States for at least 5 years following the date of graduation from the Academy --

(a)    as a merchant marine officer serving on vessels documented under the laws of the United States or on vessels owned and operated by the United States or by any State or territory of the United States;

(b)    as an employee in a United States maritime-related industry, profession, or marine science (as determined by the Maritime Administration), if the Maritime Administration determines that service under clause (a) is not available to me;

(c)    as a commissioned officer on active duty in an armed force of the United States, as a commissioned officer in the National Oceanic and Atmospheric Administration, or other maritime-related employment with the Federal Government which serves the national security interests of the United States, as determined by the Secretary; or

(d)    by combining the services specified in clauses (a), (b) and (c); and

(1212)    submit an annual service obligation compliance report form to the Compliance Specialist, Office of Policy and Plans, Maritime Administration, MAR-410 Room 7123, 400 7th Street, SW, Washington, D.C. 20590 between January 1 and March 1 of each year following the year of graduation, until all components of my service obligation are fulfilled and have been so reported. If I

AR000163

am granted a deferment of the service obligation to engage in a graduate course of study, as described below, reports must be submitted during the period of graduate course study, and then annually for the period following such deferment.

CCCI.   **BREACH OF SERVICE OBLIGATION CONTRACT**

(1006)   Failure to complete any of the obligations outlined above constitutes a breach of this agreement.

(1007)   Whether at the Academy or at sea, at anytime subsequent to the beginning date of my seventh (7th) trimester, should I fail to complete the course of instruction at the Academy, as prescribed in Section B, Paragraph 1 above, I understand and agree that: (a) I may be ordered by the Secretary of Defense to active duty in one of the armed forces of the United States to serve for a period of time not to exceed 2 years. The determination as to whether I have failed to complete the course of instruction shall be made by the Maritime Administration; or

(b) If the Secretary of Defense is unable or unwilling to order me to active duty or if the Maritime Administration determines that reimbursement of the cost of education provided would better serve the interests of the United States, the Maritime Administration may recover the cost of education provided by the Federal Government from me.

MA FORM-889 (Rev: 12-2004)          Original Copy - MAR 410          Photo Copy - Midshipman Official Personnel Jacket
Photo Copy - Midshipman

(1008)   If I have failed to fulfill any part of this Service Obligation Contract as set out in Section B, Paragraphs (2) through (6) above, I understand and agree that:

(mmmmmmmmmmmmmmmmm)          I may be ordered to active duty in one of the armed forces of the United States to serve a period of time not less than three (3) years and not more than the unexpired portion of the service required under Section B, Paragraph 5 above (as determined by the Maritime Administration). The Maritime Administration, in consultation with the Department of Defense, shall determine in which service I shall be ordered to serve such period of time.

(nnnnnnnnnnnnnnnn) If the Secretary of Defense is unable or unwilling to order me to active duty under subparagraph (a) above, or if the Maritime Administration determines that reimbursement of the cost of education provided would better serve the interests of the United States, the Maritime Administration may seek to recover the cost of education provided by the Federal Government to me.

(1009)   Indebtedness Agreement: I agree that if the Maritime Administration decides to proceed against me under either C.2.b. or C.3.b, I will be indebted to the United States and upon request will pay to the United States the "cost of the education provided" to me by the Federal Government as such term is defined in the law and the regulations.

(1010)   Remedies for Cost of Education Provided: In pursuing its remedies hereunder, I recognize and agree that the Maritime Administration may pursue any remedy available at law or equity and exercise all administrative remedies available to the United States.

D.   **WAIVERS AND DEFERMENTS:**

Upon application by me, the Maritime Administration may waive the remedies for breach of this Service Obligation Contract or defer my service obligations. Waivers and deferments are granted only upon the satisfaction of certain conditions. Information concerning the requirements to obtain such a waiver or deferment are set forth at 46 C.F.R. Part 310; Subpart C. For further information concerning such waivers and deferments, contact the individual listed as the contact on the Maritime Administration's website at https://mscs.marad.dot.gov.

E.   **CONTRACT EMBODIES ENTIRE UNDERSTANDING OF PARTIES, CHANGES CLAUSE**

Except as modified by applicable law or regulation, this Service Obligation Contract embodies the entire agreement and understanding among the undersigned relating to this subject matter hereof and supercedes prior agreements and understandings relating to such subject matter. Neither this Service Obligation Contract nor any terms thereof may be changed, waived, discharged, or terminated orally, but only by an

AR000164

instrument in writing signed by the party against whom enforcement of the change. waiver. discharge. or termination is sought.

G,    PRIVACY ACT: I have read and understand the Privacy Act Notice below on this form.

SIGNATURE                                                    8- 14-15

                                                            DATE

WITNESS (Signature)                                          8/14/2015

                                                            DATE

AR000165

## Stroud, CAPT Mikel

| | |
|---|---|
| **From:** | Ilaria, Greg |
| **Sent:** | Tuesday, October 2, 2018 2:00 PM |
| **To:** | Stroud, CAPT Mikel |
| **Cc:** | Eng, Melinda |
| **Subject:** | RE: Failures |

CAPT Stroud,

I checked all of his PRT scores and have M/n Sell failing 3 PFA's, not including his failure to report for the most recent 2019 T1 PRT.

1. AY16 T1
2. AY16 T3
3. AY18 T1
4. AY19 T1 – No show

Below are his scores:

| Year | | CU | PU | Min | Sec | Result |
|---|---|---|---|---|---|---|
| **AY 2016 T1** | | | | | | |
| Sell | Benjamin | 41 | 31 | 14 | 8 | Fail |
| | | | | | | |
| **AY 2016 T2** | | | | | | |
| Was not required to take | | | | | | |
| PRT | | | | | | |
| | | | | | | |
| **AY 2016 T3** | | | | | | |
| Sell | Benjamin | 55 | 43 | 10 | 58 | Fail |
| | | | | | | |
| **AY 2017 T1** | | | | | | |
| Sell | Benjamin | 72 | 55 | 10 | 58 | Pass |
| | | | | | | |
| **AY 2017 T2** | | | | | | |
| Sea | | | | | | |
| | | | | | | |
| **AY 2017 T3** | | | | | | |
| Sell | Benjamin | 70 | 47 | 11 | 30 | Pass |
| | | | | | | |
| **AY 2018 T1** | | | | | | |
| Sell | Benjamin | 62 | 50 | 12 | 2 | Fail |
| | | | | | | |
| **AY 2018 T2** | | | | | | |
| Sea | | | | | | |
| | | | | | | |
| **AY 2018 T3** | | | | | | |
| Sea | | | | | | |
| | | | | | | |
| **AY 2019 T1** | | | | | | |

1

AR000166

Did not report                                                        Fail

Greg Ilaria
Head Wrestling Coach
US Merchant Marine Academy
516-726-5254

**From:** Eng, Melinda
**Sent:** Tuesday, October 2, 2018 1:39 PM
**To:** Stroud, CAPT Mikel <StroudM@USMMA.EDU>
**Cc:** Ilaria, Greg <IlariaG@USMMA.EDU>
**Subject:** FW: Failures

Sir,

Was MIDN Ritchie put up for an ERB?  I sent the E-mail below in August regarding this.

RE: MIDN Ben Sell-  I only have him failing 2 times.
-BCA 1st tri 2015-2016
-PRT 1st tri 2017-2018

Let me know if you have any other questions.

Melinda Eng, MSEd, ATC
Assistant Athletic Director/SWA
Head Athletic Trainer
Assistant Professor
U.S. Merchant Marine Academy
O'Hara Hall
300 Steamboat Road
Kings Point, NY 11024
Phone# (516) 726-5587
Fax# (516) 773-5469
E-mail: engm@usmma.edu



**From:** Eng, Melinda
**Sent:** Tuesday, August 14, 2018 11:55 AM
**To:** Stroud, CAPT Mikel <StroudM@USMMA.EDU>; McCarthy, CDR Andrew <McCarthyA@USMMA.EDU>; Jaeger, LT
John <JaegerJ@USMMA.EDU>
**Cc:** Ilaria, Greg <IlariaG@USMMA.EDU>
**Subject:** Failures

Below are additions for multiple PFA failures.  Both need to be put up for E boards for either failing BCA or PRT.

2

AR000167



# Memorandum

U. S. Department
of Transportation

**Maritime
Administration**

U. S. Merchant
Marine Academy

**To:**      MIDN Benjamin Sell, Class of 2019

**From:**    Dr. John Ballard
            Acting Deputy Superintendent

**Date:**    19 October 2018

**Re:**      Revised Notice of Executive Board Suitability Hearing

In accordance with Chapter 6, Section 6.1, of the 2018 USMMA Midshipman Regulations (as set forth in SI 2018-07), you are hereby directed to appear before an Executive Board for a hearing to determine your suitability to continue as a Midshipman at the Academy. You were placed on Deferred Graduate status for failed Sea Year projects; you stood before an Honor Board on 19 September 2018 and were found guilty; and you have failed the Physical Fitness Assessment (PFA) multiple times during your tenure at the Academy.

While you are expected to appear, you are not required to provide evidence, make a statement, or answer questions. However, be advised that your suitability to continue as a Midshipman at the Academy will be considered based on the evidence, statements, and/or information presented at the hearing. You bear the burden of demonstrating sufficient cause for retention by a preponderance of the evidence.

The hearing shall be convened onThursday, 25 October 2018 at 1030 in the Patterson Conference Room, 2nd Deck, Wiley Hall. Uniform shall be Seasonal Dress Uniform.

The Executive Board Secretary, a non-voting participant, will maintain detailed, but not verbatim, minutes of the hearing (except for the deliberations). The hearing may also be digitally recorded (except for the deliberations). The Secretary's minutes will be deemed a sufficient record of the proceedings in the event a digital recording is not made or preserved. A copy of the minutes or the recording, if made, will be provided to you upon your request, subject to your acceptance and signature of a Confidentiality/Non-Disclosure Agreement, if applicable. Once the Executive Board procedures have been completed, including any appeals, if applicable, the copy of the minutes or digital recording must be returned to the Executive Board Secretary. Requests for a copy of the minutes or digital recording made after the conclusion of all disciplinary proceedings will be denied.

The following individuals will serve as members of the Executive Board:

Dr. John Ballard, Acting Deputy Superintendent, Chair
CDR David Pulis, Assistant Academic Dean
CDR Bradley Hawksworth, Head, Department of Naval Science
CAPT Bill Fell, Assistant Athletic Director, Department of Physical Education and Athletics

AR000168

19 October 2018
Page 2

MIDN Adam Viscovich, Battalion Commander

The Academy intends to call the following witnesses at the Hearing:

LT John Jaeger, Company Officer
Ms. Melinda Eng, Athletic Trainer, Department of Physical Education and Athletics
Mr. Greg Ilaria, Coach, Department of Physical Education and Athletics
Mr. Rick Sager, Director, Health Services

You are being provided with copies of the following documents, which will be considered by the Executive Board:

1.    The Commandant's recommendations that an Executive Board be convened and the Superintendent's notification that a hearing will be held;

2.    Academic File (with transcript), as maintained by the Academic Dean;

3.    Company File, as maintained by your Company Officer;

4.    Midshipman Profile, prepared by your Company Officer;

5.    Personnel Jacket, as maintained by the Commandant;

6.    Honor Case File, as maintained by the Honor Board;

7.    Sea Year File, as maintained by the Department of Career Services and Professional Development; and

8.    PFA history.

The Executive Board will also consider all documentary evidence and witness testimony provided by you.

You have the following rights prior to and at the hearing:

1.    To receive written notice of the Executive Board hearing at least five (5) days before the hearing, which notice shall include the following: (1) the specific charges to be considered by the Executive Board; (2) the date, time, and location of the hearing; (3) the names of those who will comprise the Executive Board; (4) the witnesses to be called by the Executive Board, if any; (5) the uniform to be worn at the hearing; and (6) your additional rights, as delineated below.

2.    To receive, with the written notice, copies of all documentation to be considered by the Executive Board in making its recommendation, subject to you signing a Confidentiality/Non-Disclosure Agreement upon request by the Chair.  (With your consent, your advisor and/or counsel may receive a copy of the relevant

AR000169

19 October 2018
Page 3

documentation, likewise subject to execution of a Confidentiality/Non-Disclosure Agreement, upon request by the Chair.)

3.   To seek advice and assistance of legal counsel in the preparation of your case at your own expense.  Legal counsel will not be permitted to be present during the Executive Board hearing unless, at the time of the Board hearing, you are charged with a criminal offense by a Federal, state, or local jurisdiction arising out of the same circumstances as the charge before the Board.  In such cases, counsel shall not actively participate in the proceedings but shall be allowed to be present to consult with you and provide advice.

4.   To request any Academy faculty or staff member other than a Chaplain, Counsel to the Academy or Assistant Counsel, member of the Commandant's Office, or witness to be called at the hearing to act as your advisor as long as serving in that capacity does not present a conflict with the faculty or staff member's professional responsibilities.  In the event that you are unable to obtain an advisor, the Superintendent will appoint one on request.

5.   To challenge the impartiality of any or all members of the Executive Board.  A written justification for any such challenge must be submitted to the Secretary of the Executive Board within 24 hours of you being informed of the membership of the Executive Board.  The Chair will rule on any such challenge.  Members disqualified will be replaced by the Chair.  Challenge of the Chair will be resolved by the Superintendent.  You shall be notified of the decision on any such challenge and the substitution of new members, if any.

6.   To be present during the entire hearing, except for the Executive Board's deliberations.

7.   To make opening and closing statements.

8.   To present evidence including but not limited to documentary evidence and the testimony of reasonably available witnesses during the hearing.  You must notify Ms. Ross in the Superintendent's Office, Wiley Hall, 2nd Deck in writing no later than 1030 on 23 October 2018 of the identity of your witnesses.  The Academy shall make reasonable efforts to insure the attendance of the witnesses identified by you who are enrolled at or employed by the Academy.  Appearance by witnesses not employed by, or enrolled at, the Academy are your sole responsibility.

9.   To question all witnesses, whether called by the Academy or by you.

10.  To receive, upon request, a copy of the minutes prepared by the Executive Board Secretary and/or a copy of the digital recording of the hearing (exclusive of deliberations), if made, subject to your signing a Confidentiality/Non-Disclosure Agreement upon request by the Chair.  (With your consent, your advisor and/or counsel may also receive a copy of the recording, likewise subject to execution of a Confidentiality/Non-Disclosure Agreement, upon request by the Chair.)  Once the disciplinary procedures have been completed, including any appeals, any copy of

AR000170

19 October 2018
Page 4

the minutes or digital recording must be returned to the Executive Board
Secretary.  Requests for a copy of the minutes or digital recording made after the
conclusion of all disciplinary proceedings will be denied.

Attached to this Notice is a copy of Superintendent's Instruction 2018-07, Chapter 6, which sets
forth the procedures for an Executive Board Hearing.

RECEIPT ACKNOWLEGED:

_____          10-22-18
M/N Benjamin Sell                          Date

AR000171

**U.S. MERCHANT MARINE ACADEMY**
KINGS POINT, NY 11024-1699
Office of Shipboard Training

**MIDN ID**

**Sell/BA2019E**

**MIDSHIPMAN SEA YEAR PERSONAL DATA**
(Rev. 3/6/15)

Sail Per:
**16-2**

| M/N (LAST NAME): Sell | M/N (FIRST NAME): Benjamin | M/N (MIDDLE NAME): Arthur | M/N (SUFFIX): |
|---|---|---|---|
| M/N CLASS: 2019 | M/N MAJOR (D, L, E, S, M): EN | ATR: ATR-WC | |

**Address**

| Number    Street | Apt. No. | Alternate Email Address: |
|---|---|---|
| City | State | Zip Code | Cell Phone: |
| Home Telephone: | | Home of Record Airport: CAE |

**PERSONAL STATISTICS:**

| Social Security No: | Citizenship: USA | TWIC No: | TWIC Expires: . |
|---|---|---|---|
| Mariner ID No: | MMC No: | | MMC Expires: |
| Passport No. f | Passport Expiration Date: . | | |
| Date of Birth: | Place of Birth (city, county and state): | | |
| Height: 68 inches | Weight: 190 LBS | Gender: M | Race: C |
| Complexion: Fair | Color Eyes: Brown | | Color of Hair: Brown |
| Tax Status (Exempt/Single/Married): | Dependents Claimed: | | |
| KP P.O. Box: 833 | Room No: 2329 | | |

**NEXT OF KIN (NOK – Person to be contacted in the event of illness, injury or other emergency)**

| NOK Full Name: Donald W, Sell | Relationship to NOK: father | Marital Status of NOK (Single/Married): | Single |
|---|---|---|---|
| NOK Address: | | | |
| NOK City, State, Zip: | | | |
| NOK Telephone No.: | NOK Alt Telephone No.: | | |

Requested Sailing Partner: (M/N Full Name, Class, Major)

**5 USC 552.a(e)(3) PRIVACY ACT and 20 USC 1232g.(a)(1)(D) FAMILY EDUCATIONAL AND PRIVACY RIGHTS STATEMENT:**
The authority to request this information and copies of documents is contained in 46 USC 1295b, 7101, 7501, 8701 and 46 CFR Part 310 and applies to this form, and to copies of my passport, Merchant Mariners Document, STCW Competency Letter, medical records including drug free certificates, inoculation records and records of HIV Test results. The principal purpose of this information is to assist the Academy Training Officer (ATR) in effecting administrative procedures for ship assignments during sea periods. The ATR may need to share this information with shipping companies and medical facilities for ship assignment purposes. Release of this information is voluntary, however failure to provide this information may prevent ship assignments.

I hereby grant the USMMA Department of Professional Development and Career Services authorization to share the foregoing information with perspective shipping companies for the purpose of ship assignments.

M/N Signature:                               Date: 10/18/16

AR000172

DEPARTMENT OF HOMELAND SECURITY
U.S. Coast Guard

OMB No 1625-0040
Exp. Date 01/31/2016

## APPLICATION FOR MERCHANT MARINER MEDICAL CERTIFICATE

### Section I: Applicant Information - To be completed by the Applicant and reviewed by the Medical Practitioner

Last Name: ▓ell

First Name: Benjamin

Middle Name: Arthur

Suffix (Jr  Sr . III)

Reference Number (if applicable):

Gender: ☒ Male   ☐ Female

Date of Birth (MM/DD/YYYY): ▓▓▓

Please indicate best method(s) of contact by checking the appropriate box(es). Optional if information is same as most recent CG-719B.

Home Address (PO Box NOT acceptable) ☒
Street Address:

Primary Phone Number ☒ ▓▓▓

City: ▓▓▓   State:   Zip Code:

Alternate Phone Number ☐

Delivery/Mailing Address, if different  (PO Box acceptable) ☐
Street Address:

E-mail Address ☐

City:   State:   Zip Code:

Other ☐

Application Type  ☒ Medical Certificate   ☐ First Class Pilot
I have a medical waiver:  ☐ Yes  ☒ No   If YES, provide a copy of the medical waiver to the Medical Practitioner.

### Section II(a): Medical Conditions - To be completed by the Applicant and reviewed by the Medical Practitioner

To the best of your knowledge, have you ever had, required treatment for, or do you presently have any of the following conditions?

☐ Yes ☒ No  1. Eye/vision problems except glasses

☐ Yes ☒ No  2. Ear/nose/throat problems or other ENT problems/surgery

☐ Yes ☒ No  3. High or low blood pressure

☐ Yes ☒ No  4. Heart or vascular disease of any kind

☐ Yes ☒ No  5. Heart surgery and/or implanted devices (pacemaker, defibrillator, etc.)

☐ Yes ☒ No  6. Lung disease of any type (asthma, bronchitis, emphysema, etc.)

☐ Yes ☒ No  7. Any blood disorder (anemia, hemophilia, blood clots, polycythemia, etc.)

☐ Yes ☒ No  8. Diabetes, glucose intolerance, or sugar in urine

☐ Yes ☒ No  9. Thyroid problem

☐ Yes ☒ No  10. Stomach, liver, or intestinal disorder

☐ Yes ☒ No  11. Kidney problems/stones or blood in urine

☐ Yes ☒ No  12. Any other urinary or bladder problems not listed above

☐ Yes ☒ No  13. Skin disorder or problem

☐ Yes ☒ No  14. Allergies or allergic reactions to any substance, medication, or food.

☐ Yes ☒ No  15. Infectious/contagious disease

☐ Yes ☒ No  16. Any sleep problems: obstructive sleep apnea, restless leg syndrome, narcolepsy, shift work sleep disorder, insomnia, etc.

☐ Yes ☒ No  17. Epilepsy, fits, or seizures

☐ Yes ☒ No  18. Loss of consciousness or memory

☐ Yes ☒ No  19. Frequent or severe headaches

☐ Yes ☒ No  20. Dizziness/fainting spells/balance problems

☐ Yes ☒ No  21. Frequent motion sickness requiring medication

☐ Yes ☒ No  22. Stroke or Transient Ischemic Attack (TIA), brain tumor or other brain disorder

☐ Yes ☒ No  23. Any neurologic disorder or nerve problems including numbness and/or paralysis, not listed above

☐ Yes ☒ No  24. Attention deficit disorder with or without hyperactivity

☐ Yes ☒ No  25. Anxiety, depression, bipolar disorder, adjustment disorder, PTSD, or schizophrenia

☐ Yes ☒ No  26. Suicide attempt or thought (ideation) of suicide

☐ Yes ☒ No  27. Evaluation, treatment, or hospitalization for alcohol or substance use, abuse, addiction, or dependence (including illegal drugs, prescription medications, or other substances)

☐ Yes ☒ No  28. Any other psychiatric disorder, mental health evaluation hospitalization

☐ Yes ☒ No  29. Back pain, joint problems, or orthopedic surgery

☐ Yes ☒ No  30. Amputation, prosthesis, or use of ambulatory devices (cane, walker, braces, etc.)

☐ Yes ☒ No  31. Fractures, recurrent dislocations or limitation of motion of any joint

☐ Yes ☒ No  32. Have you ever been signed off as sick or repatriated for medical reasons within the last six years?

☒ Yes ☐ No  33. Any diseases, surgeries, cancers, illnesses, or disabilities not listed on this form?

☐ Yes ☒ No  34. Any hospital admissions within the last six years not listed elsewhere in this Section?

CG-719K (01/14)

Applicant Name (Last, First, MI.) ▓▓▓

Date of Birth (MM/DD/YYYY) ▓▓▓

AR000173 of 5

## Section II(b): Medical Conditions - T~~~~~~ completed by the Medical Practitione

Instructions: For each "YES" answer, identify the item numbers, the condition/diagnosis, date of onset or diagnosis, any treatment required or received, the current status of the condition, and any limitations due to the condition. As applicable, attach supporting documentation to verify findings. Additional sheets may be added as needed being sure applicant name and date of birth appear on each additional sheet.

**Number   Additional Information (Please Print)**

| 53 | ~~~~~ A~ - D.~~~~~~ ~~~~ ~~~~ ? - R N~~ |

## Section III: Medications - To be completed by the Applicant and reviewed by the Medical Practitioner

Applicants who are required to complete a general medical exam are required to report all prescription medications prescribed, filled or refilled, and/or taken within 30 days prior to the date that the applicant signs the CG-719K. In addition, all prescription medications, and all non-prescription (over-the-counter) medications including dietary supplements and vitamins, that were used for a period of 30 or more days within the last 90 days prior to the date that the applicant signs the CG-719K or approved equivalent form, must also be reported.

The information reported by the applicant must be verified by the verifying medical practitioner or other qualified medical practitioner to the satisfaction of the verifying medical practitioner to include the following two items: (1) Report all medications (prescription and non-prescription), dietary supplements, and vitamins. (2) Include dosages of every substance reported on this form, as well as the condition for which each substance is taken.

Additional sheets may be added by the applicant and/or medical practitioner if needed to complete this section (include applicant name and date of birth on each additional sheet).

If none, check "NONE"  ☒ NONE

| Applicant (Please Print) | Medical Practitioner (Please Print) |
|---|---|
| ~~~~~ pro.tein powder<br>Cal. amino acid.<br>Culcunce<br>1 - 2x/wd | R.~~~ J~~~~ |

# REPORT OF MEDICAL EXAMINATION

Sections IV and V should be completed by the Medical Practitioner or other medical staff to the satisfaction of the Medical Practitioner

## Section IV: Vision

The Medical Practitioner must indicate test used and results (number of errors). Additional information must be reported in Section VII. Color sensing lenses (e.g. X-Chrome) are prohibited.

### a. Visual Acuity

| Distant Uncorrected | If Necessary, Distant Corrected To | Field of Vision |
|---|---|---|
| Right 20/ 2.5. | Right 20/ | This applicant must have a 100-degree horizontal field of vision |
| Left. 20/ 2.0 | Left. 20/ | ☒ Normal / ☐ Abnormal |

### b. Color Vision (check one)

The following color sense testing methodologies are acceptable

☐ AOC (1965) - (6 or fewer errors on plates 1-15)

☐ AOC-HRR (2nd Edition) - (No errors in test plates 7-11)

☐ HRR PIP (4th Edition) - (No errors in test plates 5-10)

☐ Richmond (2nd and 4th Edition) - (6 or fewer errors)

☐ Titmus Vision Tester/OPTEC 2000 - (No errors on 5 plates)

☐ OPTEC 900 (colored lights) Test per instruction booklet

☐ Farnsworth D-15 Hue Test (attach test results) (Engineer/radio officer/tankerman/MODU only)

☐ Ishihara pseudoisochromatic plates test. 14 plate (5 or less errors)

☐ Ishihara pseudoisochromatic plates test. 24 plate (6 or less errors)

☐ Ishihara pseudoisochromatic plates test. 38 plate (8 or less errors)

☐ Farnsworth Lantern (colored lights) Test per instruction booklet

☐ Dvorine pseudoisochromatic 15 plate test (6 or less errors)

☐ An alternative test approved by the Coast Guard (indicate test)

## Color Vision Testing Results:

☒ Passed    ☐ Failed    Number of Errors ( / )

If color vision test is failed, can the Applicant distinguish red, green, blue, and yellow    ☐ Yes    ☐ No

## Section V: Hearing

An applicant with normal hearing by forced whispered voice ≥ 5 feet with or without hearing aids does not need to complete either the audiometer test or the functional speech discrimination test

☒ Normal Hearing    ☐ Abnormal Hearing    ☐ Hearing Aid Required

(a) If hearing is abnormal, then perform either a functional speech discrimination test at 65dB or an audiogram documenting thresholds and averages as indicated below. Both aided and unaided values should be recorded for applicants requiring hearing aids

(b) All applicants with an unaided threshold > 30dB in the better ear should have functional speech discrimination testing performed at 65dB

(c) Refer to Medical and Physical Evaluation Guidelines for Merchant Mariner Credentials from the NMC website (http://www.uscg.mil/nmc/medical/default.asp) for further guidance. Report any additional information or comments in Section VII

| Audiometer Threshold Value | | | | | |
|---|---|---|---|---|---|
|  | 500Hz | 1,000Hz | 2,000Hz | 3,000Hz | Average |
| Right Ear (Unaided) |  |  |  |  |  |
| Left Ear (Unaided) |  |  |  |  |  |
| Right Ear (Aided) |  |  |  |  |  |
| Left Ear (Aided) |  |  |  |  |  |

| Functional Speech Discrimination Test @ 65dB, if required by instruction (b) above | |
|---|---|
| Right Ear (Unaided) |  % |
| Left Ear (Unaided). |  % |
| Right Ear (Aided) |  % |
| Left Ear (Aided). |  % |

CG 719K (01/14)

Applicant Name (Last, First, MI)

Date of Birth (MM/DD/YYYY)

**Section VI: Physical Examination - I** s 1-17 of this section must be complet **y the Medical Practitioner.**

Height *(inches only)* · [ 67 ]     Weight *(lbs)* [ 163 ]     Body Mass Index *(BMU·* *(For BMI > 40 refer to Section VII)* [ 285 ]

Pulse Resting [ 56 ]     Initial Blood Pressure [ 138/60 ]     Repeat Blood Pressure *(if needed)* [ ]

*Please make comments in the space provided on any item indicated as an "abnormal" system/organ*

| System | | Additional Medical Comments |
|---|---|---|
| 1. Head, Face, Neck, Scalp | ☑ Normal ☐ Abnormal | Item     Additional Information (Please Print) |
| 2. Eyes/Pupils/EOM | ☑ Normal ☐ Abnormal | |
| 3. Mouth and Throat | ☑ Normal ☐ Abnormal | |
| 4. Ears/Drums | ☑ Normal ☐ Abnormal | |
| 5. Lungs and Chest | ☑ Normal ☐ Abnormal | |
| 6. Heart | ☑ Normal ☐ Abnormal | |
| 7. Abdomen | ☑ Normal ☐ Abnormal | |
| 8. Upper/Lower Extremities | ☑ Normal ☐ Abnormal | |
| 9. Spine/Musculoskeletal | ☐ Normal ☐ Abnormal | |
| 10. Skin | ☐ Normal ☒ Abnormal | #10  3 Tattoos |
| 11. Lymphatic | ☑ Normal ☐ Abnormal | (1) Right Frontal fenur extremely — octopus |
| 12. Neurologic | ☑ Normal ☐ Abnormal | (2) Dorsum Rt "feet — Chelsea |
| 13. Vascular System | ☑ Normal ☐ Abnormal | (3)  "     Left  "  — Pig |
| 14. Genitourinary System | ☑ Normal ☐ Abnormal | |
| 15. General/Systemic | ☑ Normal ☐ Abnormal | |
| 16. Hernia | ☐ Yes ☑ No | |
| 17. Missing Extremities/Digit | ☐ Yes ☑ No | |

DATE:

| | |
|---|---|
| 4/12/16 | G6PD: WITHIN RANGE |
| | SICKLE CELL SCREEN  NEGATIVE |
| | BLOOD GROUP AND TYPE:  O Pos |
| 8/29/17 | CBC: WITHIN NORMAL LIMITS |
| | HIV: NEGATIVE |

3-719K (01/14)

Applicant Name *(Last, First, M)* [ ]     Date of Birth *(MM/DD/YYYY)* [ ]     Page 4 of 5

AR000176

## Section VII: Demonstration of Physical Ability - To be completed by the Medical Practitioner

1  The Medical Practitioner shall require that the applicant demonstrate the ability to meet the guidelines contained within Section VII of the CG-719K instructions. This does not mean, for example, that the applicant must actually don an exposure suit, pull an unchanged 1.5 inch diameter 50' fire hose with nozzle to full extension, or lift a charged 1.5 inch diameter fire hose to firefighting position. Rather, the Medical Practitioner may utilize alternative measures to satisfy himself or herself that the applicant possesses the ability to meet the guidelines in the third column. A description of the methods utilized by the medical practitioner should be reported in the Comments section provided below

2  All practical demonstrations should be performed by the applicant without assistance. Any prosthesis normally worn by the applicant, and any other aid devices, may be used in all practical demonstrations except when the use of such items would prevent the proper wearing of mandated personal protection equipment (PPE).

3  If the Medical Practitioner is unable to conduct the practical demonstration, the applicant should be referred to a competent evaluator of physical ability. The Coast Guard recognizes that all medical practitioners may not have the equipment necessary to test all of the tasks as listed. Equivalent alternate testing methodologies may be used. For further information, check the Medical and Physical Evaluation Guidelines for Merchant Mariner Credentials (http://www.uscg.mil/nmc/medical/default.asp).

4  If the applicant is unable to perform any of the following functions, the Medical Practitioner should provide information on the degree or the severity of the applicant's inability to meet the standards. The results of any practical demonstration or attendant physical evaluation should be recorded in the Comments section provided below.

**Physical Ability Results**

☐ Applicant has the physical strength, agility, and flexibility to perform all of the items listed in the instruction table.

☐ Applicant does NOT have the physical strength, agility, and flexibility to perform all of the items listed in the instruction table.

**COMMENTS** *(Please Print)*

## Section VIII: Food Handler Certification - To be completed by the Medical Practitioner

If Food Handler Certificate is sought by the applicant, is applicant free from communicable disease:    ☐ Yes ☐ No

## Section IX: Summary - To be completed by the Medical Practitioner

Applicant proof of identity provided    ☑ Yes ☐ No

Overall fitness recommendation    ☑ Fit for Duty    * DENTALLY CLEARED: 8/22/17 by Dr. Isabel Martins

☐ Not Fit for Duty   ☐ Needs Further Review

Provider Name   Date

Comments *(Please Print)*

**Medical Practitioner:**

My signature attests, subject to criminal prosecution under 18 USC § 1001, that all information reported by the medical practitioner is true and correct to the best of his/her knowledge and that the medical practitioner has not knowingly omitted or falsified any material information relevant to this form. My signature also attests that I have fully evaluated all examination tests and results submitted in support of this application.

| Last Name | First Name | M.I | License Number | State |
|---|---|---|---|---|
| Terpellen | Ronald | | 139311 | N Y |

| Signature | Date (MM/DD/YYYY) | | |
|---|---|---|---|
| Ronald H (H) | 10/03/2017 | | |

☐ MD/DO   ☐ PA   ☐ NP

Office Street Address

City    State    Zip Code

Phone Number

United States Merchant Marine Academy
Office of Health Services, Patten Hall
300 Steamboat Road
Kings Point, New York 11024-1699
Phone: (516) 726-5680, Option #3
Fax: (516) 773-5341

*(Place office address stamp here)*

## Section X: Applicant Certification - To be completed by the Applicant

My signature below attests, subject to prosecution under 18 USC § 1001, that all information provided by me on this form is complete and true to the best of my knowledge and I agree that it is to be considered part of the basis for issuance of any medical certificate to me. I have not knowingly omitted any material information relevant to this form. I have also read and understand the Privacy Act Statement that accompanies this form

Signature of Applicant    Date (MM/DD/YYYY)

CG-719K (01/14)    Applicant Name (Last, First, MI)    Date of Birth (MM/DD/YYYY)    Page 5 of 5

AR000177

# MERCHANT MARINER CREDENTIAL APPLICATION
## THIRD PARTY AUTHORIZATION

I _Benjamin A. Sell_ (print full name), authorize the U.S. Coast Guard National Maritime Center (NMC) to disclose information and/or records regarding my **current credential application** to/with the Third Party authorized, to include only those boxes checked below.

Taking this action is entirely voluntary; you are under no obligation to consent to the release of your information to any third party.

[✓] Act on my behalf in **ALL MATTERS** pertaining to the processing of my current U.S. Coast Guard credential application.

### Or, Matters Specifically Pertaining to

[✓] Professional qualifications, certification records, or sea service time.

[✓] Any medical information related to the processing of my current application for a Merchant Mariner Credential.

[✓] Safety and Suitability.

[✓] Official correspondence and/or previous Merchant Mariner Credentials.

[✓] Mail my credential to the third party listed below.

**Third Party Information:**

| Authorized Person's Name: (Last, First MI) | Organization: (If applicable) |
|---|---|
| Martinez, Sonia Y | PATTEN HALL OHS USMMA |
| **Authorized Person's Mailing Address:** | **Authorized Person's Phone Number:** |
| 300 Steamboat Rd<br>Kings Point, NY 11024 | 516-726-5682 or 518-726-5681 |
| | **Authorized Person's Email Address (optional):** |
| | sonia.martinez.ctr@usmma.edu |

This authorization expires upon final agency action regarding my current application for a Merchant Mariner Credential.

Mariner's Signature: _Ben Sell_    Date: _04/01/2017_
(MM/DD/YYYY)

Mariner's Reference Number or Last 4 of Social Security Number: _11:1_

**You may send the release to the NMC by the four methods listed below:**

- Include it with your credential application packet
- Scan the signed release and email it to IASKNMC@uscg.mil
- Fax the signed release to (304) 433-3416
- Mail the signed release to the NMC at 100 Forbes Drive, Martinsburg, WV  25404

AR000178



U.S. Department
of Transportation
Maritime
Administration

Kings Point, New York 11024-1699

October 16, 2017

**46 CFR Part 310 Merchant Marine Training**

This is to certify that I, **Benjamin A. Sell,** have received a copy of 46 CFR Part 310 and that I am in agreement with the terms and conditions of the cadet shipping assignment.

_(signature)_

**MIDN Benjamin A.  Sell**
U.S. Merchant Marine Academy

**CAPT. Eugene Albert**
Department Head
Professional Development & Career Services

AR000179

# United States Merchant Marine Academy
## Shipboard Performance Evaluation
(See attached instruction sheet)

**1. Cadet Name (Last, First MI)**

Sell, Benjamin, A

**Assigned Region: WC**

**2. Class & Split**
Class: 2019
Split: A

**3. Assigned Department**
☐ Deck
☒ Engine

**4. Major (Check One)**
☐ Marine Transportation
☐ Logistics & Intermodal Program
☒ Marine Engineering
☐ Marine Engineering Systems
☐ Marine Engineering & Shipyard Mgmt.

**5. Occasion for Report** ☒ Detachment of supervisor
☐ Periodic (Every 45 Days) ☐ Detachment of cadet

**6. Period of Report**
From: 1/25/18    To: 5/11/8

**7. Vessel Name**
MV MAERSK KENSINGTON

**8. Check One**
☒ Motor Vessel ☐ Steamship ☐ Gas Turbine

**9. Vessel Operator (Include Address)**
Maersk Line Limited

**10. Master's Name**
Paul Cian

**11. GRT**
74,642

**12. Year Built**
2007

**13. Vessel Type & Route (i.e. Tanker/Coastwise)**
Container / Foreign

**14. Horsepower**
70,020

**15. Official Number**
1257726

**16. Cadet duties (Please include primary/collateral and watchstanding responsibilities)**
☒ Day Work ☐ Watch standing ☐ Both ☐ Other:

| | 0.0 Unacceptable or Unsatisfactory | 1.0 Below Standards but Progressing | 2.0 Acceptable and Meets Standards | 3.0 Very Good and Above Standards | 4.0 Exceptional and Always Exceeds Standards |
|---|---|---|---|---|---|
| **Fire Prevention and Fire Fighting (STCW Competency)** | | | | | |
| Check one ⇨ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **17.** Minimize the risk of fire and maintain a state of readiness to respond to emergency situations involving fire. | • Possesses inadequate knowledge of shipboard fire-fighting organization • Unable to identify emergency escape routes. • Fails to recognize general fire/explosion hazards and/or those specific to the vessel. • Fails to understand the need for constant vigilance. • Never read the vessel's fire-fighting plans. • Unable or unwilling to improve. | | • Knowledge of shipboard fire-fighting organization is adequate and will improve. • Understands his/her role in fire prevention and fire fighting aboard this vessel. • Possesses good knowledge of the vessel and emergency escape routes. | | • Displays a highly professional attitude toward fire prevention and the fire-fighting organization aboard this vessel. • Sets a good example for other crewmembers in the areas of fire prevention. • Possesses excellent knowledge of smoke detection and automatic alarm systems |
| Check one ⇨ | ☐ | ☐ | ☐ | ☒ | ☐ |
| **18.** Fight and extinguish fires | • Displays poor knowledge of fire equipment (location and operation) aboard this vessel. • Posses little knowledge of fighting fires and effecting rescues aboard this vessel • Unable or unwilling to improve. | | • Asks questions regarding the location and operation of fire-fighting equipment aboard the vessel. • Reads vessel's operating manuals relating to fire-fighting gear. • Displays adequate understanding of fire fighting plans. | | • Clearly understands his/her role and the roles of senior officers in fighting fire aboard this vessel • Participates fully in fire drills. • Assists in training other crewmembers |
| **Personal Safety and Social Responsibilities (STCW Competency)** | | | | | |
| Check one ⇨ | ☐ | ☐ | ☐ | ☒ | ☐ |
| **19.** Complies with shipboard emergency procedures. | • Unfamiliar with the location and/or operation of personal safety equipment. • Unaware of hazards such as collision, fire, foundering, etc. • Did not turn in required safety checklists, etc. • Displayed no interest in training and drills. • Turned in for drills late or dressed inappropriately. • Unfamiliar with Abandon Ship duties and emergency signals and how to sound them • Unable or unwilling to improve. | | • Seeks instruction as to the location and operation of safety equipment that is unfamiliar. • Aware of standard procedures for avoiding hazards such as collision, fire, foundering, etc. • Diligently executes required safety checklists, etc. • Displays an acceptable interest toward safety training and drills. • Understands Abandon Ship duties • Possesses acceptable knowledge of emergency signals and how to sound them. | | • Unusual knowledge of safety equipment beyond his/her experience. • Participates fully during training sessions and drills. • Dependable contributor to the deck/engineering emergency teams. • Seeks opportunities to share knowledge with vessel's crew during drills • A valuable shipmate to have in an emergency |

J:/ATR1/Department Forms/Shipboard Performance Evaluation Form (Rev 4/20/15)

AR000180

| 20. Cadet Name (Last, First MI) | 21. Vessel name & route (i.e. MV Astern/Foreign) | 22. Period and type of report: ☐ Periodic   ☐ Detach |
| | | Department: ☐ Deck  ☑ Engine |
| Benyamin, Spll, H | MV Maersk Kensington | From: 1/25/18  To: 5/11/18 |

| | 0.0 Unacceptable or Unsatisfactory | 1.0 Below Standard but Progressing | 2.0 Meets Standard | 3.0 Good but Above Standard | 4.0 Exceptional and Always Exceeds Standards |
|---|---|---|---|---|---|
| **Personal Safety and Social Responsibility (STCW Competency)** | | | | | |
| Check one ⇨ 23. Takes precautions to prevent pollution of the marine environment | ☐ Fails to observe international regulations and company policies regarding water control. Inattentive during critical operations (i.e. bunkering, transferring cargo, etc.). Unable or unwilling to improve. | ☐ | ☐ Seeks knowledge of shipboard procedures for bunkering, transferring cargo, etc. Displayed common sense regarding pollution prevention. | ☑ | ☐ Knowledgeable regarding vessel's pollution prevention procedures. Displays mature & professional attitude regarding responsibilities for pollution prevention. |
| Check one ⇨ 24. Observes safe working practices | ☐ Careless attitude toward safe working practices. Unprofessional approach to routine work. Unwilling to maintain standards of vessel and/or company policy. Unable or unwilling to improve. | ☐ | ☐ Accurate and exceptional familiarity with vessel's SMS. Observed regulations and policies regarding work hours and practices. | ☑ | ☐ Totally committed to getting work done safely. Conscious for the safety of others. Set a good example for others. |
| Check one ⇨ 25. Ability to understand orders and can be understood in relation to shipboard duties | ☐ Weak meaning or listening skills. Lacked common sense. Argumentative. Needs to improve communication skills. Impatient and/or irritable. Unable or unwilling to improve. | ☐ | ☐ Slow to relate. Speaks confidently. Listens attentively and asks for clarification if necessary. Understands his/her responsibilities. Uses proper nautical terms. | ☐ | ☒ Carries out assignments with minimal supervision. Assists vessel's officers in communicating with the crew. |
| Check one ⇨ 26. Contributes to effective human relationships on board ship | ☐ Maintained quarters in unacceptable condition. Fails to support company's drug and alcohol program. Unacceptable personal hygiene. Displayed little respect for the condition of public spaces aboard ship. Unaware of health issues aboard ship. Officers and ratings performed his work with him/her. Exhibited discriminatory tendencies. Unable or unwilling to improve. | ☐ | ☐ Fosters effective team interaction & duties without additional instruction. Used adopted responsible with coworkers on performance or line at all. Was appropriate mannerism. Situations professional and maintains courtesy and frequent efforts. Works well with ratings and officers. Recognizes and responds to the need of others. Committed to the safety and well being of their ration. | ☐ | ☑ Contributes to good morale aboard the vessel. Strongly supports company's drug and alcohol program. Promotes team effort. Sought responsibility. Strongly committed to becoming a responsible officer. Possesses remarkable sensitivity to issues of life aboard (labor relations, safety, health, morale). Unusual desire to improve him/ and win the respect of others. |
| **Professional Development and Progress** | | | | | |
| Check one ⇨ 27. Developing professionally toward a license. | ☐ Is not attempting to complete professionally. Failing to learn maritime skills. Shows reluctance for a full attempt at professional development. Unable or unwilling to improve. | ☐ | ☒ Usable progressing toward duties to perform at a licensed officer. Commonly in a shipboard job related skills and/or watchstanding are sometimes minimum and exceeded. | ☐ | ☐ Knowledgeable regarding shipboard operations and maintenance procedures. Displays mature & professional attitude toward simplicities. Additional watchstanding. |
| Check one ⇨ 28. Creative thinking & problem solving | ☐ Offers gets overwhelmed with assignments. Unable to resolve problems solving out. | ☐ | ☐ Demonstrates adopted capacity. Has good routine solving skill. Not able to tackle problems with a good attitude. | ☒ | ☐ Breaks down problems in task into manageable parts. Is imaginative in resolving issues and more. Demonstrates extraordinary analytical job. |

29. Comments on Performance. (Please use this space to justify or explain rating or to report extraordinary conduct or behavior   IF EXTRA SPACE IS NEEDED, PLEASE ATTACH EXTRA SHEETS.)

☐ See Attached Sheet(s)

☐ Concur with evaluation ☐ See attached and comments of:

| 30. Department Head's Endorsement: | | Date: | ☐ Concur with evaluation ☐ See attached and comments of: | 32. ATR's Grade |
| 31. Master's Endorsement. | | Date: | | |

AR000181

U.S. Department of Transportation
Maritime Administration

U.S. Merchant Marine Academy
Kings Point, NY 11024 – 1699

Department of Shipboard Training
ACADEMY TRAINING REPRESENTATIVE

Tel: 516-726-5828

Email: treacys@usmma.edu

Assigned Region: ATR-WC

**MIDSHIPMAN ASSIGNMENT REPORT**

| | |
|---|---|
| Name: | MIDN Benjamin A Sell |
| Class/Split: | 2019 – 17-4 |
| Vessel: | MAERSK KENSINGTON |
| Company: | SE201817557 |
| Assignment: | 1/24/2018 |
| STD: | |
| Joining: | |

1. Actual Join date: 1/25/18
2. Detach Date: 5/11/18
3. Days Aboard: 107
4. Route: ☐ Coastwise ☒ Foreign
5. Join Port: Houston, TX ~~Norfolk~~
6. Detach Port: Newark NJ

7. Ports of Call:
Algeciras, Spain
Port Said, Egypt
Salalah, Oman
Jebel Ali, UAE
Papaou – ~~_____~~ India
Nheva Sheva, India

8. Officers:

| | Name. | KP Graduate? |
|---|---|---|
| Master: | Paul Coan | ☒ Yes Year: 1978? |
| Chief Engineer: | Paul Deming | ☒ ~~Yes~~ Year: 1997? |
| 1st Mate / Assistant Eng. | Mike Marx | ☐ Yes Year: |
| 2nd Mate / Assistant Eng. | Bill Cadden Jr | ☐ Yes Year: |
| 3rd Mate / Assistant Eng. | Richard Gorensky | ☐ Yes Year: |
| 3rd Mate / Assistant Eng. | | ☐ Yes Year: |
| Other Cadets: | Wayne Winthrow | |

Working Hours:
9. Average number of hours worked per weekend: ☐16
10. Did you work weekends? Yes
11. Hours per day worked on your sea project: 3
12. Was above time ship's time or personal time? Personal
13. Was your sea project checked by your supervisor? NO
14. Percentage of work performed alone (unsupervised): 90%
15. Percentage of work performed under supervision: 10%

Uniform requirements:
List uniforms worn while:
16. Working: Steel toe Boots
17. On Watch: N/A
18. At meals: N/A
19. Off Duty: N/A
20. When reporting: N/A

21. Ship's Training Program; List the watches stood and duties performed:

In Port: NONE

At Sea: NONE

Arrivals / Departures: Start Generators, change sea suction,
Start/shutdown of Boilers Roll over main engine

22. What was the contribution of the officers aboard to your learning experience?

General attitude toward Cadet:
☒ Very Good ☐ Good ☐ Average ☐ Poor
Answering questions:
☒ Very Good ☐ Good ☐ Average ☐ Poor
Giving cadet responsibility:
☒ Very Good ☐ Good ☐ Average ☐ Poor
Treating cadet as an officer:
☒ Very Good ☐ Good ☐ Average ☐ Poor

23. Would you like to speak with any member of Shipboard Training regarding your experiences aboard this ship? ☐ Yes ☒ No    ✓

24. Did you experience/witness sexual harassment, sexual assault or other discriminatory incidents?    ☐ Yes ☒ No    ✓
If so, please contact the SARC or Civil Rights Office immediately.

24. Suggestions and Items of Interest. List suggestions or details of any noteworthy events:    ✓

AR000182

**U.S. Department of Transportation**
**Maritime Administration**

**U.S. Merchant Marine Academy**
Kings Point, NY 11024 - 1699

**Department of Shipboard Training**
**ACADEMY TRAINING REPRESENTATIVE**

**MIDSHIPMAN ASSIGNMENT REPORT**

Tel: 516-726-5828

Email:treacys@usmma.edu

*Assigned Region:ATR-WC*

| Name: MIDN Benjamin A Sell | 1. Actual Join date: | 2. Detach Date: | 3. Days Aboard: |
|---|---|---|---|
| Class/Split: 2019 - 17-4 | 5/28/18 | 6/28/18 | 29 |
| Vessel: MAERSK MONTANA | | | |
| Company: SE201818196 | 4. Route: | 5. Join Port: | 6. Detach Port: |
| Assignment: 5/28/2018 | ☐ Coastwise | | |
| STO: | ☒ Foreign | Haston, TX | Pt · Everglades |
| Joining: | | | |

| 7. Ports of Call: | 8. Officers: | Name: | KP Graduate? |
|---|---|---|---|
| Bremerhaven | Master: | | ☐ Yes Year:_____ |
| Antwerp | Chief Engineer: | | ☐ Yes Year:_____ |
| Rotterdam | 1st Mate / Assistant Eng. | Vu Tran | ☐ Yes Year:_____ |
| Port Everglades | 2nd Mate / Assistant Eng. | William Fulk | ☒ Yes Year:_____ |
| | 3rd Mate / Assistant Eng. | | ☐ Yes Year:_____ |
| | 3rd Mate / Assistant Eng. | Alex Snyder | ☒ Yes Year: 2013 |
| | Other Cadets: | | |

**Working Hours:**
9. Average number of hours worked per weekend: 4
10. Did you work weekends? Yes
11. Hours per day worked on your sea project: 2
12. Was above time ship's time or personal time? Both
13. Was your sea project checked by your supervisor? Yes
14. Percentage of work performed alone (unsupervised): 20%
15. Percentage of work performed under supervision: 80%

**Uniform requirements:**
List uniforms worn while:
16. Working: N/A
17. On Watch: N/A
18. At meals: N/A
19. Off Duty: N/A
20. When reporting: N/A

**21. Ship's Training Program:** List the watches stood and duties performed:

In Port: NONE

At Sea: NONE

Arrivals / Departures: ARR/DEPT #5, Boiler Operation, Sea Suctions, Start up of generators, Roll ME

**22. What was the contribution of the officers aboard to your learning experience?**

**General attitude toward Cadet:**
☐ Very Good ☐ Good ☒ Average ☐ Poor

**Answering questions:**
☐ Very Good ☐ Good ☒ Average ☐ Poor

**Giving cadet responsibility:**
☐ Very Good ☐ Good ☒ Average ☐ Poor

**Treating cadet as an officer:**
☐ Very Good ☐ Good ☒ Average ☐ Poor    ✓

**23.** Would you like to speak with any member of Shipboard Training regarding your experiences aboard this ship?
☐ Yes ☒ No    ✓

**24.** Did you experience/witness sexual harassment, sexual assault or other discriminatory incidents? ☐ Yes ☒ No    ✓
If so, please contact the SARC or Civil Rights Office immediately.

**24. Suggestions and Items of Interest:** List suggestions or details of any noteworthy events:

ATR Review ☐ATR-NE          ☐ATR-SE          ☐ATR-WC

AR000183

U.S. Department of Transportation
**Maritime Administration**

U.S. Merchant Marine Academy
Kings Point, NY 11024 - 1699

**Department of Shipboard Training**
**ACADEMY TRAINING REPRESENTATIVE**

**MIDSHIPMAN ASSIGNMENT REPORT**

Tel: 516-726-5826
Fax: 516-706-1146
Email:jones1@usmma.edu

*Assigned Region:ATR-WC*

| | | | |
|---|---|---|---|
| Name: | MIDN Benjamin Sell | 1. Actual Join date: | 2. Detach Date: | 3. Days Aboard: |
| Class/Split: | 2019 16-2 | | | |
| Vessel: | USS PONCE (LPD-15) | 12/22/16 | 3/8/17 | 78 |
| Company: | MSC – AFLOAT PERSONNEL MANAGEMENT CENTER | 4. Route: | 5. Join Port: | 6. Detach Port. |
| Assignment: | Engine Cadet | ☐ Coastwise | | |
| STO: | NEMSC201613774 | ☒ Foreign | Jebel Ali: | Jebel Ali |
| Joining: | 12/22/2016 | | | |

7. Ports of Call:
_Jebel Ali , UAE_
_NAVAL STATION Bahrain_

| 8: Officers: | Name: | KP Graduate? |
|---|---|---|
| Master: | | ☐ Yes  Year:_____ |
| Chief Engineer: | | ☐ Yes  Year:_____ |
| 1st Mate / Assistant Eng. | Jeffery Young | ☐ Yes  Year:_ _ ___ |
| 2nd Mate / Assistant Eng. | Christopher Marsch | ☐ Yes  Year:_____ |
| 3rd Mate / Assistant Eng. | James Brittan | ☒ Yes  Year: 2015 |
| 3rd Mate / Assistant Eng. | Fraterick Padua | ☐ Yes  Year:_____ |
| Other Cadets: | | |

Working Hours:
9. Average number of hours worked per weekend: __0__
10. Did you work weekends? __NO__
11. Hours per day worked on your see project: __2-3__
12. Was above time ship's time or personel time? __personal__
13. Was your sea project checked by your supervisor? __NO__
14. Percentage of work performed alone (unsupervised): __90%__
15. Percentage of work performed under supervision. __10%__

Uniform requirements:
List uniforms worn while:
16. Working: __N/A__
17. On Watch:
18. At meals:
19. Off Duty:
20. When reporting:

21. Ship's Training Program: List the watches stood and duties performed:

In Port: __NO watches in port__

At Sea: __08x12 or 12x16__

Arrivals / Departures: _Some arrivals, departures, and UNREPs_
_at CE discretion_

22. What was the contribution of the officers aboard to your learning experience?

General attitude toward Cadet:
☐ Very Good ☒ Good ☐ Average ☐ Poor

Answering questions:
☒ Very Good ☐ Good ☐ Average ☐ Poor

Giving cadet responsibility:
☐ Very Good ☒ Good ☐ Average ☐ Poor

Treating cadet as an officer:
☐ Very Good ☒ Good ☐ Average ☐ Poor   ✓

23. Would you like to speak with any member of Shipboard Training regarding your experiences aboard this ship?
☐ Yes  ☒ No   ✓

24. Suggestions and Items of Interest: List suggestions or details of any noteworthy vents:

AR000184

U.S. Department of Transportation
Maritime Administration

U.S. Merchant Marine Academy
Kings Point, NY 11024 - 1699

Department of Shipboard Training
ACADEMY TRAINING REPRESENTATIVE

**MIDSHIPMAN ASSIGNMENT REPORT**

Tel: 516-726-5826

Email: jonesi@usmma.edu

Assigned Region: ATR-WC

| Name: MIDN Benjamin Sell | 1. Actual Join date: | 2. Detach Date: | 3. Days Aboard: |
|---|---|---|---|
| Class/Split: 2019 17-4 | 11 /10 /18 | 1 /19 /18 | 71 |
| Vessel: USNS ROBERT E. PEARY | 4. Route: | 5. Join Port: | 6. Detach Port: |
| Company: MSC - AFLOAT PERSONNEL MANAGEMENT CENTER | ☒ Coastwise | | |
| Assignment: Engine Cadet | ☐ Foreign | Norfolk, VA | Norfolk, Va |
| STO: NEMSC201716932 | | | |
| Joining: 11/10/2017 | | | |

| 7.  Ports of Call. | 8: Officers: | Name: | KP Graduate? |
|---|---|---|---|
| Norfolk, Va | Master: | | ☐ Yes Year:_____ |
| Ponce, Puerto Rico | Chief Engineer: | Steven Birds | ☒ Yes Year:_____ |
| | 1st Mate / Assistant Eng. | Mike Falcone | ☐ Yes Year:_____ |
| | 2nd Mate / Assistant Eng. | Chris Ingersoll | ☐ Yes Year:_____ |
| | 3rd Mate / Assistant Eng. | Sean Ivens | ☐ Yes Year:_____ |
| | 3rd Mate / Assistant Eng. | Ferdinand Ragasa | ☐ Yes Year:_____ |
| | Other Cadets: | | |

**Working Hours:**
9. Average number of hours worked per weekend: __0__
10. Did you work weekends? __NO__
11. Hours per day worked on your sea project: __2__
12. Was above time ship's time or personal time? __Personal__
13. Was your sea project checked by your supervisor? __NO__
14. Percentage of work performed alone (unsupervised): __~~60%~~ 60%__
15. Percentage of work performed under supervision: __40%__

**Uniform requirements:**
List uniforms worn while:
16. Working: __coveralls (FR)__
17. On Watch: __FR coveralls__
18. At meals: __N/A__
19. Off Duty: __N/A__
20. When reporting: __N/A__

21. Ship's Training Program: List the watches stood and duties performed.

In Port: __Engine Room watch (Ex 12)__

At Sea: __Engine Room Watch (Ex12)__

Arrivals / Departures: ____

22. What was the contribution of the officers aboard to your learning experience?

General attitude toward Cadet:
☒ Very Good ☐ Good ☐ Average ☐ Poor

Answering questions:
☐ Very Good ☒ Good ☐ Average ☐ Poor

Giving cadet responsibility:
☐ Very Good ☒ Good ☐ Average ☐ Poor

Treating cadet as an officer:
☐ Very Good ☐ Good ☒ Average ☐ Poor    ✓

23. Would you like to speak with any member of Shipboard Training regarding your experiences aboard this ship?
☐ Yes ☒ No    ✓

24. Did you experience/witness sexual harassment, sexual assault or other discriminatory incidents? ☐ Yes ☒ No    ✓
If so, please contact the SARC or Civil Rights Office immediately.

25. Suggestions and Items of Interest: List suggestions or details of any noteworthy vents:

# United States Merchant Marine Academy
## Shipboard Performance Evaluation
(See attached instruction sheet)

**1. Cadet Name (Last, First MI)**  Sell, Benjamin, A.

**2. Class & Split** Class: 2019  Split: A

**3. Assigned Department** ☐ Deck  ☒ Engine

**4. Major (Check One)**
☐ Marine Transportation
☐ Logistics & Intermodal Program
☒ Marine Engineering
☐ Marine Engineering Systems
☐ Marine Engineering & Shipyard Mgmt.

**Assigned Region: WC**

**5. Occasion for Report** ☐ Detachment of supervisor  ☐ Periodic (Every 45 Days) ☒ Detachment of cadet

**6. Period of Report** From: 12/22/16  To: 3/5/17

**7. Vessel Name** USS PONCE (AFSB IS)

**8. Check One** ☐ Motor Vessel ☒ Steamship ☐ Gas Turbine

**9. Vessel Operator (Include Address)**

**10. Master's Name**

**11. GRT** 16,591 tons

**12. Year Built** 1971

**13. Vessel Type & Route (i.e. Tanker/Coastwise)** AFSB  Forward

**14. Horsepower**

**15. Official Number**

**16. Cadet duties (Please include primary/collateral and watchstanding responsibilities)**
☒ Day Work  ☒ Watch standing  ☒ Both  ☐ Other:

| | 0.0 Unacceptable or Unsatisfactory | 1.0 Below Standards but Progressing | 2.0 Acceptable and Meets Standards | 3.0 Very Good and Above Standards | 4.0 Exceptional and Always Exceeds Standards |
|---|---|---|---|---|---|
| **Fire Prevention and Fire-Fighting (STCW Competency)** | | | | | |
| Check one ⇒ | | ☐ | ☒ | ☐ | ☐ |
| 17. Minimize the risk of fire and maintain a state of readiness to respond to emergency situations involving fire. | • Possesses inadequate knowledge of shipboard fire-fighting organization. • Unable to identify emergency escape routes. • Fails to recognize general fire/explosion hazards and/or those specific to the vessel. • Fails to understand the need for constant vigilance. • Never read the vessel's fire-fighting plans. • Unable or unwilling to improve. | | • Knowledge of shipboard fire-fighting organization is adequate and will improve. • Understands his/her role in fire prevention and fire fighting aboard this vessel. • Possesses good knowledge of the vessel and emergency escape routes. | | • Displays a highly professional attitude toward fire prevention and the fire-fighting organization aboard this vessel. • Sets a good example for other crewmembers in the areas of fire prevention. • Possesses excellent knowledge of smoke detection and automatic alarm systems. |
| Check one ⇒ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 18. Fight and extinguish fires | • Displays poor knowledge of fire equipment (location and operation) aboard this vessel. • Posses little knowledge of fighting fires and effecting rescues aboard this vessel. • Unable or unwilling to improve. | | • Asks questions regarding the location and operation of fire-fighting equipment aboard the vessel. • Reads vessel's operating manuals' relating to fire-fighting gear. • Displays adequate understanding of fire fighting plans. | | • Clearly understands his/her role and the roles of senior officers in fighting fire aboard this vessel. • Participates fully in fire drills. • Assists in training other crewmembers. |
| **Personal Safety and Social Responsibilities (STCW Competency)** | | | | | |
| Check one ⇒ | ☐ | ☐ | ☐ | ☒ | ☐ |
| 19. Complies with shipboard emergency procedures. | • Unfamiliar with the location and/or operation of personal safety equipment. • Unaware of hazards such as collision, fire, foundering, etc. • Did not turn in required safety checklists, etc. • Displayed no interest in training and drills. • Turned to for drills late or dressed inappropriately. • Unfamiliar with emergency signals and how to sound them. • Unable or unwilling to improve | | • Seeks instruction as to the location and operation of safety equipment that is unfamiliar. • Aware of standard procedures for avoiding hazards such as collision, fire, foundering, etc. • Diligently executes required safety checklists, etc. • Displays an acceptable interest toward safety training and drills. • Understands Abandon Ship duties. • Possesses acceptable knowledge of emergency signals and how to sound them. | | • Unusual knowledge of safety equipment beyond his/her experience. • Participates fully during training sessions and drills. • Dependable contributor to the deck/engineering emergency teams. • Seeks opportunities to share knowledge with vessel's crew during drills. • A valuable shipmate to have in an emergency |

| 20. Cadet Name (Last, First MI) | | 21. Vessel name & route (i.e. MV Aspen/Foreign) | 22. Period and type of report: ☐ Periodic    ☒ Detach | | |
|---|---|---|---|---|---|
| Bell Benjamin, A. | | USS PONCE (AFSB3) FOREIGN | Department:  ☐ Deck   ☒ Engine | | |
| | | | From: 12/22/16   To: 08/03/17 | | |

| | **0.0** Unacceptable or Unsatisfactory | **1.0** Below Standards but Progressing | **2.0** Acceptable and Meets Standards | **3.0** Very Good and Above Standards | **4.0** Exceptional and always Exceeds Standards |
|---|---|---|---|---|---|
| **Personal Safety and Social Responsibilities (STCW Competency)** | | | | | |
| Check one ⇨ | ☐ | ☐ | ☐ | ☒ | ☐ |
| 23. Takes precautions to prevent pollution of the marine environment. | • Fails to observe international regulations and company policies regarding water control • Inattentive during critical operations (i.e. bunkering, transferring cargo, etc.) • Unable or unwilling to improve. | | • Seeks knowledge of shipboard procedures for bunkering, transferring cargo, etc. • Displayed common sense regarding pollution prevention | | • Knowledgeable regarding vessel's pollution prevention procedures. • Displays mature & professional attitude regarding responsibility for pollution prevention |
| Check one ⇨ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 24. Observes safe working practices. | • Careless attitude toward safe working practices. • Unprofessional approach to routine work • Failed to maintain standards of sobriety set by law and/or company policy • ... | | • Acquired and maintained familiarity with vessel's SMS. • Observed regulations and policies regarding work hours and practices | | • Totally committed to getting work done safely. • Concerned for the safety of others • Set a good example for others |
| Check one ⇨ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 25. Ability to understand orders and can be understood in relation to shipboard duties. | • Weak speaking or listening skills • Lacked common sense. • Argumentative. • Needs to improve communications skills • Impatient and/or impolite • Unable or unwilling to improve | | • Open to ideas. • Speaks confidently. • Listen attentively and asks for clarification if necessary. • Understands his/her responsibilities • Uses proper nautical terms | | • Carries out assignments with minimal supervision • Assists vessel's officers in communicating with the crew |
| Check one ⇨ | ☐ | ☐ | ☒ | ☒ | ☐ |
| 26. Contributes to effective human relationships on board ship. | • Maintained quarters in unacceptable condition • Fails to support company's drug and alcohol program • Unacceptable personal hygiene • Displayed little regard for the condition of public spaces aboard ship. • Unaware of health issues aboard ship • Officers and ratings preferred not work with him/her • Exhibited discriminatory tendencies • Unable or unwilling to improve. | | • Listens effectively then executes duties without additional instruction. • Used alcohol responsibly with no effect on performance or not at all • Asks appropriate questions • Maintains professional relationships with ratings and licensed officers • Works well with ratings and officers • Recognized and responded to the needs of others. • Concerned for the safety and well being of those aboard. | | • Contributes to good morale aboard the vessel. • Strongly supports company's drug and alcohol program • Promotes team effort • Sought responsibility. • Strongly committed to becoming a responsible officer • Possesses remarkable sensitivity to issues of life aboard (labor relations, safety, health, morale) • Unusual desire to improve from and win the respect of others |
| **Professional Development and Progress** | | | | | |
| Check one ⇨ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 27. Developing professionally toward a license. | • Is not attempting to progress professionally. • Lacking in basic maritime skills • Shows consistent lack of interest in professional development • Unable or unwilling to improve, etc. | | • Steadily progressing toward ability to perform as a licensed officer • Continuously developing professional skills such as watchstanding and navigation, maintenance and repair, etc. | | • Knowledgeable regarding shipboard operations and maintenance procedures. • Displays mature & professional attitude toward watchstanding. • Will make a fine officer |
| Check one ⇨ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 28. Creative thinking & problem solving. | • Often gets overwhelmed with assignments • Unable to display problem solving skills | | • Demonstrates analytical capacity • Has good problem solving skill. • Has ability to tackle problems with a good attitude. | | • Breaks down problems or tasks into manageable pieces • Brainstorms to develop options and ideas • Demonstrates extraordinary analytical skill |

29. Comments on Performance. (Please use this space to expand or explain rating or to report extraordinary conduct or behavior. IF EXTRA SPACE IS NEEDED, PLEASE ATTACH EXTRA SHEETS.)

During his time on the ship he really improved his mechanical skills, He needed some supervision when performing tasks and needs to improve on making sure equipment is clean when reassembling. Overall a good cadet and would like to sail with again.

☐ See Attached Sheet(s)

| 30. Department Head's Endorsement: MATTHEW H. CLARK | (Printed Name) | (Signature) | 7 May 17 (Date) | ☐ Concur with evaluation ☐ See initials and comments | |
|---|---|---|---|---|---|
| 31. Master's Endorsement: | | | | ☐ Concur with evaluation ☐ See initials and comments | 31. ATR's Code |
| | Printed Name: | (Signature) | (Date) | | |

West Coast Region
## INTERNSHIP TRAINING ORDERS

Benjamin **A** Sell

Class 2019

Lexington County Sheriff Department

## MIDSHIPMAN INTERNSHIP TRAINING ASSIGNMENT PERFORMANCE EVALUATION

## EVALUATION OF MIDSHIPMAN

| | | | |
|---|---|---|---|
| | Very Polite | Pleasant | Calm |
| | | Good Worker | Helpful |
| | Cooperative | Smart | Unsatisfactory |
| | Acceptable | | |
| | Above | | Good |
| | | | |
| | | | Poor |
| | | | Fair |

GENERAL EVALUATION
Pleased    Satisfied    Dissatisfied

GENERAL COMMENTS

# INTERNSHIP PREFERENCE REQUEST

(REV 1/27/2018)

PRINT OR TYPE ALL INFORMATION. BE COMPLETE. BE ACCURATE

See back of this page **for instructions.**

| M/N LAST NAME | M/N FIRST NAME | M/N MIDDLE INITIALS | |
|---|---|---|---|
| Sell | Benjamin | A | ATE Tracey FARMER |
| M/N CLASS/SPLIT | M/N MAJOR or COURSE OF STUDY | P.O. BOX NO | M/N CELL |
| 2019A | EN | 633 | 803-477-7964 |

## INTERNSHIP OPTIONS (MIDN must initial one)

☐ PDCS will assign me a local internship at a time convenient to the department. I understand that I will be confined at USMMA and provided local public transportation on the internship site.

☑ I elect to have the option of selecting my internship at an organization approved by PDCS. **I fully understand that the Academy will not** bear expenses related to this option.

1 **I am interested in an internship with a company in the field of:** Lexington County Sheriff Dept. Marine Patrol

2 **FIRST CHOICE INFORMATION**

| | |
|---|---|
| Organization's Full Name | Lexington County Sheriff Department |
| Organization's Full Address | 521 Gibson Road  Lexington, SC 29072 |
| Full Name of Contact | Dan Rusinyak | Tel: No. | 803-785-8230 |
| Contact's Title | Recruiter | Fax No. | |
| Contact's Email | DRusinyak@lcsd.sc.gov | | |

| Did you contact the organization? | Is your contact a KP Alum? | Is the company in the Internship Directory? |
|---|---|---|
| YES ☐    NO | YES ___  Year ___   NO  X | ES ___   NO  X |

**Shipboard Training Approval:** _____   Date _____

3 **SECOND CHOICE INFORMATION**

| | |
|---|---|
| Organization's Full Name | |
| Organization's Full Address | |
| Full Name of Contact | | Tel No. | |
| Contact's Title | | Fax No. | |
| Contact's Email | | | |

| Did you contact the organization? | Is your contact a KP Alum? | Is the company in the Internship Directory? |
|---|---|---|
| YES ___  NO | YES ___  Year ___  NO ___ | YES ___  NO ___ |

**Shipboard Training Approval:** _____   Date _____

4 **THIRD CHOICE INFORMATION**

| | |
|---|---|
| Organization's Full Name | |
| Organization's Full Address | |
| Full Name of Contact | | Tel No. | |
| Contact's Title | | Fax No. | |
| Contact's Email | | | |

| Did you contact the organization? | Is your contact a KP Alum? | Is the company in the Internship Directory? |
|---|---|---|
| YES ___  NO | YES ___  Year ___  NO ___ | YES ___  NO ___ |

**Shipboard Training Approval:** _____   Date _____

5. I request that my internship Assignment be completed (state requested time frame): July 1 – July 14

6 REMARKS (if extra space is needed, use back of this form)

*Benjamin A. Sell*        (M/N Signature)        9/25/2017        (Date)

AR000189




## UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK

### TURNITIN.COM REQUIRED STUDENT CONSENT FORM

I hereby consent to allow any and all required writing assignments ("papers") in the course, **_PDCS Internship_**, taught by **_PDCS Academy Training Representatives and Department Head_** to be submitted to Turnitin.com, an electronic database, owned and operated by iParadigms, LLC, for plagiarism assessment purposes. I further understand and agree that my papers may be included as a source document in the Turnitin.com database, solely for the purpose of detecting plagiarism. I acknowledge and agree that use of the Turnitin.com service is subject to the terms of Turnitin.com's Usage Policy and Privacy Policy, which are posted on its website.

I represent and warrant that I am the sole creator and owner of my papers submitted for the course listed on this Consent and that I hold the complete and undivided copyright interest to all of my papers submitted for this course. I understand that, to the extent applicable by law, my papers are considered part of my education record under the Family Educational Rights and Privacy Act (FERPA) and the Privacy Act of 1974 and, as such, are protected from disclosure without my written consent.

I acknowledge that my consent is given freely and voluntarily and that I may revoke this consent in writing at any time, except to the extent action has been taken in reliance upon my prior consent.

_Ben Sell_
Student's signature

8-7-17
Date

_Benjamin Sell_
Student's name

Signature of student's parent or guardian
(if student is under 18 years of age)

This information is released subject to the confidentiality provisions of appropriate state and federal laws and regulations that prohibit any further disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations.

U.S. Department
of Transportation
Maritime
Administration

**U.S. Merchant Marine Academy**
**Department of Shipboard Training**
**ACADEMY TRAINING REPRESENTATIVE**
**West Coast Region**
# INTERNSHIP TRAINING ORDERS

Kings Point, NY 11024 - 1699
Tel: 516-726-5827
Fax. 516-706-2843
Email: farmerd@usmma.edu

**Assigned Region: ATR-WC**

Training Orders No          WC201818557 - STINA

Date                        6/27/2018

For                         MIDN Benjamin A. Sell, 2019 (17-4)

## COMMENCEMENT ENDORSEMENT
1.   Upon commencement of the internship, you will request that the Coordinator endorse these orders.

This midshipman has commenced his/her internship with our organization.

Organization:   Lexington County Sheriff Department        Date: 7/9/18     Time: 1400

_____                        Daniel Rusnyek
Signature of Coordinator                             Printed Name

## COMPLETION ENDORSEMENT
1    Upon completion of the internship or upon receiving orders your Academy Training Representative to detach, you will request that the Coordinator endorse these orders.

This midshipman has completed his/her internship with our organization.

Organization.   Lexington County Sheriff Department        Date: 7/11/18    Time: 1400

_____                        Daniel Rusnyek
Signature of Coordinator                             Printed Name

## DOCUMENTATION INSTRUCTIONS:

**Refer to guidelines and instructions on Turnitin.com,**

AR000191



**SUPERINTENDENT**
**UNITED STATES MERCHANT MARINE ACADEMY**
KINGS POINT, NEW YORK 11024-1699

11 October 2018

From:   Superintendent

To:     MIDN Benjamin Sell, 2019

Subj:   Superintendent's Decision, Honor Board of 19 September 2018

Upon review of your case, I have decided to affirm the finding of the Honor Board that you are guilty of lying and direct the following actions:

1. You will complete Term 1, Academic Year 2018-19 and then placed on leave of absence.  You will depart the Academy for your leave of absence on a date determined by the Commandant of Midshipmen.  You will not depart the Academy until any outstanding board actions are completed.

2. You will return to the Academy and be set back to the Class of 2020 on a date to be determined jointly by the Academic Dean and Provost and Commandant of Midshipmen but no earlier than the start of Term 3, Academic Year 2018-19.  You will resume your academic studies, to include remediation of failed sea projects, with a schedule as determined by the Academic Dean and Provost.

3. During your leave of absence, you must complete 50 hours of community service, which must be documented in writing by the agencies or organizations you are supporting.  You must also enroll in and pass a college-level ethics-based course prior to returning to the Academy.  The course must be approved in advance by the Commandant or his designated representative.

4. You will report your progress to the Commandant or his designated representative every thirty days during your leave of absence.

5. Prior to joining the Class of 2020, you must take and pass a Physical Readiness Test as administered by the Commandant or his designated representative.  You will receive instructions for the time and place of the PRT from the Commandant's Office.

6. Upon return to the Academy, you will undergo an honor remediation program in accordance with Paragraph 312 of the June 2015 Honor Manual.  The Commandant of Midshipmen will designate an officer to serve as your remediation officer.  At the discretion of the Commandant, remediation activities may be assigned during your leave of absence.  These activities will not shorten the 120-day remediation period once you return to the Academy.

7. You will comply with all Remediation restrictions in Paragraph 312B of the June 2015 Honor Manual.  You must request any exception in writing through your chain of command to the Commandant of Midshipmen, who will make a decision.  The Commandant's decisions on exceptions to restriction are final.  The Commandant may not delegate the authority to decide exceptions to restriction.  You are ineligible for Sea Duty until your remediation is complete.

AR000192

8   If the Commandant determines your remediation was unsuccessful you will be referred to an
    Executive Board or Superintendent's hearing and may be disenrolled from the Academy.

You may appeal this decision in accordance with Paragraph 410B of the June 2015 Honor Manual

By copy of this memorandum, the Office of the Dean, Commandant of Midshipmen, and Registrar are
directed to implement this decision immediately.


Sincerely

James A. Helis
Rear Admiral, USMS
Superintendent

Encl.    Acknowledgement of Decision

cc       Office of the Dean
         Commandant of Midshipmen
         Registrar

AR000193

UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK

From:       MIDN Benjamin Sell, 2019

To:         Superintendent

Subj:       Superintendent's Decision re
            Honor Board of 19 September 2018


I am in receipt of the Superintendent's Decision of 11 October 2018 concerning the Honor Board which was convened to inquire into my conduct

I acknowledge the terms set forth in that decision, my responsibilities to abide by them, and the consequences should I fail to do so.

I acknowledge that I have until the close of the business day after receipt of this notice to provide the Superintendent written notice of my intent to appeal this decision. I acknowledge that I must submit my appeal in writing no later than seven days after receipt of this decision.


_____                          _____
Midshipman Benjamin Sell                                  Date


This acknowledgement shall be hand delivered to the Office of the Superintendent within 24 hours

Midshipman Benjamin [redacted]                                    June 20, 2017
Class of 20[redacted]
Marine Engineering

TERMS OF PROBATION

MIDN [redacted]:

After a careful review of your academic record, I have accepted the recommendation of the Interim Academic Dean and the Academic Review Board that you be put on Continued Academic Probation status. The terms of your probation are as follows:

You will be on Academic Probation status through the end of the second sailing period. See [redacted] and [redacted] Any academic skill will constitute a violation of terms and will result in your being Referred for Disenrollment.

If you fail to meet the conditions of probation that result in your disenrollment. Disenrollment will necessitate your degree. You [redacted] and [redacted] unable to fulfill your service obligations potentially subjecting you to [redacted] by the federal government to recover the cost of your education.

Finally, you agree you to dedicate yourself to successful completion of the USMMA program.

JAMES [redacted] HELIS
Rear Admiral, USMS
Superintendent

cc: [redacted] R. L. MIDN [redacted] Dll, HDWE

I hereby acknowledge and understand the probationary terms set forth in this letter.

[redacted]                                            Date

AR000195

June 29, 2017

Midshipman Benjamin Ses
Class of 2019
Marine Engineering

## TERMS OF PROBATION

MIDN Self

After a careful review of your academic record, I have accepted the recommendation of the Interim Academic Dean and the Academic Review Board that you be put on Continued Academic Probation status. The terms of your probation are as follows:

You will be on Academic Probation status through the end of the second sailing period: No Fs and QPA/CQPA = 2.00. Any deficiency status will constitute a violation of terms, and will result in your being Referred for Disenrollment.

Failure to meet the conditions set forth may result in your disenrollment. Disenrollment will jeopardize your degree, your license, and your ability to fulfill your service obligations, potentially subjecting you to claims by the federal government to recoup the cost of your education.

I therefore urge you to dedicate yourself to successful completion of the USMMA program.

JAMES A. HELIS
Rear Admiral, USMS
Superintendent

cc: D, R, C, MPO, ADD, HOWD

I hereby acknowledge and understand the probationary terms set forth in this letter.

Signed _____     Date _____



# Memorandum

U. S. Department
of Transportation

U. S. Merchant
Marine Academy

Maritime
Administration

---

**To:**      MIDN Benjamin Sell, Class of 2019

**From:**    Dr. John Ballard
            Acting Deputy Superintendent

**Date:**    18 October 2018

**Re:**      Notice of Executive Board Suitability Hearing

---

In accordance with Chapter 6, Section 6.1, of the 2018 USMMA Midshipman Regulations (as set forth in SI 2018-07), you are hereby directed to appear before an Executive Board for a hearing to determine your suitability to continue as a Midshipman at the Academy. You were placed on Deferred Gradute status for failed Sea Year projects; you stood before an Honor Board on 19 September 2018 for and were found guilty; and you have failed the Physical Fitness Assessment (PFA) multiple times during your tenure at the Academy.

While you are expected to appear, you are not required to provide evidence, make a statement, or answer questions. However, be advised that your suitability to continue as a Midshipman at the Academy will be considered based on the evidence, statements, and/or information presented at the hearing. You bear the burden of demonstrating sufficient cause for retention by a preponderance of the evidence.

The hearing shall be convened onThursday, 25 October 2018 at 1030 in the Patterson Conference Room, 2nd Deck, Wiley Hall. Uniform shall be Seasonal Dress Uniform.

The Executive Board Secretary, a non-voting participant, will maintain detailed, but not verbatim, minutes of the hearing (except for the deliberations). The hearing may also be digitally recorded (except for the deliberations). The Secretary's minutes will be deemed a sufficient record of the proceedings in the event a digital recording is not made or preserved. A copy of the minutes or the recording, if made, will be provided to you upon your request, subject to your acceptance and signature of a Confidentiality/Non-Disclosure Agreement, if applicable. Once the Executive Board procedures have been completed, including any appeals, if applicable, the copy of the minutes or digital recording must be returned to the Executive Board Secretary. Requests for a copy of the minutes or digital recording made after the conclusion of all disciplinary proceedings will be denied.

The following individuals will serve as members of the Executive Board:

Dr. John Ballard, Acting Deputy Superintendent, Chair
CDR David Pulis, Assistant Academic Dean
CDR Bradley Hawksworth, Head, Department of Naval Science
CAPT Bill Fell, Assistant Athletic Director, Department of Physical Education and Athletics

18 October 2018
Page 2

MIDN Michael Sobelman, Battalion Commander

The Academy intends to call the following witnesses at the Hearing:

LT John Jaeger, Company Officer
Ms. Melinda Eng, Athletic Trainer, Department of Physical Education and Athletics
Mr. Greg Ilaria, Coach, Department of Physical Education and Athletics
Mr. Rick Sager, Director, Department of Health Services

You are being provided with copies of the following documents, which will be considered by the Executive Board:

1.   The Performance Review Board and Commandant's recommendations that an Executive Board be convened and the Superintendent's notification that a hearing will be held;

2.   Academic File (with transcript), as maintained by the Academic Dean;

3.   Company File, as maintained by your Company Officer;

4.   Midshipman Profile, prepared by your Company Officer;

5.   Personnel Jacket, as maintained by the Commandant;

6.   Honor Case File, as maintained by the Honor Board;

7.   Sea Year File, as maintained by the Department of Career Services and Professional Development; and

8.   PFA history.

The Executive Board will also consider all documentary evidence and witness testimony provided by you.

You have the following rights prior to and at the hearing:

1.   To receive written notice of the Executive Board hearing at least five (5) days before the hearing, which notice shall include the following: (1) the specific charges to be considered by the Executive Board; (2) the date, time, and location of the hearing; (3) the names of those who will comprise the Executive Board; (4) the witnesses to be called by the Executive Board, if any; (5) the uniform to be worn at the hearing; and (6) your additional rights, as delineated below.

2.   To receive, with the written notice, copies of all documentation to be considered by the Executive Board in making its recommendation, subject to you signing a Confidentiality/Non-Disclosure Agreement upon request by the Chair.  (With your consent, your advisor and/or counsel may receive a copy of the relevant

AR000198

18 October 2018
Page 3

> documentation, likewise subject to execution of a Confidentiality/Non-Disclosure
> Agreement, upon request by the Chair.)

3. To seek advice and assistance of legal counsel in the preparation of your case at your own expense. Legal counsel will not be permitted to be present during the Executive Board hearing unless, at the time of the Board hearing, you are charged with a criminal offense by a Federal, state, or local jurisdiction arising out of the same circumstances as the charge before the Board. In such cases, counsel shall not actively participate in the proceedings but shall be allowed to be present to consult with you and provide advice.

4. To request any Academy faculty or staff member other than a Chaplain, Counsel to the Academy or Assistant Counsel, member of the Commandant's Office, or witness to be called at the hearing to act as your advisor as long as serving in that capacity does not present a conflict with the faculty or staff member's professional responsibilities. In the event that you are unable to obtain an advisor, the Superintendent will appoint one on request.

5. To challenge the impartiality of any or all members of the Executive Board. A written justification for any such challenge must be submitted to the Secretary of the Executive Board within 24 hours of you being informed of the membership of the Executive Board. The Chair will rule on any such challenge. Members disqualified will be replaced by the Chair. Challenge of the Chair will be resolved by the Superintendent. You shall be notified of the decision on any such challenge and the substitution of new members, if any.

6. To be present during the entire hearing, except for the Executive Board's deliberations.

7. To make opening and closing statements.

8. To present evidence including but not limited to documentary evidence and the testimony of reasonably available witnesses during the hearing. You must notify Ms. Ross in the Superintendent's Office, Wiley Hall, 2nd Deck in writing no later than 1030 on 23 October 2018 of the identity of your witnesses. The Academy shall make reasonable efforts to insure the attendance of the witnesses identified by you who are enrolled at or employed by the Academy. Appearance by witnesses not employed by, or enrolled at, the Academy are your sole responsibility.

9. To question all witnesses, whether called by the Academy or by you.

10. To receive, upon request, a copy of the minutes prepared by the Executive Board Secretary and/or a copy of the digital recording of the hearing (exclusive of deliberations), if made, subject to your signing a Confidentiality/Non-Disclosure Agreement upon request by the Chair. (With your consent, your advisor and/or counsel may also receive a copy of the recording, likewise subject to execution of a Confidentiality/Non-Disclosure Agreement, upon request by the Chair.) Once the disciplinary procedures have been completed, including any appeals, any copy of

AR000199

18 October 2018
Page 4

the minutes or digital recording must be returned to the Executive Board Secretary. Requests for a copy of the minutes or digital recording made after the conclusion of all disciplinary proceedings will be denied.

Attached to this Notice is a copy of Superintendent's Instruction 2018-07, Chapter 6, which sets forth the procedures for an Executive Board Hearing.

RECEIPT ACKNOWLEDGED:

M/N Benjamin Self

Date ____ 10 - 18-18 ____

AR000200



# Memorandum

U. S. Department
of Transportation

U. S. Merchant
Marine Academy

**Maritime
Administration**

---

To:        MIDN Benjamin Sell, Class of 2019

From:     Dr. John Ballard, Ph.D.
            Acting Deputy Superintendent

Date:     30 October 2018

Re:       Third Revised Notice of Executive Board Suitability Hearing

---

In accordance with Chapter 6, Section 6.1, of the 2018 USMMA Midshipman Regulations (as set forth in SI 2018-07), you are hereby directed to appear before an Executive Board for a hearing to determine your suitability to continue as a Midshipman at the Academy. You were placed on Deferred Graduate status for failed Sea Year projects; you stood before an Honor Board on 19 September 2018 and were found guilty; and you have failed the Physical Fitness Assessment (PFA) multiple times during your tenure at the Academy.

While you are expected to appear, you are not required to provide evidence, make a statement, or answer questions. However, be advised that your suitability to continue as a Midshipman at the Academy will be considered based on the evidence, statements, and/or information presented at the hearing. You bear the burden of demonstrating sufficient cause for retention by a preponderance of the evidence.

The hearing shall be convened on Tuesday, 06 November 2018 at 1430 in the Patterson Conference Room, 2nd Deck, Wiley Hall. Uniform shall be Seasonal Dress Uniform.

The Executive Board Secretary, a non-voting participant, will maintain detailed, but not verbatim, minutes of the hearing (except for the deliberations). The hearing may also be digitally recorded (except for the deliberations). The Secretary's minutes will be deemed a sufficient record of the proceedings in the event a digital recording is not made or preserved. A copy of the minutes or the recording, if made, will be provided to you upon your request, subject to your acceptance and signature of a Confidentiality/Non-Disclosure Agreement, if applicable. Once the Executive Board procedures have been completed, including any appeals, if applicable, the copy of the minutes or digital recording must be returned to the Executive Board Secretary. Requests for a copy of the minutes or digital recording made after the conclusion of all disciplinary proceedings will be denied.

The following individuals will serve as members of the Executive Board:

Dr. John Ballard, Acting Deputy Superintendent, Chair
CDR David Pulis, Assistant Academic Dean
CDR Bradley Hawksworth, Head, Department of Naval Science
CAPT Bill Fell, Assistant Athletic Director, Department of Physical Education and Athletics

25 October 2018
Page 2

MIDN Adam Viscovich, Battalion Commander

The Academy intends to call the following witnesses at the Hearing:

LT John Jaeger, Company Officer
Ms. Melinda Eng, Athletic Trainer, Department of Physical Education and Athletics
Mr. Greg Ilaria, Coach, Department of Physical Education and Athletics
Mr. Rick Sager, Director, Health Services

You are being provided with copies of the following documents, which will be considered by the Executive Board:

1.   The Commandant's recommendations that an Executive Board be convened and the Superintendent's notification that a hearing will be held;

2.   Academic File (with transcript), as maintained by the Academic Dean;

3.   Company File, as maintained by your Company Officer;

4.   Midshipman Profile, prepared by your Company Officer;

5.   Personnel Jacket, as maintained by the Commandant;

6.   Honor Case File, as maintained by the Honor Board;

7.   Sea Year File, as maintained by the Department of Career Services and Professional Development; and

8.   PFA history.

The Executive Board will also consider all documentary evidence and witness testimony provided by you.

You have the following rights prior to and at the hearing:

1.   To receive written notice of the Executive Board hearing at least five (5) days before the hearing, which notice shall include the following: (1) the specific charges to be considered by the Executive Board; (2) the date, time, and location of the hearing; (3) the names of those who will comprise the Executive Board; (4) the witnesses to be called by the Executive Board, if any; (5) the uniform to be worn at the hearing; and (6) your additional rights, as delineated below.

2.   To receive, with the written notice, copies of all documentation to be considered by the Executive Board in making its recommendation, subject to you signing a Confidentiality/Non-Disclosure Agreement upon request by the Chair.  (With your consent, your advisor and/or counsel may receive a copy of the relevant

documentation, likewise subject to execution of a Confidentiality/Non-Disclosure Agreement, upon request by the Chair.)

3.     To seek advice and assistance of legal counsel in the preparation of your case at your own expense. Legal counsel will not be permitted to be present during the Executive Board hearing unless, at the time of the Board hearing, you are charged with a criminal offense by a Federal, state, or local jurisdiction arising out of the same circumstances as the charge before the Board. In such cases, counsel shall not actively participate in the proceedings but shall be allowed to be present to consult with you and provide advice.

4.     To request any Academy faculty or staff member other than a Chaplain, Counsel to the Academy or Assistant Counsel, member of the Commandant's Office, or witness to be called at the hearing to act as your advisor as long as serving in that capacity does not present a conflict with the faculty or staff member's professional responsibilities. In the event that you are unable to obtain an advisor, the Superintendent will appoint one on request.

5.     To challenge the impartiality of any or all members of the Executive Board. A written justification for any such challenge must be submitted to the Secretary of the Executive Board within 24 hours of you being informed of the membership of the Executive Board. The Chair will rule on any such challenge. Members disqualified will be replaced by the Chair. Challenge of the Chair will be resolved by the Superintendent. You shall be notified of the decision on any such challenge and the substitution of new members, if any.

6.     To be present during the entire hearing, except for the Executive Board's deliberations.

7.     To make opening and closing statements.

8.     To present evidence including but not limited to documentary evidence and the testimony of reasonably available witnesses during the hearing. You must notify Ms. Ross in the Superintendent's Office, Wiley Hall, 2nd Deck in writing no later than 1430 on 02 November 2018 of the identity of your witnesses. The Academy shall make reasonable efforts to insure the attendance of the witnesses identified by you who are enrolled at or employed by the Academy. Appearance by witnesses not employed by, or enrolled at, the Academy are your sole responsibility.

9.     To question all witnesses, whether called by the Academy or by you.

10.     To receive, upon request, a copy of the minutes prepared by the Executive Board Secretary and/or a copy of the digital recording of the hearing (exclusive of deliberations), if made, subject to your signing a Confidentiality/Non-Disclosure Agreement upon request by the Chair. (With your consent, your advisor and/or counsel may also receive a copy of the recording, likewise subject to execution of a Confidentiality/Non-Disclosure Agreement, upon request by the Chair.) Once the disciplinary procedures have been completed, including any appeals, any copy of

AR000203

25 October 2018
Page 4

the minutes or digital recording must be returned to the Executive Board
Secretary.  Requests for a copy of the minutes or digital recording made after the
conclusion of all disciplinary proceedings will be denied.

Attached to this Notice is a copy of Superintendent's Instruction 2018-07, Chapter 6, which sets
forth the procedures for an Executive Board Hearing.

RECEIPT ACKNOWLEGED:

M/N Benjamin Sell                          Date    10/29 30/18

AR000204

Sell Failures

| Year | CU | PU | Min | Sec | Result |
|------|-----|-----|-----|-----|--------|
| AY 2016 T1 | | | | | |
| Sell        Benjamin | 41 | 31 | 14 | 8 | Fail |

AY 2016 T Class Did not take during second tri

| AY 2016 T3 | | | | | |
|------|-----|-----|-----|-----|--------|
| Sell        Benjamin | 55 | 43 | 10 | 58 | Fail |

| AY 2017 T1 | | | | | |
|------|-----|-----|-----|-----|--------|
| Sell        Benjamin | 72 | 55 | 10 | 58 | Pass |

AY 2017 T2
Sea

| AY 2017 T3 | | | | | |
|------|-----|-----|-----|-----|--------|
| Sell        Benjamin | 70 | 47 | 11 | 30 | Pass |

| AY 2018 T1 | | | | | |
|------|-----|-----|-----|-----|--------|
| Sell        Benjamin | 62 | 50 | 12 | 2 | Fail |

AY 2018 T2
Sea

AY 2018 T3
Sea

| AY 2019 T1 | | | | | |
|------|-----|-----|-----|-----|--------|
| Sell        Benjamin | 64 | 54 | 11 | 52 | Pass |

PEP
AY 2016 T3
- Missed several PEP sessions

AY 2018 T1
- Missed several PEP sessions due to no show/sick
- Passed off on 9/22/18 with the following scores:
  - SU 60
  - PU 48
  - RUN 1056

AR000205

MIDN Benjamin Sell          Class of 2019
BCA History

| Official BCA | Height | Weight | Neck | Waist | BF% | |
|---|---|---|---|---|---|---|
| 7/20/2015 | 67 | 191 | 15 | 36 | 23% | * and Failed the PRT |

| Remedial BCA | July 20th Official BCA | Week of 27-Jul | Week of 3-Aug | Week of 10-Aug | Week of 17-Aug | Week of 24-Aug |
|---|---|---|---|---|---|---|
| | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT |
| | 23%/191 | No Show | No Show | 20%/179 | 18%/172 | 18%/174 |

| Official BCA | Height | Weight | Neck | Waist | BF% | | |
|---|---|---|---|---|---|---|---|
| 3/14/2016 | 68 | 183 | | | | Pass by weight | *But failed the PRT |

| Official BCA | Height | Weight | Neck | Waist | BF% | |
|---|---|---|---|---|---|---|
| 7/18/2016 | 67 | 177 | 15 | 35.5 | 18% | Passed the PRT |

| Official BCA | Height | Weight | Neck | Waist | BF% | |
|---|---|---|---|---|---|---|
| 3/13/2017 | 67 | 206 | 15 | 35 | 21% | Passed the PRT |

AR000206

| Official BCA | Height | Weight | Neck | Waist | BF% | |
|---|---|---|---|---|---|---|
| 7/17/2017 | 67 | 189 | 15 | 35 | 21% | *But failed the PRT |

| Remedial | July 17th | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of | Week of |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Official BCA | 24-Jul | 31-Jul | 7-Aug | 14-Aug | 21-Aug | 28-Aug | 5-Sep | 11-Sep | 18-Sep | 25-Sep | 2-Oct | 10-Oct | 16-Oct |
| | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT | BF/WT |
| | 21%/186 | | | 22%/191 | 21%/188 | NO SHOW | 19%/189 | 21%/186 | 20%/185 | 21%/183 | PFA Passed | | | |

| Official BCA | Height | Weight | Neck | Waist | BF% | |
|---|---|---|---|---|---|---|
| 7/16/2018 | 67 | 172 | | | | Passed by Weight    **Passed the PRT** |

| Official BCA | Height | Weight | Neck | Waist | BF% | |
|---|---|---|---|---|---|---|
| 11/5/2018 | | | | | | NO SHOW for BCA & PRT |

AR000207

UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK

27 June 2018

<u>SUPERINTENDENT INSTRUCTION 2018-07</u>

<u>Subj</u>: **MIDSHIPMAN REGULATIONS**

1. <u>**Purpose**</u>. To authorize and promulgate revisions to the Midshipman Regulations.

2. <u>**Background**</u>: The Academy is required by the U.S. Department of Transportation, Maritime Administration, as directed by the Merchant Marine Education and Training Act of 1980 to have formal rules governing the operation of the Regiment. These Midshipman Regulations fulfills this requirement.

3. <u>**Applicability**</u>. This policy applies to all Midshipmen at the United States Merchant Marine Academy.

4. <u>**Supersedes**</u>. Midshipman Regulations, dated 16 May 2011; Superintendent Instruction (SI) 2006-26, *Alcohol Awareness Education and Treatment Policy*; SI 1998-11, *Hold Over Program Guide*; SI 1998-04, *Policy Governing Athletic Holdovers and Other Transient Midshipmen*; SI 2012-10, *Illegal Drug Use by Midshipmen and Drug Testing Program*; SI 2016-04, *Sea Year Conduct Policy*; Superintendent Notice (SN) 2017-07, *Revision of Chapter 10 of 2011 Midshipman Regulations*; Commandant Instruction (CI) 2008-06, *Uniform Regulations for USMMA Services*; CI 2009-02, *Drug Paraphernalia*; CI 2009-06, *Noon Mess Attendance*; CI 2012-06, *Cell Phone/Mobile Device Usage in Uniform*; CI 2015-01, *Changes in Special Liberty Request Procedures*; and, CI 2012-01, *Liberty Policy*.

5. <u>**Policy**</u>: The Midshipman Regulations serves as a guide for Midshipmen to ensure they understand the Academy's expectations. This guide is critical to the orderly governance of the Regiment of Midshipmen. By taking the Midshipman Oath, Midshipmen commit to comply with these Regulations. Midshipmen are expected to maintain the highest standards of self-discipline and to enforce the standards of conduct outlined in these Regulations.

   a. Midshipmen will comply with these Regulations and all other written or oral directives issued.

   b. Midshipmen are expected to act in accordance with the intent or spirit of these Regulations. A Midshipman who is reported correctly for a deficiency is expected to acknowledge and accept the resultant disciplinary action.

   c. A Midshipman who believes that a specified policy or regulation is detrimental to the United States Merchant Marine Academy is encouraged to present views and

recommendations to the Midshipman chain of command, Company Officer or Midshipman Council. Nevertheless, a Midshipman is expected to comply with the policy or regulation in effect.

d.  A Midshipman who receives an order which is in violation of the Regulations or in violation of State or Federal laws will seek recourse from a Midshipman in the chain of command senior to the Midshipman who issued the order. If the Midshipman does not receive what he/she believes to be sufficient recourse, he/she should speak with the Deputy Commandant of Midshipmen. A Midshipman who elects to comply with what is known to be an unauthorized order is considered to be accountable for his/her actions.

6.  **Expiration.** This Superintendent Instruction goes into effect immediately and remains in effect until superseded or rescinded.

James A. Helis
Rear Admiral, USMS
Superintendent

Dist. Via Email and Intranet

AR000209

# United States Merchant Marine Academy



# Midshipman Regulations 2018

AR000210

## TABLE OF CONTENTS

**Chapter 1 – SCOPE**
1.1    Background
1.2    Purpose
1.3    Responsibility for Implementation
1.4    Jurisdiction
1.5    Professional Ethics
1.6    Integrity
1.7    Oath
1.8    Duty
1.9    USMMA Core Values and Guiding Principles
1.10   Regimental System

**Chapter 2 – ROUTINE EVENTS**
2.1    Priority of Routine and Orders
2.2    Reveille
2.3    Sick Call
2.4    Formation and Meal
2.5    Quiet Study Period
2.6    Call to Quarters
2.7    Liberty
2.8    Leave Procedures
2.9    Barracks Life
2.10   Visitors Policy
2.11   Class Rates
2.12   Hold-Over Policy
2.13   Team and Club Movements (TMs)
2.14   Restriction
2.15   Extra Duty

**Chapter 3 – STANDARDS OF CONDUCT**
3.1    General
3.2    Accidents
3.3    Floating Equipment
3.4    Motor Vehicles
3.5    Alcohol, Drugs, and Smoking
3.6    Relationships
3.7    Midshipman Safety and Conduct
3.8    Hazing and Bullying
3.9    Discrimination and Harassment
3.10   Retaliation
3.11   Sexual Misconduct
3.12   Sexual Assault, Sexual or Gender-Based Harassment, Relationship Violence, Stalking, and Sexual Exploitation
3.13   Sea Year Conduct
3.14   Spirit Related Activities
3.15   Etiquette
3.16   Physical Appearance and Uniforms

AR000211

## Chapter 4 – DISCIPLINARY SYSTEM

4.1    Purpose
4.2    Rights and Obligations during Conduct Proceedings
4.3    Reporting
4.4    Organization of the Academy Conduct System
4.5    Sanctions for Misconduct
4.6    Interim Sanctions
4.7    Midshipman Disciplinary Files and Records

## Chapter 5 – MIDSHIPMAN PERFORMANCE REVIEW BOARDS

5.1    General
5.2    Rights of the Midshipman
5.3    Performance Review Board Membership
5.4    Responsibilities of the Deputy Commandant/Regimental Officer
5.5    Responsibilities of the Company Officer to the Midshipman
5.6    Responsibilities of the Midshipmen's Company Commander
5.7    Midshipman Performance Review Board Procedures
5.8    Performance Review Board Results
5.9    Decision by the Commandant

## Chapter 6 – EXECUTIVE BOARDS/SUPERINTENDENT'S HEARINGS

6.1    General
6.2    Executive Boards
6.3    Rights of Midshipmen
6.4    Pre-Hearing procedures
6.5    Procedures for Disciplinary Hearings Before the Executive Board or Superintendent
6.6    Procedures for Suitability Hearings Before the Executive Board or Superintendent
6.7    Decision by the Superintendent
6.8    Midshipman's Request for Reconsideration to the Superintendent
6.9    Appeal to the Maritime Administrator

AR000212

# CHAPTER 1 – SCOPE

## 1.1 BACKGROUND

1. The Regiment of Midshipmen are a select group of women and men who were chosen to serve the national security, marine transportation, and economic needs of the United States as licensed Merchant Marine Officers and commissioned officers in the Armed Forces. The Regiment is predicated on a structure relying on community (Regimental) obligations with the purpose of bringing out the highest standard of moral and ethical strengths of the individual while simultaneously developing a strong sense of self-discipline, camaraderie, responsibility, pride, and professionalism. In short, the Regiment's goal is to build ethical and principled leaders who make sound judgments that foster a positive and healthy work and social environment. The embodiment of the "Regimental way" is the development of leadership skills that are necessary for an individual entering the U.S. Merchant Marine and Armed Forces. Midshipmen are expected to maintain the highest standards of self-discipline and to enforce the standards of conduct outlined in these Regulations.

2. Merchant Marine Officers are licensed professionals who are educated to serve as leaders and who must be able to make difficult, high-stakes decisions affecting life and property, often in unknown and dangerous environments. The demands and expectations of Merchant Marine Officers are completely different from those of individuals engaged in conventional commercial activities. Merchant Marine Officers are trained leaders that look beyond short-term profitability and make decisions affecting the safety of their shipmates and the vessel capabilities. The conventional corporate structure requires development of good management, whereas the seagoing profession requires strong leadership, sound judgment, and principled conduct in demanding and tactically challenging situations. The USMMA graduate is educated to possess both management and leadership acumen that is well beyond that of individuals much more seasoned and in a civilian role.

3. The Academy is required by the U.S. Department of Transportation, Maritime Administration, as directed by the Merchant Marine Education and Training Act of 1980 to have formal rules governing the operation of the Regiment. These Midshipman Regulations fulfills this requirement.

## 1.2 PURPOSE

1. The primary purpose of the Midshipman Regulations is to further the educational mission of the Academy and to protect the well-being of the Academy community. These Regulations help foster an environment that is conducive to learning, promotes the Academy's educational purposes, provides order on campus, and protects the rights of all members of the Academy community. These Regulations also help develop ethical character, personal accountability, and civility toward others. All Midshipmen are required to review and comply with these Regulations. Compliance with the Midshipman Regulations is a requirement for all Midshipmen to maintain enrollment at the Academy as well as to graduate.

2. Additional guidance may be issued through Superintendent Instructions, Superintendent Notices, Commandant Instructions. and/or Commandant Notices.

3. In the absence of written or oral guidance, a Midshipman is expected to exercise good judgment. common sense, and initiative to obtain further instructions.

## 1.3 RESPONSIBILITY FOR IMPLEMENTATION

The Superintendent is granted the overall authority to authorize and implement the Midshipman Regulations. including its Conduct System. The Superintendent delegates the management and implementation of the Midshipman Regulations to the Commandant of Midshipmen.

## 1.4 JURISDICTION

1. The Midshipman Regulations apply to conduct that occurs on Academy premises, at Academy-sponsored activities, whether on or off-campus, and to off-campus conduct that adversely affects the Academy community and/or the pursuit of its mission or its strategic objectives. This includes conduct during Academy sponsored Team Movements and during sea duty.

2. Each Midshipman will be responsible for his/her conduct from the first day of Indoctrination through graduation day (or earlier withdrawal from the Academy). even though the conduct may occur before classes begin or after classes end, during Academy breaks, during periods between terms. or during leaves of absence. These Regulations apply to a Midshipman's conduct even if he/she withdraws from the Academy while a disciplinary matter is pending (unless the Academy has agreed to dismiss the disciplinary action).

3. A Midshipman committing a criminal offense. on or off-campus, that is also a violation of the Midshipman Regulations may be subject to Academy discipline. Further, the Academy may pursue disciplinary action against a Midshipman at the same time he/she is facing criminal charges for the same offense, even if the criminal prosecution is pending, has been dismissed. or the charges have been reduced.

## 1.5 PROFESSIONAL ETHICS

Midshipmen must conduct themselves with propriety, sobriety, decorum. and sound judgment. Midshipmen are expected to exercise moderation in all things. and must not engage in any activities that violate Academy policies or procedures, or local. State, or Federal laws. A Midshipman's word is binding; his/her signature or initials attest to the truth and accuracy of a document. A Midshipman's behavior must at all times reflect credit upon the individual and the United States Merchant Marine Academy.

## 1.6 INTEGRITY

Midshipmen are expected to reflect the highest standards of integrity. The Academy Honor Code is the primary means by which excellence of character and integrity is developed in the Regiment of Midshipmen. Midshipmen are obligated to live by and support the Honor Code: *A Midshipman Will Not Lie Cheat or Steal.*

AR000214

## 1.7 OATH

1. **BACKGROUND**

   In keeping with the high standards expected of Midshipmen preparing to be Merchant Marine Officers and Officers of the Armed Forces, all Midshipmen are expected and required to abide by these Regulations. While it is important to comply with these Regulations, of equal importance is an individual Midshipman's commitment to observe them, and efforts taken toward that end. This individual commitment frames the Midshipman's subsequent actions in terms of personal integrity, honesty, honor and personal courage.

2. **USMMA MIDSHIPMAN OATH**

   *"I, (state your name), having been appointed a Midshipman to the U.S. Merchant Marine Academy, accept appointment and do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I will comply with all the regulations of the U.S. Merchant Marine Academy; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter, so help me God."*

## 1.8 DUTY

1. **RESPONSIBILITY OF ALL MIDSHIPMEN**

   a. All Midshipmen have the following duties:

      1) Discharge all responsibilities of the position to the best of his/her ability:
      2) Set a good example for subordinates in appearance, bearing, performance of duty, and personal conduct; and
      3) Accept responsibility for the actions, whereabouts, and conduct of the Midshipmen under his/her supervision.

## 1.9 USMMA CORE VALUES AND GUIDING PRINCIPLES

1. **USMMA CORE VALUES**

   a. **Respect**

      1) Promote an environment where inclusion, multiculturalism, and diversity are encouraged and valued.
      2) Communicate effectively and engage in healthy relationships.
      3) Maintain the highest level of professionalism as it relates to behavior and interpersonal skills.

AR000215

b. **Honor**

    1) Be honest and trustworthy, and maintain the highest level of integrity.
    2) Take responsibility and accountability for your actions and for those under your leadership.
    3) Demonstrate courage and stand up for the honor of others.

c. **Service**

    1) Generate the highest levels of trust, unity, and pride in all Academy undertakings.
    2) Consider the needs of others before your own self-interest.
    3) Engage in leadership opportunities that contribute to our Nation's maritime and military interests and our community.

## 2. GUIDING PRINCIPLES (WHAT IS A USMMA GRADUATE?)

a. Men and women of exemplary character.

b. Mentally strong, physically tough, and morally sound.

c. Capable decision makers, communicators, and critical thinkers (<u>especially</u> under pressure).

d. Experts in their profession devoted to excellence in everything they do.

e. Embrace the challenge and the privilege of leadership in the public and private sectors.

f. Committed to serving the nation's marine transportation and defense needs in peace and war.

g. **Be KP!!**

## 1.10 REGIMENTAL SYSTEM

### 1. DESCRIPTION

a. The Regimental system enables the Academy to meet its mission. It is a system where Midshipmen are held accountable to the Academy and each other for their development of leadership, character, and judgment capabilities. It supports the professional training of all Midshipmen and provides a framework for safely managing a large number of Midshipmen while at the Academy and during the sea year training.

b. The leadership development program is part of the Midshipman education. It begins with the arrival of the new Midshipmen and continues throughout the four years of instruction. The program consists of both practical training and experiences in the Regiment ashore

9 | P a g e

AR000216

and at sea. During the first year, the entering Midshipman learns the vital nature of following instructions and how to work as a member of a team. In the subsequent years, the Midshipman is given greater leadership responsibility, accountability, and authority. The leadership program develops servant leadership traits in the upper-class Midshipman that will enable him/her to lead other Midshipmen through positive motivation and to carry these skills into his/her career upon graduation.

## 2. GOALS

The Regimental System contributes to the education and leadership development of each Midshipman, and has the following goals:

a. LEADERSHIP: to provide training and a progression of experiences that allows Midshipmen to understand how to positively motivate and influence the performance and actions of both individuals and groups, as well as to develop self-discipline.

b. HUMAN RELATIONS: to promote the ability to function in close or team relationships with diverse populations and to understand key principles of interpersonal relationships, and to provide an understanding of how discrimination and harassment (including sexual and gender-based harassment), sexual assault, relationship violence, stalking, and retaliation adversely affect the individual's own performance and self-worth as well as those of others, including classmates.

c. INTEGRITY: to develop within Midshipmen a sense of the importance of integrity and honesty of the individual through their everyday actions in their role as Merchant Marine Officers and Officers in the Armed Forces.

d. LOYALTY: to place mission and service to the greater good above self-interest, including to the ship (organization or Academy), shipmate (supervisor, co-worker or classmate, and subordinate) and one's self, which is an essential element of the seagoing professional.

e. RESPONSIBILITY: to develop within Midshipmen an understanding of the importance of responsibility and accountability for one's actions, both in public, in their private lives, and in their roles as Merchant Marine Officers and Officers in the Armed Forces.

f. JUDGMENT AND DECISION MAKING: to develop within Midshipmen the ability to make correct judgments, and an understanding that decision-making is the essence of intellectual and emotional maturity. Correct judgment and decision-making is highly rewarded when practiced intelligently and especially in a highly complex environment.

g. PROFESSIONAL DEVELOPMENT: to support the professional growth of aspiring Merchant Marine Officers through practical experience within the operation of the Regiment of Midshipmen.

AR000217

h. MISSION ACCOMPLISHMENT AND PERFORMANCE: to emphasize the importance of getting the job done effectively, efficiently and on time. Professional tasks and academic achievement while at the Academy are foundational to developing a sense of mission performance.

i. TRADITIONS OF THE SEA: to instill in Midshipmen an understanding of the culture and traditions of the maritime environment, as well as an appreciation of its history.

AR000218

## CHAPTER 2 – ROUTINE EVENTS

Unless specifically authorized by proper authority, Midshipmen will follow the daily routine published in the applicable Commandant Notice. The Commandant will issue changes to the daily routine as needed through the Chain of Command and the Plan of the Week.

### 2.1 PRIORITY OF ROUTINE AND ORDERS

1. In cases where a conflict exists concerning routine or procedures, the routine with the highest priority listed on the Table of Priorities (see below) will be followed.

2. When a Midshipman receives conflicting orders or is confronted with conflicting duties, and is in doubt as to his/her proper course of action he/she will seek the advice of his/her chain of command, or the Command Duty Officer (CDO). <u>In any case, when an appointment or class is missed because of a conflict of priorities, it is the responsibility of the Midshipman concerned to ensure that appropriate parties are informed.</u>

    a. Table of Priorities

        1) Emergency Medical Treatment
        2) Emergency Leave
        3) Final examinations
        4) Orders to report to the Superintendent, Deputy Superintendent, Commandant, Deputy Commandant, or CDO
        5) Scheduled tests or examinations
        6) Academic Team Movement (STCW competences)
        7) Routine classes
        8) Watch Standing
        9) Accountability formations
        10) Extra Duty work and Restriction Musters
        11) Regimental Team/Group Movement
        12) Appointments with Faculty Members and Commissioned Officers
        13) Special Liberty or Leave (Midshipmen must have obtained release from all other obligations)
        14) Routine (non-emergency) medical and dental treatment
        15) Divine Services
        16) Evening Study Hours
        17) Intramural Activities
        18) Extra-Curricular Activities
        19) Recreational Activities
        20) Prescribed Liberty or Leave

### 2.2 REVEILLE

1. Midshipmen shall be out of their racks with all overhead lights on.

2. Upperclass Midshipmen shall not return to their rack until after the Morning Colors.

3.  Plebes shall not return to their rack until 2000 Sunday through Friday or until 1000 Saturday.

4.  No events are to take place prior to reveille without the written permission of the Commandant or his/her designee.

## 2.3 SICK CALL

Walk-in sick call is available at the Office of Health Services. Midshipmen reporting to sick call shall wear the Uniform of the Day (UOD) or regulation physical training (PT) gear.

## 2.4 FORMATION AND MEAL

1.  Midshipmen shall be in a prescribed uniform when attending formation. Any Midshipmen authorized to wear an alternate uniform for medical purposes must carry their chit on their person at all times.

2.  Midshipmen will conduct themselves in a professional manner during formation and maintain silence while word is being passed.

3.  All meals following formations are mandatory with the exception of Friday evening meal through Sunday evening meal, unless a Midshipman is on a Team Movement or otherwise authorized to be absent by the Commandant or his/her designee. Midshipmen will report to Delano Hall directly following formation.

## 2.5 QUIET STUDY PERIOD

1.  Quiet study hours are to be observed from 2000 to 2300 from Sunday through Thursday.

2.  In order to preserve an environment conducive to academic success, Midshipmen shall not play loud music or have loud conversations in the passageways.

3.  No 1/C, 2/C, or 3/C Midshipman shall enter a Plebe or 4/C Midshipman's room unless providing academic assistance.

4.  Plebes and 4/C Midshipmen shall not use personal cell phones during study hours except for academic purposes.

## 2.6 CALL TO QUARTERS

1.  **OVERALL GUIDANCE**

    a.  For Plebes and 4/C Midshipmen, Call to Quarters accountability will be conducted from 2100 to 2200 Sunday through Thursday, and at 2300 on Friday and Saturday.

    b.  For 3/C Midshipmen, Call to Quarters accountability will be conducted from 2100 to 2200 Sunday through Thursday, and at 0000 on Friday and Saturday.

AR000220

c. For 2/C Midshipmen, Call to Quarters accountability will be conducted from 2100 to 2200 Sunday through Thursday, and at 0000 on Friday.

d. For 1/C Midshipmen, Call to Quarters accountability will be conducted from 2100 to 2200 Sunday through Thursday.

## 2. PROCEDURE

a. At the prescribed Call to Quarters time, Midshipmen will report to the Company Resource Room and sign next to their name on the Company Accountability Sheet.

b. The Company Officer of the Day (OOD) will observe each Midshipman sign the accountability sheet.

c. Midshipmen shall:

1) Be physically present in the Resource Room to sign in.
2) Remain in their company area after Call to Quarters unless authorized to depart by the Company OOD. If authorized to depart, Midshipmen must sign the accountability log upon departure and immediately upon return.
3) All Midshipmen approved to depart their company area must return by 0100.

d. If a Midshipman does not sign in at the prescribed time, the Company OOD will check the white board and room of the missing Midshipman. The Company OOD shall request to enter the room by knocking and verbally identifying him/herself, waiting for an affirmative response, and then entering. If no response is received, the Company OOD may enter the room. If the Midshipman is not located in the room or is not on an approved Team Movement or Special Liberty, the Company OOD is to report the Midshipman Absent Without Leave to the CDO.

e. The Company Accountability Sheet is to be turned into the CDO by 2230 Sunday through Thursday and by 0030 on Friday and Saturday.

f. Any Midshipman returning from a Team Movement or Special Liberty must check in with their Company OOD if they return after Call to Quarters Accountability.

## 2.7 LIBERTY

### 1. AUTHORIZATIONS

a. Liberty and leave privileges are extended to Midshipmen when the Regimental and academic requirements of the Regiment of Midshipmen permit. Liberty and leave privileges will be prescribed by the Commandant of Midshipmen.

AR000221

b.  Liberty will be authorized as per the schedule below:

| Class | Day | Commences | Expires |
|-------|-----|-----------|---------|
| 1/C* | Tuesday & Thursday | ALRF ** | 2200 |
| | Friday: | ALRF | Overnight |
| | Saturday: | ALRF | Overnight |
| | Sunday: | - | 2100 |
| 2/C | Thursday: *** | ALRF | 2200 |
| | Friday: | ALRF | 0000 |
| | Saturday: | ALRF | Overnight |
| | Sunday: | - | 2000 |
| 3/C | Friday: | ALRF | 0000 |
| | Saturday: | ALRF | 0000 |
| | Sunday: | 0800 | 1900 |
| 4/C | Saturday: **** | ALRF | 2300 |
| | Sunday: | 0800 | 1800 |

* Free Gangway will only be for RC, RX, BC, BX, CC, and CX. One or the other must always be on deck. In season Varsity Team Captains are awarded Free Gangway M-TH. Free Gangway expires at 2200 Monday through Thursday.
** After Last Regimental Function (ALRF)
*** Thursday Liberty may be granted based on Commandant approval; it is not automatic.
**** Plebe Liberty according to Phase Rates; 4/C Liberty only after Recognition.

c.  An upgrade in Class Rates may be awarded at the discretion of the Commandant's Department based on outstanding service to the Regiment.

d.  Midshipmen may not depart on, or return from, Liberty in any uniform other than authorized Liberty attire.

## 2.  WEEKEND LIBERTY REQUIREMENTS

a.  Eligibility requirements:

1)  GPA of 2.0 or better based on the most recent mid-term or end of trimester grades.
2)  Not **Academically Deficient*** or on **Conduct Probation.**
3)  Not on **Restriction.**
4)  Not deficient in PRT/PFA. **Midshipmen who have failed the PRT/PFA at the beginning of the academic year, or who have not passed the most recent PRT/PFA will not be eligible for Liberty** until they pass a remedial PRT administered by the PE&A Department, an officer from Naval Science, or the Commandant's Command Fitness Officer.

**\* Academically Deficient**: Midshipmen on Academic Probation **(AP)**, Continued Academic Probation **(CAP)**, Suspended Setback **(SS)**, Suspended Disenrollment **(SD)**, Referred for Disenrollment **(RFD)**

AR000222

3. **SPECIAL LIBERTY**

   a. Special Liberty is an authorized liberty for the purpose of receiving medical treatment or conducting important personal obligations which cannot be taken care of during regular Liberty hours. For example, Special Liberty may be authorized to attend a funeral of a family member, or another important family event that is not considered an emergency.

      1) Special Liberty requests will only be authorized to miss up to three days of class, if needed.

      2) Midshipmen and Plebes will not be granted more than two Special Liberties per Trimester.

      3) Midshipmen **Academically Deficient** or on **Conduct Probation** are not normally eligible for Special Liberty.

      4) In cases where a Midshipman has been granted a Special Liberty request, and subsequently is placed on restriction because of a Class I offense, such restriction may be lifted or deferred, as determined by the Class I Masting Official, following a written request by the charged Midshipman.

4. **DINNER LIBERTY**

   a. Plebes, and 4/C, 3/C, and 2/C Midshipmen may apply for Dinner Liberty as per Class Rates.

      1) Requests for Dinner Liberty will be routed through the chain of command and approved by the Platoon Commander, Company Commander, and Company Officer.

      2) Dinner Liberty will commence After Last Regimental Function (ALRF) or After Last Class (ALC), whichever is later, and terminate at 2100.

      3) Midshipmen **Academically Deficient** or on **Conduct Probation** are not eligible for Dinner Liberty.

5. **HOLIDAYS**

   a. End of Leave formation will be at Class Rates for the following:

      1) Fall Break
      2) Thanksgiving Break
      3) Winter Break
      4) Spring Break

   b. Leave Procedures will follow Section 2.8 listed below.

AR000223

6. **LIBERTY LOGS**

Liberty Logs will be maintained by each Company and the Regimental Staff. All Midshipmen are required to sign out/in when departing/returning from Liberty, Weekday Liberty, Special Liberty, and Dinner Liberty. Additionally, a copy of the signed Special Liberty/Dinner Liberty chit will be placed in the Liberty Log when departing on Special/Dinner Liberty.

## 2.8 LEAVE PROCEDURES

1. Leave will begin for the following breaks ALRF and end at "End Leave Formation" held at Class Rates:

   a. Fall Break
   b. Thanksgiving Break
   c. Winter Break
   d. Spring Break
   e. Summer Break

2. Before departing on leave, all Midshipmen must do the following:

   a. Obtain a Room Check-off by the CO, CC, CX, or PC before departing on Leave. All rooms are to be cleaned to Class B Standards, including the following:

      1) Empty all trash
      2) Close and lock all windows
      3) Pull window shades to half mast
      4) Unplug all electronics
      5) Turn off all lights
      6) Set HVAC to lowest setting
      7) Secure all valuables or take home (padlocks may be placed on wardrobes to secure valuables during break)
      8) Dispose of perishable food items
      9) Secure all gear and clear all belongings from passageways
      10) Clean sink area
      11) Vacate and secure all laundry rooms

   b. Post proper accountability on their whiteboards

   c. Not depart until ALRF or at approved Special Liberty time.

3. Midshipmen residing on campus during Academy Leave Periods must follow all Holdover Regulations as per Section 2.12.

4. **EMERGENCY LEAVE**

   a. When an emergency, such as serious illness or death, affects the Midshipman, the Midshipman may be granted emergency leave.

17 | P a g e

AR000224

    b. The Midshipman's CO, or CDO if outside working hours, must authorize emergency leave. Emergency leave will normally only be authorized for up to three days of class.

## 2.9 BARRACKS LIFE

### 1. OVERVIEW

    a. "Midshipman facilities" refer to all athletic, academic, or recreational facilities authorized for Midshipman use. Midshipmen shall not maintain personal belongings or other articles in any locker, closet, or space other than that regularly assigned to him/her or authorized by proper authority to use on Zero Deck within the barracks. Midshipmen must have their Academy-issued ID card with them at all times for security purposes. Midshipmen are required to have their Academy-issued ID card in order to access certain campus buildings. Midshipmen shall not enter or use any space that is locked or restricted, except as authorized.

    b. All rooms will be assigned by the Commandant.  At the time of assignment, Midshipmen assuming responsibility for the room will make an inspection of the room and all its contents and sign a property inventory accepting the room, all of its equipment, furniture, and physical condition.

    c. Roommates will be assigned as follows:

        1) Upperclass Midshipmen may select their own roommate from among their classmates assigned to the Company, when approved by the Company Officer. Classes must room together; in no instance will members of different classes be berthed together.  If the berthing list permits, First Class will have the privilege of singling up with priority based on Midshipman Officer Rank.  Fourth Class/Plebes will be tripled or singled up only if there is an odd number of them in the Company.

        2) Upon submission of sufficient justification, changes of roommates may be authorized by the Company Officers during the academic year.

    d. Room Changes.  When Company Officers approve any room change, Midshipmen making the change will properly checkout of their old rooms and into their new rooms. The Midshipmen Personnel Officer (MPO) must be notified in writing of the approved room changes.

### 2. ASSIGNMENT OF ACTIVITY SPACES

    a. General.  All activity spaces will be assigned to the Midshipman Officer in Charge or the president of the club to which the space is assigned.

    b. Acceptance.  At the time of assignment, the Midshipman assuming responsibility for the space will make an inspection of the space and all its contents and will sign a property inventory accepting the space, all its furniture and equipment and the condition of space contents.

18 | PAGE

c. Transfer of Responsibility.  Upon the removal or replacement, for any reason, of a Midshipman responsible for an activity space, the relieving Midshipman will perform an inspection of the space in the presence of the Director of Student Activities, or his/her designee. The relieving Midshipman will examine all of the equipment and furniture and their condition. All missing items and all damaged items not previously noted will be reported and investigated. When damage or loss is the result of negligence, the cost will be evaluated and assessed against the organization or individuals responsible.

## 4. WORK ORDERS

a. All damaged government-owned property or equipment will be reported as follows:

1) Work Order Requests will be submitted to the Company Officer via the Company Logistics Officer (CLOG), with the white copy placed on the area or space where damage is located.

2) Emergency Repair Requests will be reported immediately to the CLOG who will report the condition immediately to the CO during normal business hours and to the CDO/MCDO otherwise.

## 5. FOOD IN ROOMS

a. Cooking or preparing food in Midshipman rooms is prohibited in accordance with Class Rates.  The use of instant beverages is permitted provided provided supplies used in preparation are packages for individual servings or are kept in air tight containers.

b. Removing food from the Commissary is not permitted, unless authorized by sick chit.

c. Non-perishable foods may be retained in a Midshipman's room indefinitely provided they are stored in an airtight container.

d. Food purchased in the canteen or NEX facilities, food sent from home, and foods purchased on Liberty are permitted in Midshipman rooms if consumed or thrown out prior to the 0730 daily inspection the following morning.  However, food may be retained if stored in an airtight container.

e. In no case are any food items to be left out in the open in any Midshipman's room when that room is unoccupied.

f. Midshipmen are not to remove any commissary equipment from the Commissary, unless specifically given permission by the Food Service Officer.

g. Midshipmen are permitted to order food for delivery to Vickery Gate from outside establishments.

## 6. HOLIDAY DECORATIONS

Midshipmen must have the approval of their CO or his/her designee to display holiday decorations.  Live trees are not permitted at any time.

AR000226

## 7. LAUNDRY ROOMS

There are three laundry rooms located in the barracks area for the exclusive use of Midshipmen. Midshipmen should not leave their clothing and belongings unattended. Midshipmen must not to leave a laundry room in a disorderly condition.

## 8. LINEN SCHEDULE

Each Midshipman shall be issued two blankets, one pillow, one pillowcase, one mattress cover and two sheets upon arrival at the Academy on an annual basis. The two blankets are to be considered organizational equipment and must be turned in upon departing the Academy for sea year or graduation. The pillow, pillowcase, mattress cover, and two sheets belong to the Midshipman and should be maintained by him/her at all times.

## 9. ROUTES OF TRAVEL

a. The passageways of the barracks complex are maintained by Midshipmen. It is incumbent upon Midshipmen to cooperate in maintaining these areas at a high standard of cleanliness and to maintain a quiet and orderly atmosphere conducive to study at all times.

b. Zero Decks (basements) of Barracks. The Zero Deck passageway is the primary route of travel between barracks, different parts of the Regiment, and to Delano Hall.

c. Midshipmen are not authorized to transit Main Deck passageways for the purpose of passing between Companies. Exceptions are those Midshipmen on watch, First Class, and Company personnel.

d. The following entrances and passages will not be used except when on official business:

   1) Regimental Row.
   2) Dining Hall as passage from Murphy to Cleveland Hall.
   3) Academic Building (unless authorized).
   4) Gymnasium Floor.

e. Except as required for formations, Midshipmen will not walk on the grass.

## 10. PROPERTY ACCOUNTABILITY

a. Midshipmen are responsible for safeguarding the property for which they have signed as well as that which is entrusted to them without signature, such as barracks fixtures. Any government property lost, destroyed, or damaged as a result of negligence will result in the financial liability of the responsible Midshipman.

b. No Midshipman will move or change any piece of equipment, fixture or furniture in any Academy facility without the permission of the CO. The CO will designate where such equipment or furniture may be stored for future use.

c. The Academy is not responsible for the loss of personal property in any building or areas of the Academy, whether the loss occurs by theft, fire, or other causes. This includes any

AR000227

belongings left in any baggage storage locker. <u>Midshipmen are advised to have personal property covered by their family's insurance policy or a personal insurance policy</u>.

11. **PERSONAL PROPERTY OF GRADUATED, RESIGNED, OR DISENROLLED MIDSHIPMEN**

Upon graduation, resignation, or disenrollment, a Midshipman must remove all of his/her personal property from Academy grounds. Baggage lockers, the bike locker, club spaces and the First Class parking lot exist for the convenience and welfare of Midshipmen. There is no room to store former Midshipmen's property on Academy grounds. Personal property left behind, for any reason, shall be considered to be abandoned and appropriate actions will be taken to remove abandoned property from Academy grounds.

## 2.10 VISTOR POLICY

1. **VISITATION BETWEEN MIDSHIPMEN IN MIDSHIPMAN ROOMS**

   a. In this section, Midshipmen encompasses Plebes, Plebe Candidates, and 1/C, 2/C, 3/C, and 4/C Midshipmen.

   b. Midshipmen must maintain a professional study hall environment, and comply with the policy on professional relationships set out in Section 3.6, below.

   c. Visitation between Midshipmen will be unrestricted between reveille and 2100 (Call to Quarters), provided all regulations concerning professional relationships are strictly observed.

      1) For the purpose of this regulation, the term visiting will be defined as an association between Midshipmen not required by the performance of their duties or as authorized by a commissioned officer.
      2) When the door to a Midshipman's room is closed, persons desiring entry will knock and await acknowledgment before entering.
      3) All Midshipmen will have their doors open from 0630 until 1200.
      4) Midshipmen may lock their doors at any time when they are permitted to close their doors.
      5) Midshipmen in a room, who are not occupants of the room, must place their name on the white board of the room they are entering.
      6) Midshipmen may close their doors while addressing matters of personal grooming that require privacy.

AR000228

## 2.11 CLASS RATES

1. **STANDARD DEFINITIONS**

   1) Class Rates are the privileges granted to classes, giving Midshipmen more privileges as they advance in class standing.  All Class Rates are listed and maintained in the Class Training Handbooks.

   2) Issued PT Gear.  Issued PT gear includes the Running Suit Top and Bottom, Gray Sweat Suit Top and Bottom, Ringer Tee, and PT Shorts. The Running Suit, Ringer Tee, and Gray Sweat Suit are the only authorized PT gear for Delano.

   3) Alternate PT Gear.  Alternate PT Gear only includes T-shirts and shorts with the USMMA name or logo issued by the Commandant's Department, Athletic Department, or recognized Academy clubs (for members of those clubs only).  T-shirts or other attire sold by clubs or teams as a fundraiser must be approved by the Commandant for wear. Personally purchased PT Gear (e.g. Under Armour®, Nike Dri-FIT®, track/XC lined shorts) and alternate shirts/shorts purchased in the NEX that do not have USMMA branding are not approved for wear.  USMMA branded PT Gear and alternate shirts/shorts with USMMA branding are authorized for 1/C and 2/C Midshipmen wear.  Items purchased in the NEX that were also issued by the Academy can be worn as PT gear in accordance with Class Rates.

   4) Alternative Liberty Attire. USMMA issued polo shirt, sweat shirt, jacket, khaki pants/shorts or skirt, brown or black belt and shoes.

AR000229

**Midshipman Attire**

| | | Barracks | Transiting to and from non-Class Rates areas | Tomb Field, O'Hara Hall, and Off campus Runs | Departing and returning from Leave/Liberty/ Dinner Liberty |
|---|---|---|---|---|---|
| 1st Classmen | Uniform | Tasteful shirts/shorts with USMMA, Military, or Maritime Company Logo or Names | Alternate PT Gear | Alternate PT Gear | Civilian Attire |
| | Shoes | Sandals or flip flops | Non-athletic shoes (no sandals or flip flops) | Tennis shoes | |
| 2nd Classmen | Uniform | Alternate PT Gear | Alternate PT Gear | Alternate PT Gear | Civilian Attire |
| | Shoes | Closed heal sandals | Tennis shoes | Tennis shoes | |
| 3rd Classmen | Uniform | Class and Company Shirts Alternate PT Gear | Class and Company Shirts Alternate PT Gear | Class and Company Shirts Alternate PT Gear | Seasonal Dress Uniform or Alternative Liberty Attire |
| | Shoes | Tennis shoes | Tennis shoes | Tennis shoes | |
| 4th Classmen/Plebes | Uniform | Issued PT Gear (Ringer T) and/or Alternate PT Gear | Issued PT Gear (Ringer T) and/or Alternate PT Gear | Issued PT Gear (Ringer T) and/or Alternate PT Gear | Seasonal Dress Uniform |
| | Shoes | Tennis shoes | Tennis shoes | Tennis shoes | |

## 2.12 HOLD-OVER POLICY

1. A Holdover is any Midshipman who is assigned to, or requests to stay in, the barracks outside of the normal in-residence term for the following reasons:

   a. <u>Regimental Holdover</u>: Midshipmen may, from time to time, be recalled from sea, or held prior to going to sea, for administrative, academic, disciplinary, medical, athletic, or other purposes.

      1) Midshipmen assigned as Regimental holdovers will be berthed in the barracks, in the Company to which they are assigned unless otherwise directed.

23 | P a g e

AR000230

2) Midshipmen may be assigned to the *T/V Kings Pointer* to accumulate sea time and work on Sea Projects, but will reside in the barracks.

    a) In such cases, the respective assignment authority shall contact the Department of Shipboard Training to determine whether assignment to the *T/V Kings Pointer* is possible.

3) The respective assignment authority shall establish internal procedures for making such assignments. In addition, the following departments shall be informed beforehand of the arrival and duration of a Holdover:

    a) Commandant of Midshipmen, via the Midshipman Personnel Officer.

    b) If assigned to the *T/V Kings Pointer*, the Department of Waterfront Activities, via the Master, *T/V Kings Pointer*.

b. Sea Year Holdover: Any Midshipman who, during the course of their Sea Year, is assigned by the Department of Shipboard Training to the *T/V Kings Pointer* for the purpose of accumulating credited sea time. In addition, any transient Midshipman who requires berthing traveling from or going to another vessel, but not assigned to the *T/V Kings Pointer*.

1) Midshipmen assigned as Sea Year Holdovers will normally be berthed in the barracks.

2) Department of Shipboard Training shall provide advance notification to the following departments, advising of the arrival date and duration of each Sea Year Holdover:

    a) Commandant of Midshipmen, via the Midshipmen Personnel Officer

    b) Department of Waterfront Activities, via the Master, *T/V Kings Pointer*

## 2. PROCEDURE AND DAILY ROUTINE

a. General

1) Midshipmen assigned as Holdovers will follow the prescribed Daily Routine, unless modified by the Commandant.

b. Upon Arrival

1) During normal Academy operating hours, a Holdover will:

    a) Report to their Company Officer

    b) Report to the Company Executive Officer (CX) in order to obtain a room assignment and instructions to obtain personal belongings in the company baggage lockers.

    c) Once a room is assigned, clearly indicate on their door the following:

        (1) Name of Occupant
        (2) Reason Aboard
        (3) Expected Date of Departure

24 | Page

       d) Occupy and maintain only that room which was assigned to them by the appropriate authority.

    2) After normal operating hours, a holdover will:

       a) Report to the CDO immediately upon their arrival on Academy grounds for further instruction. Upon the start of normal operating hours, the Holdover should proceed with the directions in Step (1) above.

c. Holdovers will be added to company accountabilities by the CX and follow the Plan of the Day without interfering with the normal daily routine of the Regiment.

d. Holdovers will attend all required musters and accountabilities, including:

    1) Sign in at the ATR's office prior to 0715, if assigned as a Sea Year Holdover.
    2) Report to the CDO and form up on First/Second Company's Front Company path for morning Colors at 0730, in Boiler Suits and Noon Lunch Muster at 1210 in Issued PT Gear.
    3) Sign in for OOD at 2200 within the Company occupied.

e. Checking Out

    1) During normal Academy operating hours, Holdovers will:

       a) Replace their dirty linens with new linens from GSK, and clean the previously occupied room.
       b) Report to the CX and CO for checkout and to be removed from the accountability sheet.

    2) After normal operating hours, Holdovers will:

       a) Replace their dirty linens prior to Close of Business, with new linens from GSK, and clean the previously occupied room.
       b) Report to the CDO to check out and be removed from the accountability sheet.

## 3. ADHERENCE TO REGULATIONS

a. <u>Midshipmen Regulations</u>. Midshipmen, regardless of status, are required to adhere to the Midshipmen Regulations at all times.

    1) Holdover rooms will be maintained at Class B standards at all times, subject to inspection at any time.

b. <u>Grooming Standards</u>. Midshipmen in any status are required to adhere to the grooming standards set forth in the USMMA Midshipman Uniform Regulations.

c. <u>Uniforms</u>. Midshipmen in any Holdover status are required to adhere to the uniform standards established by the Commandant of Midshipmen, which will include the

AR000232

following.

    1) USMMA issued blue boiler suit, white undershirt and USMMA baseball cover with black boots.
    2) Issued PT gear (Grey Ringer T and Running Suit Pants) in the Mess Hall at the Holdover tables, including lunch muster.

d. <u>Class Rates</u>. Midshipmen in any Holdover status are subject to their Class Rates Liberty and Leave/Liberty attire.

## 2.13 TEAM AND CLUB MOVEMENTS (TMs)

1. **GENERAL**

TMs are essential to Regimental morale. Approved teams and clubs will be allowed to make unsupervised local travel as set forth below. Rules and guidelines are established clearly in regards to travel, vehicle use and expectations of Midshipman conduct while on approved Team Movements in accordance with the applicable Commandant Instruction.

2. **DEFINITIONS**

a. Team - A unit of Midshipmen that represents the Academy in a competitive manner, which is approved by either the Department of Athletics, the Waterfront, or the Superintendent.

b. Club - A unit of Midshipmen who have been designated by the Director of Student Activities as an Academy recognized club and is in good club standing.

c. Member – a member of a team or club whose name appears on its official roster and is approved by the appropriate authorizing official.

d. Government Vehicle – any vehicle that is either owned or leased by the Academy for official Academy use.

3. **RULES**

a. TM Approval. All TM requests must be routed through the appropriate chain of command, as listed on the TM form, for ultimate approval by the Regimental Officer.

b. TMs are subject to scheduling conflicts. In the result of conflicting TM requests, the requests will considered in the following order of precedence.

    1) Academics
    2) Regimental Wide Opportunities (OSA Events)
    3) Athletic/Waterfront Team
    4) Club
    5) Leisure or Service

c. All drivers of Government Vehicles must be approved through the Academy's Safe Vehicle Operation Course, have a valid driver's license, and be at least 21 years of age.

AR000233

d. TMs are restricted to the local vicinity not to exceed 25 miles from Vickery Gate. TMs that extend outside a 25-mile radius are required to have a chaperone, with a Midshipman: Chaperone Ratio of 20:1. The Commandant must approve chaperones. Extended travel is limited to 100 miles from Vickery Gate, regardless of chaperone, unless approved in writing by the Commandant. Unless otherwise authorized in writing by the Commandant, the chaperone for a TM must travel in the Government Vehicle.

e. All overnight travel will require a Midshipman: Chaperone Ratio of 20:1. Midshipmen must procure appropriate and safe lodging in accordance with appropriate procedures.

f. The use of alcohol on approved TMs is strictly prohibited by all Midshipmen regardless of age. This applies to all vehicles, venues, lodging, etc.

g. All TM requests must be submitted in their entirety to the Regimental Officer electronically. Completed TM request shall include (1) Request Form (2) Food Request (3) Driver Agreement

## 2.14 RESTRICTION

1. **GENERAL**

    a. Liberty and TMs are privileges that are granted to Midshipmen in good standing and may be rescinded as a result of disciplinary action, or for any other reason as determined by the Commandant or Superintendent. The Superintendent and the Commandant or his/her designee are the approval authorities for placing any Midshipmen in a restricted status.

    b. Conditions of restriction. When restriction is imposed, the Midshipman will be confined to the Academy grounds and is not entitled to Class Rate Liberty or TMs except for emergency absences, varsity athletics, academic, or other pre-approved TMs away from the Academy that were authorized by the Deputy Commandant. Midshipmen that receive permission from the Deputy Commandant to be absent from muster must sign out with the MCDO upon departure and sign in upon return. Restricted Midshipmen will not act as a watch replacement for another Midshipman without the approval of the CDO.

    c. Any Midshipmen having a conflict with fulfilling his/her restriction muster responsibility will inform the MCDO and CDO respectively. In addition, Midshipmen should consult the Table of Priorities listed above in paragraph 2.1.2.a to assist in determining a solution to any conflict.

        1) Midshipmen standing watch are authorized to miss restriction muster.

    d. Midshipmen assigned to restriction will not be held from departing on regularly scheduled leave/break periods (Fall/Thanksgiving/Christmas/Spring/Summer) or Sea Year participation for the sole purpose of completing the assigned restriction. If the assigned number of days has not been completed prior to the start of leave/break, the Midshipman will complete those days upon return to the Academy.

AR000234

e.  Restricted Midshipmen may be entitled to Special Liberty for religious purposes.  Such Liberty will be requested on a Special Liberty request form and approved by the Deputy Commandant.

f.  Restricted Midshipmen may attend athletic events conducted at the Academy.  They may attend all other special events conducted at the Academy only with the permission of the Deputy Commandant.  Under no circumstance are the Midshipmen exempt from scheduled restriction musters.

g.  Restriction, as a result of Class I Mast, Conduct Probation, or a specific action of a Performance Review Board/Executive Board, will be credited on a day-for-day basis.  Any excused or non-excused absences from restriction muster will add make-up days on the end of the Midshipman's restriction dates, and non-excused absences may result in further discipline.

h.  Athletes on restriction will not be excused from sign in periods with the exception of those times when the athletic team is going to or coming from competition, or when the team is actually competing at the sign in time.  Practice is not an excuse to miss sign in, and the athlete must make arrangements with the CDO for alternate muster times.

i.  First Class Midshipmen on restriction at the time of graduation will be placed on deferred graduate status and may not participate in Commencement unless permission is received from the Superintendent.

2.  **EXECUTION OF RESTRICTION MUSTER**

a.  The MCDO will be responsible for the accountability and execution of Restriction Muster.

b.  The MCDO, supervised by the CDO, will serve as Officer In Charge (OIC) and supervise the musters each day to ensure no talking or inappropriate behavior takes place. The OIC has the authority to remove any Midshipman from the formation for inappropriate conduct; the Midshipman's removal from the formation will be annotated on the muster sheet and he/she will NOT receive credit for that day.

c.  Uniform for all restriction musters will be the uniform of the day only.  At the start of Restriction Muster. the MCDO will conduct a formal uniform inspection of all assigned Midshipmen.

d.  All Midshipmen assigned to restriction will muster in front of the NEX on Zero Deck in accordance with the Plan of the Week.

e.  Midshipmen carrying a Sick Chit directing them to remain in their rooms will not be penalized for missing musters; however, they must notify their CC/CO and provide the CDO with a copy of the Chit.  Midshipmen who are on Sick Chit, but are not required to remain in their rooms, will report to restriction muster.

AR000235

## 2.15 EXTRA DUTY

1.  Extra Duty musters will be held every Tuesday and Thursday at 1615. Extra Duty will run for at least 60 minutes for each session.

2.  Midshipmen assigned Extra Duty through the mast system will report to at least one Extra Duty Session on Tuesday or Thursday every week until all Extra Duty is completed.

3.  The Regimental Logistics Officer (RLOG) and the Regimental Logistics Department will be responsible to ensure that approved Extra Duty assignments are provided to the CDO and MCDO prior to the Extra Duty Musters.

4.  Authorized absences from Extra Duty musters must be communicated to the RLOG, Regimental Logistics Department, CDO, and MCDO, but will not be given Extra Duty credit. Authorized absences include approved leave, approved medical authorizations, and authorized academic absences.

5.  Additional Extra Duty opportunities will be made available to all Midshipmen in addition to the Extra Duty mandated at Extra Duty musters, but will adhere to the same authorizations and shall not include other (company-level or individual) Extra Duty assignments not authorized by these procedures.

6.  Midshipmen reporting to the Extra Duty muster will present a neat appearance in the prescribed mandated working uniform announced for the muster. The assigned Extra Duty assignments will determine the uniform for that Extra Duty assignment.

7.  Extra Duty musters will include both accountability and assignments of Extra Duty. Upon completion of Extra Duty musters, all assigned duties will be immediately carried out for the duration of the assigned Extra Duty period assigned. Accountabilities and Extra Duty sheets will be maintained and collected for record by the RLOG and Regimental Logistics Department.

8.  Only authorized individuals may validate completion of Extra Duty via Extra Duty Chits describing Extra Duty tasks, amount of Extra Duty credited, authorizing individual name, title, and signature. These authorized individuals include the RLOG, his/her designee, the CDO, the MCDO, and designated staff authorized by the Commandant.

AR000236

# CHAPTER 3 – STANDARDS OF CONDUCT

## 3.1 GENERAL

1.  Midshipmen are required to conduct themselves in a military/professional manner at all times.

    a.  These standards of conduct apply to Midshipmen for conduct that occurs on Academy premises, at Academy-sponsored activities, whether on or off-campus, and to off-campus conduct that adversely affects the Academy community and/or the pursuit of its mission or its strategic objectives. This includes conduct during Academy sponsored Team Movements and during sea duty. Each Midshipman will be responsible for his/her conduct from the first day of Indoctrination through graduation day (or earlier withdrawal from the Academy), even though the conduct may occur before classes begin or after classes end, during Academy breaks, during periods between terms, or during leaves of absence. These Regulations apply to a Midshipman's conduct even if he/she withdraws from the Academy while a disciplinary matter is pending (unless the Academy has agreed to dismiss the disciplinary action).

    b.  Midshipmen are responsible for the conduct and decorum of their guests while they are visiting the Academy.

## 3.2 ACCIDENTS

Any accident involving Academy vehicles, equipment, or boats in which Midshipmen are involved, or any accident involving injury to Midshipmen, will be reported to the CDO immediately. The CDO and MCDO will enter pertinent facts in the CDO/MCDO log, and, as appropriate, will notify the Office of Public Safety.

## 3.3 FLOATING EQUIPMENT

1.  Midshipman Regulations will be adhered to on all Academy boats and training vessels.

2.  Power boats will not be used by Midshipmen for any purpose without authorization from the Director of Waterfront Activities or his/her designee.

3.  Small boats, as designated by the Director of Waterfront Activities, will be available during recreational free time periods only. Midshipmen who have been qualified by the Director of Waterfront Activities, or his/her designee, may use small boats for recreational purposes.

4.  Midshipmen may not keep privately owned boats at the Academy without permission from the Director of Waterfront Activities. They may not exit the Academy via privately owned boats without the permission of the Commandant or his/her designee.

5.  Midshipmen will be authorized to take guests aboard the Academy's floating equipment only when:

    a.  Specifically authorized to do so by the Director of Waterfront Activities, or his/her designee.

AR000237

b. A waiver of liability form has been signed by all guests and submitted to the Midshipmen on Dock Watch along with written authorization by the Director of Waterfront Activities, or his/her designee.

## 3.4 MOTOR VEHICLES

1. First Class Midshipmen may maintain and operate private motor vehicles, and may be granted the privilege of parking them in the lot next to Roosevelt Field on a space available basis.

2. Midshipmen operating vehicles within the Academy grounds must familiarize themselves with the current applicable Superintendent Instruction.

## 3.5 ALCOHOL, DRUGS AND SMOKING

1. **GENERAL**

    a. Illegal activity involving alcohol or drugs damages the quality of campus life and is contrary to the qualities required of a Merchant Marine Officer/Commissioned Officer or leader in the maritime industry. The following are examples of the damage alcohol and illicit drugs can do:

        1) Places at risk those who are dependent on the professional competence and safe practices of those in positions of responsibility
        2) Injures the physiological and psychological well-being of individuals
        3) Disrupts and endangers the welfare of those in the immediate environment of the illegal activity.
        4) Attracts criminal activity to the Academy.

    b. Illicit drug use poses a serious threat to the safe and efficient transportation of passengers and cargo at sea, the environment, and the members of the vessel's crew. The Academy has zero tolerance for illicit drug use. In compliance with Department of Transportation and Coast Guard regulations, the Academy has a drug testing program as set forth in subparagraph 4 below.

    c. Those Midshipmen who believe that they have either an alcohol or drug abuse problem should seek assistance. The Office of Health Services is available to provide counseling and referrals should a Midshipman so desire. This will be done on a confidential basis and will not be used to charge a Midshipman for violation of these Regulations. However, entering into a counseling program may not be used as a defense at Class I Mast for a violation of the alcohol and drug policies described herein, or the drug testing program.

2. **ALCOHOL POLICY**

    a. Alcohol use and abuse is a major issue in the community and on the Academy grounds. Physical abuse, sexual assaults, auto accidents, violence, vandalism, self-destruction and poor academic performance are routinely associated with inappropriate or excessive use of

AR000238

alcohol.  Accordingly, the Academy takes both a disciplinary approach and a preventive approach to inappropriate alcohol consumption.

b. Except as noted below, Midshipman use of, consumption of, possession of, or transportation of alcoholic beverages is strictly prohibited on the Academy grounds, and in any vehicle or craft belonging to or in custody of the Academy.  This is a Class I Offense. Additionally, Midshipmen who, whether on or off-campus, dispense or furnish alcoholic beverages to individuals who are not of legal drinking age violate the Academy's alcohol policy, and will be charged with a Class I offense.

c. Midshipmen returning to the Academy grounds under the influence of alcohol are subject to disciplinary action for this offense.

    1) In cases of intoxication and/or alcohol poisoning, the primary concern is the health and safety of the individual(s) involved. Individuals are strongly encouraged to call for medical assistance (516-726-5858 on campus, 911 off campus) for themselves or for a friend/acquaintance who is dangerously intoxicated.

    2) No Midshipman seeking medical treatment for an alcohol related overdose will be subject to Academy discipline for the sole violation of using or possessing alcohol. This policy shall extend to another Midshipman seeking help for the intoxicated Midshipman.

d. Alcoholic beverages may be authorized by the Superintendent in a Superintendent Instruction for certain Midshipman events where the attendees will be 21 years of age or older.  At these events, the individuals involved in the serving of alcoholic beverages must also be at least 21 years of age.

e. The presence of empty alcoholic beverage containers in or about Academy grounds is prima facie evidence of use, consumption, and/or transportation of alcohol and will be dealt with in a disciplinary form.

f. Midshipmen present in the barracks with alcoholic beverages, regardless if being consumed, will be charged with a Class I offense.

## 3.  DRUG POLICY

a. The wrongful use, possession, distribution or introduction onto Academy grounds of a controlled substance, prescription medication, over-the-counter medication or intoxicating substance (other than alcohol, the misuse of which is covered by subparagraph 2 above) is strictly prohibited and constitutes a Class I offense.

b. "Wrongful" means without a prescription, legal justification or excuse.  It includes use contrary to the directions of a professional health care provider or the manufacturer and use of any intoxicating substance not intended for human ingestion (such has cleaning solvents or glue).  It also includes inhalant abuse (sometimes referred to as "huffing") and steroid usage other than that specifically prescribed by a health care provider.

AR000239

c.  Drugs include, but are not limited to the following:

1)  Drugs requiring a prescription, but which are obtained without a physician's order. such as methedrine (speed), amphetamines (uppers), antidepressants, sedatives and barbiturates (downers), tranquilizers, and hypnotics.

2)  Narcotics, such as morphine, heroin, codeine, and cocaine in its many forms.

3)  Aerosol (Freon), airplane glue, paint thinner, nail polish remover, or gasoline, when used to cause intoxication.

4)  Chemical substances and organic matter, such as LSD (acid), marijuana, hashish, THC, Peyote buttons, mescaline, DMT, DOM, STP, etc.

5)  Designer drugs, including but not limited to synthetic marijuana (K2, Spice, herbal potpourri).

## 4.  DRUG TESTING

a.  USMMA recognizes that the prohibition of drug use among commercial vessel personnel in the maritime industry and the Armed Forces is vitally important and considers it an essential part of its professional training program.  Accordingly, the Academy conducts drug testing at specified times throughout a Midshipman's enrollment at the Academy, and also conducts random and reasonable suspicion drug testing.

1)  **Pre-admission.**  Drug testing may be conducted as part of the physical examination process prior to admission to the Academy.  A positive test is grounds to refuse admission.  This testing program is administered by the Department of Defense Medical Examination Review Board (DODMERB).

2)  **Indoctrination.**  A drug test will be conducted on each candidate reporting for admission within the first week of reporting.  A positive test is grounds for immediate dismissal.  This testing is coordinated by the Commandant's Department.

3)  **Setbacks.**  A drug test will be conducted on each Midshipman who is setback, regardless of the reason, within the first week of reporting back to the Academy.  A positive test is grounds for referral to an Executive Board with a recommendation for dismissal.  This testing is coordinated by the Commandant's Department.

4)  **Pre-Sea Assignment.**  A drug test is required for each Midshipman within six months of assignment to sea training.  A positive test is grounds for referral to an Executive Board with a recommendation for dismissal.  This testing is coordinated by the Commandant's Department.

5)  **Coast Guard Licensing.**  A drug test is required for each Midshipman within six months of sitting for the licensing examination administered by the United States Coast Guard.  A positive test is grounds for referral to an Executive Board with a

AR000240

recommendation for dismissal. This testing is coordinated by the Commandant's Department.

6) **Random.** Midshipmen in residence at the Academy will be tested at random in accordance with the procedures outlined in this instruction. A positive test result is grounds for referral to an Executive Board with a recommendation for dismissal. This testing is coordinated by the Commandant's Department.

a. **Procedure:**

The Commandant's Department will periodically provide a list containing the names of all Midshipmen in residence at the Academy to the testing contractor who will generate a random sample of the names.

1) **Routine.** At a frequency set forth in the agreement with the testing contractor, the contractor will notify the Commandant of the impending test. At the agreed upon time, the Commandant will order the selected Midshipmen to report to the test site. A member of the Commandant's staff will be present throughout the time that samples are being taken to supervise the procedure and support the contractor taking the samples.

2) **Reasonable Suspicion.** This type of testing may be required of a Midshipman if an Academy official believes that the Midshipman has used illegal drugs. This belief must be based on specific objective facts and reasonable inferences drawn from these facts in light of experience. Examples of what might constitute reasonable suspicion include, but are not limited to, erratic behavior, possession of illegal drugs or paraphernalia associated with illegal drug use, or an accident that reasonably could be construed as occurring as a result of impairment due to substance abuse. Reasonable suspicion does not require certainty; however, mere assertions are not sufficient to meet this standard. Reasonable suspicion testing will be ordered only upon approval of the Commandant, the Deputy Commandant, the Superintendent or the Deputy Superintendent. This testing is coordinated by the Commandant's Department.

3) **Refusal to Submit to Testing.** A Midshipman who refuses to submit to testing will be deemed to have a positive test result and will be referred to an Executive Board or a Superintendent Hearing.

4) **USCG Notification.** All positive drug tests will be reported to the United States Coast Guard.

5. **TOBACCO POLICY**

a. Midshipmen will not smoke when in public areas. They may not smoke within the confines of the barracks or any other Academy building, or in any Academy vehicles. Smoking is

34 | P a g e

AR000241

only permitted in the "smoke shack" located outside of Palmer Hall and outside of Rogers Hall.

b. Smokers must clean up after themselves. Failure to do so may result in smoking areas becoming "smoke free."

c. Midshipmen may use smokeless tobacco in the confines of their rooms. When using these tobacco products, Midshipmen will not spit in water fountains, carry containers around, or leave containers with spit in them in any area.

## 3.6 RELATIONSHIPS

1. Midshipmen are encouraged to engage in healthy and meaningful relationships with one another. However, Midshipmen must be mindful of their environments and conduct themselves appropriately. All mentoring activities between Midshipmen are to occur in public spaces on Academy grounds. Mentoring must not to take place in a barracks room or off campus.

2. **Fraternization.** An improper senior-subordinate relationship is defined as an unduly familiar association or dealing between seniors and juniors/subordinates, which prejudices good order and discipline, either by compromising regard and respect for authority, or by impairing the ability of the senior member to exercise fair and impartial judgment. Fraternization is an abuse of interpersonal relations between various levels, which may result in an overly familiar attitude, favoritism in treatment, or the perception of either. Fraternization is a gender-neutral concept.

3. The basis for relationships between the classes must be that of a proper professional relationship between seniors and juniors/subordinates. Such a relationship is based on the principles of regard for human dignity and personal respect. There must be intelligent deference by the junior, but also there must be patience, understanding, impartiality, and a feeling of responsibility on the part of the senior for the growth and professional development of the underclass. Treatment of subordinates in a manner that degrades or humiliates is a violation of these principles. Midshipmen are prohibited from relationships and actions that violate these principles. The senior Midshipman bears the primary responsibility for the prevention of improper senior-subordinate relationships, and shall be held accountable for violations of this regulation and any violation of other regulations that he/she commits as a result of the improper relationship. Similarly, the junior Midshipman is accountable for any violations of this regulation and any violation of other regulations that he/she commits by virtue of acquiescing in an improper relationship. When considering whether a relationship is appropriate, Midshipmen should not date individuals within their chain of command.

4. **RELATIONSHIP OF UPPERCLASS TO PLEBE CANDIDATES, PLEBES AND 4/C MIDSHIPMEN**

   a. Upperclass Midshipmen shall maintain a proper professional relationship with Plebe Candidates, Plebes, and 4/C Midshipmen.

   b. Upperclass Midshipmen shall **not**:

      1) Attempt to degrade or humiliate Plebe Candidates, Plebes, or 4/C Midshipmen.

35 | P a g e

2) Date, have sexual relations, or engage in other fraternization with any Plebe Candidates, Plebes, or 4/C Midshipmen.
3) Request or direct Plebe Candidates, Plebes, or 4/C Midshipmen to perform personal services.
4) Impose any informal or unauthorized punishment on Plebe Candidates, Plebes, or 4/C Midshipmen.
5) Touch Plebe Candidates, Plebes, or 4/C Midshipmen (exception: for the purpose of correcting or adjusting uniform, drill or rifle position, or other legitimate training purpose.)
6) Borrow anything from a Plebe Candidates, Plebes, or 4/C Midshipmen.
7) Direct a Plebe Candidates, Plebes, or 4/C Midshipmen to participate in any activity that could be described as hazing, bullying, or a prank.
8) Enter the rooms of Plebe Candidates, Plebes, or 4/C Midshipmen except on official business or to provide academic assistance.
9) Use any real-time electronic communication with any Plebe Candidates, Plebes, or 4/C Midshipmen for any purpose at any time, except for electronic communication via the Academy e-mail system for official Academy business. This includes, but is not limited to, social media and texting. Participating in group social media platforms created by Academy, Regimental, athletic, human relations, or student activities departments are an exception.

## 5. MARRIAGE, PREGNANCY, and PARENTHOOD

a. Parenthood is defined as having legal, financial or custodial obligations for a child or children, as determined by court adjudication, self-admission, or other evidence. Any Midshipman who becomes pregnant, causes pregnancy of another, or incurs the obligations of parenthood, must report the condition to their chain of command.

b. Midshipmen who become pregnant and choose not to resign may be allowed a Medical Leave Of Absence (MLOA) of no more than one year.

c. Midshipmen who are pregnant and who fail to resign or request a MLOA may be disenrolled.

d. Midshipmen may be married. However, married Midshipmen will not receive special accommodations in the form of leave, medical coverage, housing, or privileges. Midshipmen family members will not be allowed to live on Academy grounds.

e. The Academy assumes no responsibility of any kind for the dependents of Midshipmen, including, but not limited to, providing berthing or meals for such dependents.

AR000243

## 3.7 MIDSHIPMEN SAFETY AND CONDUCT

1. **SAFETY**

    a. It is the duty of each Midshipman to observe safe practices (abide by posted and published safety rules) in carrying out their daily activities and to report unsafe conditions they notice to the chain of command or to any watch officer.

2. **DANGEROUS MATERIAL**

    a. No Midshipman will, without proper authority, possess, or cause to be introduced onto Academy property any dangerous materials, such as ammunition, explosive substances, chemicals or liquids of inflammable nature or poisonous composition, i.e., gasoline, carbon tetrachloride, lye, etc., except small quantities of cleaning fluid, lighter fluid, hobby supplies or similar items in cans or bottles.

    b. Midshipmen will not keep candles, incense or any other lamp, lantern, etc., which utilizes an open flame or burning material in their rooms. Exceptions to these regulations are cigarette lighters and matches, which can only be lit in designated areas established in section 3.5.

3. **FIREARMS, AMMUNITION, FIREWORKS, KNIVES, AND OTHER WEAPONS**

    a. No firearms, ammunition or fireworks of any description, air rifles, paintball guns, spear fishing, or archery equipment will be introduced into or used on Academy limits, except with official written permission of both the Director of Public Safety and the Commandant, and only in places specifically designated by them.

    b. Midshipmen will not have in their possession hunting sheath knives or switchblade knives. Ordinary pen knives with blades less than three inches and the Midshipman knife are authorized.

    c. Clubs, brass knuckles, axes, or other weapons, except as delineated above, are prohibited at all times on Academy grounds.

4. **PHYSICAL VIOLENCE/ INTIMIDATING BEHAVIOR**

    a. Midshipmen will not offer or accept a challenge to fight, or encourage others to fight.

    b. Midshipmen will not strike or attempt to strike another person or encourage someone to strike another person.

    c. Midshipmen will not threaten another person or their property whether or not they intend to carry out such threats. Communication of a threat includes, but is not limited to, in person, or through a third party, telephone (including text messaging), in writing by letter, fax, or electronic mail, via social media, including Facebook, Twitter, Skype or any other social medium.

AR000244

d. Intimidating behavior on the part of any Midshipmen, but especially in the case of upper classmen versus under classmen will not be tolerated. It is a violation of both this paragraph and paragraph 3.6 Relationships.

5. **DISRESPECTFUL AND PROFANE LANGUAGE**

a. Under no circumstances will a Midshipman:

1) Use contemptuous, disrespectful, or insolent language/gestures toward a superior officer, toward any person in authority, or towards any other Midshipman in an attempt to intimidate or defame.

2) Use profane, obscene, or vulgar words in official discourse, or in a public place where one must respect the rights of others.

6. **FALSIFYING OFFICIAL DOCUMENTS**

Midshipmen are prohibited from falsifying any Official Document, such as a Watch Log, Ship's Log, Boat's Log, or any other Official Government/Academy Document, application or form. Falsifying official documents is a both a violation of these Regulations and an Honor Offense.

7. **GAMBLING**

Midshipmen may not gamble for money on Academy grounds, on any Academy property, or at any Academy function.

8. **INFORMAL PUNISHMENT**

Informal or unauthorized punishment is prohibited. Under no circumstances will Academy officers, staff or Midshipmen prescribe any punishment that is not acknowledged by these Regulations, or authorized by the Commandant. Instances of unauthorized punishment are to be reported to the Commandant through the chain of command. The only exception to the above is that immediate corrective actions may be imposed in order to correct minor deficiencies in Midshipman conduct without reference to the disciplinary system of these Regulations. Such corrective action may relate directly to the deficiency exhibited by the Midshipman (e.g. sweep the hallway because the Midshipman left trash in the area, stand an extra watch for failure to properly execute a minor watch duty, etc.). Any other disciplinary action must be done in accordance with the procedures in these Regulations and Class Training Manuals.

9. **IDENTIFICATION CARDS**

Midshipmen will not alter, damage, lend, counterfeit, or use any ID card, including a driver's license in an unauthorized manner. Reproducing, possessing, or using false Academy, military, State, or Federal government identification is a serious violation. Midshipmen will immediately report the loss or theft of ID cards to their Company Officer and to the Office of Public Safety.

AR000245

**10. NEX FACILITY**

Midshipmen must be in uniform of-the-day for transactions in the uniform shop, NEX, and the Seafarer until 1600 daily. Midshipmen may get their haircut at the Academy Barber Shop in clean Academy issue gym gear during the duty day.

**11. CONDUCT IN THE DINING HALL**

    a.  The Regimental Commander (RC) is charged with the responsibility of the internal organization, accountability, and the conduct of the Regiment in the dining hall.

    b.  The RC or, in his/her absence, the senior Midshipman present, will preside at meals.

    c.  Each table will be under the supervision of a Midshipman table captain designated by the Regimental Commissary Officer (RCO). Table captains will sit at the head of their respective tables for each mandatory meal. If unable to do so they will designate another 1/C Midshipman to serve as table captain. Each table captain will be responsible for:

        1)  The enforcement of regulations at that table.
        2)  Maintenance of order and proper table etiquette.
        3)  The orderly cleaning/stacking of all eating gear/utensils at the conclusion of the meal.
        4)  Ensuring that no Commissary utensils/equipment leave the Dining Hall.

**12. ARREST BY CIVIL AUTHORITIES**

    If arrested, Midshipmen will notify the CDO and/or their Company Officer as soon as possible.  Violations of law that result in arrest may result in disciplinary charges against the Midshipman.

**3.8    HAZING AND BULLYING**

Hazing and bullying are unacceptable and are prohibited in all circumstances and environments, including but not limited to, on or off campus, during TMs or while at sea.  The prohibition on hazing and bullying extends to misconduct committed in person, through a third party, or via electronic or other communications, such as text messaging, written or faxed letters, email, or social media (Facebook, Twitter, Instagram, Snapchat, Skype, Facetime, etc.).

    a.  **Hazing:**  any act committed or any situation intentionally created that is embarrassing, humiliating, harassing, intimidating or demeaning, or endangers the physical or mental health or safety of another person, for the purpose of initiation into, admission into, affiliation with, change in status or position within, or as a condition for continued membership in any team, organization, club, or group.  Hazing occurs regardless of the willingness to participate by the person against whom the behavior is directed.  Examples of hazing include, but are not limited to, the following:

        1)  Any form of initiation or congratulatory act that involves physical acts against another in any manner, or threatening to do the same

    2) Oral or written berating of another for the purpose of belittling or humiliating him/her
    3) Encouraging another to engage in illegal, harmful, demeaning, or dangerous acts
    4) Playing abusive or malicious tricks
    5) Forced or required consumption of food, alcohol, drugs, or any other substance

b. **Bullying**:  aggressive behavior toward another that may cause physical or psychological harm and that is repeated, or has the potential to be repeated, over time.  Bullying may involve the singling out of an individual from others for ridicule because he/she is considered different or weak.  It often involves an imbalance of power between the aggressor and the target.  Examples of bullying include, but are not limited to, the following:

    1) Taunting, teasing, name-calling, or threatening to cause harm
    2) Playing abusive or malicious tricks
    3) Degrading or damaging a person's reputation
    4) Physical acts against another in any manner, or threatening to do the same
    5) Forced consumption of food, alcohol, drugs, or any other substance

c. Soliciting, coercing, or knowingly permitting another person to solicit or coerce acts of hazing or bullying may be considered acts of prohibited hazing and bullying.

d. Incidents of hazing or bullying that involve allegations of sexual assault, sexual harassment, or discrimination will be addressed in accordance with the full panoply of laws, regulations, and policies pertaining to such allegations.

## 3.9    DISCRIMINATION AND HARASSMENT

Discrimination and harassment are unacceptable and are prohibited in all circumstances and environments, including but not limited to, on or off campus, during TMs or while at sea.  The prohibition on discrimination and harassment extends to misconduct committed in person, through a third party, or via electronic or other communications, such as text messaging, written or faxed letters, email, or social media (Facebook, Twitter, Instagram, Snapchat, Skype, FaceTime, etc.).

d. **Discrimination**:  is adverse treatment of another based on race, color, national origin, ethnicity, gender and/or gender identity or expression, disability, religion, age, sexual orientation, veteran or military status, or any other status protected by law.

e. **Harassment**:  is unwelcome verbal or physical conduct based on race, color, national origin, ethnicity, gender and/or gender identity or expression, disability, religion, age, sexual orientation, veteran or military status, or any other status protected by law.  Harassment includes conduct that creates an intimidating, hostile, or offensive academic or residential environment, or otherwise adversely affects academic opportunities or participation in any Academy activity or benefit.  Examples of harassment include, but are not limited to, the following:

AR000247

    1) Verbal abuse or hostile behavior, such as insulting, teasing, mocking, degrading, or ridiculing another person or group.

    2) Inappropriate physical contact, comments, questions, advances, jokes, epithets, or demands.

    3) Physical assault or stalking.

    4) Displays or physical or electronic transmission of derogatory, demeaning, or hostile materials.

## 3.10    RETALIATION

Retaliation is unacceptable and is prohibited in all circumstances and environments, including but not limited to, on or off campus, during TMs or while at sea. The prohibition on retaliation extends to misconduct committed in person, through a third party, or via electronic or other communications, such as text messaging, written or faxed letters, email, or social media (Facebook, Twitter, Instagram, Snapchat, Skype, FaceTime, etc.).

   a.  **Retaliation** (sometimes referred to as reprisal) means taking or threatening to take any adverse action taken against an individual for making a good faith report of conduct prohibited under this Policy, or for participating in any investigation or proceeding resulting from such a report. Retaliation includes threatening, intimidating, harassing, or any other conduct that would discourage a reasonable person from making a report, or from participating in proceedings related to such a report. Examples of retaliation include, but are not limited to the following:

    1) Disadvantaging or restricting a person in their status as a Midshipman or employee, or in their ability to gain benefits or opportunities available at the Academy;

    2) Precluding a person from filing a report of prohibited conduct;

    3) Pressuring someone to drop or not support a complaint, or to provide incomplete, false, or misleading information; or

    4) Adversely altering the educational or work environment of someone who has complained or participated in the complaint process.

   b.  Ostracism, which is a form of retaliation, means wrongfully excluding a Midshipman, or faculty or staff member, from social acceptance or membership in or with a recognized Academy group, such as the chain of command, intercollegiate or intramural team, or Academy club, of which such individual was a part of or a reasonable person would conclude wanted to be part of, with the intent to do any of the following:

    1) Inflict emotional distress on the individual.

    2) Discourage reporting of conduct prohibited under this Policy.

    3) Discourage participation in administrative proceedings related to such prohibited conduct.

and, because the perpetrator knew or believed any of the following:

AR000248

1) That the individual reported or was planning to report prohibited conduct.
2) That the individual had been or had alleged to be subjected to prohibited conduct.
3) That the individual was reported by another as being subject to prohibited conduct.
4) That the individual intervened to prevent or attempted to prevent prohibited conduct from occurring.
5) That the individual cooperated in an investigation, or has served or will serve as a witness, or otherwise cooperate in the future in an administrative and/or criminal investigation or proceeding involving prohibited conduct.

## 3.11 SEXUAL MISCONDUCT

1. Midshipmen may not engage in sexual misconduct, which is defined as consensual sexual acts on Academy grounds, on Academy vessels, on TMs, on board vessels assigned during sea training, under circumstances that are discrediting to the Academy or the Midshipman, or are prejudicial to good order and discipline in the Regiment of Midshipmen.

2. Examples of sexual misconduct include kissing, touching, sexual intercourse of any sort, sexually motivated nudity, and indecent exposure.

3. In addition to the above, Midshipmen may not hold hands while in uniform, and may not sit or lay on the same bed on Academy grounds, or aboard a ship or vessel.

## 3.12 SEXUAL ASSAULT, SEXUAL OR GENDER-BASED HARASSMENT, RELATIONSHIP VIOLENCE, STALKING. AND SEXUAL EXPLOITATION

1. Standards of decorum, and performance are expected of a Midshipmen as Officers in training. This includes actions or words which would bring discredit upon the Academy. Sexual assault. sexual or gender-based harassment, relationship violence, and stalking are unacceptable and are prohibited in all circumstances and environments, including but not limited to, on or off campus, during TMs or while at sea.  This prohibition extends to misconduct committed in person, through a third party, or via electronic or other communications, such as text messaging, written or faxed letters, email, or social media (Facebook, Twitter, Instagram, Snapchat, Skype, FaceTime, etc.).

   a. Sexual assault is a crime of violence defined as intentional touching of a sexual nature against the will (by use of force. physical threat, coercive conduct, or abuse of authority) or without the consent of another person, or where that person is incapacitated (e.g., "passed out," sleeping, or impaired due to the use of alcohol or drugs. including prescription medications) or otherwise incapable of giving consent.  The other person can be male or female and the perpetrator of the sexual assault can be of the same or opposite sex.  Examples of sexual assault include, but are not limited to, the following:

      1) Sexual intercourse, including anal. oral or, vaginal penetration, however slight. with a body part (e.g., penis, finger, hand or tongue) or an object
      2) Kissing, touching, groping, fondling, or other intentional contact with the breasts, buttocks, groin, or genitals (over or under an individual's clothing) for purposes of

AR000249

sexual gratification or when such private body parts are otherwise touched in a sexual manner

3) Sexual contact with someone who is unable to say "no" and/or change their mind due to the presence of coercion or intimidation

4) Sexual contact with someone who is under the age of consent in the jurisdiction in which the sexual assault occurs.

b. Sexual harassment is any unwelcome sexual advance request for sexual favors, or other unwelcome verbal, non-verbal, graphic or physical conduct of a sexual nature, including, but not limited to, the following:

1) Submission to or rejection of such conduct is either an explicit or implicit term or condition of an individual's employment or advancement in employment, evaluation of academic work or advancement in an academic program, or basis for participation in any aspect of an Academy program or activity, including Regimental duties (*quid pro quo*);

2) Submission to or rejection of such conduct by an individual is used as a basis for decisions affecting the individual (*quid pro quo*); or

3) Such conduct has the purpose or effect of unreasonably interfering with an individual's learning, working, or living environment; in other words, it is sufficiently severe, pervasive, or persistent as to create an intimidating, hostile, or offensive learning, working, or living environment under both an objective (a reasonable person's view) and subjective (the Complainant's view) standard (hostile environment).

c. Gender-based harassment includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature.

d. Examples of sexual or gender-based harassment include, but are not limited to, the following:

1) Unwanted flirtation, advances or propositions of a sexual nature;

2) Verbal conduct, including lewd or sexually suggestive comments, jokes, or innuendos, or unwelcome comments about an individual's sexual orientation or gender identity; and

3) Written conduct, including letters, notes, or electronic communications containing comments, words, jokes, or images that are lewd or sexually suggestive, or relate in an unwelcome manner to an individual's sexual orientation or gender identity.

e. Relationship violence refers to controlling, abusive behavior, including any act of violence or threatened act of violence, against a person who is, or has been involved, in a sexual, dating, domestic, cohabiting or married relationship with that person. Relationship violence can take place in heterosexual or same-sex relationships, and sometimes also involves violence against the children in the family. Relationship violence can take a number of forms including physical, verbal, emotional, economic and sexual abuse, or any combination thereof.

AR000250

1) Domestic violence: The term "domestic violence" includes felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabited with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the applicable jurisdiction, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the applicable jurisdiction.

2) Dating violence: The term "dating violence" means violence committed by a person (a) who is or has been in a social relationship of a romantic or intimate nature with the victim; and (b) where the existence of such a relationship shall be determined based on a consideration of the following factors: (1) the length of the relationship; (2) the type of relationship; and (3) the frequency of interaction between the persons involved in the relationship.

f.   Stalking is a course of conduct directed at a specific person that would cause a reasonable person to fear bodily injury or experience substantial emotional distress.  Such conduct includes, but is not limited to, unwelcome acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicate to or about a person or interferes with a person's property.  It includes cyber-stalking, in which electronic media, such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used.  Stalking can occur in a dating relationship, friendship, or past relationship, or can be perpetrated by a stranger.

g.   Sexual Exploitation occurs when a person takes non-consensual or abusive sexual advantage of another person for their own advantage or benefit, or for the advantage or benefit of anyone else.  Examples of sexual exploitation include, but are not limited to, the following:

   1) Voyeurism (such as watching or taking pictures, videos, or audio recordings of another person engaging in a sexual act, in a state of undress, or in a place and time where such person has the reasonable expectation of privacy, such as a changing room, toilet, bathroom, or shower, each without the affirmative consent of all parties)
   2) Disseminating, streaming, or posting pictures or video of another in a state of undress or of a sexual nature without the person's affirmative consent
   3) Exposing one's genitals to another person without affirmative consent
   4) Knowingly exposing another individual to a sexually transmitted infection or virus without the other individual's knowledge

h.   Failure to obtain consent

   1) Consent is defined as an affirmative decision given by clear words or actions to engage in mutually agreed upon sexual activity.  Consent may not be inferred from silence, passivity or lack of resistance alone.  Consent to one form of sexual activity does not imply consent to other forms of sexual activity, and the existence

AR000251

of a current or previous dating or sexual relationship is not sufficient to constitute consent to additional sexual activity. Consent may be initially given but can be withdrawn at any time.

2) Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness, being asleep, being involuntarily restrained, or being coerced or intimidated. Depending on the degree of intoxication, an individual who is under the influence of alcohol, drugs, or other intoxicants, may be incapacitated and, therefore, unable to consent.

## 3.13 SEA YEAR CONDUCT POLICY

Sailing aboard commercial and military vessels as a cadet is a privilege that should not be taken for granted. At all times, on duty or off, Midshipmen represent the Academy and the Regiment, and are expected to act as leaders of exemplary character. Midshipmen will be respectful of all crew members and others working on and with the vessel and with anyone with whom they interact on liberty. In all matters, a Midshipman's conduct is a reflection of the Academy, and the Regiment of Midshipmen.

1. **PROCEDURES**

    Liberty is granted at the discretion of the ship's master. While on Liberty, Midshipmen must carry identification, conduct themselves in an exemplary manner, and be accompanied by a liberty buddy. A liberty buddy may be a fellow Midshipman or a crewmate. Liberty buddy relationships must be in compliance with fraternization policies.

2. **PROHIBITED CONDUCT**

    a. Midshipmen under age 21 may not consume alcohol even if local laws permit it.

    b. Midshipmen will not engage with prostitutes or other sex workers, even if local laws permit it, and will not encourage others to do so.

    c. Midshipmen will not become involved in or promote human trafficking in any way.

    d. Midshipmen will not engage in sexual assault, harassment of any form, including sexual harassment, bullying, hazing or coercion of others to engage in inappropriate behavior.

    e. Midshipmen will not retaliate against any person for reporting misconduct or refusing to submit to coercion to engage in inappropriate behavior.

    f. Midshipmen will not date, have sexual relations, or engage in romantic or other unduly familiar associations with any member of the crew, including other Midshipmen assigned to the vessel. If two Midshipmen with a romantic or dating relationship at the Academy are assigned to the same vessel, both must immediately notify their Academy Training Representative (ATR) so they can be assigned to different ships.

3. **OBLIGATION TO REPORT**: Midshipmen who have witnessed any type of misconduct or inappropriate behavior have an ethical obligation to report it.

AR000252

4. **SHIP REGULATIONS:** If the regulations of the ship or shipping company to which a Midshipman is assigned are more restrictive than the policies outlined in these Regulations, Midshipmen must follow the more restrictive policy. For example, if a company has a policy that alcohol is never to be consumed while assigned to one of their ships, Midshipmen must comply with that policy.

## 3.14 SPIRIT RELATED ACTIVITIES

1. Spirit-related activities, including cheers, sheet posters, decorations, or skits, will remain within the bounds of good sportsmanship, good taste, and common decency. Spirit should focus on the efforts of Academy teams, and not on tearing down the opposition. Such activities should not be destructive in any way.

2. Midshipmen will obtain Company Officer approval before conducting any spirit-related activity or "recon."

3. **MIDSHIPMEN WILL NOT:**

   a. Demean or offend any individual or group through offensive language or actions that could cause physical harm.

   b. Deface, destroy, or move any property, including cannons, monuments, memorials, items of historical significance, and other decorative art or objects, unless sanctioned by the Commandant.

   c. Move, lift, or rearrange tables, chairs, or other equipment in Wiley Hall, Delano Hall, academic buildings, athletic facilities, or associated spaces.

   d. Gain or attempt to gain access to any roof tops at any time. At no time will items be placed or hung from roofs of any buildings.

   e. Block egress from occupied spaces.

4. **INTERNET VIDEOS**

   a. Midshipmen may create videos for morale and expression purposes. Videos intended for online publication must be in good taste and must avoid offensive and inappropriate behavior that could bring discredit upon themselves or the Academy. Such videos must be reviewed and approved by the Commandant or his/her designee and the Academy Office of External Affairs before being posted to any online website (i.e., YouTube) or Social media (i.e., Facebook). When submitted for approval, the videos must be in appropriate media format to be viewed from a computer, and must be accompanied by a typed memorandum format description of the video's content and proposed location of online posting (i.e., YouTube, Vimeo, etc.).

   b. When posted, the video must include the following disclaimer: "This video is the personal work of [person/group or persons], and not of the United States Merchant Marine

AR000253

Academy". Midshipmen are personally responsible for all content they publish on social networking sites, blogs, video hosting websites, or other websites. Midshipmen must be acutely aware that they lose control over content they post on the internet. Such loss of control will not absolve Midshipmen of responsibility under these Regulations.

c.  All Facebook pages operated as a function of the Academy must be accessible to the Commandant's Office, the Office of Public Safety, the Office of External Affairs and the Department of Information Technology.

d.  Posting any defamatory, libelous, obscene, abusive, threatening, racially or ethically discriminatory, or otherwise offensive or illegal information or material is prohibited.

e.  No miswear or inappropriate wear of uniforms may be used in the videos.

## 3.15 ETIQUETTE

1. **BACKGROUND**

   While Merchant Marine Officers do not generally follow military courtesies or rules of etiquette, the understanding and practice of them prepares Midshipmen for those situations in which they might find themselves while at the Academy and in their chosen careers.

2. **ACADEMY COURTESIES**

   a.  Deference of juniors to seniors is expected at all times. Specific rules are as follows:

      1) Juniors always initiate the salute and greeting.
      2) A Midshipman rises when an officer approaches and stands at attention, if addressing the officer or being addressed by the officer.
      3) When ordered to report to an officer, a Midshipman reports promptly.
      4) When accompanying a senior, a junior walks on the senior's left.
      5) When a Midshipman is issued an order he or she always responds by saying, "Aye-Aye Sir/Ma'am" or "yes sir/ma'am" meaning that the Midshipman understands and will obey the order.

3. **ADDITIONAL FORMS OF MILITARY COURTESY**

   a.  When ordered to report to an officer outdoors, approach the officer at attention and halt about two paces from him/her, render the appropriate salute and say, "Sir/Ma'am, Midshipman [name], [no.] class reporting as ordered, Sir/Ma'am." Hold the salute until it is acknowledged.

   b.  When the business is completed, salute and, after that salute has been returned, take one-step backward, execute an about face and depart.

   c.  When reporting to an officer indoors, follow the same procedure, except remove the headgear before approaching the officer and do not salute.

47 | Page

AR000254

d.  Midshipmen and other uniform personnel entering or leaving Wiley Hall will salute the Memorial and the colors flying in the center of the main deck. This practice has a three-fold significance: it honors our National Ensign, it conforms to saluting the Quarterdeck on a ship when coming aboard or going ashore, and honors the 142 Merchant Marine Academy midshipmen who lost their lives during World War II.

4.  **SALUTING**

a.  The saluting custom goes back to the earliest recorded history. Just as you show marks of respect to seniors in civilian life, military courtesy expect that you show respect to your seniors in the regimented profession such as the Merchant Marines. Regulations require that all officers be saluted by Midshipmen and that they return such salutes. When a salute is executed, the right hand is raised smartly until the tip of the forefinger touches the lower part of the headgear. Thumb and fingers are extended and joined. The palm is turned slightly inward until the person saluting can just see its surface from the corner of the right eye. The upper arm is parallel to the deck with the elbow slightly in front of the body. The forearm is inclined at a 45-degree angle; hand and wrist are in a straight line. Completion of the salute is executed by dropping the arm to its normal position in one sharp, clean motion.

b.  The following are some general rules regarding saluting:

1)  When meeting an officer who is either driving or walking, salute when six paces away in order to give him/her time to return your salute before you are abreast of him/her.
2)  Hold the salute until it is returned. Accompany the salute with the greeting of the day, i.e. "Good morning sir/ma'am".
3)  Render the salute once if the officer remains in the immediate vicinity. If conversation takes place, however, salute again when the officer leaves or when you depart.
4)  When passing an officer who is going in the same direction, as you come abreast of him/her, salute and say, "By your leave, sir/ma'am." He/she will return the salute and say, "Carry on," or "Granted." You then finish your salute and pass ahead of him/her.
5)  Upon approach of an officer superior in rank, individuals of a group not in formation are called to attention by the first person noticing the officer, and all come smartly to attention and salute.
6)  Midshipmen shall salute Commissioned Officers when they are out of uniform, as long as the Midshipman is in uniform.

c.  Do not salute:

1)  If you are engaged in work, unless spoken to directly.
2)  When not wearing a cover or inside. Persons in the maritime service never salute "uncovered"; that is, not wearing a cover. If indoors, Midshipmen are required to remove headgear and would not salute. For purposes of these rules and regulations, the term "outdoors" is construed to include such buildings as gymnasiums and other roofed enclosures used for drill or exercise of midshipmen, theater marquees.

AR000255

covered walks, and other shelters open on the sides to the weather. "Indoors" includes classrooms, offices, passageways, galleys, dining halls, watch offices, recreation rooms, heads, washrooms, dormitory rooms, etc.

3) With a tooth pick, cigarette, or other items in your mouth.
4) When in formation, EXCEPT at the command, "Present Arms."
5) When moving at "double time" - ALWAYS slow to a normal walk before saluting.
6) When carrying articles in both hands, or otherwise so occupied as to make saluting impractical. It would be advisable to render a proper greeting.

d.  A Midshipmen in uniform who recognizes an officer in civilian clothes is required to render the proper salute. Civilians entitled by reason of their position to honors, e.g., President of the United States, senators and other members of congress, governors, etc., rate a hand salute.

e.  When personal honors are being rendered to individuals of high rank and you are NOT IN FORMATION, salute at the first note of the music, and hold the salute until the completion of the ruffles, flourishes and march.

## 5.  COLORS AND NATIONAL ANTHEM

a.  Honors to the National Anthem or to the colors are rendered as follows:

1) Whenever the "National Anthem" or "To the Colors" is played and you are not in formation and not in a vehicle, come to attention. At the first note of the music, face the flag and render the hand salute. Hold the salute until the last note of the music has sounded.
2) If no flag is near, face the music and salute.
3) If in formation, salute only on the order, "Present Arms."
4) If outdoors and uncovered, stand at attention and face the direction of the flag or music. When the "National Anthem" is played indoors, Midshipmen will stand at attention and face the music or flag if one is present.
5) When passing or being passed by an uncased color that is being paraded, presented, or is on formal display, salute at six paces distance, and hold the salute until six paces beyond it or until it has passed you by six paces.
6) If uncovered, stand at attention or march smartly when passing or being passed by an uncased color.

b.  The marks of respect shown above are also rendered to the National Anthem of any friendly country when played on official occasions.

## 3.16 PHYSICAL APPEARANCE AND UNIFORMS

a.  Midshipmen will dress neatly and smartly at all times. Uniforms shall be scrupulously clean. All buttons, snaps, zippers, etc. shall be fastened at all times. This includes the "neck button" on all jackets for Plebe/Fourth Class Midshipmen, and the boiler suit and pocket buttons for all uniforms and classes. Nothing shall be protruding from shirt pockets; all pens and pencils should be stowed completely within. Pants pockets are for stowing necessary items only; they should never be overstuffed. The only time a Midshipmen

49 | P a g e

AR000256

should put their hands in their pockets is to retrieve an item.  If your hands are cold, wear gloves. Midshipmen are subject to these Regulations at any time while in uniform on Academy property, and Academy sponsored trips and events, or at any other such time that the uniform is worn.

b.  The uniform of the day will be prescribed by announcement by the MCDO. On most days. the uniform of the day will be "standard issue" (Poly-Wool) Khakis. Seasonal changes of uniform will be announced in advance.  Only the uniforms prescribed by the RC, or that are necessary for special classes or laboratories, shall be worn between 0700 and 1600. While in attendance at evening classes, all Midshipmen will be in the prescribed khaki uniform. No faculty member is authorized to allow Midshipmen to be out of uniform at any time while in class. On some days (Admissions Open Houses, Career Fairs, etc.), the uniform of the day will be the in-season dress uniform. All will be required to wear the dress uniform on those designated days from 0700 – 1600.

c.  After 1600 and on weekends, PT gear is authorized as per Class Rates.

d.  While attending classes, or participating in Academy-related or sponsored event, while in any official place of business on campus (i.e. the Registrar, Student Accounts, Regimental Assistant), and/or while in the Navy Exchange or Seafarer, Midshipmen are to be in the proper uniform of the day. The only exceptions to this rule are the Academic Center for Excellence and the Bland Library.

e.  For security purposes, United States Government ID cards should be carried with you at all times and presented when requested by higher authority.

f.  Uniform components deemed unserviceable will be replaced at the Midshipman's expense.

3.  **GROOMING STANDARDS**

Midshipmen must have a neatly groomed appearance while wearing uniforms. Midshipmen are required to read and adhere to the Commandant Instruction on Uniform and Grooming Standards.  This Instruction gives detailed requirements for both male and female grooming requirements as well as jewelry restrictions. Every Midshipman will be held accountable for these requirements.

AR000257

## CHAPTER 4 – DISCIPLINARY SYSTEM

### 4.1 PURPOSE

The Academy is committed to maintaining a safe, healthy and respectful environment in which Midshipmen may pursue their academic goals. The Academy seeks to instill in Midshipmen self-discipline as a daily way of life, to correct Midshipmen whose conduct is not in accordance with prescribed standards, and when necessary, to separate Midshipmen who are unwilling to conform to the minimum standards of conduct required at the Academy.

### 4.2 RIGHTS AND OBLIGATIONS DURING CONDUCT PROCEEDINGS

1. A Midshipman has the following rights during a conduct proceeding that has reached the level of a Mast (Rights a. through d. also apply to any investigative meeting held with the Investigating Officer):

    a. To remain silent and not have that silence used against him/her.

    b. To receive a written statement of the charges against him/her, in accordance with the provisions of the Midshipman Regulations.

    c. To receive adequate notice of dates set for Mast, and any related conferences and/or meetings.

    d. To review the disciplinary case file maintained by the Commandant's Office prior to a Mast and/or appeal.

    e. To present witnesses and submit any pertinent, supportive documentation.

    f. To have a closed Mast hearing unless he/ she provides written permission for others to attend.

    g. To receive a written statement of the outcome of the proceeding, and a description of the appeal procedure.

    h. To appeal the Mast decision, subject to the provisions of the Midshipman Regulations.

2. In any investigation or inquiry made pursuant to the Midshipman Regulations, it is the duty of every Midshipman to fully answer every question as to facts within their knowledge, no matter who, except themselves, may be incriminated by their answer.

### 4.3 REPORTING

1. Any member of the Academy community may initiate a complaint against a Midshipman for an alleged violation of these Regulations through the Commandant. A complainant shall submit the complaint to the Commandant within a reasonable amount of time from the date he/she becomes aware of the alleged violation of the conduct system. All complaints will be reviewed by the Commandant's Office for possible Midshipman Regulations violations, except that all complaints

51 | P a g e

of sexual assault, sexual or gender-based harassment, relationship violence, stalking or retaliation will be handled in accordance with the appropriate Superintendent Instructions.

2. **CHARGES AND NOTICE**

   a. The Commandant's Office will investigate each complaint, and if the circumstances surrounding the complaint indicate that a violation of these Regulations may have occurred, disciplinary charges will be issued. The Midshipman will be notified of the charges in writing. However, if the disciplinary charge(s) might warrant deferred graduation, a setback, or disenrollment, the Commandant's Office will make a recommendation to the Superintendent to conduct either an Executive Board or a Superintendent's Hearing on the disciplinary charge(s).

   b. Proper written notice to a Midshipmen will include the following:

      1) A recitation of facts surrounding the incident, in as sufficient detail as possible, including date, time, and location.
      2) A statement of the specific offense committed in violation of these Regulations.
      3) The amount of time in which the Midshipman has to respond to the notice.
      4) The ramifications of not responding to the notice within the time limit.
      5) A copy of the rights of a charged Midshipmen in conduct proceedings, listed in 4.2.1 above.

   c. The Commandant's Office may place a disciplinary hold on a Midshipman's academic record and/or may go forward with disciplinary action against a Midshipman in either of the following situations:

      1) The Midshipman fails to respond to a charge letter within the applicable time limit.
      2) The Midshipman withdraws from the Academy after allegedly committing a violation, whether or not the Commandant's Office has yet had the opportunity to charge the Midshipman with a violation.
      3) The Midshipman fails to appear at his/her scheduled Mast or appeal hearing.

## 4.4 ORGANIZATION OF THE ACADEMY CONDUCT SYSTEM

Any violation of these Regulations is subject to disciplinary action. In cases where a violation is committed by an individual member or members of a Midshipman organization, the organization may be subject to sanctions, in addition to the individual member, when those members not directly involved participate in the activity by encouraging, witnessing or condoning the act in any manner. Violations will be classified as either **Class I** or **Class II offenses.**

1. **CLASS I OFFENSES.** Class I offenses are serious and/or deliberate violations of the standards of conduct. Class I offenses may result in the following sanctions:

   a. Assignment of not more than 50 demerits per Class I charge.

   b. Assignment of 1 hour of Extra Duty (ED) per every 5 demerits.

   c. Assignment of Restriction of no more than 60 days per Class I charge.

AR000259

d.  Refer for counseling services.

e.  Referral to a Performance Review Board (PRB) to determine suitability to remain at the Academy.

f.  Referral to Executive Board or a Superintendent's Hearing in cases of offenses sufficiently severe that they may warrant deferred graduation, setback, or disenrollment.

g.  Class I Offenses include the following:

1)  **Absent Without Leave or Over Liberty over 60 minutes**
2)  **Aiding and abetting another in any violation of laws and/or Academy policies**
3)  **Alcohol; Unauthorized use and/or possession of**
    a)  Serving/providing to an individual under the legal drinking age
    b)  Unauthorized possession or consumption of alcohol on Academy grounds regardless of age is an alcohol violation
4)  **Assault/Personal Combat; with intent to do harm**
5)  **Authority; flagrant unwarranted assumption of**
6)  **Breach of Restriction**
7)  **Bullying, Physical Abuse, or Endangerment**
8)  **Conduct that prejudices good order and discipline, or reflects discredit on the Academy or on the Midshipman**
9)  **Cruelty, Hazing, Oppression, Personal Servitude or Maltreatment of any person**
10)  **Disrespect to superiors; in manner, language, or tone**
11)  **Drugs; possession of, use of, sale of, or possession of paraphernalia**
12)  **Duty: Improper performance of;**
    a)  Through neglect
    b)  Causing endangerment
    c)  So as to be disruptive in nature
13)  **Failure to Comply with Academy personnel or policies**
14)  **Falsification/Fraud/False Testimony**
15)  **Failure to comply with Academy or shipboard rules or regulations**
16)  **Fire and Safety Alarms; setting off or tampering of**
17)  **Fraternization**
18)  **Gambling for money or other items of value**
19)  **Gross Lack of Good Judgment**
20)  **Harassment or Discrimination**
    a)  Harassment or discrimination complaints based on race, national origin, color, religion, gender, age, sexual orientation, disability, marital status, genetic information or any other status protected by law will be handled in accordance with the applicable Superintendent Instructions.
    b)  Harassment complaints that are not based on a protected category set forth in the preceding subparagraph will be handled in accordance with this Disciplinary System.
21)  **Information Technology; Unauthorized use of**
    a)  Any act in violation of law and/or Academy policies and guidelines regulating computer-related use.

53 | P a g e

AR000260

22) **Insubordination**
23) **Missing Movement**
    a)   This includes buses, vessels, aircraft transportation to or from vessel assignments, ground transportation to or from vessel assignments, or Academy vehicles.
24) **Moral Turpitude; Indecent acts; Indecent exposure**
25) **Property/Facilities/Services;**
    a)  Endangering or hazarding.
    b)  Willful destruction of Federal, or another's
    c)  Unauthorized entry into Academy facilities
26) **Retaliation**
    a)  Retaliation complaints will be handled in accordance with the applicable Superintendent Instructions.
27) **Sexual Misconduct, Consensual, on Academy grounds/buildings/vessels**
28) **Sexual Assault, Sexual or Gender-Based Harassment, Relationship Violence, or Stalking**
    a)  Sexual assault, sexual or gender-based harassment, relationship violence, or stalking complaints will be handled in accordance with the applicable Superintendent Instructions.
29) **Violation of Academy Policy or Federal Laws**
29) **Watch;**
    a)  Absence from
    b)  Sleeping or malingering on
30) **Weapons/Firearms/Explosives/Fireworks; Unauthorized use and/or possession of**
    a)  Including non-lethal weapons. Examples of such weapons may include, but are not limited to pellet guns, air-soft guns and paintball guns, or knives with illegal length blades. Knife blades must be 4 inches in length or less.

h.  **Procedures for Class I Mast:**

   1)  Investigation of Alleged Class I Violations

      a)  The Deputy Commandant will have reported Class I violations investigated by a Company Officer (Investigating Officer) other than the Midshipman's Company Officer or the reporting officer.
      b)  The Investigating Officer will, whenever possible, interview all those individuals involved with first-hand knowledge of the case and obtain written statements.
      c)  The Investigating Officer is to complete the investigation within five business days from the time being assigned, unless an extension is requested in writing to the Deputy Commandant and granted.

   2)  Notice of Mast - Class I Mast will be conducted to adjudicate any of the infractions listed above, and may be combined with Class II offenses if they are part of the same incident. The Deputy Commandant will notify the Midshipman involved of the date, time and place of the Mast.

AR000261

    a) At least 24 hours prior to Mast, the Midshipman involved will have the opportunity review all documentation relating to the charge.

3) Mast Processes – The following process will govern all Masts:

    a) All Class I Masts will be adjudicated by the Deputy Commandant or his/her designee, with the RC and/or RX, CO, and the Midshipman's CC/CX/PC. No other individuals will be present without the written consent of charged Midshipman

    b) The focus of inquiry in a Mast will be the determination of whether a violation of Academy rules occurred. Such inquiry will be totally unrelated to any criminal or civil actions against the Midshipman arising from the same incident.

    c) Formal rules of evidence will not apply to Mast, nor will deviations from these prescribed procedures necessarily invalidate a decision or proceeding unless significant prejudice to the charged Midshipman or the Academy may result.

    d) The charged Midshipman will be presumed to have not violated the Midshipman Regulations until it is proven otherwise.

    e) The burden of proof during a Mast will rest with the Academy. The Academy must prove its case by a preponderance of the evidence, meaning that the evidence, considered in its entirety, indicates that, more likely than not, the charged Midshipman committed the violation(s).

4) Disposition of Class I Mast

    a) The Deputy Commandant or his/her designee, with input from the RC and/or RX will adjudicate the Class I Mast and administer one of the following sanctions:

        (1) Clear the Midshipman of charges, if no violation has occurred.

        (2) Reclassify the violation as a Class II offense and adjudicate the Class II Offense.

        (3) Find the Midshipman responsible for the offense and assign sanctions in accordance to the Midshipmen Regulations, as listed above in paragraph (4.6.1.a – f)

        (4) Refer the Midshipman to a Performance Review Board (PRB) to determine suitability to remain at the Academy. In case where the Midshipman's suitability is in question, he/she will be referred to an Executive Board or a Superintendent's Hearing for final determination.

        (5) Refer the matter to the Academy Honor Board, which may accept or reject the referral in accordance with its procedures.

    b) Decisions of the Class I Mast will be in writing and delivered to the Charged Midshipman at the conclusion of Mast. If a violation is found, the decision will state what rule was violated, the behavior constituting the violation, and any sanctions issued.

5) Appeal of Class I Mast Results

AR000262

a. Right to and Grounds for Appeal – The Midshipman may request that the Commandant review the decision rendered at the conclusion of the Mast process. The following are the only grounds for an appeal:

    i.    There is new evidence of a substantive nature not previously available at the time of the hearing, which would have materially affected the decision.

    ii.   There were procedural errors in the case or in the interpretation of Regulations serious enough to deny the Midshipman a fair hearing.

    iii.  The severity of the sanction is disproportionate to the violation(s) committed in accordance with the Regulations.

b. Appeal Process – The steps to file an appeal are as follows:

    i.    The Midshipman must submit a written, typed request for an appeal to the Commandant within five (5) business days from the date of the Mast. Unless extenuating circumstances can be shown, failure to appeal within the allotted time will render the Mast decision final.

    ii.   The written request for an appeal must state the grounds for appeal (citing the appropriate grounds from the Para. 1 above), include a discussion of the evidence and facts in support of the appeal, propose a recommended solution, and include any supporting documentation that should be considered by the Commandant.

c. Appeal Hearing

    i.    The Commandant, when possible, is not to exceed five (5) business days from the receipt of the written appeal to schedule a hearing for the appeal.

    ii.   The Commandant shall call in the Deputy Commandant and the Midshipman to the appeal hearing.

    iii.  The Midshipman may bring an advisor to the hearing. The advisor must be a member of the Academy community (other than a Chaplain, Counsel or Assistant Counsel to the Academy or a member of the Commandant's office). If the advisor is a Midshipman, he/she must a Midshipman in good standing.

    iv.  On appeal, the burden of proof rests with the Midshipman to clearly exhibit that one of the three grounds for an appeal has been met; this is not a re-hearing of the entire case.

    v.   Any sanction(s) issued at the Mast will not take effect until the appeal process is completed.

    vi.  Deviations from these prescribed procedures will not necessarily invalidate a decision or proceeding unless significant prejudice to the charged Midshipman or the Academy may result.

d. Disposition of the Appeal

i.   The Commandant may take one of the following actions:

(1) Uphold the decision of the Mast in its entirety;
(2) Decrease the sanctions imposed at the Mast; or
(3) Dismiss the case against the Midshipman.

ii.  The Commandant will send the written decision to the Midshipman within one (1) business day following the hearing.

2. **CLASS II OFFENSES.** Class II offenses are minor conduct breaches that do not warrant special consideration by either a Performance Review Board or an Executive Board, but may result in:

a.   Assignment of not more than the pre-determined demerits for each offense.

b.   Assignment of 1 hour of Extra Duty for every 5 demerits issued.

c.   Class II offenses include the following:

** Note:  The number indicates the demerit amount allocated to each offense that may not be exceeded. The demerit amount may be lowered when mitigating circumstances exist.

**Academic Classes:**
Absent from class.................................................................................... 15
Absent from Physical Fitness Examination, or remedial Physical Training................15
Late to class............................................................................................10
Leaving class unauthorized.........................................................................10
Engaging directly or indirectly in disruption within the classroom or academic
building passageways............................................................................... 15

**Accountability:**
Absent accountability check....................................................................... 20
Late to accountability check.......................................................................10
Absent Regimental Formation, Function, Muster, or official scheduled activity..........20
Late to Regimental Formation, Function, Muster, or official scheduled activity.......... 10
Failure to log out....................................................................................05

**Appearance:**
Out of uniform........................................................................................10
Belt buckle, unshined............................................................................... 05
Not properly shaven................................................................................. 10
Gross personal appearance....................................................................... 15
Haircut, in need of..................................................................................10
Hands in pockets.................................................................................... 05
Cover; dirty.......................................................................................... 05
Shoes unshined...................................................................................... 05
Uniform, not properly striped.....................................................................10

AR000264

**Duty:**

Interfering with an individual who is performing his duty.................................. 40
Gross failure to properly perform a duty .................................................... 30
Late to watch, over 20 minutes.................................................................. 30
Neglect of duty ....................................................................................... 30
Sleeping on watch ................................................................................... 40
Improper performance of duty .................................................................. 20
Failing to correct a report of deficiency...................................................... 10
Demonstrating indifference toward the 4/C system....................................... 10

**Government Property:**

Losing drill rifle, sword, or other government equipment................................ 40
Damaging government property through carelessness or improper use.................. 30
Unauthorized use of government property.................................................... 35

**Liberty:**

Absent over leave, 30 minutes or less......................................................... 20
Absent over leave, special liberty, or long weekend in excess of 30 minutes.............. 40
Improper liberty procedures...................................................................... 15
Failure to turn in special liberty pass by 1200 the day after the expiration of liberty....... 10

**Mess Hall:**

Commissary gear, unauthorized possession of................................................ 10
Handling food before seats........................................................................ 10
Mess Hall Duties, improper performance of................................................... 10
Improper Mess procedure.......................................................................... 10
Causing a disturbance in the Mess Hall........................................................ 20
Failing to maintain discipline or expected standards of behavior in the Mess Hall........ 20
Removing any food from Delano Hall or galley unauthorized.............................. 20

**Orders and Instructions:**

Failing to comply with specific written or oral instructions or orders of a
Commissioned officer. ............................................................................. 40
Continuing to violate or disregard instructions, orders, regulations, or corrections
which were previously promulgated............................................................. 30
Demonstrating gross ignorance of regulations or directives............................... 25
Failing to comply with general instructions, orders, or regulations through neglect, laxness or
ignorance, **with minor effect**............................................................... 15
Failing to comply with general instructions, orders or regulations through neglect,
laxness or ignorance, resulting in a **serious violation** of these directives................. 35

**Quarters:**

Reveille, violation of. .............................................................................. 10
Bunk, not made...................................................................................... 05

AR000265

Bunk, lying on unauthorized..............................................................................05
Food on window sill..........................................................................................05
Articles hanging out of window.......................................................................05
Cleaning station not done..................................................................................10
Cleaning station improperly done....................................................................05
Inspection, not ready for....................................................................................10
Possession of unauthorized electrical equipment.........................................20
Lost key.................................................................................................................20
Preparing food in room......................................................................................20
Unauthorized furniture in room.......................................................................10
Improper room arrangement............................................................................10
Unstencilled gear.................................................................................................05
Inspection sheet, lack of or improperly written............................................05
Linen, dirty...........................................................................................................10
Gear adrift.............................................................................................................10
Room in gross disorder......................................................................................15
Improper door tag...............................................................................................05
Unauthorized presence in watch office..........................................................10

**Standards of Behavior:**

Guest unauthorized............................................................................................35
Unauthorized destruction of a report or document, including posted material
or official bulletin boards..................................................................................25
Gross display of affection reflecting discredit on the Regiment of Midshipmen...........20
Engaged in unauthorized business activities.................................................35
Demonstrating conduct which reflects discredit on the Regiment of Midshipmen........35
Entering an unauthorized area outside prescribed Academy limits............25
Absent unauthorized from prescribed Academy limits................................40
Unprofessional relationship..............................................................................35
Failing to submit a report, or rendering an inaccurate report.....................20
Demonstrating gross laxness or inattention to detail in the submission of a
written report or muster....................................................................................15
Displaying insubordination toward a superior or individual in a position of
Authority..............................................................................................................20
Demonstrating conduct which reflects discredit on self................................20
Discourteous conduct.........................................................................................20
Failing to demonstrate proper military courtesy...........................................10
Using obscene, profane or improper language..............................................10
Public display of affection.................................................................................10
Creating a disturbance.......................................................................................15
Smoking unauthorized.......................................................................................20
Unauthorized assumption of duty/authority.................................................20
Failing to safeguard government property......................................................20
Removing articles from a building, room, locker, or classroom without the
permission of proper authority........................................................................15

AR000266

**Vehicles:**

Car, parked or driven aboard unauthorized...................................................... 15
Allowing unauthorized persons to operate vehicle.......................................... 15

**Watches:**

Permitting unauthorized personnel in watch office........................................... 10
Violation of watch standing orders.................................................................. 15
Leaving watch post without proper relief...................................................... 20
Gross negligence as to duties........................................................................ 20
Unauthorized log entries................................................................................ 10

**Miscellaneous Regulations:**

Extra Duty, absent from................................................................................. 15
Extra Duty, late to........................................................................................ 10
Extra Duty, leaving prior to completion........................................................ 15
Musters, late in submitting............................................................................ 10
Ranks, falling out of without authorization.................................................... 15
Improper route of travel................................................................................. 10
Improper conduct in ranks............................................................................. 15
Unmilitary bearing......................................................................................... 10

d. Procedures for Class II Mast:

1) When a reporting official classifies a violation as a Class II, that individual will submit the report through CAMS or its replacement.

2) Once placed in the Conduct System, the charged Midshipman will receive an electronic notification that a charge has been initiated.

3) Within three (3) business day of receiving the notification. the charged Midshipman must report to the Regimental Officer (RO) or his/her designee indicating whether or not he/she wishes to make a statement. Failure to make a statement will be deemed acceptance of the charge as preferred.

4) When a charged Midshipman wants to make a statement, the following procedures apply:

a) First Class Midshipmen: The RO will review the statement and convene a Mast composed of the charged Midshipman with his/her CC to review the facts of the case. Based on the facts of the case. the RO will take one of the following actions:

(1) Clear the Midshipman of charges; or
(2) Assign appropriate sanctions as outlined in these Regulations.

b) Second through Fourth Class Midshipmen/Plebes: The Midshipman Battalion Commanders. under the supervision of the RO, will review the statement and convene a Mast composed of the charged Midshipman with his/her CC to review the facts of the case. Based on the facts of the case. they will take one of the following actions:

(1) Clear the Midshipman of charges; or
(2) Assign appropriate sanctions as outlined in these Regulations.

AR000267

e. Appeal of Class II Mast Results

   1) Right to and Grounds for Appeal - The Midshipman may appeal to the Deputy Commandant whose decision will be final. The following are the only grounds for an appeal:

      a) There is new evidence of a substantive nature not previously available at the time of the hearing, which would have materially affected the decision.

      b) There were procedural errors in the case or in the interpretation of the Regulations serious enough to deny the Midshipman a fair hearing.

      c) The sanctions awarded at Mast were not in line with the standards set forth in the Regulations.

   2) Appeal Process– The steps to file an appeal are as follows:

      a) The Midshipman must submit a written, typed request for an appeal to the Deputy Commandant within two (2) business days from the date of the Class II Mast.

      b) The written request for appeal must state the grounds for the appeal (citing the appropriate grounds from Para. 1 above), include a discussion of the evidence and facts in support of the appeal, propose a recommended solution, and include any supporting documentation that should be considered by the Deputy Commandant.

   3) Appeal Hearing:

      a) The Deputy Commandant. when possible, is not to exceed five (5) business days from the receipt of the written appeal to schedule a hearing for the appeal.

      b) The Deputy Commandant shall call in all parties to the appeal to the hearing.

      c) On appeal, the burden of proof rests with the Midshipman to clearly exhibit that one of the three grounds for an appeal has been met; this is not a re-hearing of the entire case.

      d) Any sanction(s) issued at the Mast will not take effect until the appeal process is completed.

      e) Deviations from these prescribed procedures will not necessarily invalidate a decision or proceeding unless significant prejudice to the charged Midshipman or the Academy may result.

   3) Disposition of the Appeal

      a) The Deputy Commandant may take one of the following actions:

         (1) Uphold the decision of the Mast in its entirety;

         (2) Decrease the sanctions imposed by the Mast; or

         (3) Dismiss the case against the Midshipman.

AR000268

      b)  The Deputy Commandant will send the written decision to the Midshipman within one (1) business day following the Appeal decision.

3. **CONDUCT PERIODS:** Conduct periods are utilized to operate the Disciplinary System and commence the day of graduation and end on graduation day each year.

4. **CONDUCT GRADES:** Conduct grades will be determined on a Trimester basis in accordance with the following:

    a.  Total Demerits Assigned During a Conduct Trimester

| Conduct Grade | First Class Period | Second Class Period | Third Class Period | Fourth Class Period |
|---|---|---|---|---|
| A | 0-10 | 0-10 | 0-15 | 0-20 |
| B | 11-20 | 11-20 | 16-30 | 21-40 |
| C | 21-30 | 21-30 | 31-40 | 41-55 |
| D | 31-39 | 31-39 | 41-49 | 56-74 |
| F | 40 or over | 40 or over | 50 or over | 75 or over |

    b.  The following table sets forth the demerit boundaries for Midshipman conduct:

| Conduct Year | Conduct Counseling | Conduct Probation |
|---|---|---|
| Fourth Class Period | 75 | 150 |
| Third Class Period | 60 | 120 |
| Second Class Period | 55 | 110 |
| First Class Period | 50 | 100 |

    1)  Conduct Counseling: The CO will personally meet with a Midshipman who has accrued sufficient demerits to be counseled on his/her conduct to mutually identify the reason(s) for the unsatisfactory conduct record, and advise the Midshipman how to develop a better approach toward achieving conduct standards. At the time of this meeting, the CO will give the Midshipman a letter detailing the number of demerits earned and expectations for participation in the Regiment. A copy of this letter, signed by the Midshipman and the CO, will be made a permanent part of the Midshipman's Company Jacket and the Midshipman's Personnel Jacket.

    2)  Conduct Probation: The Deputy Commandant will place a Midshipman on official conduct probation when he/she accrues demerits as set forth above or, if warranted, when a Midshipman is found guilty of a Class I offense. At the time, the Deputy Commandant will meet with the Midshipman and his/her CO for the purpose of

AR000269

discussing the Midshipman's record. The Deputy Commandant will give the Midshipman a letter detailing the number of demerits earned by the time of the meeting, and explaining the terms of probation. A copy of this letter, signed by the Midshipman and the Deputy Commandant, will be made a permanent part of the Midshipman's Company Jacket and the Midshipman's Personnel Jacket. Once placed on Conduct Probation, the Midshipman will be considered in a probationary status for the following 120 days not including holidays or Leave break periods.

## 4.5 SANCTIONS FOR MISCONDUCT

The purpose of the Academy discipline system is to be corrective and educational as well as punitive. The disciplinary process is intended to make clear to Midshipmen the limits of acceptable behavior and to give Midshipmen who violate the rules an opportunity to more fully understand the rules and incorporate the experience into his/her overall development. Assigned discipline may include a combination of sanctions for a particular incident.

1. **PROCESS AND SANCTIONS FOR A MIDSHIPMAN**

   a. **Mast System:** An official written statement of the Academy's disapproval of a Midshipman's actions. Formal reprimands may include the assignment of restriction, demerits, extra duty, marching tours, or reduction in Class Rates.

   b. **Conduct Probation:** An official notice that the Midshipman's conduct is in violation of these Regulations but does not warrant suspension or permanent dismissal. Probation is for a designated period of time and includes the probability of more severe disciplinary sanctions if the Midshipman commits another conduct violation during the probationary period. The probationary period will be 120 days following being placed on Conduct Probation, not including holidays or Leave break periods. During Conduct Probation, a Midshipman will be considered "not in good standing" and will be excluded from some programs and curricular or extra-curricular activities, including:

      1) 1 Month restriction
      2) 50 demerit cap for probationary period
      3) Loss of all liberty and TM privileges
      4) Restricted from running for and/or holding office in any Midshipman organization.

   If the specified demerit total is exceeded during Conduct Probation, the Midshipman will be forwarded to a PRB.

   c. **Delay and/or Denial of Degree Award:** During the period disciplinary charges are pending against a Midshipman, the Academy may deny and/or delay issuance of a degree. Further, the Academy will not issue a degree to a Midshipman who is serving a suspension or has been permanently dismissed from the Academy.

   d. **Revocation of degree:** The Academy may revoke an awarded degree for violations of the Regulations that occur prior to the award of the degree but are discovered after the degree

AR000270

has been awarded, where the violation is sufficient to justify the suspension or permanent dismissal of the Midshipman.

e.  Other secondary sanctions may be imposed instead of or in addition to those specified above. Secondary sanctions include, but are not limited to:

   1)  Community Service
   2)  Educational activities such as a reflective writing assignment or attendance at an event related to the violation committed. (e.g. alcohol workshop; diversity awareness training; ethics workshop)
   3)  Restrictions (temporary or permanent loss of privileges or the use of an Academy facility or service)

## 2.  SPECIAL PROVISIONS GOVERNING THE ACADEMY RECOGNITION OF CLUBS

a.  The Academy may take action against an individual member of a Midshipman organization for misconduct that is both a violation of this provision and of the Conduct Code, regardless of any separate disciplinary action taken against the Midshipman organization.

b.  This section of the Regulations applies only to the relationship between the Academy and the organizations and has no bearing on relations between national agreements set forth by governing bodies.

c.  Good standing must be maintained in order for organizations to participate in Academy sponsored activities.  Failure to do any of the following will constitute a violation of these provisions of the Regulations and will subject the organization to disciplinary action, including possible loss of good standing, as described within these provisions:

   1)  Registering annually as a recognized Midshipman organization with the Office of Student Activities;
   2)  Submitting a roster for active members during the first month of the fall trimester.
   3)  Following all rules and guidelines of the Office of Student Activities; and
   4)  Abiding by all terms and conditions of the alcohol and controlled substance guidelines below:
       a)  The possession, use and/or consumption of alcoholic beverages while on Academy premises during an official event or in any situation sponsored or endorsed by the organization must be in compliance with any and all applicable laws and Academy rules and policies.
       b)  No organization members, collectively or individually, shall purchase for, serve to, or sell alcoholic beverages to anyone under the legal drinking age.
       c)  The possession, sale, and/or use of any illegal or controlled substance at any organization or Academy sponsored event are strictly prohibited.
       d)  Alcohol or controlled substances will be prohibited at any and all recruitment activities.

64 | Page

e) Open parties where alcohol is provided by the host organization, meaning those with unrestricted access by non-members of the organization, without specific invitation, will be prohibited.

f) All organizations must provide, at no charge, an alternative non-alcoholic beverage and food at any event where alcohol is provided.

g) There will be no solicitation or encouragement of alcohol consumption by contest or promotion at any event where alcoholic beverages are present.

d. Organizations whose members are in violation of this policy, regardless of whether the individuals are identified, will be subject to one or more of the sanctions listed in the Regulations.

## 4.6 INTERIM SANCTIONS

1. For alleged violations of these Regulations, or any other Academy policy, interim sanctions, including but not limited to, reassignment to alternate housing, limitation of access to designated Academy housing facilities and/or campus facilities by time and location, and limitation of privilege to engage in specified Academy activities may be imposed by the Superintendent, Commandant, or their designees. Such interim sanctions are to be utilized only when there is reason to believe that the Midshipman's conduct poses a substantial threat of harm to oneself or others, threatens or endangers Academy property, or disrupts the stability and continuance of normal Academy operations and functions.

2. A Midshipman will be notified of an interim sanction by written notice served on him/her. The interim sanctions takes effect the day it is issued by the Superintendent, Commandant, or their designees.

## 4.7 MIDSHIPMAN DISCIPLINARY FILES AND RECORDS

1. The Commandant's Office will establish a Midshipman disciplinary file whenever a case is referred for investigation of a possible conduct code violation. The file of a Midshipman found to have violated the Regulations will be retained for five (5) years from the date of the sanction or until the Midshipman's graduation from the Academy, whichever comes first. Midshipman conduct records may be retained longer or permanently if the Midshipman was suspended or permanently dismissed, or if there is reason to believe the case could result in future litigation.

2. The release of Midshipman disciplinary records will be governed by applicable federal and state laws governing the privacy of educational records.

AR000272

# CHAPTER 5 – PERFORMANCE REVIEW BOARD

## 5.1 GENERAL

1. A Performance Review Board (PRB) is convened under the authority of the Commandant by the Deputy Commandant or the Regimental Officer. The PRB will review performance, and assist in development of Midshipmen with substandard performance in regimental participation, conduct, physical fitness, human relations, and other areas. The PRB can recommend a Midshipman for an Executive Board or Superintendent hearing to determine suitability.

   a. **Regimental Participation.** Midshipmen are expected to assume leadership responsibilities as they advance in the Regiment. Midshipmen who demonstrate a lack of motivation and fail to assume leadership responsibility may be recommended for a PRB.

   b. **Conduct.** Midshipmen are expected to comply with these Regulations. Midshipmen who demonstrate recurring non-compliance with the Regulations may be recommended for a PRB.

   c. **Physical Fitness.** Midshipmen who are unable to meet required physical fitness standards (including height and weight standards), may be recommended for a PRB.

   d. **Human Relations Skills.** Midshipmen who establish a history of deficient human relations skills which have not been resolved by formal leadership counseling may be recommended for a PRB.

   e. **Other Areas.** Midshipmen may be brought before a PRB as directed by the Deputy Commandant.

## 5.2 RIGHTS OF MIDSHIPMEN

1. Midshipmen appearing before a PRB have the following rights:

   a. To receive notification at least 48 hours prior to convening of the PRB of the time and location of the Board.

   b. To review their company jacket and conduct record prior to convening of the PRB.

   c. To receive a copy of the PRB's recommendation to the Commandant.

## 5.3 PERFORMANCE REVIEW BOARD MEMBERSHIP

1. A PRB convened by the Deputy Commandant or RO will be comprised of:

   a. The Deputy Commandant or RO, as Chair of the PRB.

   b. A uniformed member of the faculty and staff.

   c. An active duty Officer of the Department of Naval Science.

AR000273

    d.  A non-uniformed Academy Staff member.

    e.  A CO from outside the Midshipman's Battalion.

    f.  The Midshipman's CC as Board Recorder, who is a non-voting member.

## 5.4 RESPONSIBILITIES OF THE DEPUTY COMMANDANT/REGIMENTAL OFFICER

1.  Upon request from a CO for a PRB for a Midshipman in his/her respective company, the Deputy Commandant/RO shall review the petition for a PRB. If a determination is made that a PRB should be convened, the Deputy Commandant/RO will:

    a.  Notify the Midshipman of the time and location of the PRB.

    b.  Conduct the PRB proceedings in accordance with these Regulations.

    c.  Inform the Midshipman, prior to dismissing the PRB, of the PRB's recommendation to the Commandant.

## 5.5 RESPONSIBILITIES OF THE COMPANY OFFICER TO THE MIDSHIPMAN

1.  If a CO makes a determination that a PRB is appropriate, the CO will:

    a.  Recommend a PRB to the Deputy Commandant/RO.

    b.  Explain the Midshipman's rights as per paragraph 5.2 to the Midshipman.

    c.  Provide an opportunity for the Midshipman to view his/her company jacket and conduct record prior to the convening of the PRB.

    d.  Ensure in matters relating to deficient human relations skills that the Midshipman in question is offered Academy counseling as soon as possible.

## 5.6 RESPONSIBILITIES OF THE MIDSHIPMAN'S COMPANY COMMANDER

The Company Commander (CC) shall serve as Recorder for the PRB and perform other duties as directed by the Chair of the PRB. The Recorder shall serve during all sessions of the PRB and transcribe minutes of the PRB's proceedings. The Recorder shall serve at the pleasure of the Chair until relieved.

## 5.7 MIDSHIPMAN PERFORMANCE REVIEW BOARD PROCEDURES

1.  PRB hearings are conducted in an informal, cooperative manner. The PRB is a fact finding body charged with assessing Midshipman performance, and determining a course of action in the best interests of the Midshipman and the Academy. The specific format and sequence for the PRB shall be at the discretion of the Chair. The general procedures for the PRB are:

    a.  Opening statement by the Chair.

AR000274

b. Opening statement by the Midshipman.

c. A review of the record of performance as contained in the Midshipman's company jacket, sea year record, and other records as determined by the Chair.

d. Closing statement by the Midshipman.

e. Closed session of the PRB to review the record and Midshipman's performance, and make a determination by simple majority of their recommendation to the Commandant.

f. PRB notifies the Midshipman of their recommendation to the Commandant.

g. PRB is adjourned.

## 5.8 PERFORMANCE REVIEW BOARD RESULTS

1. Upon adjournment of the PRB, the Chair shall submit a written report to the Commandant of the PRB's recommendation, and as enclosure, the Board transcript. Additionally, a copy of the Chair's report shall be forwarded to the Midshipman, and inserted into the Midshipman's company jacket.

2. The PRB recommendation may include any combination of the following:

a. Refer the Midshipman to the Academy Counseling Department for counseling.

b. Establish conditions of probation for the Midshipman.

c. Restrict participation by the Midshipman in extra-curricular activities.

d. Recommend an Executive Board or Superintendent's hearing be convened.

e. Establish a course of action not aforementioned, that the PRB concludes is in the best interests of the Midshipman and the Academy.

## 5.9 DECISION BY THE COMMANDANT

After the Commandant has arrived at a decision based on the PRB's recommendation, he/she will provide a memorandum to the Midshipman setting forth his/her decision. A copy of the memorandum will be placed in the Midshipman's Official Personnel Jacket and copies will be provided to Academy officials who must carry out the terms of the decision.

AR000275

## CHAPTER 6 - EXECUTIVE BOARDS/SUPERINTENDENT'S HEARINGS[1]

### 6.1 INTRODUCTION

The Superintendent may, on his/her own or upon the recommendation of the Commandant, order an Executive Board or a Superintendent's hearing be convened for consideration and recommendation on the following:

1. Any disciplinary offense(s) committed by a Midshipman[2] that may be sufficiently grave as to warrant a recommendation for disenrollment, or
2. Any report(s) by the Commandant's Performance Review Board which, in the opinion of the Superintendent, indicates a serious lack of aptitude or suitability of a Midshipman for a career in the merchant marine and the United States Navy Reserve, including but not limited to repeated failures of a Midshipman to meet the U.S. Navy physical fitness standards for commissioning or exceeding 300 total demerits at any point during enrollment at the Academy.

### 6.2 EXECUTIVE BOARDS

1. GENERAL

   a. Executive Board hearings are conducted in an informal, non-adversarial manner. The Executive Board is a fact-finding body charged with presenting a recommendation to the Superintendent. In reaching its recommendation, the Executive Board should consider the best interests of the Academy and of the Midshipman before it.

   b. The rules of evidence for judicial proceedings do not apply to Executive Board proceedings. Because the appearance before the Executive Board may have a major effect on the status of the Midshipman, it is essential that the prospective Board members be knowledgeable in Board procedures and in their duties and responsibilities.

2. MEMBERSHIP

   Each Executive Board will consist of five (5) members, each with one vote.

   a. **Deputy Superintendent or designee as Chair.** If challenged for good cause or unable to serve, the Superintendent will designate a replacement.

   b. **Head of the Department of Naval Science or designee.** If challenged for good cause or unable to serve, the Chair will designate a replacement from the Department of Naval Science.

---

[1] Sexual assault, sexual and gender-based harassment, relationship violence, stalking and retaliation Class I offenses will be adjudicated according to the procedures set out in the applicable Superintendent Instructions or Standard Operating Procedures.
[2] The term "Midshipman" as used herein is coterminous with the term "cadet" used in Title 46, United States Code, Chapter 513, and includes all undergraduate individuals matriculated at the Academy as students, whether referred to as Midshipman, cadet, or student, and whether U.S. citizens or not.

AR000276

c.  **An Assistant Academic Dean**. If challenged for good cause or unable to serve, the Chair will designate a replacement who will be either another Assistant Academic Dean or a senior licensed member of the STCW Council.

d.  **One (1) faculty or senior staff member who will have five (5) or more years of service at the Academy**. This member will be selected by the Chair from a list maintained by the Superintendent. If challenged for good cause or unable to serve, the Chair will designate a replacement from the Superintendent's list.

e.  **One (1) Midshipman**, selected by the Chair from among the Regimental Commander, the Regimental Executive Officer, the Battalion Commanders, and the Regimental Honor Board Chair. If challenged for good cause or unable to serve, the Chair will designate a replacement from among these Regimental positions or, if necessary, from among all of the Regimental officer positions.

3.  The **Executive Board Secretary** is a non-voting participant who will attend the hearing and maintain detailed, but not verbatim, minutes of its proceedings (except for the deliberations). The hearing may also be digitally recorded (except for the deliberations). The Secretary's minutes will be deemed a sufficient record of the proceedings in the event a digital recording is not made or preserved.

4.  At the discretion of the Chair, **Counsel for the Academy** may be present at the hearing to provide advice to the Board.

## 6.3 SUPERINTENDENT'S HEARINGS

1.  Superintendent's hearings are conducted in an informal, non-adversarial manner. The rules of evidence for judicial proceedings do not apply to Superintendent's hearings. In reaching a determination, the Superintendent should consider the best interests of the Academy and of the Midshipman before him/her.

2.  The Superintendent may elect to have the Executive Board Secretary attend the hearing and maintain detailed, but not verbatim, minutes of the proceedings (except for deliberations), have the hearing digitally recorded (except for the deliberations), or both. The Secretary's minutes will be deemed a sufficient record of the proceedings in the event a digital recording is not made or preserved.

3.  At the discretion of the Superintendent, Counsel to the Academy or his/her designee may be present at the hearing to provide advice to the Superintendent.

## 6.4 RIGHTS OF MIDSHIPMEN

1.  A Midshipman appearing before the Executive Board or Superintendent for a hearing has the following rights:

    a.  To receive written notice of hearing at least five (5) days before the hearing, which notice shall include the following: (1) the specific charges to be considered by the Executive Board or Superintendent; (2) the date, time, and location of the hearing (including notice

AR000277

that Phase II of the hearing, if necessary, may commence immediately after the conclusion of Phase I): (3) the names of those who will comprise the Executive Board, if applicable; (4) the witnesses to be called by the Executive Board or Superintendent, if any: (5) the uniform to be worn at the hearing; and (6) the Midshipman's additional rights, as delineated below.

b.  To receive. with the written notice, copies of all documentation to be considered by the Executive Board or Superintendent in making its recommendation or decision, subject to the Midshipman's signature of a Confidentiality/Non-Disclosure Agreement upon request by the Chair or Superintendent. (With the Midshipman's consent, the Midshipman's advisor and/or counsel may receive a copy of the relevant documentation, likewise subject to execution of a Confidentiality/Non-Disclosure Agreement, upon request by the Chair or Superintendent.)

c.  To seek advice and assistance of legal counsel in the preparation of his/her case at his/her own expense.  Legal counsel will not be permitted to be present during the Board hearing unless the Midshipman is, at the time of the hearing, charged with a criminal offense by a Federal, state, or local jurisdiction arising out of the same circumstances as the charge before the Board or Superintendent.  In such cases, counsel shall not actively participate in the proceedings but shall be allowed to be present to consult with the Midshipman and provide advice to him/her.

d.  To request any Academy faculty or staff member other than a Chaplain, Counsel or Assistant Counsel to the Academy, member of the Commandant's Office, or witness to be called at the hearing to act as an advisor as long as serving in that capacity does not present a conflict with the faculty or staff member's professional responsibilities.  In the event that the Midshipman is unable to obtain an advisor. the Superintendent will appoint one on request.

e.  To challenge the impartiality of any or all members of the Executive Board.  A written justification for any such challenge must be submitted to the Secretary of the Executive Board within 24 hours of the Midshipman being informed of the membership of the Executive Board.  The Chair will rule on any such challenge.  Members disqualified will be replaced by the Chair.  Challenge of the Chair will be resolved by the Superintendent. The Midshipman shall be notified of the decision on any such challenge and the substitution of new members, if any.

f.  To be present during the entire hearing, except for deliberations.

g.  To make opening and closing statements.

h.  To present evidence including but not limited to documentary evidence and the testimony of reasonably available witnesses during each phase of the hearing.  The Midshipman must identify witnesses. and provide written notice to the Secretary of the Executive Board[3], not later than two (2) days before the hearing.  The Academy shall make reasonable efforts to insure the attendance of the witnesses identified by the Midshipman who are enrolled at or

---

[3] The Executive Board Secretary shall also perform administrative tasks, as needed, for Superintendent's hearings.

AR000278

employed by the Academy. Appearance by witnesses not employed by, or enrolled at, the Academy is the sole responsibility of the Midshipman.

i.  To question all witnesses, whether called by the Academy or the Midshipman.

j.  To receive, upon request, a copy of the minutes prepared by the Executive Board Secretary or a copy of the digital recording of the hearing (exclusive of deliberations), subject to the Midshipman's signature of a Confidentiality/Non-Disclosure Agreement upon request by the Chair or Superintendent. (With the Midshipman's consent, the Midshipman's advisor and/or counsel may also receive a copy of the recording, likewise subject to execution of a Confidentiality/Non-Disclosure Agreement, upon request by the Chair or Superintendent.) Once the disciplinary procedures have been completed, including any appeals, the copy of the minutes or digital recording must be returned to the Executive Board Secretary. Requests for a copy of the minutes or digital recording made after the conclusion of all disciplinary proceedings will be denied.

**NOTE:** The Executive Board Secretary (or designee) shall deliver a written notice of the foregoing rights as set out in this Section for the Midshipman's signature acknowledging receipt. The Executive Board Secretary (or designee) will provide a copy of the signed notice of rights, as well as copies of all documentation to be considered by the Executive Board or Superintendent to the Midshipman (upon receipt from the Midshipman of signed a Confidentiality/Non-Disclosure agreement as to the file and its contents upon request by the Chair or Superintendent).

## 6.4 PRE-HEARING PROCEDURES

1.  The Superintendent will convene, or will direct the Chair to convene, a disciplinary or suitability hearing, as appropriate.

2.  For an Executive Board, the Chair will schedule the appropriate hearing and select the faculty or senior staff member and the Midshipman member to serve on the Executive Board.

3.  The Executive Board Secretary (or designee) shall do the following:

    a.  Gather the following documentation on the Midshipman scheduled to appear before the Board or Superintendent: (1) the Commandant's recommendation that an Executive Board or Superintendent's hearing be convened and the Superintendent's notification that a hearing will be held, if applicable; (2) the investigation report (if any), with any attachments; (3) Official Personnel Jacket; (4) Company Jacket; (5) Academic File, including Transcript; (6) Sea Year Jacket; (7) the Midshipman profile prepared by the Midshipman's Company Officer; and (8) any other relevant documents.

    b.  At least five (5) days before the scheduled hearing, meet with the Midshipman and provide him or her with written notice of the hearing and all documentation to be considered by the Executive Board or Superintendent. At this meeting, the Executive Board Secretary will also ensure that the Midshipman is aware of the right to an advisor and obtain the name of the advisor selected by the Midshipman. If the Midshipman wishes to waive the right to an advisor, he/she must do so in writing. The Executive Board Secretary will notify the Superintendent of the waiver request. The Superintendent may exercise his/her discretion to assign an advisor to the Midshipman notwithstanding the waiver request.

AR000279

c.  At least five (5) days before the scheduled hearing, prepare and distribute all documentation to be considered by the Executive Board or Superintendent to the members of the Executive Board or Superintendent, as appropriate.  For Phase I of a disciplinary hearing, the members or Superintendent will be provided with only the Commandant's recommendation that an Executive Board or Superintendent's hearing be convened, the Superintendent's notification that a hearing will be held (if applicable) and the investigation report, with any attachments.  For a suitability hearing, and for any Phase II of a disciplinary hearing, the members or Superintendent will be provided with the Official Personnel Jacket, Company Jacket, Academic File, including Transcript, Sea Year Jacket, the Midshipman profile prepared by the Midshipman's Company Officer, and any other relevant documents.

## 6.5 PROCEDURES FOR DISCIPLINARY HEARINGS BEFORE THE EXECUTIVE BOARD OR SUPERINTENDENT

1.  A Disciplinary Hearing will be conducted in two steps, Phase I and Phase II (if necessary), both of which will be recorded as provided above. The deliberations of the Executive Board or Superintendent will not be recorded in any manner.

2.  Phase I will deal exclusively with the determination of the facts pertaining to the case at hand, the objective evaluation of those facts and a determination of whether the charge(s) have been proven by a preponderance of the evidence.

    a.  The Chair or Superintendent can recess the hearing at any time for any reason.

    b.  The Chair or Superintendent can request additional witnesses, documents, or other evidence.

    c.  If the Chair or Superintendent requests additional witnesses, documents, or other evidence, the Midshipman will be given the same opportunity to review and prepare as provided in the Notice of Hearing, for a period of five (5) days after notice of the identities of additional witnesses or availability of documentary evidence for review.

3.  Phase II, if necessary, will deal exclusively with the Executive Board's recommendation to be made to the Superintendent as to the appropriate penalty or, for a Superintendent's hearing, with the Superintendent's determination as to the appropriate penalty.

4.  If the Midshipman elects to admit violation of the Midshipman Regulations as specified in the charge(s), Phase I may be bypassed, provided:

    a.  The Midshipman is advised of the consequences of admitting to the violation(s), including that his/her admission(s) may be used in proceedings outside the jurisdiction of the Academy, that his/her Academy Personnel Jacket will reflect the admission and the penalty imposed and, that if the penalty imposed is disenrollment, his/her transcript will reflect a "non-academic disenrollment," he/she will not be eligible for readmission, he/she will not be eligible for a letter of good standing for other institutions of higher education, and he/she may be financially responsible for the cost of his/her education.

73 | P a g e

    b.   The Midshipman submits a signed statement which indicates formal admission of violation of the charges as specified and that the admission is given freely, without coercion, and with the full knowledge of his/her counsel and/or advisor, if the Midshipman had counsel and/or an advisor.

5.  **The procedure for <u>Phase I</u> will be as follows:**

    a.   Introductory statement by the Chair or Superintendent, including a review of the Midshipman's rights and a description of and basis for the charges against him/her.

    b.   Opening statement by the Midshipman and/or his/her advisor.

    c.   Presentation of evidence, including questioning of witnesses identified by the Academy (if any), followed by questioning of Midshipman's witnesses (if any), and presentation of documentary evidence by Midshipman (if any). Witnesses from either side may be recalled at the discretion of the Chair or Superintendent.

        1)  Witnesses will normally appear in person. However, depending on the nature of the allegations of misconduct, the Chair or Superintendent, either at the request of the Midshipman or on his/her own initiative, may direct that the testimony to be provided by one or more witnesses be by alternative means, such as remotely via VTC or telephone, behind a screen, or through written questions.

        2)  All Midshipmen and Federal employees will be reminded that they have an affirmative obligation to speak truthfully in any administrative proceeding, including before the Executive Board or Superintendent, and all other witnesses will be advised of their obligation to testify truthfully. Further, Midshipmen will be advised that failure to testify truthfully is a violation of the Honor Code, which may result in a separate charge under the Honor Code. Employees will be advised that failure to testify truthfully may result in disciplinary action. If a witness is recalled, the Chair or Superintendent will remind the witness that he or she must testify truthfully.

        3)  After all the witnesses have been heard, the Midshipman will be given the opportunity to testify before the Executive Board or Superintendent.

        4)  The Executive Board members or Superintendent may question any and all witnesses called at the hearing, including but not limited to the Midshipman.

        5)  The Midshipman will be present during the presentation of all evidence and will be permitted to question any and all witnesses.

    d.   Closing statement by Midshipman and/or his/her advisor.

    e.   The Executive Board or Superintendent will consider all the data available pertaining to the offense(s) in order to objectively determine, based on a preponderance of the evidence and as agreed by a majority of the Board or by the Superintendent, whether the Midshipman committed the violations as charged.

        1)  All deliberations will take place outside the presence of the Midshipman, his/her counsel/advisor, and any witnesses. For Executive Board hearings, only the Executive Board members and the Executive Board Secretary will be present during deliberations and all must be present during deliberations. For

74 | P a g e

Superintendent's hearings, the Superintendent will deliberate alone. For both Executive Board and Superintendent's hearings, the deliberations will not be recorded, digitally or otherwise.

2) If, during deliberations, the Executive Board or Superintendent determines it or he/she needs additional documentary or testamentary evidence, the Chair or Superintendent may determine to reconvene the hearing at a later time, subject to providing the Midshipman the same opportunity to review and prepare as provided in the Notice of Hearing for a period of five (5) days after notice of the identities of additional witnesses or availability of documentary evidence for review.

f.  The Executive Board or Superintendent will reconvene the hearing to issue its decision. If the Executive Board or Superintendent determines that the Midshipman has not committed any violations as charged, it will recommend to the Superintendent that the Midshipman be exonerated or the Superintendent will exonerate the Midshipman, as appropriate. If the Midshipman is found to have committed one or more of the violations as charged, Phase II will commence. Phase II may commence immediately after Phase I or may commence at a later time and/or date as determined by the Chair or Superintendent.

6.  **The procedure for _Phase II_ will be as follows:**

    a.  The Midshipman may present evidence, including written statements from witnesses, and call witnesses to demonstrate exceptional potential for development and present extenuating and/or mitigating evidence and arguments for retention at the Academy or for minimum or no disciplinary action. The burden for demonstrating sufficient cause for retention by a preponderance of the evidence is on the Midshipman.

    b.  The Executive Board or Superintendent will deliberate and determine the appropriate recommended penalty outside the presence of the Midshipman, his/her advisor, and any witnesses. In making its determination, the Executive Board or Superintendent may examine the record pertaining to the charge(s) the Midshipman was found to have violated, any statements or evidence provided by the Midshipman, and the Midshipman's entire Academy record (academic, regimental, sea year, and extra-curricular).

6.  The Executive Board or Superintendent will reconvene the hearing to issue its recommendation to the Superintendent on a penalty or the decision of the Superintendent on the penalty, as appropriate.

7.  For Executive Board hearings, within two (2) business days after the completion of the hearing, the Chair will submit a written report to the Superintendent, which shall include one of the following recommendations:

    a.  Exoneration of the charge(s);

    b.  Imposition of disciplinary or other corrective action, other than a suspension or disenrollment;

    c.  Suspension from the Academy for a specified period of time; or

AR000282

    d. Disenrollment from the Academy.

8. The Executive Board's written report shall include a cover sheet signed by the Chair, the findings of the Board, and the documents considered by the Board.

## 6.6 PROCEDURES FOR SUITABILITY HEARINGS BEFORE THE EXECUTIVE BOARD OR SUPERINTENDENT

1. A **Suitability Hearing**, unlike a Disciplinary Hearing, has only one phase, as the sole issue for consideration by the Executive Board or Superintendent is whether the Midshipman has the aptitude or suitability needed of a Midshipman for a career in the merchant marine and the United States Navy Reserve. The Midshipman may present evidence, including written statements from witnesses, and call witnesses to demonstrate exceptional potential for development and present extenuating and/or mitigating evidence and arguments for retention at the Academy. The burden for demonstrating sufficient cause for retention by a preponderance of the evidence is on the Midshipman.

    a. The hearing will be digitally recorded, with the exception of the deliberations of the Executive Board or Superintendent. The Executive Board Secretary will also maintain detailed, but not verbatim, minutes of the hearing (except for the deliberations).

    b. The Chair or Superintendent can recess the hearing at any time for any reason.

    c. The Chair or Superintendent can request additional witnesses, documents, or other evidence.

    d. If the Chair or Superintendent requests additional witnesses, documents, or other evidence, the Midshipman will be given the same opportunity to review and prepare as provided in the Notice of Hearing, for a period of five (5) days after notice of the identities of additional witnesses or availability of documentary evidence for review.

2. The procedures for the hearing will be as follows:

    a. Introductory statement by the Chair or Superintendent as to the purpose of the hearing, including the basis for questioning the suitability of the Midshipman for continued enrollment, and a review of the Midshipman's rights.

    b. Opening statement by the Midshipman and/or his/her advisor.

    c. Presentation of evidence, including questioning of witnesses identified by the Academy (if any), followed by questioning of the Midshipman's witnesses (if any) and presentation of documentary evidence by the Midshipman (if any). Witnesses from either side may be recalled at the discretion of the Chair.

       1) All Midshipmen and Federal employees will be reminded that they have an affirmative obligation to speak truthfully in any administrative proceeding, including before the Executive Board or Superintendent, and all other witnesses will be advised of their obligation to testify truthfully. Further, Midshipmen will be

AR000283

advised that failure to testify truthfully is a violation of the Honor Code, which may result in a separate charge under the Honor Code. Employees will be advised that failure to testify truthfully may result in disciplinary action. If a witness is recalled, the Chair or Superintendent will remind the witness that he/she must testify truthfully.

2) After all the witnesses have been heard, the Midshipman will be given the opportunity to testify before the Executive Board or Superintendent.

3) The Executive Board members or Superintendent may question any and all witnesses at the hearing, including but not limited to the Midshipman.

4) The Midshipman will be present during the presentation of all evidence and will be permitted to question any and all witnesses.

5) Closing statement by Midshipman and/or the advisor.

6) The Executive Board or Superintendent will deliberate and reach a recommended determination, as agreed by a majority of the Board, or a decision in the case of a Superintendent's hearing, on the Midshipman's suitability to continue as a Midshipman at the Academy.

    a) This deliberation will take place outside the presence of Midshipman, his/her advisor, and any witnesses. Only the Executive Board members and the Executive Board Secretary will be present during deliberation. For Superintendent's hearings, the Superintendent will deliberate alone. For both Executive Board and Superintendent's hearings, the deliberations will not be recorded, digitally or otherwise.

    b) If, during deliberations, the Executive Board or Superintendent determines it or he/she needs additional documentary or testamentary evidence, it or he/she may reconvene the hearing at a later time, subject to providing Midshipman the same opportunity to review and prepare as provided in the Notice of Hearing, for a period of five (5) days after notice of the identities of additional witnesses or availability of documentary evidence for review.

7) The Executive Board or Superintendent will reconvene the hearing to issue its recommendation to the Superintendent on retention or to issue his/her decision on retention, as appropriate.

8) For Executive Board hearings, within two (2) business days after the completion of the hearing, the Chair will submit a written report to the Superintendent, which shall include one of the following recommendations:

    a) Retention of the Midshipman (with or without corrective action, such as suspension, demerits, etc.); or

    b) Disenrollment from the Academy.

9) The Executive Board's written report shall include a cover sheet signed by the Chair, the findings of the Board, and the documents considered by the Board.

## 6.7 DECISION BY THE SUPERINTENDENT

After the Superintendent has arrived at a decision regarding a disciplinary or suitability case, he/she will provide a memorandum to the Midshipman and his/her advisor setting forth the Superintendent's decision, including the penalty imposed, if any. This memorandum will describe the Midshipman's right

AR000284

to request reconsideration of non-disenrollment decisions to the Superintendent and to appeal disenrollment decisions to the Maritime Administrator, and include the procedures for such appeals. Copies of the memorandum will be placed in the Midshipman's Official Personnel Jacket and the Executive Board or Superintendent's hearing file, and copies will be provided to Academy officials who must carry out the terms of the decision.

## 6.8 MIDSHIPMAN'S REQUEST FOR RECONSIDERATION TO THE SUPERINTENDENT

The Midshipman has the right to request a reconsideration of a non-exoneration decision not providing for disenrollment to the Superintendent. He/she must submit an intent to request a reconsideration, in writing, to the Superintendent within 24 hours after receiving the decision. The Midshipman's request for reconsideration must be submitted, in writing, to the Superintendent within seven (7) days after receiving the decision.

## 6.9 APPEAL TO THE MARITIME ADMINISTRATOR

1. Midshipmen may only appeal disenrollment decisions to the Maritime Administrator, whose decision will be final. If a Midshipman does not appeal the Superintendent's disenrollment action, the Midshipman shall proceed immediately with checkout procedures.

2. If a Midshipman is disenrolled and wishes to appeal his/her disenrollment, he/she must notify the Superintendent, in writing, within 24 hours after receiving the memorandum of decision of his/her intent to appeal to the Maritime Administrator.

3. Such appeal will be submitted, in writing, to the Superintendent no later than seven (7) days after receipt of the Superintendent's memorandum of decision.

4. The Superintendent will forward the appeal to the Maritime Administrator, with the Superintendent's recommendation. A copy of the Superintendent's recommendation will be provided to the Midshipman and his/her advisor.

5. The Midshipman is entitled to remain at the Academy pending consideration of his/her appeal, including, as appropriate, in a deferred graduate status, provided that the Midshipman abides with all Academy policies, including the Midshipman Regulations. If the Midshipman is enrolled in classes during the pendency of the appeal, he/she will continue in those classes. If the Midshipman is scheduled to depart for sea year or an internship during the pendency of the appeal, he/she will not do so during the pendency of the appeal. In such case, the Superintendent will determine whether the Midshipman remains on board at the Academy or departs the Academy during the pendency of the appeal.

6. If the Maritime Administrator upholds the decision of the Superintendent, the Midshipman will be disenrolled immediately upon receipt of the Maritime Administrator's written decision. If the Maritime Administrator grants the appeal, his/her written decision should include a statement of the reasons therefor.

AR000285

# MIDSHIPMAN
# HONOR MANUAL



# UNITED STATES
# MERCHANT MARINE ACADEMY
# JUNE 2017

AR000286

# FOREWORD

This revised Honor Manual supersedes the version published in 2007. It is noteworthy that it represents the first changes in eight years to the rules and guidelines for Honor at Kings Point. No less significant is the fact that this new Manual is the result of the initiative of members of the Regimental Honor Board. It also represents the input and participation of other members of the Regiment of Midshipmen. The most important single change in this Manual is the addition of the Honor Concept. This statement expresses the broad purpose of the observance of Honor among Midshipmen, its vital role in the training and education of officers and "leaders of exemplary character."

Other changes reflect a desire to simplify procedures and to ensure that they are both rigorous and fair. Additional safeguards have been added to protect the rights of midshipmen. A section on Honor Remediation has also been included.

The new Manual will be the subject of instruction and of discussion. Emergent ideas to further improve and strengthen the place of Honor at the Academy may already be the subject of conversation in barracks, mess hall and classroom. I welcome this, and I enjoin every Midshipman and member of the Academy community to read and ponder this new Honor Manual, repository of our most prized possession.

James A. Helis
Rear Admiral
U.S. Maritime Service
Superintendent

2

AR000287

## THE MISSION OF THE UNITED STATES
## MERCHANT MARINE ACADEMY

*To educate and graduate licensed merchant mariners and leaders of exemplary character who will serve America's marine transportation and defense needs in peace and war.*

## THE HONOR CODE

## A Midshipman will not Lie, Cheat or Steal.

## THE HONOR CONCEPT

The United States Merchant Marine Academy is a place of honor, committed to the belief that a Midshipman's character is his or her most prized possession. This concept is required by the far-reaching nature of our professional heritage and the fact that an officer's word aboard ship or ashore must be utterly reliable. To that end, the Academy realizes that honor itself goes far beyond a set of rules enforced through sanctions; it is a direct reflection of character and the ideals we wish to embody. To protect and cultivate this standard, Midshipmen have created an Honor Concept at the Academy to which we are all responsible.

The Academy provides a safe and supportive environment for midshipmen and other members of our community. It is united by heritage, esprit de corps and a common mission. The Regiment of Midshipmen has standards that it expects to be met by every midshipman. A Midshipman at the United States Merchant Marine Academy will not break this bond of trust by lying, cheating or stealing in any form. We further characterize noble action as that which strives toward continual self-improvement and the realization that honorable living is what defines an honorable person.

Membership in the Regiment requires that every Midshipman realizes that loyalty to their principles supersedes any friendships or cultivated relations with their classmates. A person who is lacking high moral and ethical standards is unfit to lead. In pursuance to this end it is each Midshipman's personal duty to ensure their classmates are maintaining the high standards which they have sworn to uphold.

3

AR000288

# THE HONOR CREED

## May your life's course be defined by Honor.


## INTRODUCTION

Authority.

Under Title 46, section 310.65(b)(1)(iv) of the United States Code of Federal Regulations, a Midshipman must comply with the prescribed disciplinary and honor systems to graduate from the Academy. This manual defines the honor system and describes the procedures to be followed to measure Midshipman compliance with the system.


History.

Honor is as important to today's society as it was in the societies we inherited its ideals from, in particular from such heroic and chivalric societies as that of ancient Greece and medieval and Renaissance Europe. Certain modern communities preserve the idea of honor because it provides a sense of personal responsibility for actions within the community, and as a way of retaining a sense of tradition. Many professional associations, institutions of higher learning, as well as the armed forces espouse and practice the idea of honor. Honor is an ancient ideal of conduct. It has been the means by which close-knit, hierarchical, and highly-directed societies have developed a moral sense.

Aspects of Honor

The practice of honor can be broken down into four parts. These are Honesty, Reciprocity, Forbearance and Restraint, and Autonomy and Free Choice.

Honesty

Good faith and values can only be maintained if all members of a community can trust one another. This is why honor systems like those at service academies and other military schools put such a premium on honesty. Honesty is honor at the entry-level. Honor is not just about telling the truth, but without truth-telling, the practice of honor is impossible. If someone is "out there" telling lies, cheating or stealing, he or she isn't a person of honor, isn't one of the community, but is isolated from the community and its standards. If too many people insist on acting this way, out of false pride, or because they are "alienated," disaffected, or cynical, the connection between members is lost, and the community of honor collapses into individuals each pursuing selfish ends through unscrupulous means. Too many in today's society have traveled or are traveling down this path.

Reciprocity

The person who desires honor relies on the good opinion of peers, so as much as possible he or she will observe the golden rule, live up to obligations, repay debts, and return favors in full. Persons desiring honor must pull their own weight in the community of honor. The

4

military unit or ship's company is such a community that may appear simple but which is really quite complex. Superimposed on the formal structure of the community or regiment is the unofficial framework of status and obligation, favors and repayment, past record and expectation that determine how the individual and unit function. Members of the organization enter into a social contract to treat one another with respect.

### Forbearance and Restraint

The kind of structured and mission-oriented communities that traditionally embrace honor often wield considerable power, and honor requires that this power be used wisely and for the good of all. Because of the power of officers to influence the lives of their subordinates, for good or ill, the officer has a traditional obligation to demonstrate self-restraint in the use of authority. Since military organizations have an enormous ability to do harm, those who carry arms must likewise subscribe to a concept of forbearance and restraint, which involves the commitment to use a weapon only in the service of the avowed cause, and to limit the destructiveness of that use as much as possible, not harming, and even shielding those who are unarmed. The military organization should, as one of the requirements of honor, act to provide a climate of values that condemns the irresponsible use of authority or of force.

### Autonomy and Free Choice

Autonomy and free choice are most characteristic of honor communities composed of experienced individuals, in professional organizations both military and civilian. A profession is identified by the independence and self-governing capability of the profession. The degree of autonomy granted to an individual in an honor community rests on experience, on confidence born of achievement, on reputation, on the practical wisdom of long service. Among the core values of the maritime and naval services, honor, courage and commitment, honor is the pinnacle, coming after commitment has led to the development of virtues like courage and wisdom.

### Conclusion.

The Regiment of Midshipmen is an organization dedicated to training and educating officers and leaders of character. We cherish the tradition of honor as an inheritance from the past and as the basis for the character of every officer in the Armed Forces and Merchant Marine. As Midshipmen and future officers, honor is our most prized possession.

> "The most tragic thing in the world is a man of genius who is not a man of honor." George Bernard Shaw

> "The shortest and surest way to live with honor in the world is to be in reality what we would appear to be; all human virtues increase and strengthen themselves by the practice and experience of them." Socrates

5

AR000290

**CHAPTER ONE - General Overview**

*101. Scope of the Honor Concept*

All persons entering the Academy must accept the obligation of adhering to the Honor Concept at all times. All Midshipmen will sign an Honor Oath document during their indoctrination period upon completion of the introduction to the Honor Concept and preliminary honor education classes. The signed Honor Oath will be placed in the 1st LT Aaron Seesan Room. Honor Board Officers are charged with the instruction and administrative duties. This Oath consents to adherence to both the Concept and its procedures contained herewith. Ignorance of the Concept and procedures is not an excuse. **All Midshipmen are bound by the Concept at all times including leave, liberty, sea-year, and internships. Midshipmen are bound by the Concept in all hemispheres of the globe and on all oceans.**

The Honor Concept describes behavior that demonstrates a person's character. Violations of the Concept are indications of deficiencies in a person's ethical standards. The Honor System is a method for Midshipmen to evaluate whether or not actions by another Midshipman actually occurred, whether or not the actions demonstrate a deficiency in character, and whether or not the deficiency can be remedied without disenrollment.

*102. Definitions of Honor Terms*

**Honor -** Exhibiting behavior that is characterized by integrity and adherence to ethical and moral standards.

**Lie-** A lie is considered a deliberate attempt to present an oral or written untruth, quibble, or make a non-verbal communication with the intent of misleading another person(s). Examples include, but are not limited to:
   a) <u>False Identification</u> The possession or use of an identification card with any false information of any kind shall be considered a lie. This includes modifying an existing identification, or using an identification card other than a Midshipman's own for any purpose.
   b) <u>False Official Report</u>. Making a false report of any kind. Examples include log book entry, liberty request, and statement to investigating officer or watch stander.

**Cheat-** To cheat is to possess or obtain unauthorized assistance in submitting work designed to represent one's own efforts to deliberately gain an unfair advantage over others, or to attempt to do so. Cheating also involves knowingly assisting another person by word or action when such assistance is prohibited, or attempting to do so. Some examples of Cheating are the possession, communication, or use of information, materials, notes, study aids, or other devices not explicitly authorized by the instructor in any academic exercise, or any communication on the substance of the exercise with another person before, during, or after such exercise. Failure to adhere to the standards of academic honesty, as defined in the Academy's Academic Policies Handbook is considered cheating. The definitions of academic dishonesty are set forth below:

6

a)  <u>Plagiarism</u> – To steal and pass off the ideas or words of another as one's own without crediting the source; to present as new and original an idea or product derived from an existing source.

b)  <u>Multiple Submission</u> – The submission of academic work for which academic credit has already or will be earned, when such submission is made without explicit instructor authorization.

c)  <u>Fabrication/Falsification of Research Results</u> – Inventing or counterfeiting information; creating results not obtained in a study or laboratory experiment; the deliberate alteration or changing of results to suit one's needs in an experiment or other academic exercise.

d)  <u>Pony</u> – A pony is an exam or other piece of academic work completed previously by another Midshipman, which has been graded and/or returned by a professor. Midshipman use of ponies will be determined by a policy detailed in the syllabus of each individual instructor. If ponies are authorized in the syllabus, their use must be cited in a manner approved by the instructor.

**Steal-** To steal is to attempt to wrongfully take, obtain, or withhold property without the consent of the owner, either temporarily or permanently, with the intent of depriving the owner of the property.

7

AR000292

## CHAPTER TWO- Midshipman Honor Board Organization

### 201. Midshipman Honor Board

A.    The Regimental Honor Board Chair (RHBC) will be appointed by the Superintendent, will be a member of the First Class and will hold the rank of MIDN LCDR.
The RHBC will be appointed as Chair for both rotations of his/her first class year. This is necessary to establish consistency in hearings, due to the nature of the material he/she is privy to, and due to the carryover of cases between rotations.

B.    The Regimental Honor Board Vice-Chair (RHBVC), Regimental Honor Board Vice Chair of Education (RHBVCE), Regimental Honor Board Vice Chair of Investigation (RHBVCI), and Regimental Honor Board Vice Chair of Operations (RHBVCO) will be appointed by the Superintendent. These members will be members of the First Class and will hold the rank of MIDN LT. At the discretion of the Superintendent they may continue their duties during the second rotation of officer billets.

C.    The Company Honor Board Chairs (CHBCs) will be appointed by the Superintendent. The Company Chairs will be members of the First Class and will hold the rank of LT(JG). At the discretion of the Superintendent the CHBCs may continue their duties during the second rotation of officer billets.

D.    The Honor Board Petty Officers will be appointed by the RHBC. Petty Officers may be members of the Second or Third Class.

E.    The Plebe Candidates will elect 2 Honor Board Representatives per company at the completion of their Honor education program during Indoctrination. The length of the term will be one year. These Plebes will assist in Honor Board procedures and act as ambassadors of the Honor Board.

### 202. Duties of Honor Board Members

A.    The RHBC will coordinate all the actions of the Midshipman Honor Board. The Chair's responsibilities include:

1.    Supervising the planning and organization of Honor education with respect to both Midshipmen and faculty/staff members.

2.    Arranging for investigations and hearings. The Chair will oversee the progress of the Investigating Team, and insure the expedient processing of violations.

3.    Presiding over Honor Board Hearings in an impartial manner and insuring that only relevant testimony is heard.

8

AR000293

4.      Presenting the Honor Board's findings, decisions, and reasoning to the Honor Review Officer, as well as posting memoranda to the Regiment informing the Regiment of Honor Board actions.

5.      Confer with the Superintendent in regards to all hearings to assist in the final action. A meeting will be held after each Formal Hearing of the Superintendent, the Commandant, and the RHBC to discuss recommended actions for each case.

B.      The RHBVC will act as the chief of staff for the Honor Board. The RHBVC acts as a liaison between the RHBC and the other Honor Board Officers, thereby allowing the RHBC to handle cases and other matters more freely and efficiently.

C.      The RHBVCE is responsible for coordinating and planning all Honor education for the Regiment, Faculty, and Staff.  He/she will also coordinate the Honor education program for the incoming class before he/she graduates.

D.      The RHBVCI will be responsible for assigning an Investigating Team to each case. In addition, he/she will review the methods and content of the investigation before the case is forwarded to the RHBVC.

E.      The RHBVCO is responsible for the organization and operating procedures concerning the Honor Board.  His/her duties include the proper organization and transfer of case files and paperwork concerning an investigation, to include record keeping and audio recording during formal hearings.

F.      The CHBCs provide representation of the Honor Board on the Company level. They are responsible for the education, investigations, counseling, etc. that involves their Company.

G.      Honor Board Petty Officers' primary responsibility is to learn the billet of the Midshipman officer they are assigned to. Honor Board Petty Officers are able to assume any of the duties of regular Honor Board members, including acting as presiding officer. Any duties that are assigned to Petty Officers will be at the discretion of the RHBC and their respective Midshipman officer. Honor Board Officers may have more than one Petty Officer.

H.      Plebe Honor Representatives will be available for duties assigned to them by the Honor Board, including counseling and company honor education. Representatives should have an intimate knowledge of the Honor Board's processes in order that they may advise other Midshipmen, including violators, of their rights and duties under the Honor system.

I.      No member of the Honor Board may serve as an advisor to a suspected honor violator.

## 203.  *Honor Board Officer Advisor*

9

AR000294

A.    The purpose of the Honor Board Officer Advisor is to provide the Honor Board with advice and direction, and to act as a reviewing officer. This individual will monitor all case reviews and hearings to ensure that the procedures are followed and to ensure that the rights of the accused are not violated.

B.    This individual will be a faculty/staff member appointed by the Superintendent, after consultation with the outgoing Honor Board Officer Advisor and Midshipman Honor Board Officers. The term of office is at the discretion of the Superintendent, upon the advice of the Honor Board.

## 204.   *Advisor to the Accused*

A.    The Accused may select an Advisor in the event he or she has committed a possible honor violation, which has been put under a formal investigation. An Advisor's role is to assist the Accused in Honor Board procedures, and to counsel the Accused during the course of the investigation and hearing. The Advisor may attend all hearings on the case but cannot answer questions for the Accused. The Advisor may not question the witness nor address the jury members directly during the Formal Hearing. The Advisor may protest any of the Honor Board procedures.

B.    The Advisor may be a Faculty/Staff member or Midshipman, except for members of the Commandant's staff, Counsel to the Academy or chaplains. Under no circumstances may an Advisor be anyone that is not employed by or enrolled at the Academy.  The Accused may seek the advice and assistance of legal counsel in the preparation of his or her case at his or her own expense.  However, legal counsel will not be permitted to be present during any of the Honor Board proceedings, including but not limited to interviews and hearings.

C.    The Accused Advisor is required to be present at a Formal Hearing.

D.    The Accused may only have one.

## 205. *Honor Board Hearing Voting Members (Jury)*

A.    Nine Midshipmen will comprise the Honor Board Voting Members (Jury).  The members will consist of:

1.    A Battalion Commander (BC) other than the BC of the battalion of the accused, or in his/her absence, the Battalion Executive Officer (BX).

2.    Three Company Commanders (CC), or in their absence their Executive Officers (CX).  The CCs (or CXs) will not be from the accused's company.

10

AR000295

3. Five members selected at random from members of the accused's class, but not from the accused's company. Midshipmen who are serving Class I or II restriction, or who are in the same class section or on the same varsity team, club or activity as the accused are not eligible to serve as members.

B.  It is every Midshipman's duty to ensure that the Honor Concept is upheld, and, for this reason, every Midshipman may be called to serve as a Voting Member. Jury duty has priority over other Midshipman responsibilities, including athletic practice and events, club activities, or liberty. A Voting Member will be given 5 days' notice prior to a Formal Hearing, and may request from the RHBC in writing to be excused from jury duty if it is in conflict with another activity, or in the case of illness or a medical appointment. Normally, excuses for illness and medical will be granted. If the RHBC declines to excuse a Midshipman who has asked to be excused, this decision may be appealed to the Honor Board Advisor, who may consult with the Commandant for a final decision. Should a Midshipman feel that, for any reason, they are incapable of casting a fair or unbiased vote, it is their obligation to request relief from voting duty.

C.  Before the first Honor Board case of each rotation of Midshipman Officers, the Commandant of Midshipmen, Regimental Honor Board Staff, and the Honor Advisor will meet with the BCs, BXs and CCs (standing members of the Jury) and undergo a conduct briefing to ensure all members are prepared to serve effectively in a formal hearing.

## 206. Composition of Honor Board Hearing

A.  Midshipman Presiding Officer (no vote): RHBC or an officer appointed by him or her. In the event that the RHBC feels that he or she may be too close to the case being heard whereas it may affect his or her impartiality, the RHBC shall excuse him or herself as Presiding Officer. The RHBC will then appoint the RHBVC or the RHBVCE as Presiding Officer.

B.  Midshipman Investigating Officer (no vote).

C.  Recorder (A Midshipman designated by the RHBC and having no vote).

D.  Nine voting members as described in para 205(A) above.

E.  No Honor Board member, or any other Midshipman directly involved in the case, may sit as a Voting Member hearing the case.

## 207. Dismissal of Board Members

If any Honor Board Officer or Representative fails to maintain the standards of the Concept or the Regiment, as determined by the RHBC, the RHBC may recommend to the Superintendent

11

through the Honor Board Advisor and the Commandant that the person be dismissed from his or her Honor Board position. Conduct grades and disciplinary actions will be monitored to ensure that those Midshipmen voting on Boards maintain an acceptable standard of conduct. Those members with poor conduct grades may be recommended for removal by the Chair. If an Honor Board Officer is dismissed, his or her position will be filled based on the recommendation of the existing Honor Board Staff, Honor Board Advisor, and the Commandant, and the approval of the Superintendent.

AR000297

## CHAPTER THREE - Honor Violation Procedures

### 301.   Path of a Possible Honor Violation

If a Midshipman becomes aware or otherwise learns of a dishonorable act, the burden of action falls on any party having knowledge of the act.  The Midshipman must then take appropriate measures, in line with this Academy's Honor Concept, to determine the subsequent action to be taken with the accused. Each midshipman has an individual responsibility for the Honor of the Regiment, and if a breach of that trust has occurred in the form of an Honor Violation, then they are bound to take informal or formal action, as set forth below.

### A.  Informal Action

The path of a possible Honor Concept violation is left to the discretion of the witness.  Every Midshipman is bound to do *something* upon witnessing a violation of the Concept, and an informal action may be the first step.

   1.   Confrontation

Informal action may be taken by any member of the Regiment who witnesses a violation of the Academy's Honor Concept by personally confronting the individual and counseling him/her on how and why they possibly violated the Honor Concept. This informal confrontation is meant to foster a collective responsibility for the Honor Concept by allowing the Midshipmen of the Regiment to practice it among themselves. The Honor Board recognizes that confrontation of a fellow midshipman is not an easy task to undertake.  The Honor Board recognizes this fact, but maintains that confrontation is a necessary aspect of the Honor System.

Confrontation with a fellow Midshipman should be used to determine basic information about the incident, such as why it occurred, and how that Midshipman feels about it now.  The accusing Midshipman must be ready to challenge their counterpart to do the right thing. Confrontation may be deemed satisfactory, in the sense that the confronting midshipman is satisfied that he/she need not report the confronted Midshipman to the CHBC or Regimental Honor Board, if and only if the following conditions are met:

    a.   The confronted individual can give a satisfactory, believable exculpatory explanation that is consistent with the known facts; or

    b.   The confronted individual confesses to the act and is prepared to make a full reparation by, for example, returning stolen property and admitting the theft to the owner, or confessing an act of cheating to the instructor, or personally rescinding an untrue statement to the person to whom it was originally made.  The option to report could then be in the hands of the victim or subject of the honor violation, but the violator would have in his or her favor the fact that he or she had made an effort to make reparations.

13

AR000298

If confrontation is satisfactory, the confronting individual shall fill out an HB-0 form (Appendix 1) and submit it to his or her CHBC.  This not only protects the confronting party from future actions, but allows the Honor Board to track the type and frequency of minor cases.  If the confronted individual acknowledges that he or she has violated the Honor Code, he or she should be encouraged to self-report.  If the confronted individual refuses to self-report in the case of what appears to be a violation, the confronting individual should take responsibility to see that a written report (HB-1) is submitted.

2.  Report to Company Honor Board Chair

A Midshipman who witnesses a violation of the Academy's Honor Concept may report the incident to his or her CHBC, who will hold an Informal Counseling Session with the accused. The CHBC will then forward a summary report of the informal counseling session to the RHBC, who will determine whether further counseling is needed. Confrontation, while encouraged, is not a mandatory step; it is possible for a violation to go straight to a formal report. If further counseling occurs, the Honor Board members and the CHBC from the accuser's company will determine if a formal investigation should be initiated, based on the information/evidence and recommendations presented by the members who formally counseled the accused Midshipman.

B. Formal Report

A report of an honor violation may be made by any Midshipman or any member of the faculty or staff who has knowledge of the possible honor violation.  The report is made by submitting an HB-1 form, entitled "Report of a Possible Honor Violation" (Appendix 2).  The HB-1 form may be submitted to any member of the Commandant's staff or to any member of the Honor Board, who will forward it expeditiously to the RHBC.  After the HB-1 form has been submitted to the RHBC, and he or she has ensured the veracity of the charge(s), he or she will direct the RHBVCI to conduct an investigation.   The Honor Board reserves the right to not consider any case that is not reported within thirty days of the occurrence of the suspected violation.

## 302. Investigation of a Formal Report of an Honor Violation

A.  Initial Investigation Interview of the Accused

The Initial Investigation Interview is the first step in the investigation of a formal report of an honor violation.  It commences when the RHBVCI completes and delivers, in person, as soon as possible, Form HB-2, entitled "Notification to the Accused" (Appendix 3) to the accused Midshipman.  This Notification shall include the following enclosures: (1) The Rights of a Midshipman Accused of an Honor Violation Notice; and (2) Advisor Selection.

The RHBVCI will schedule the Initial Investigation Interview within five days of the delivering the Notification to the Accused.  This Interview will be conducted by an Interview Team, which shall include the Accused's CHBC, his or her Company Commander (CC), his or her CHBC, and a member of the Regimental Honor Board Staff.  Other Honor Board Officers and Petty Officers may be present to observe.  In addition, if the Accused wishes to have an Advisor, the Advisor,

14

who must be selected by the date of the Initial Investigation Interview, may be present at the Interview.  If a Regimental or Battalion Officer is accused, the process will be moved to the Regimental Level, (i.e. a Regimental Honor Board Officer will act as CHBC for the Accused).

Prior to or at the Interview, the Accused shall complete, sign and return to his or her CHBC the two enclosures included with the Notification – the Rights of a Midshipman Accused of an Honor Violation Notice and the Advisor Selection Form.  In addition, the Accused may also submit a written statement to his or her CHBC within seven days from the date of receiving the Notification.

The Interview Team shall conduct the Initial Investigation Interview and the CHBC shall keep detailed notes of it, including as many facts as possible.  The purpose of the Interview is to determine the Accused's version of the events that took place with regard to the possible honor violation.  The Interview is for preliminary fact-finding, to determine whether more information needs to be uncovered, and whether enough evidence exists to warrant a Formal Investigation. Each individual present is permitted to interview the Accused. Anyone not involved with the Investigation team is not allowed to interview the accused.

Upon completion of the Initial Investigation Interview, all individuals present will sign Form HB-3, entitled "Initial Investigation Interview Muster" (Appendix 5).  The CHBC will compile the notes from the Interview, and attach them as a Report to Form HB-3.  In this Report, the CHBC, CC, and Regimental Honor Officer shall recommend, in writing and with their rationale, one of the following:  (1) that the case be dismissed; (2) that the case be referred to the Commandant for disciplinary review (for situations involving infractions of the regiment's rules, not of the Academy's Honor Code); or (3) that a Formal Investigation be conducted.

The CHBC will forward Form HB-3, and its attachments, to the Honor Review Board, via the RHBVCI.  The Honor Review Board will consist of the Regimental Honor Board members, the CHBC from the Accused's Company and the Honor Board Advisor. The Honor Review Board will vote on one of the following actions: (1) dismiss the case where there is a lack of evidence to determine whether a violation has occurred; (2) refer to case to the Commandant for disciplinary review; or (3) initiate a Formal Investigation.

Until such time as a Formal Investigation is ordered or the case is referred to the Commandant, the Accused may review only his or her statements and evidence that he or she has entered into the case file.

B.  Formal Investigation

The purpose of a Formal Investigation is to uncover all facts and evidence regarding a potential Honor Concept violation. An Investigation Team will be convened, consisting of an Investigating Officer from the Honor Board Staff, a Company Honor Representative, and one or more Petty Officers, appointed by the RHBVCI will appoint the Honor Board Staff member, the Company Honor Representative, and the Petty Officers who will conduct the investigation.  The

AR000300

Investigating Team must remain objective and unbiased throughout the course of the Formal Investigation. All points of view should be examined and fully considered. The Investigation Team should complete the Formal Investigation, including interviews and evidence collection, and prepare its Investigation Report within seven days.

The Investigating Officer shall be responsible for scheduling interviews with the Accused, the Accuser, and any other witnesses. The Investigating Officer must take notes during each interview; electronic recordings of the interviews are also encouraged. For each interview conducted, the Investigating Officer shall also complete Form HB-4, entitled "Record of Interviews" (Appendix 6). The first interview conducted should be of the Accused. The Accused is under no circumstances required to answer any questions; however, the Investigation Team is required to ask.

After interviewing the Accused, the Investigation Team shall interview the Accuser, whether it is a Midshipman or faculty or staff member. Once this is complete, the Investigation Team shall interview any other individuals who may have knowledge of the potential Honor Concept violation. The Investigation shall also compile any non-witness evidence of the potential violation. Thus, for example, in a cheating case, the Investigating Team should interview the professor (if the professor was not the accuser), and obtain (if available) a copy of the test or other evidence.

After completing these interviews, the Investigation Team shall collect character statements from individuals involved with the development of the Accused, such as Athletic Coaches, Company Training Officers, Company Commanders, or Company Officers. The purpose of a character statement is to give the Investigation Team and Honor Board members a more complete picture of the character of the Accused. Additionally, the academic and disciplinary records of the Accused Midshipman shall be obtained by the Investigation Team or the RHBC and included with the Formal Investigation Report. The RHBVCI ensures confidentiality throughout the entire process and protects sensitive documents and information.

Upon completion of the Formal Investigation, the Investigating Officer shall submit the Formal Investigation Report, attached to Form HB-5, entitled "Report of Formal Investigation" (Appendix 7), to the Honor Review Board, via the RHBVCI. This Report shall type-written in memorandum format using a font that is easily read and submitted without grammatical and spelling errors. This Report shall consist of the following in the order listed: (1) Investigating Officer's summary; (2) interview of the Accused; (3) interview of the Accuser; (4) interviews of witnesses; (4) statements from the Accused; (5) statements from the Accuser; (6) statements from Witnesses; and (7) any other additional evidence.

C.   Honor Review Board

The Honor Review Board is composed of the following individuals: the RHBC, RHBVC, RHBVCE, RHBVCI, Honor Advisor, and the Investigation Team. The purpose of the Honor Review Board is to examine the Formal Investigation Report, and determine whether a Formal Hearing is necessary. The Accused shall not be present for deliberations of the Honor Review Board.

16

The Honor Review Board shall meet within two days of receipt of the Formal Investigation Report. Each member of the Honor Review Board will be presented with a copy of the Formal Investigation Report, all of which will be collected at the end of the review and secured. The Investigating Officer shall give the Honor Review Board a synopsis of interviews conducted, evidence collected, and any other pertinent information. After reading this material and hearing the Investigating Officer's presentation, the Honor Review Board shall vote. The outcome shall be decided by a majority vote, with each member except the Honor Advisor casting a vote. The possible outcomes are as follows:

1.    Formal Hearing:  The case shall be forwarded to a Formal Hearing, to allow a jury drawn from the Regiment to vote on the outcome of the case; this step shall be taken when a majority of the Board feels that the case requires the examination of the jury.

2.    Case Dismissal: The case shall be dismissed and erased from the record; this step shall be taken when a majority of the Board feels that the case does not merit further proceedings or consequences.

3.    Refer to Commandant: The case shall be dismissed as an honor case and referred to the Commandant for disciplinary action; this step shall be taken when a majority of the Board feels that the case does not meet the qualifications of an Honor Board case, yet may still require disciplinary action

The Honor Review Board decision will be documented on Form HB-6, entitled "Review of Formal Investigation" (Appendix 8) and turned over to the RHBC. If the recommendation is to dismiss the case or for other non-Honor Board action, the RHBC will endorse the recommendation and forward it to the Honor Board Advisor.   For a case where a formal hearing is recommended, the RHBC will convene a hearing and cause the Formal Investigation Report to be made available for the hearing. The Honor Review Board decision will be conveyed to the Accused on Form HB-7, entitled "Result of Honor Review Board" (Appendix 9)

## 303.   *Formal Honor Board Hearings*

A.    The Open Board Program

The Open Board Program has been designed so that the Regiment, faculty, and staff may learn more about the Honor System at the Academy. The Program allows a limited number of Midshipmen, faculty, and staff personnel to attend Formal Honor Board Hearings as observers, except during deliberations. Under no circumstance may non-Academy personnel attend any Honor Board process.

The Accused may elect whether to have an Open Board, via Form HB-10, entitled "Formal Hearing" (Appendix 12), which shall be included with the Notification of Hearing (Form HB-8) and must be returned no later than 48 hours before the scheduled hearing. RHBC, with the advice of the Honor Board Officer Advisor, may disallow an Open Board at any point. Open hearings are preferred for the majority of cases, and should be the norm. If an Open Board is being held, all persons wishing to observe must sign Form HB-11, entitled "Formal Hearing Accountability" (Appendix 13) before the beginning of the hearing. The RHBC may deny any

17

AR000302

persons the privilege to observe these proceedings with or without disclosing his or her reason. This is done for the protection of the Accused, Accuser, witnesses, Board Members and due to the sensitivity of the material being presented. The RHBC may choose at any time to have a closed Board, even if after the commencement of an Open Board. Should the board be closed, a written report as to the reason must be submitted along with the accused Midshipman's case packet.

B.      Jury Selection Process

The composition of a Formal Hearing Jury is detailed above in Section 204(A).  The jury shall be selected five days prior to the Formal Hearing, and notification shall be delivered that same day via Form HB-9, entitled "Formal Hearing Jury" (Appendix 11).  The RHBVC is responsible for selecting the jurors and alternates for every Formal Hearing and notifying them of the Formal Hearing.

Nine jurors shall be present for every Formal Hearing, with four alternates.  Two Alternates are to be eligible to replace one of the designated Midshipman officer members, and the other two eligible to replace any of the other members.  Any juror who fails to appear without prior approval (see Section 204(B)) shall face disciplinary action.

All Midshipmen are obligated to provide a fair and impartial vote.  Should any juror feel themselves incapable of casting a fair or impartial vote for any reason, they must request to be removed from the voting panel (see Section 204(B)).

The jurors shall be selected using the random number generator function in the Microsoft Excel application.  A complete list of all Midshipmen onboard at the Academy shall be obtained from the Office of Midshipmen Personnel.  All members of the Accused's company, academic section, and varsity athletic team shall have their names removed from the list.  Any Midshipmen currently serving restriction shall also have their names removed from the list.  Current lists of these names shall be obtained from the Company Commander, Academic Dean, Director of Athletics, and Commandant's Office.

The Battalion Commander shall not be from the Battalion of the Accused.  In the event the Accused is in Band Company, either Battalion Commander may sit as a voting member.  In this case, the Battalion number shall be drawn at random. In the event that the Accused is a member of the Regimental Staff, jury selection will proceed based on his/her parent company and battalion.

The Company Commanders who will be sitting as the standing members of the jury shall not be from the Company of the Accused.  The Company Commanders shall be selected by drawing Company numbers at random.  Three names shall be drawn as voting members.

Upon completion of jury selection, the thirteen drawn names shall be cross-checked by the RHBVC.  Should a voting member be found to be a member of the Accused's company,

AR000303

academic section, or athletic team, their name will be removed from the roster, and the random number generator will be used to find another replacement.

Prior to the Formal Hearing, the Accused shall be presented with a roster of the voting members. If the Accused feels that one or more of these representatives may be prejudiced in the case, he or she may challenge the selection and request another Midshipman be appointed to the Board. The Accused must explain his or her reason for the challenge. The Presiding Officer will make the final decision whether to replace the challenged board member when the final selection is made. After the Accused has approved the list, he or he will sign the list to document approval. Should the Presiding Officer disapprove the Accused's challenges of the jury members, the Accused must still sign a document acknowledging the jury members.

C.      Notice to the Accused

At least five days before the Formal Hearing, the Accused and his or her Advisor will receive written notification of the date and time of the Formal Hearing via Form HB-8, entitled "Notification of Hearing" (Appendix 10). This notice will include a copy of the Formal Investigation Report and the identities of the members of the Jury, and all evidence to be presented to the jury by the Investigating Officer, as well as any witnesses who may be called by the Investigating Officer.

D.      Overview of Formal Hearing

A Formal Hearing is presided over by a Presiding Officer and heard by the nine Voting Members of the Jury. The Investigating Officer presents the case summary and witnesses of the possible Honor violation. The Accused may make opening and closings statements, question the witnesses called by the Investigating Officer and present witnesses of his or her own. After presentation of the case, the Jury deliberates and can dismiss the case, refer the case to the Commandant for possible disciplinary action or find the Accused guilty. If found guilty, the Accused will have an opportunity to present evidence, including written statements from witnesses, and call witnesses to present extenuating and/or mitigating evidence and arguments for retention at the Academy or for minimum or no disciplinary action. Where the Accused has admitted guilt, the hearing will be limited to the Accused presenting such evidence.

## 304. Detailed Procedures for Honor Board Hearings (other than admitted guilt)

A.      The RHBC shall determine the date and time of the Formal Hearing, which shall be held in the Eliot M. See Room, in Wiley Hall, in the seasonal dress uniform. If it will be an Open Board, the Regiment shall be extended notification of the Hearing, and those who are interested may attend subject to the limitations set forth above in Section 303(A). The Presiding Officer has the responsibility for maintaining order during the Board. Any improper conduct during the Board is cause for immediate dismissal from the Board and will result in disciplinary action.

B.      The designated Recorder will take a muster prior to the Honor Board Hearing.

AR000304

C.    The Midshipman Presiding Officer will read the following after the 9 Voting Members have been seated and given the opportunity to read the case file:

    1.    **"May I have your attention. This Honor Board Hearing will now come to order. All Midshipmen are reminded that this is a formal hearing and that all persons in this room will be held to the highest standards of conduct."**

    2.    **"The accused is Midshipman (Name) who is charged with lying/cheating/stealing."**

    3.    **"If any member of the Honor Board Hearing sitting on this case feels that he or she will not be able to cast all unbiased vote, it is your moral responsibility to excuse yourself from the Hearing."**

    (In the event of this occurrence, the Presiding Officer will appoint one or more of the four (4) alternate Honor Board Representative(s), who has been approved by the accused, to act as a voting member(s).

    4.    **"The testimony of this Hearing is confidential and is not to be discussed at any time.  This includes the statements of any individual participating in the hearing. Only after final action by the Superintendent may these matters be discussed outside of this hearing."**

D.    The Recorder will introduce the Accused and his or her Advisor to the Board.

    **"The recorder will now present the accused and his/her advisor."**

E.    The Midshipman Presiding Officer will read the following:

    1.    **"Midshipman (Name), this Honor Board Hearing has been convened to hear evidence and reach a recommendation concerning allegations that you have violated the Honor Concept by lying/cheating/stealing. Around this table are nine Midshipmen from the Regiment who will vote on your case."**

    2.    **"Midshipman (Name), you are entitled to be present during the presentation of all evidence except closed deliberations and balloting. You will be given the opportunity to call witnesses and present any relevant evidence you may wish to offer. You may testify on your behalf. We believe that the Honor Concept which you have accepted by becoming a Midshipman imposes a duty upon you to disclose any relevant information you might have. However, if you prefer not to testify, your silence will not be considered as evidence against you. If you do testify, any statements you make during the course of the proceedings may be used against you in further proceedings. When the hearing begins, the Board will first hear the investigating officer's opening statement."**

AR000305

3.     As a Midshipman accused of an honor violation, you have rights.  You have already signed a form acknowledging your rights.  I will now read the rights for the benefit of the Board.

   i.   The right to remain silent.
  ii.   The right not to be subjected to self-incrimination.
 iii.   The right to an advisor.
  iv.   The right to submit a statement to the Investigating Officer for consideration during the course of the Investigation.
   v.   The right to protest any Honor Board Representative selected for the Honor Board Hearing.
  vi.   If found guilty of an honor violation, the right to submit an appeal to the Honor Advisor concerning procedural matters.
 vii.   The right to submit a statement to the Superintendent for consideration in the final decision.
viii.   The right to appeal to the Maritime Administrator if disenrollment sanction is imposed.

Do you acknowledge and understand your rights?

4.     "You have the right to question any witnesses and challenge any statements or documents presented at the Board. You may introduce any new evidence which may help clarify or further your defense. You may question any of the procedures which occur during the Hearing. Your advisor or I will answer any of your questions regarding your rights or Honor Board Hearing procedures, on your behalf. Do you understand?"

5.     The Presiding Officer now addresses the Board.

"We are about to hear evidence presented concerning an alleged violation of our Honor Concept and a member of the Regiment. This Midshipman is charged with (lying/cheating/stealing). The purpose of an Honor Board Hearing is to uncover all the facts in the case and make a final recommendation based on these facts."

F.     The Midshipman Presiding Officer now instructs the Investigating Officer to present his/her case to the Board. The Investigating Officer will call witnesses and conduct an examination. The Investigating Officer's witnesses will be available for questioning by the Accused at the conclusion of the witness's testimony.  If statements are used, the Accused will be provided with copies of the statements at least five days before the Formal Hearing. The Accused may challenge any statement, testimony, or evidence presented. Board members may ask questions of the witnesses or the Investigating Officer, and may examine any evidence presented.

G.     The Investigating Officer will now present the case.

21

AR000306

**"Will the Investigating Officer please make an opening statement and Case summary?"**

I.      Witnesses.

    1.    **"Does the Investigating Officer wish to call any witnesses?"**

        (Requested witnesses are called and questioned by the investigating officer, after which the accused is offered the opportunity to question each witness.)

        **"Does the accused wish to question this witness?"**

        (After the accused questions or declines to question each witness, the Hearing Members are offered the opportunity to question each witness.)

        **"Do any of the members wish to question the witness?"**

        (After questions or if no questions, the witness will cautioned to not discuss the case with anyone, and be dismissed and leave the hearing room.)

        The Midshipman Presiding Officer then requests the Accused to present his/her case to the Board.

        **"Does the accused wish to make an opening statement?  This can include any information that will inform the Board in your own words of the circumstances as they relate to this incident. You may enter documents, call witnesses, or present statements during your testimony at this time."**

        (Accused responds.)
        **"Does the accused wish to call any further witnesses?"**

        (Requested witnesses are called and questioned by the accused, after which the investigating officer is offered the opportunity to question each witness.)

        **"Does the Investigating Officer wish to question this witness?"**

        (After the Investigating Officer questions or declines to question each witness, the Hearing Members are offered the opportunity to question each witness.)

        **"Do any of the members wish to question the witness?"**

        (After questions or if no questions, the witness will cautioned to not discuss the case with anyone, and be dismissed and leave the hearing room.)

22

AR000307

(Only witnesses with direct knowledge of the specific alleged Honor Offense may be called as witnesses. Any character witnesses may submit written statements, but may not testify.)

J.    Questioning the Accused:

**"The Jury may now ask the accused any questions to clarify evidence"**

K.    After all evidence has been presented by the Investigating Officer and the Accused, the Presiding Officer will proceed as follows:

**"Does the Board have any further questions?"**

If there are questions they may be asked.

L.    After any questions or if no questions, the Presiding Officer will proceed as follows:

**"Does the Investigating Officer wish to make any closing statements?"**

(Investigating Officer makes summary statement.)

**"Does the Accused wish to make a closing statement?"**

(This may be either the accused or his/ her advisor.)

M.    After closing statements, the Presiding Officer should remind the Midshipmen, not to discuss the case with anyone until the Superintendent's final action it is released to the Regiment.  The Presiding Officer will then require the Accused, his/her advisor and all observers to leave the room.

N.    The Presiding Officer will then read the following to the Board:

**"We have heard all the evidence concerning this possible violation of the Honor Concept. If as a result of the evidence introduced, you are convinced by a preponderance of the evidence that an Honor Violation has been committed by the accused then you must vote so. If you are not so convinced, then you must vote to terminate this case. "**

**"Preponderance of the evidence is a lesser burden of proof standard than the criminal "beyond a reasonable doubt" standard.  Plainly stated, it is when the jury finds that "it is more likely than not" that the defendant is guilty of a violation. In other words, when making a decision using this standard, all reasonable doubt need not be dispelled to find a Midshipman guilty of a violation.    Instead, a Midshipman will be found guilty of a violation if there is a greater than 50% chance that the**

AR000308

**Midshipman committed the violation. The burden of proof is on the jury to determine whether the Midshipman committed the violation; the accused Midshipman does not have the burden to prove that he or she did not commit the violation. Midshipman (Name), you, your advisor, and all observers or visitors are excused, while the Board deliberates."**

O.  The Presiding Officer will ask the members if they feel the case should be referred to the Commandant as a matter of violation of Midshipman Regulations, or to an Executive Board or Superintendent's Disciplinary Hearing. If necessary, the Presiding Officer will take a vote on the question. If six (6) of the members (all members shall cast a vote) determine that the case should be referred to the Commandant, or to an Executive Board or Superintendent's Disciplinary Hearing, the Presiding Officer will order all parties brought into the room and will read the following:

> **"Midshipman (Name), the Board has determined that this case should be referred to the Commandant (or Executive Board/Superintendent's Disciplinary Hearing) for action, and will forward that recommendation to the Superintendent.**

> The Presiding Officer will remind the Accused that final action on the case will be taken by the Superintendent, and announce:

> **"The testimony of this Board is confidential and is not to be discussed at any time. This includes the statements of any individual participating in the hearing, including the names of the Voting Board members. Only after final action by the Superintendent may these matters be discussed outside of this hearing."**

> **"This Board, hearing case_____is now closed pending the Superintendent's final action"**

Otherwise, the Presiding Officer will proceed as follows.

P.  The Presiding Officer will ask the members if they are prepared to make a finding of guilty or not guilty, and allow discussion of the question. When the discussion is complete, the Presiding Officer will ask the Recorder to distribute guilty/not guilty ballots to the members. No discussions will be permitted once the Presiding Officer calls for the vote. All members shall cast a vote and six (6) votes are required for a finding of guilty. The vote will be conducted by secret ballot. Only one ballot shall be taken. In the event of a failure to obtain six votes for "Guilty," the Presiding Officer will dismiss the members and inform the Accused that a verdict of "Not – Guilty" has not been reached.

Q.  When the votes are obtained, the Presiding Officer will inform the members of the finding.

24

AR000309

R.   If the vote is "Not Guilty", the Presiding Officer will order the Accused, his or her Advisor, and all observers brought into the room, and will read the following:

> **"Midshipman (Name), the Board will forward a verdict of Not Guilty to the Superintendent.**

> The Presiding Officer will remind the accused that final action on the case will be taken by the Superintendent, and announce:

> **"The testimony of this Board is confidential and is not to be discussed at any time.  This includes the statements of any individual participating in the hearing, including the names of the Voting Board members. Only after final action by the Superintendent may these matters be discussed outside of this hearing."**

> **"This Board, hearing case_____is now closed pending the Superintendent's final action"**

S.   If the vote is "Guilty," then the Presiding Officer will reconvene the Formal Hearing and read the following:

> **"Midshipman (Name), the Board will forward a verdict of Guilty to the Superintendent.**

> The Presiding Officer will then allow the Accused to present evidence, including written statements from witnesses, and call witnesses to present extenuating and/or mitigating evidence and arguments for retention at the Academy or for minimum or no disciplinary action.  The burden for demonstrating sufficient cause for retention by a preponderance of the evidence is on Midshipman.

> The voting members will then deliberate and determine the appropriate recommended penalty outside the presence of the Accused, his or her Advisor and any witnesses.  In making its determination, the members may re-examine the record pertaining to the Honor Concept violation, any statements or evidence provided by the Accused, and the Accused's entire Academy record (academic, regimental, sea year, and extra-curricular).

T.   After deliberations have been completed, the Recorder will distribute blank ballots. The Presiding Officer will require each voting member to indicate his/her recommendation for either retention or separation on the ballot.  All members shall cast a vote and six votes are required for separation. If six votes are not reached for separation, then the result is automatically retention. The vote will be conducted by secret ballot.

U.   The Presiding Officer will read the decision to the members.

AR000310

V.    If the recommendation is separation, the Accused, his/her Advisor, and all observers will be brought into the room, and informed of the Midshipmen Honor Board's recommendations by the Presiding Officer. The Presiding Officer will read the following:

> **"The Board recommends separation."**

The Presiding Officer will remind the Accused that final action on the case will be taken by the Superintendent, and announce:

> **"The testimony of this Board is confidential and is not to be discussed at any time. This includes the statements of any individual participating in the hearing, including the names of the Voting Board members. Only after final action by the Superintendent may these matters be discussed outside of this hearing."**

> **"This Board, hearing case_____is now closed pending the Superintendent's final action."**

W.    If the recommendation is retention, the Presiding Officer will initiate a discussion of sanctions that Hearing Members may recommend. All Midshipmen retained will participate in an honor remediation program as described in paragraph 312. The jury may suspension with setback to succeeding class in addition to remediation.. When the Presiding Officer believes that the members have reached a point in the discussion where a vote is appropriate, he/she will distribute ballots calling for votes on the sanctions discussed. All members shall vote and a majority vote (5 of 9) is required to approve a sanction short of separation.

The Presiding Officer will now instruct the members to deliberate:

(The members of the Honor Board may answer questions that the jury might have. While anyone can answer the questions, the Presiding Officer should principally answer questions regarding procedural matters. Questions pertaining to the case itself shall be directed to the Investigating Officer.) Prior to a vote taking place it is the responsibility of the Vice Chair to brief jurors on sanction standards. The Vice Chair shall make available previous cases and their awarded sanctions for reference to a Jury. The Jury however shall not make a decision based on a previous case and its specific circumstances, as the Honor Board views every suspected Honor Violation as its own case. However, these previous cases and their sanctions can be used as an informative tool from the Honor Board to help guide a Jury in their deliberations on sanctions.

Following the completion of the above procedures, the Accused, his/her Advisor, and all observers will be brought into the room, and informed of the Midshipmen Honor Board's recommendations by the Presiding Officer. The Presiding Officer will read the following:

AR000311

> **"Midshipman (Name), the Board will forward a verdict of Guilty to the Superintendent. In addition, the Board will recommend retention with the following sanctions: _____. You are reminded that the only possible penalty for a further honor violation on your part is disenrollment from the academy."**

The Presiding Officer will remind the accused that final action on the case will be taken by the Superintendent, and announce:

> **"The testimony of this Board is confidential and is not to be discussed at any time. This includes the statements of any individual participating in the hearing, including the names of the Voting Board members. Only after final action by the Superintendent may these matters be discussed outside of this hearing."**

> **"This Board, hearing case_____is now closed pending the Superintendent's final action"**

### 304.  *Procedures for Admitted Honor Violations*

In the case that a midshipman admits to violating the Honor Concept, the procedure will be modified so that guilty or not guilty is not what is being determined. Rather the hearing will be used to discern a suitable and equitable recommendation for the admitted offense.  The Honor Board hearings will be conducted in a formal manner in a designated conference room. The Presiding Officer has the responsibility for maintaining good order during the Board. Any improper conduct during the board is cause for immediate dismissal from the Board and disciplinary action.  The procedure is as follows:

A.    The nine (9) Honor Board Voting Members along with four (4) alternates will assemble as directed by the RHBC.

B.    The designated Recorder will take a muster prior to the Honor Board Hearing.

C.    Once the representatives have completed reading the investigation packet, observers will be brought in the Board room. The observers are to be reminded that they will be held to the highest standards of conduct, they will not be permitted to speak to anyone during the proceedings, nor will they discuss the case, in detail, with anyone outside of the Board. Due to the length of some hearings, observers may leave quietly at any point during the hearing. The Midshipman Presiding Officer will read the following:

1.    **"May I have your attention. This Honor Board Hearing will now come to order. All Midshipmen are reminded that this is a formal hearing and that all persons in this room will be held to the highest standards of conduct."**

27

AR000312

2.    **"The accused is Midshipman (Name), who has admitted to lying/cheating/stealing."**

3.    **"If any Voting Member sitting on this case feels that he or she will not be able to cast an unbiased vote, it is your moral responsibility to excuse yourself from the hearing."**

(In the event of this occurrence, the Presiding Officer will appoint one or more of the four alternate Voting Members(s), who have been approved of by the accused, to act as a voting member(s).

4.    **"The testimony of this Hearing is confidential and is not to be discussed at any time. This includes the statements of any individual participating in the hearing, including the names of the Voting Board members. Only after final action by the Superintendent may these matters be discussed outside of this hearing."**

D.    The recorder will introduce the accused midshipman and his/her advisor to the Board.

**"The recorder will now present the accused and his/her Advisor."**

E.    The Midshipman Presiding Officer will read the following:

1.    **"Midshipman (Name), this Honor Board Hearing has been convened to hear evidence and reach a recommendation concerning allegations that you have violated the Honor Concept by lying/cheating/stealing. Around this table are nine Midshipmen from the Regiment who will vote on your case."**

2.    **"Midshipman (Name), you are entitled to be present during the presentation of all evidence except closed deliberations and balloting. You will be given the opportunity to call witnesses and present any relevant evidence you may wish to offer. You may testify on your behalf. We believe that the Honor Concept which you have accepted by becoming a Midshipman, imposes a duty upon you to disclose any relevant information you might have. However, if you prefer not to testify, your silence will not be considered as evidence against you. If you do testify, any statements you make during the course of the proceedings may be used against you in further proceedings. When the hearing begins, the Board will first hear the investigating officer's opening statement."**

3.    **As a midshipman accused of an honor violation, you have rights. You have already signed a form acknowledging your rights. I will now read the rights for the benefit of the board.**
        ix.  **The right to remain silent.**
        x.  **The right not to be subjected to self-incrimination.**

28

    xi.   **The right to an advisor.**

    xii.   **The right to submit a statement to the Investigating Officer for consideration during the course of the Investigation.**

    xiii.   **The right to protest any Honor Board Representative selected for the Honor Board Hearing.**

    xiv.   **If found guilty of an honor violation, the right to submit an appeal to the Honor Advisor concerning procedural matters.**

    xv.   **The right to submit a statement to the Superintendent for consideration in the final decision.**

    xvi.   **The right to appeal to the Maritime Administrator if disenrollment sanction is imposed.**

**Do you acknowledge and understand your rights?**

4.    **"You have the right to question any witnesses and challenge any statements or documents presented at the Board. You may introduce any new evidence which may help clarify or further your defense. You may question any of the procedures which occur during the Hearing. Your advisor or I will answer any of your questions regarding your rights or Honor Board Hearing procedures, on your behalf. Do you understand?"**

5.    The Presiding Officer now addresses the Board.

    **"We are about to hear evidence presented concerning an alleged violation of our Honor Concept and a member of the Regiment. This midshipman is charged with (lying/cheating/stealing). The purpose of an Honor Board Hearing is to uncover all the facts in the case and make a final recommendation based on these facts."**

F.    The Midshipman Presiding Officer now instructs the Investigating Officer to present his/her case to the Board. The Investigating Officer will call witnesses and conduct an examination. The Investigating Officer's witnesses will be available for questioning by the accused at the conclusion of the witnesses testimony, if statements are used, the accused will be provided with copies or permitted to view the statements or documents presented. The accused may challenge any statement, testimony, or evidence presented. Board members may ask questions of the witnesses or the Investigating Officer, and may examine any evidence presented.

G.    The Investigating Officer will now present a summary of the case.

    **"Will the Investigating Officer please present a case summary?"**

H.    The Presiding Officer will then allow the Accused to present evidence, including written statements from witnesses, and call witnesses to present extenuating and/or mitigating evidence and arguments for retention at the Academy or for minimum or no disciplinary

AR000314

action.  The burden for demonstrating sufficient cause for retention by a preponderance of the evidence is on Midshipman.

I.      Witnesses.

    1.      **"Does the accused wish to call any witnesses?"**

        (Requested witnesses are called and questioned by the accused, after which the investigating officer is offered the opportunity to question each witness.)

        **"Does the Investigating Officer wish to cross examine this witness?"**

        (After the Investigating Officer questions or declines to question each witness, the Hearing Members are offered the opportunity to question each witness.)

        **"Do any of the members wish to question the witness?"**

        (After questions or if no questions, the witness will cautioned to not discuss the case with anyone, and be dismissed and leave the hearing room.)

(Only witnesses with direct knowledge of the specific alleged Honor Offense may be called as witnesses. Any character witnesses may submit written statements, but may not testify.)

J.      After all evidence has been presented by the Investigating Officer and the accused, the Presiding Officer will proceed as follows:

**"Does the Board have any further questions?"**

If there are questions they may be asked.

K.      After any questions or if no questions, the Presiding Officer will proceed as follows:

**"Does the Investigating Officer wish to make any closing statements?"**

(Investigating Officer makes summary statement.)

**"Does the accused wish to make a closing statement?"**

(This may be either the accused or his/ her advisor.)

L.      After closing statements, the Presiding Officer should remind the Midshipmen not to discuss the case with anyone until The Superintendent's final action it is released to the Regiment.

M.      The Presiding Officer will then read the following to the Board:

30

AR000315

> **"We have heard all the evidence concerning this admitted violation of the Honor Concept. Midshipman (Name), you, your advisor, and all observers are excused, while this Board deliberates."**

N.    The voting members will then deliberate and determine the appropriate recommended penalty outside the presence of the Accused, his or her Advisor and any witnesses. In making its determination, the members may re-examine the record pertaining to the Honor Concept violation, any statements or evidence provided by the Accused, and the Accused's entire Academy record (academic, regimental, sea year, and extra-curricular).

O.    Once the Presiding Officer determines that the members are prepared to vote on recommended sanctions, he/she will ask the Recorder will distribute blank ballots. The Presiding Officer will require each voting member to indicate his/her recommendation for either retention or separation on the ballot. All members shall cast a vote and six (6) votes are required for separation. The vote will be conducted by secret ballot.

P.    The Presiding Officer will read the decision to the members.

Q.    If the recommendation is separation, the accused, his/her advisor, and all observers will be brought into the room, and informed of the Midshipmen Honor Board's recommendations by the Presiding Officer. The Presiding Officer will read the following:

> **"Midshipman (Name), for this case of admitted guilt, the Board will forward a recommendation for separation to the Superintendent."**

The Presiding Officer will remind the accused that final action on the case will be taken by the Superintendent, and announce:

> **"The testimony of this Board is confidential and is not to be discussed at any time. This includes the statements of any individual participating in the hearing, including the names of the Voting Board members. Only after final action by the Superintendent may these matters be discussed outside of this hearing."**

> **"This Board, hearing case_____is now closed pending the Superintendent's final action."**

R.    If the recommendation is retention, the Presiding Officer will initiate a discussion of sanctions that Hearing Members may recommend. The sanctions may include any combination of the following: suspension with setback to succeeding class, demerits, restriction, extra duty, and/or participation in an honor remediation program. When the Presiding Officer believes that the members have reached a point in the discussion where a vote is appropriate, he/she will distribute ballots calling for votes on the sanctions

31

discussed. All members shall cast a vote and a majority vote (5 of 9) is required to approve a sanction short of separation.

Following the completion of the above procedures, the accused, his/her advisor, and all observers will be brought into the room, and informed of the Midshipmen Honor Board's recommendations by the Presiding Officer. The Presiding Officer will read the following:

> **"Midshipman (Name), for this case of admitted guilt, the Board will forward a recommendation for retention to the Superintendent. In addition, the Board will recommend retention with the following sanctions: _____. You are reminded that the only possible penalty for a further honor violation on your part is disenrollment from the academy."**

The Presiding Officer will remind the accused that final action on the case will be taken by the Superintendent, and announce:

> **"The testimony of this Board is confidential and is not to be discussed at any time. This includes the statements of any individual participating in the hearing, including the names of the Voting Board members. Only after final action by the Superintendent may these matters be discussed outside of this hearing."**

> **"This Board, hearing case_____is now closed pending the Superintendent's final action."**

## 305. RHBC's Action

Following the hearing, the RHBC shall forward the case to the Honor Board Advisor, with the jury's recommendation and the RHBC's recommendation. The RHBC will review the case with the Honor Board Advisor for procedural accuracy.

## 306. Honor Board Advisor's Action

The Honor Board Advisor shall review the file and recommendations for procedural accuracy. If he or she determines that procedural errors occurred, the Honor Board Advisor will take appropriate steps to correct them to the extent possible. The Honor Board Advisor will forward the entire file, with his or her recommendation, to the Commandant. If the Honor Board Advisor finds that errors committed prejudice the outcome of the case (such as a violation of the rights of the accused), he or she may recommend that the case be dismissed.

## 307. Commandant's Action

AR000317

Upon receipt of the file, with the recommendations of the jury, the RHBC and Honor Board Advisor, the Commandant will review the case and forward the entire file, with his recommendation, to the Superintendent.

### 308.   Superintendent's Review of Honor Proceedings and Final Action

The Superintendent reviews the case and the findings of the Formal Hearing and renders a final decision regarding the sanctions imposed.  In the event of a *not guilty* decision, the case file will be placed in the *not guilty file* and stored for four years.

If the sanction of a guilty decision is *disenrollment,* and this sanction is upheld by the Superintendent, the accused may then proceed with a written appeal to the Maritime Administrator, as set forth below in Section 310.

### 309.   Notification of the Accused as to the Superintendent's Final Decision

The Superintendent will notify the Accused of the decision through a written statement containing the basis for the decision and the sanction imposed. The Honor Board will then publish the final decision to the Regiment, Faculty and Staff in a XYZ report.

### 310.   Appeals

A.    If the Accused wishes to make an appeal to the Honor Advisor regarding *procedural* matters, he or she shall be allotted 24 hours following the adjournment of the Formal Hearing to submit a written appeal to the Superintendent.

B.    If the Accused receives a sanction other than disenrollment, he or she may appeal that sanction to the Superintendent.  The Accused must notify the Superintendent, in writing, by close of business of the next business day after receiving the decision of his or her intent to appeal and must submit the written appeal to the Superintendent no later than seven days after receipt of the decision.  The Superintendent may, if he or she so chooses, meet with the Accused and/or his or her Advisor, prior to issuing a decision on the appeal.  The Superintendent's decision on appeal is final.

The Superintendent will notify the Accused, the Honor Board Advisor, the RHBC, and the Commandant of the decision.  The Accused should then contact the Honor Board Advisor to commence remediation.

C.    Appeal of Disenrollment Decision

1.    If the Accused is disenrolled and wishes to appeal his or her disenrollment, he or she must notify the Superintendent, in writing, by close of business of the next business day after receiving the decision of his or her intent to appeal to the Maritime Administrator.  If the Accused

33

does not appeal the disenrollment, the Accused shall proceed immediately with checkout procedures.

2.    Such appeal will be submitted, in writing, to the Superintendent no later than seven (7) days after receipt of the decision.

3.    The Superintendent will forward the appeal to the Maritime Administrator, with his or her recommendation. A copy of the Superintendent's recommendation will be provided to the Accuse and his or her Advisor.

4.    The Accused is entitled to remain at the Academy pending consideration of his or her appeal, including, as appropriate, in a deferred graduate status, provided that the Accused abides with all Academy policies, including the Midshipman Regulations. If the Accused is enrolled in classes during the pendency of the appeal, he or she will continue in those classes. If the Accused is scheduled to depart for sea year or an internship during the pendency of the appeal, he or she will remain on board at the Academy until a decision has been reached.

5.    If the Maritime Administrator upholds the disenrollment decision, the Accused will be disenrolled immediately upon receipt of the Maritime Administrator's written decision. If the Maritime Administrator finds merit in the appeal, his or her written decision should include a statement of the reasons therefor.

## 311.  *Records of Honor Board Proceeding*

A.    Proceedings of the Honor Board will be electronically recorded. Original case files and recordings will be retained by the Honor Board Advisor and the Midshipman Honor Board for a period of four years after final action has been completed. The case files and recordings may be requested by any reviewing authority in the Honor Board chain of command, including the Maritime Administrator.

B.    Each year, the RHBC will insure that all records are complete and that records over four years old are destroyed. At the end of each academic year, the RHBC will report in writing on the total number of Honor Cases reported, investigated, and heard by the Honor Board, to the Commandant and Superintendent.

C.    The RHBC will ensure that all Honor Board rules and regulations have been complied with before turning the records over to his or her successor.

AR000319

*312.  Honor Remediation*

A.     General. Any midshipmen found guilty of an honor violation will be assigned to Honor
       Remediation.  Honor Remediation is conducted under the oversight of the Director of
       Ethics, who shall at his/her discretion conduct the Remediation personally or permit the
       midshipman undergoing Remediation to nominate another individual to supervise the
       Remediation.  This individual must be an employee of the Academy and will normally
       be a commissioned officer and/or member of the faculty.  This additional duty is
       voluntary. Honor Remediation is both punitive and developmental.  In fact these two
       purposes are linked, since the restrictions and sanctions placed on a midshipman
       undergoing Remediation are intended to remove distractions and to ensure that the
       midshipman fully grasps the immediate need for self-correction.  Midshipmen will
       remain in a remediation status for at least 120 days, or longer at the discretion of the
       remediation supervisor, Director of Ethics, or Commandant.  Remediation officially
       begins with the Superintendent's decision and completion of all appeals.

B.     Restrictions.  All midshipmen found guilty of an Honor violation and undergoing
       Remediation will be subject to the following restrictions for the duration of the
       remediation.

       Restriction to conduct probation limits.

       Loss of all class privileges.

       No TMs, other trips, leave or liberty (unless approved on a case by case basis in writing
by the Commandant).

       Midshipmen in a remediation status are ineligible for intercollegiate or club athletics,
waterfront activities, or trips associated with Midshipmen clubs.

       Midshipmen in a remediation status will not be released for sea duty.  Midshipmen who
are returned to the Academy for an honor violation during sea year who are placed in
remediation status will not return to sea until remediation is complete.

C.     Required.  All midshipmen undergoing Remediation will be required to complete the
       following, under the direction of the Remediation Supervisor.

       Keep a journal of ethical challenges, leadership opportunities, and personal development
throughout the period of Remediation.

       Meet with or report to the Remediation Supervisor at least once a week.

       Perform 50 hours of Extra Duty, at least 20 of which should be community service.

35

Conduct and report on at least three interventions with fellow midshipmen over some matter of conduct related to Honor or ethics.

D.  Elective.  At the discretion of the Remediation Supervisor, the midshipman undergoing Remediation may be required to perform the following tasks.

Directed Readings.  A Supervisor may assign a midshipman to read, write about, and discuss with him/her any book that seems pertinent to the offense or to the general development of judgment and responsibility.  A midshipman should usually be required to write about or discuss a work, not just in an abstract or purely academic sense, but in terms of its personal relevance.  The reading lists published (and made available online) by the Marine Corps Commandant and Navy Chief of Operations may be consulted for appropriate readings, and the Leadership and Ethics section of Bland Library has many books that might suit the purpose.

Interviews and Consultation.  A midshipman may be instructed to interview certain members of the faculty, staff or Regiment in order to gain perspective on his or her offense.  The Supervisor might also have an occasion to consult with members of the Midshipman Development or Chaplain's office in a case in which an honor offense may be linked to psychological or spiritual problems.  The Supervisor of a Remediation is not bound by the strict rules of confidentiality that apply to psychological counselors or chaplains, so can and should report violations of the law, threats to safety, and (with normal discretion permitted) hitherto unreported violations of regulations.

Presentation.  A midshipman undergoing Remediation may be required to give a presentation to a group of midshipmen on his or her offense and the means to avoid similar lapses.  This activity requires coordination with the Regiment and a clear appraisal on the ability of the midshipman to give a valuable presentation.  A presentation is the capstone, rather than the basis of a course of Remediation.

E.  Written Instructions and Reporting.  Within the first two weeks of taking on a Remediation, the Remediation Supervisor will present the midshipman with a letter setting forth a plan for the activities and timeline of the Remediation.  This letter will be copied to the Director of Ethics.  Supervisors will report on the progress of Remediations by the 20th of each month, and by the end of each month the Director of Ethics will submit a report to the Superintendent on the progress of all Remediation.  This report will be copied to the Commandant and Regimental Honor Board Chairman.

F.  Timing. Remediation will normally commence once the Superintendent has made a final decision on an Honor case.  If a setback is mandated, Remediation will be deferred until the Midshipman returns to the Academy. A midshipman undergoing or beginning a Remediation is ineligible for sea.

36

AR000321

G.    **Duration.**  A Remediation will normally take four months. If at the end of this period, the Director of Ethics deems that the midshipman has not demonstrated sufficient effort or progress, the midshipman may be granted an extension of up to 90 days to complete the Remediation. During this extension, all Remediation Restrictions will remain in effect.

H.    **Completion.**  When a Remediation has reached the limit of its four month duration or extension, the Supervisor and Director of Ethics will forward a memorandum to the Commandant containing a summary of the Remediation with any necessary enclosures, such a writings by the midshipman.  This memorandum should also bear the endorsement of the midshipman's Company Officer. On reviewing this information, and if he concurs with the recommendation of the Supervisor and Director of Ethics, the Commandant will instruct the Regimental Officer to convene and chair a board of three officers to interview the midshipman and to make a final recommendation to the Commandant.    The Commandant may make a final decision on Remediation cases which he deems to have been successfully completed.  In cases of a failed Remediation, the Commandant will forward a recommendation to the Superintendent. Normally, the consequence of a failed Remediation will be disenrollment.  This decision is made by the Superintendent and may be appealed to the Superintendent and Maritime Administrator in the same manner as for an Honor violation.

37

## APPENDIX 1



**UNITED STATES MERCHANT MARINE ACADEMY**
**KINGS POINT, NEW YORK**
**REGIMENTAL HONOR BOARD**

### REPORT OF CONFRONTATION

**Date:**

Confronting Midshipman: _____

To: Regimental Honor Board Chairman via Company Honor Board Chairman _____ Company

Subj: Report of Midshipman Confrontation

Ref: MIDSHIPMAN HONOR MANUAL

Confronted Midshipman (Optional) _____

Description of circumstance requiring confrontation: (Include dates/times, locations/ method and description of confrontation and description of reason for confrontation.)

_____

_____

_____

_____

_____

_____

_____

_____

Submitted: (sig) _____

HB-0

38

AR000323

APPENDIX 2



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

## REPORT OF POSSIBLE HONOR VIOLATION

Date:

From: _____
To:    Regimental Honor board Chairman

Subj:  REPORT OF POSSIBLE HONOR VIOLATION

Ref:   HONOR CONCEPT MANUAL

1. Midshipman who may have committed an honor violation:

   _____

2. Time/date of violation: _____ _____

3. Part of Concept broken:    Lying/Cheating/Stealing

4. Did you counsel the Midshipman on the matter?  Yes / No

5. Description:

Submitted: (sig)_____

Form HB-1

39

AR000324

**APPENDIX 3**



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

**ACCUSED NOTIFICATION**

Date:_____

To:  MIDN _____

From: Regimental Honor Board

Subj: Accused of Honor Violation

MIDN _____ you have been accused of violating the Academy's
Honor Concept by **lying/cheating/stealing/toleration**.  You are hereby ordered to complete the
following tasks:

1.  The RHBVCI will set up an Initial Investigation Interview among your Company
    Commander, Company Honor Board Chair, a Regimental Honor Board Staff Member
    and you, which will be scheduled within five (5) days from the date above.
2.  You must sign your Rights of the Accused (enclosed) and bring them to your
    Interview and turn them into your Company Honor Board Chair.
3.  If you choose to have an advisor, you must make your selection and complete and
    return the enclosed form prior to or at you Interview.  Your Advisor may be present at
    the Interview.
4.  If you choose to write an official statement it must be turned into your Company
    Honor Board Chair within seven (7) days from the date above.

If you have any questions please refer to the Honor Manual and/or ask your Company Honor
Board Chair.

Very Respectfully,

(original signed)
MIDN LCDR _____, 1/C
Regimental Honor Board Chairman

Form HB-2
Enclosure

40

AR000325

**APPENDIX 4**



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### The Rights of a Midshipman Accused of an Honor Violation

Every Midshipman who is accused of an honor violation has the following rights:

1. The right to remain silent.

2. The right not to be subjected to self-incrimination.

3. The right to have an advisor.

4. The right to submit a statement to the Honor Board for consideration in the case.

5. The right to protest any Honor Board Representative selected for the Formal Honor Board Hearing.

6. If found guilty of an Honor Violation, the right to submit an appeal to the Honor Officer Advisor concerning procedural matters.

7. The right to submit a statement to the Superintendent for the consideration in the final decision.

8. The right to appeal to the Maritime Administrator if a disenrollment sanction is imposed.

If there are any questions concerning your rights or the procedures that the Honor Board will follow during its course of action, please direct them to your Company Honor Board Chairman.

Accused Name (Print)_____

Accused Signature_____

Date_____

HB-3

41

AR000326

**APPENDIX 5**



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

**ADVISOR SELECTION**

Date:_____

From: _____

To:  Regimental Honor Board Chair

Subj: Selection of an Advisor, Case No. _____

As the Accused, I have decided to (circle 1 or 2):

1.  Select _____ as my advisor.

2.  **Waive my right to an advisor.**

Very Respectfully,

Name: _____
Signature: _____

HB-4

42

AR000327

APPENDIX 6



UNITED STATES MERCHANT MARINE ACADEMY

KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

**Accused Midshipman Plea in Regards to Accusations against Him or Her**

After studying the Honor Manual, and having a full and fair understanding of what I am

being accused of, I Midshipman _____
plead

## Guilty                                    ## Not Guilty

To the accusation(s) that have been made against me.

Signed: (Printed Name)_____

        Signature:_____

        Date:_____

HB-5

43

AR000328

## APPENDIX 7



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### INITIAL INVESTIGATION INTERVIEW MUSTER

To:  Honor Review Board
From:  Company Honor Board Chair
Subj:  MIDN _____

The following people were present for the Formal Investigation session that was held on,

**Date:**_____

**Company Commander**
Print Name:_____

Signature:_____

**Company Honor Board Chair**
Print Name:_____

Signature:_____

**Regimental Honor Board Staff Member**
Print Name:_____

Signature:_____

**Accused Midshipman**
Print Name:_____

Signature:_____

**Accused Advisor**
Print Name:_____

Signature:_____

Enclosed with this sheet is the report from the Initial Investigation Interview, for the use in the
Honor Review Board.
Form HB-6

44

AR000329

# APPENDIX 8



### UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

## RECORD OF INTERVIEWS

To: Honor Review Board

From: Investigating Team

Subj: Record of Interviews conducted for Investigation

A record of all interviews conducted during the formal Investigation process should be kept. All interviews should be recorded on this form, with multiple copies present if necessary to denote multiple interviews.

**DATE OF INTERVIEW:**_____

**PLACE OF INTERVIEW:**_____

**PERSONS PRESENT AT INTERVIEW:**

Name:_____     Title:_____

    Signed:_____

Name:_____     Title:_____

    Signed:_____

Name:_____     Title:_____

    Signed:_____

Name:_____     Title:_____

    Signed:_____

Form HB-7

45

AR000330

APPENDIX 9



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

## REPORT OF FORMAL INVESTIGATION

Date:_____

To: Honor Review Board
From: Investigation Team

Subj:  Investigation Results

Following is a report of the investigation regarding a possible honor violation by MIDN
_____, Class of _____.

All materials pertaining to the investigation of the above mentioned midshipman should be
included in this report of investigation.  All records of interviews (HB-6), copies of tests, and
other pertinent documentation should be included in this report.  This report will be used in the
formal hearing process, so the materials included should be as complete and accurate as possible
to ensure a fair process for the accused.

**Note; before turning this Investigation Report in to the Honor Review Board, the
Investigation Team should sign this report.**

Name:_____          Title:_____

    Signed:_____

Name:_____          Title:_____

    Signed:_____

Name:_____          Title:_____

    Signed:_____

Name:_____          Title:_____

    Signed:_____

Form HB-8

46

AR000331

APPENDIX 10



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

### REVIEW OF FORMAL INVESTIGATION

After holding an Honor Review Board on **Date:**_____ the board voted on the
case of the accused MIDN_____ , who is held in violation of the Honor
Concept by:

### LYING / CHEATING / STEALING

The results are as followed:

RHBC_____        Formal Hearing / Dismiss / Refer to Commandant

RHBVC_____        Formal Hearing / Dismiss / Refer to Commandant

RHBVCI_____        Formal Hearing / Dismiss / Refer to Commandant

RHBVCE_____        Formal Hearing / Dismiss / Refer to Commandant

RHBVCO _____        Formal Hearing / Dismiss / Refer to Commandant

CHBC_____        Formal Hearing / Dismiss / Refer to Commandant

Form HB-9

47

AR000332

APPENDIX 11



## UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

### RESULT OF HONOR REVIEW BOARD

Date:_____

To: MIDN _____

From: Honor Review Board

Subj:  Result of Honor Review Board

After examining the report from your Formal Interview and your written statement, if you chose that right, the Honor Review Board has voted in majority to:

### Proceed with a Formal Hearing

- You are hereby advised to familiarize yourself with the Honor Board procedures, outlined in the Midshipman Honor Manual and SOP.

- Your Formal Hearing will be held in the Eliot M. See room in Wiley Hall on:
    - Date:_____
    - Time:_____

- The uniform for this Honor Board is the seasonal dress uniform.

- Be prepared (with witnesses and statements) to present your case to the nine voting members of the jury.  All statements and the names of any witnesses must be presented to the RHBC prior to the Hearing.

### OR

### Dismiss your case.

If you have any further questions, please direct them to your Company Honor Board Chairman.

Very Respectfully,

(original signed)
MIDN LCDR _____, 1/C
Regimental Honor Board Chairman

Form HB-10

48

AR000333

APPENDIX 12



### UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

### NOTIFICATION OF HEARING

Date:_____

To: _____[Insert Witness Name]

From: Regimental Honor Board Chairman

Subj:  Request to Attend Formal Honor Board Hearing

- Your presence is requested at an upcoming Honor Board hearing as a **WITNESS.**

- You are hereby advised to familiarize yourself with the Honor Board procedures, outlined in the Midshipman Honor Manual.

- The Formal Hearing will be held in the Eliot M. See room in Wiley Hall on:
    - Date:_____
    - Time:_____

- The uniform for this Honor Board is the seasonal dress uniform or the civilian equivalent.

- Please be prepared to present a statement to the voting members of the board regarding the Honor Board case for the accused, MIDN _____.

- Please contact the RHBC within one day of receiving this notification to verify your attendance.

- If you are unable to attend, please provide the RHBC with a statement of any information you believe would be relevant to the Honor Board case in question.

- Additionally, this information is confidential, and must remain so until the Superintendent's final decision.

Very Respectfully,

(original signed)
MIDN LCDR _____, 1/C
Regimental Honor Board Chairman

Form HB-11

49

AR000334

APPENDIX 13



UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK
REGIMENTAL HONOR BOARD

**FORMAL HEARING JURY**

Date:_____

To:  Formal Hearing Jury

From:  Regimental Honor Board

Subj:  Jury Duty

If you are receiving this you have been selected to sit on the jury for an Honor Board Formal Hearing, using the jury selection process described in the Honor Manual Section 203.  You are hereby ordered to report to the Formal Hearing, which will be held in the Eliot M. See room in Wiley Hall, on **Date,**_____ at **Time**_____.  The dress for the hearing will be seasonal dress uniform.

In addition you are ordered to keep this information confidential and schedule this event as a priority. Jury duty is considered a Regimental function and as having priority over other midshipman responsibilities, to include athletic events and practice, club activities, or liberty.  A midshipman designated as a juror will normally be given 48-72 hours' notice previous to a Formal Hearing, and may request from the RHBC in writing to be excused from jury duty if it is in conflict with another activity, or in the case of illness or a medical appointment.  Normally, excuses for illness and medical will be granted.  If the RHBC declines to excuse a midshipman who has asked to be excused, this decision may be appealed to the Honor Board Advisor, who may consult with the Commandant for a final decision. If you have watch, you have been given authorization from the Senior Watch Officer to exchange it for extra duty credit.

If you have any further questions please direct them to the Regimental Honor Board Vice Chairman.

Very Respectfully,

(Original signed)
MIDN LCDR _____, 1/C
Regimental Honor Board Chairman

Form HB-12

50

AR000335

APPENDIX 14



### UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

**FORMAL HEARING**

Date:_____

To: MIDN _____

From: Honor Review Board

Subj:  Option for Open Board Proceedings

The decision has been made to proceed with to a formal hearing. You now have the option to allow the members of the Regiment of Midshipmen to attend your hearing. This option is one that you must approve of. Additionally, the RHBC has final choice on this matter and may disallow the open board at any point. Please circle one of the following indicating your preference.

### I wish to have an open hearing

I have no issue with members of the Regiment attending my formal hearing. I understand that the final decision on the allowance of an open hearing is at the discretion of the RHBC.  I acknowledge that certain members of the Regiment may be permitted to observe the hearing with or without my consent.

### I do not wish to have an open hearing

I, for my own reasons, do not wish members of the Regiment to attend my formal hearing.  I understand that certain members of the Regiment may be permitted to observe the hearing with or without my consent.

Very Respectfully,


MIDN _____


Form HB-13

51

AR000336

**APPENDIX 15**
**UNITED STATES MERCHANT MARINE ACADEMY**
**KINGS POINT, NEW YORK**

### REGIMENTAL HONOR BOARD

This is the accountability for MIDN_____ Formal Hearing.

Held on:

| Name | Signature/Printed Name |
|---|---|
| ACCUSED | |
| ADVISOR | |
| RHBC | |
| RHBVC | |
| RHBVCI | |
| RHBVCE | |
| CHC1 | |
| CHC2 | |
| CHC3 | |
| CHC4 | |
| CHCB | |
| BC / BX | |
| CC / CX | |
| CC / CX | |
| CC / CX | |
| JURY | |
| JURY | |
| JURY | |
| JURY | |
| JURY | |
| ALTERNATE JURY | |
| ALTERNATE JURY | |
| ALTERNATE JURY | |
| ALTERNATE JURY | |
| WITNESS | |
| WITNESS | |
| WITNESS | |
| WITNESS | |
| WITNESS | |

| | |
|---|---|
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |

52

AR000337

| | |
|---|---|
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |
| OBSERVER | |

Form
HB-14

53

AR000338

APPENDIX 16



### UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

### DELIBERATION RESULTS

Date:_____

A Formal Hearing was convened on Date:_____, for the accused,
MIDN _____.

The possible honor violation presented before the voting members was:

### LYING / CHEATING / STEALING/ TOLERATION

The ballot results are as follows:

Refer to Commandant          _____

Case Dismissal               _____

Guilty                       _____

Not Guilty                   _____

As per the Midshipman Honor Manual, a two-thirds majority vote reached the following
conclusion:

### REFER TO COMMANDANT

### GUILTY                              NOT GUILTY

Sanctions Imposed under Guilty Verdict: _____

_____

_____

Presiding Officer Name: _____

        Signed: _____

Form HB-15

54

AR000339

APPENDIX 17



### UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

## RESULT OF HONOR BOARD FORMAL HEARING

Date:_____

To:             The Superintendent
Via (1):        Honor Advisor
Via (2):        Commandant of Midshipmen

From: MIDN LCDR_____, 1/C, RHBC

Subj:  Result of Honor Board Formal Hearing

Sir,

On the evening of_____ [insert date of hearing], a Formal Hearing was convened to hear case _____ [insert case number] concerning allegations of MIDN_____ [insert accused name] _____ [insert offence]. (S)He was found_____ [insert Guilty/ Not Guilty/ case dismissed/ referred to Commandant's Department/ Admitted Guilt] and the Voting Members of the board recommended

_____
_____ [insert punishment].

Attached is the case file. The Honor Board _____
_____ [insert upholds the recommended punishment/recommends XXX]. (Add additional comments as desired)

Very Respectfully,

MIDN LCDR_____, 1/C
Regimental Honor Board Chairman

Form HB-16

55

AR000340

APPENDIX 18



### UNITED STATES MERCHANT MARINE ACADEMY
### KINGS POINT, NEW YORK
### REGIMENTAL HONOR BOARD

## HONOR BOARD CASE CONTROL FORM
## CASE NO: _____

1.  HB-0 Submitted (If applicable) _____ By: _____

2.  Report of Possible Honor Violation (**HB-1**) received on _____

3.  Investigation Team:  Date of Assignment: _____

     Regimental Honor Board Officer: _____
     Company Honor Board Chairman: _____

4.  Notification (**HB-2**) given to accused Midshipman on _____

5.  Accused acknowledgement of rights (**HB-3**) received on _____

6.  Selection of Advisor (**HB-4**) _____

7.  Accused submits guilty or not guilty plea (**HB-5**) _____

8.  Accused Midshipman's Statement Received on _____

9.  Interview with Accused held on _____

10. Interview with Witness _____ held on _____

    Interview with Witness _____ held on _____
    Interview with Witness _____ held on _____ Interview
    with Witness _____ held on _____
    Interview with Witness _____ held on _____

    11. Formal Investigation completed by _____

    _____

    12. Formal Investigation Report (**HB-8**) received on _____

AR000341

13. Honor Review Board Review of Formal Investigation (**HB-9**) completed on

14. Result of HRB (**HB-10**) received by Accused _____

15. Notification of Hearing to Witnesses (**HB-11**) distributed on _____

16. Notification of Hearing to Jurors (**HB-12**) distributed on _____

17. Open Board Option (**HB-13**) selected on _____

18. Formal Hearing convened on _____

19. Hearing Accountability (**HB-14**)_____

20. Deliberation Results (**HB-15**) completed _____

21. Result of Formal Hearing (**HB-16**) forwarded to Honor Advisor _____

22. Superintendent's Final Action received on _____

HB-17

57

AR000342

# EXHIBIT C

Mail - Benjamin.Sell.2019@midshipman.usmma.edu                    https://webmail.midshipman.usmma.edu/owa/#path=/mail/search

## RE: Sea year hold

2019Sell, Benjamin

Wed 10/10/2018 3:59 PM

Review Board Evidence

To:Ilaria, Greg <IlariaG@USMMA.EDU>;

Thank you

Very Respectfully,

M/N Benjamin A. Sell
Class of 2019
2nd Company
Engineer

From: Ilaria, Greg <IlariaG@USMMA.EDU>
Sent: Wednesday, October 10, 2018 3:58 PM
To: 2019Sell, Benjamin <Benjamin.Sell.2019@midshipman.usmma.edu>
Subject: RE: Sea year hold

You are all set

Greg Ilaria
Head Wrestling Coach
US Merchant Marine Academy
516-726-5254

From: 2019Sell, Benjamin <Benjamin.Sell.2019@midshipman.usmma.edu>
Sent: Wednesday, October 10, 2018 3:34 PM
To: Ilaria, Greg <IlariaG@USMMA.EDU>
Subject: Sea year hold

Sir,
I am on the list for sea year hold for the PRT. Can you confirm if I am on this list? I took the PRT on 7/17 and understand
there was an issue with the scores being lost (Joseph Springer and Christopher Kahl were in my group if that helps).

Very Respectfully,

M/N Benjamin A. Sell
Class of 2019
2nd Company
Engineer

Mail - Benjamin.Sell.2019@midshipman.usmma.edu                https://webmail.midshipman.usmma.edu/ows/#path=/mail/search

# RE: PRT Make up

### 2019Springer, Joseph

Fri 8/17/2018 10:53 AM
Review Board Evidence

To:Ilaria, Greg <IlariaG@USMMA.EDU>; 2019Sell, Benjamin <Benjamin.Sell.2019@midshipman.usmma.edu>; 2019Kahl, Christopher
<Christopher.Kahl.2019@midshipman.usmma.edu>;

Sir,

    I already took the PRT several weeks ago. I have noticed that my entire push-up/sit up group is also on this email list.
There must be some sort of mistake.

Very Respectfully,

M/N Joey Springer 1/C
USMMA Class of 2019-A
Marine Engineering and Shipyard Management
Cell: 240-472-0614

From: Ilaria, Greg <IlariaG@USMMA.EDU>
Sent: Friday, August 17, 2018 10:02 AM
To: 2019Barnett, Braden <Braden.Barnett.2019@midshipman.usmma.edu>; 2019Curry, Thomas
<Thomas.Curry.2019@midshipman.usmma.edu>; 2019Kahl, Christopher <Christopher.Kahl.2019@midshipman.usmma.edu>;
2019Olsen, John <John.Olsen.2019@midshipman.usmma.edu>; 2019Schmidt, Lane
<Lane.Schmidt.2019@midshipman.usmma.edu>; 2019Sherrill, Ella <Ella.Sherrill.2019@midshipman.usmma.edu>; 2019Yi, Zuriel
<Zuriel.Yi.2019@midshipman.usmma.edu>; 2019Blauw, Tyson <Tyson.Blauw.2019@midshipman.usmma.edu>; 2019Cole, Connor
<Connor.Cole.2019@midshipman.usmma.edu>; 2018Jeffrey, Mary Kate <MaryKate.Jeffrey.2019@midshipman.usmma.edu>;
2019Johnson, Gunner <Gunner.Johnson.2019@midshipman.usmma.edu>; 2019Lee, Sang
<Sang.Lee.2019@Midshipman.usmma.edu>; 2019OHaro, Devan <Devan.OHaro.2019@midshipman.usmma.edu>; 2019Sell,
Benjamin <Benjamin.Sell.2019@midshipman.usmma.edu>; 2019Springer, Joseph
<Joseph.Springer.2019@midshipman.usmma.edu>; 2019Williams, Joseph <Joseph.Williams.2019@midshipman.usmma.edu>;
2020Biehl, Lexus <Lexus.Biehl.2020@midshipman.usmma.edu>; 2020Douglas, Bly <Bly.Douglas.2020@midshipman.usmma.edu>;
2020Gardella, Joseph <Joseph.Gardella.2020@midshipman.usmma.edu>; 2020Gulizia, Jacob
<Jacob.Gulizia.2020@midshipman.usmma.edu>; 2020Hilditch, Sarah <Sarah.Hilditch.2020@midshipman.usmma.edu>; 2020Ibinson,
Rachael <Rachael.Ibinson.2020@midshipman.usmma.edu>; 2020Jackson, Kyle <Kyle.Jackson.2020@midshipman.usmma.edu>;
2021Cordova, Brandon <Brandon.Cordova.2021@midshipman.usmma.edu>; 2021Cullen, Kieran
<Kieran.Cullen.2021@midshipman.usmma.edu>; 2021Diehl, Jeremy <Jeremy.Diehl.2021@midshipman.usmma.edu>; 2021Johnson,
James <James.Johnson.2021@midshipman.usmma.edu>; 2021Johnson, Ragen <Ragen.Johnson.2021@midshipman.usmma.edu>;
2021McCorkendale, Christopher <Christopher.McCorkendale.2021@midshipman.usmma.edu>; 2021Neloms, Jesse
<Jesse.Neloms.2021@midshipman.usmma.edu>; 2021Shen, Winston <Winston.Shen.2021@midshipman.usmma.edu>; 2021Waller,
Christopher <Christopher.Waller.2021@midshipman.usmma.edu>; 2022Germanakos, Hope
<Hope.Germanakos.2022@midshipman.usmma.edu>
CC: 2019Magnusen, Dylan <Dylan.Magnusen.2019@midshipman.usmma.edu>
Subject: PRT Make up

If you are receiving this email then I do not have a PRT score for you and I need to schedule you for a PRT as soon as you are cleared
for your CHIT.

1. If there is a mistake and you have already ran the PRT please notify me through email
2. If you are on CHIT for an extended period of time please notify me through email (I apologize if this is repetitive)
3. If you are off CHIT, or will be off CHIT soon stop by my office to schedule a time/day to take the PRT

Thanks

Coach

Greg Ilaria
Head Wrestling Coach
US Merchant Marine Academy
516-726-5254